Exhibit A

1  THE ZAPPIA LAW FIRM
   A Professional Corporation
2  Edward P. Zappia (State Bar No 175099)
   Gail E. Wise (State Bar No. 240644)
3  333 S. Hope St., Suite 3600
   Los Angeles, California 90071
4  Tel:  (213) 814-5550
   Fax:  (213) 814-5560
5  ezappia@zappialegal.com
   gwise@zappialegal.com
6
7  Attorneys for Petitioner and Plaintiffs
   RALEY'S; VICKI LYNN LIKES; LORI LYNN BELGER
8           SUPERIOR COURT FOR THE STATE OF CALIFORNIA
9              FOR THE COUNTY OF SACRAMENTO

10 | RALEY'S, a California corporation; VICKI | Case No.: |
11 | LYNN LIKES, an individual;  and LORI LYNN BELGER, an individual |
12 | | **COMPLAINT FOR:** |
   | Petitioner and Plaintiffs, | |
13 | | 1. **INJUNCTIVE RELIEF** |
   | and | 2. **DECLARATORY RELIEF** |
14 | | 3. **RESCISSION** |
   | UNITED FOOD AND COMMERCIAL | 4. **PETITION TO VACATE** |
15 | WORKERS, LOCAL 8-GOLDEN STATE, a | **CONTRACTUAL ARBITRATION** |
   | California incorporated labor association; and | **AWARD** |
16 | DOES 1-20 | |
17 | Respondent and Defendant. | |
18

19

20                      **INTRODUCTION**

21      Petitioner and Plaintiff Raley's (hereinafter "Raley's" or "Petitioner") and Plaintiffs

22 Vicki Lynn Likes and Lori Lynne Belger (collectively, "Individual Plaintiffs") hereby petition

23 this Court to void and enjoin enforcement of an illegal neutrality provision in collective

24 bargaining agreements between Petitioner Raley's, on the one hand, and Respondent and

25 Defendant United Food and Commercial Workers Union Local 8—Golden State

26 ("Respondent"), on the other hand.  The neutrality provision is illegal and against the public

27 interest because it (1) requires the disclosure to Respondent of personal information of

28 Petitioner's non-unionized employees in violation of privacy rights guaranteed under the

                                    1
   ─────────────────────────────────────────────────────────
   PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
                    FOR DECLARATORY RELIEF

California Constitution without their waiver or consent (and in this case, over their objections); (2) it constitutes exchange of an  unlawful exchange of a "thing of value" for labor/union concessions in violation of section 302 of the Labor Relations Management Act; and (3) it was wrongfully coerced through economic duress in the form of a crippling 10-day strike.

Petitioner and Individual Plaintiffs seek: (1) declaratory relief that the neutrality provision is void and unenforceable; and (2) injunctive relief to prevent Respondent from seeking the personal/personnel information of Raley's non-union employees without their waiver and consent to disclose their private information.  Petitioner additionally seeks (3) rescission of the neutrality provision for these reasons, and (4) to vacate arbitration award below over these matters.

## THE PARTIES

1.     Petitioner and Plaintiff RALEY'S is a California corporation qualified to do business in the State of California.  Petitioner owns and operates supermarkets and other stores throughout Northern California and Northern Nevada under three banners, i.e., "Raley's," "Nob Hill Foods" and "Bel Air," among others.

2.     Plaintiff VICKI LYNN LIKES is a resident of California.  She is a non-unionized Raley's employee whose personal information would be subject to disclosure without her consent if the neutrality provision is upheld.

3.     Plaintiff LORI LYNN BELGER is a resident of California.  She is a non-unionized Raley's employee whose personal information would be subject to disclosure without her consent if the neutrality provision is upheld.

4.     Respondent and Defendant UNITED FOOD AND COMMERCIAL WORKERS UNION, Local 8 is an incorporated labor association, formed and existing under the laws of the State of California, and operating in Sacramento County, California, among others.

5.     JOHN KAGAL is the arbitrator who issued a decision below on these matters, finding that Raley's should disclose its non-unionized employees' private personal/personnel information without the express written consent and, over their objection.

2

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

6.      Petitioner and Individual Plaintiffs (collectively, "Plaintiffs") do not know the true names or capacities of those defendants sued herein as DOES 1 THROUGH 20, inclusive, (collectively, "Doe Defendants") and therefore sue them by those fictitious names.  When the true name and capacity of any Doe Defendant has been ascertained, Plaintiffs will amend their complaint accordingly.  All references herein to "Respondent" or "Respondents" are intended to include, without limitation, each of the fictitiously named Respondents and Defendants in addition to the named Respondent and Defendant.

## JURISDICTION AND VENUE

7.      Petitioner and Individual Plaintiffs (collectively, "Plaintiffs") all bring their cause of action for Injunctive Relief pursuant to California Code of Civil Procedure section 525 *et seq.*

8.      Petitioner Raley's brings its cause of action for Rescission pursuant to Civil Code Section 1688 *et seq.* and its cause of action for Declaratory Relief pursuant to Code of Civil Procedure section 1060.

9.      Petitioner brings claims for Rescission and Petition to Vacate the subject arbitration award pursuant to Section 1285 of the California Code of Civil Procedure.

10.     Jurisdiction and venue are properly brought before this Court because Collective Bargaining Agreement/Neutrality Agreement were negotiated and executed in Sacramento County and Respondent does business in Sacramento County.

11.     Venue in this Court is proper pursuant to California Code of Civil Procedure sections 1292 and 1292.2 because the arbitration was not held exclusively in any one county of California, and this Court is in a county in which the agreement is to be performed.

## GENERAL ALLEGATIONS

12.     From 2008 to 2011, Petitioner and Respondent operated under three collective bargaining agreements governing the terms and conditions of employment of many of Petitioner's workers (the "2008-2011 CBAs".)  Attached as Exhibits A, B and C are true and correct copies of the 2008-2011 CBAs.

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

13.     Each of the 2008-2011 CBAs contains an identical arbitration provision which states as follows:

> 18.3 INTERPRETATION OR APPLICATION DISPUTES:   For contract interpretation disputes which proceed to Arbitration, the parties will mutually select an impartial arbitrator.  If the parties are unable to agree upon the selection of an arbitrator, they shall request a panel of arbitrators from the United States Federal Mediation and Conciliation Service; and they shall select an arbitrator there from by the strike-off method.
>
> The award of the . . . arbitrator shall be final and binding upon the Employer, the Union and the employee.

(Exh. A at 48, Exh. B at 47 and Exh. C at 51-52)

14.     In 2011 and 2012  Petitioner, Respondent and United Food and Commercial Workers Union Local 5 ("Local 5") were engaged in bargaining sessions for a new collective bargaining agreement.   Throughout those sessions, Respondent and Local 5 improperly demanded that Petitioner agree to a neutrality provision that would require Petitioner to remain neutral with respect to Respondent and Local 5's organization of Petitioner's non-union stores and disclose to Respondent and Local 5 the contact information of its non-unionized employees, even though neutrality is a non-mandatory subject of bargaining.  Petitioner refused to agree to the neutrality provision and filed unfair labor practice charges ("Charge") with the National Labor Relations Board ("NLRB") as a result of Respondent and Local 5's insistence on the provision.

15.     On or about July 30, 2012, the NLRB dismissed Petitioner's Charge because its investigation revealed that Respondent and Local 5 had *withdrawn* their proposed neutrality language.  Attached as Exhibit D is a true and correct copy of the NLRB's dismissal.

16.     In or about October, 2012, Respondent and Local 5 initiated a strike of Petitioner's Raley's, Bel Air and Nob Hill locations in Northern California.   The strike was

4

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

economically crippling, as it caused Petitioner to lose $17,000,000 and confronted Petitioner with the possibility of store closures and layoffs.

17.    As a condition of ending the strike, Respondent and Local 5 reasserted their demand for neutrality.  In order to end the strike and because it had no reasonable alternative, Petitioner was forced to accept the neutrality provision and entered into two agreements with Respondent and Local 5 on or about November 13, 2012 for successor collective bargaining agreements (the "Successor CBAs.")  Attached hereto as Exhibits E and F are true and correct copies of the Successor CBAs.  The first pertains to employees at Petitioner's "Bel Air" and "Raley's" stores; the second pertained to employees at Petitioner "Nob Hill General Stores."

18.    The Successor CBAs, which were not ratified by the unions until late December 2012, had an effective date of October 9, 2011 and were to remain in effect through October 11, 2014.  The Successor CBAs both provided that the provisions of the 2008-2011 CBAs were to "remain the same and in full force and effect" except for the modifications stated in the Successor CBAs.

19.    Both of the Successor CBAs contained the illegal neutrality provision ("Neutrality Provision"), which states, in pertinent part, as follows:

> 1. Section 1.1 Card Check Neutrality Language: The parties mutually recognize national labor law guarantees employees the right to form or select any labor organization to act as the employees' exclusive bargaining representative for the purpose of collective bargaining with the Employer.
>
> The parties hereby establish the following procedure for the purpose of ensuring an orderly environment for the exercise by the Employer's employees of their rights under Section 7 of the National Labor Relations Act and to avoid picketing and/or other economic action directed at the Employer in the event the Union decides to conduct an organizing campaign at any operation at which the Union does not have representation rights.

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT FOR DECLARATORY RELIEF

The Employer will take a neutral approach to unionization of employees. The Employer will not take action nor make any statement that will directly or indirectly state or imply any opposition by the employer to the selection by such employees of a collective bargaining agent.

Within ten (10) days following receipt of written notice of intent to organize certain employees, the Employer will furnish the Union with a complete list of such employees, including job classifications and departments. Within two (2) weeks thereafter, the Employer will furnish a second list of such employees to the Union, including the addresses of all employees. Thereafter, the Employer will provide updated lists as requested, but no more frequently than monthly.

*      *      *

The parties agree that any disputes over compliance with or the application of this Section, including claims of Union violation, shall be submitted to expedited arbitration using the expedited arbitration process set forth in the parties' collective bargaining agreements. The arbitrator shall have the authority to order the non-compliant party to comply with this section and to order such other remedies deemed necessary to effectuate the intent of this Section. The parties hereto consent to the entry of any order of the arbitrator as the order of judgment of the United States District Court, without notice. (Exhibits E at and F at 2-3.)

20.     For nearly two years, neither Respondent nor Local 5 issued a notice of intent to organize pursuant to the illegal Neutrality Provision. Then, on or about September 8, 2014, Petitioners received letters from Respondent and Local 5 informing Petitioners of Respondent and Local 5's intent to organize and requesting a complete list of employees, including job

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

classifications and departments, within ten days of the request. Attached as Exhibits G and H are true and correct copies of the letters from the Respondent and Local 5.

21.     In a letter dated September 19, 2014, Petitioner's attorney, Edward P. Zappia, responded to Respondent stating that it was rescinding the Neutrality Provision and Petitioner would not provide the requested information without employee waivers because the Neutrality Provision is an illegal agreement and thus unenforceable, and explaining the reasons why. Attached as Exhibit I hereto is a true and correct copy of Mr. Zappia's letter.

22.     In September 2014, Petitioner rescinded the Neutrality Provision as unenforceable because it was unlawful in that (1) it requires Petitioner to produce personal information contained in non-union employees' personnel files, in violation of those employees' right to privacy; (2) it constitutes a "thing of value" exchanged in violation of section 302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186; and (3) it was unlawfully forced upon Petitioner under duress and coercion in that the unions wrongfully required Petitioner to agree to a non-mandatory term of bargaining in conjunction with and in order to end an economically crippling ten day strike.

23.     In response, Respondent and Local 5 demanded expedited arbitration pursuant to the Neutrality Provision.

24.     John Kagel was duly selected as arbitrator.

25.     Arbitration hearings were conducted in December 2014 and January 2015 in San Francisco and Roseville, California.

26.     At the arbitration hearing, one of Raley's employees, Plaintiff Lori Lynn Belger, objected to the disclosure of her personal information to Respondent and Local 5. Attached as Exhibit J is a true and correct copy of pertinent portions of the transcript from the hearing with Ms. Belger's testimony.

27.     On or about June 18, 2015, the arbitrator issued an opinion and decision providing that the Neutrality Provision is enforceable ("Arbitration Award"). A true and correct copy of the Arbitration Award is attached hereto as Exhibit K.

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

28.     Plaintiffs nevertheless contend that the Neutrality Provision is illegal, against public policy, obtained through duress and therefore unenforceable, regardless of the Arbitration Award, as the enforcement of such a contractual provision is beyond the arbitrator's powers.

29.     Individual Plaintiffs object to the enforcement of the Neutrality Provision and the disclosure of their personal information to Respondent or Local 5 pursuant to that provision.

30.     Since the arbitration, Petitioner has continued to negotiate the Neutrality Provision with Respondent and Local 5.

31.     Petitioner and Local 5 have reached a resolution of the matter pursuant to which Local 5 has agreed to drop the Neutrality Provision.   However, Respondent continues to insist on the enforcement of the illegal Neutrality Provision.

**FIRST CAUSE OF ACTION**

**FOR INJUNCTIVE RELIEF**

**(BY ALL PLAINTIFFS/PETITIONER)**

**(CCP § 525 *et seq.*; CALIFORNIA CONSTITUTION,**

**ARTICLE I, SECTION 1; SECTION 302 OF THE LABOR MANAGEMENT**

**RELATIONS ACT, 29 U.S.C. § 186; DURESS)**

32.     Plaintiffs incorporate and reallege paragraphs 1 through 30 as if fully set forth herein.

33.     Pursuant to California Code of Civil Procedure § 527, a preliminary injunction may be granted at any time before judgment upon a complaint if the complaint shows satisfactorily that sufficient grounds exist therefor.   In evaluating whether or not to grant injunctive relief, the courts consider two interrelated factors:   (1) "the likelihood that the plaintiff will prevail on the merits at trial;" and (2) "the interim harm that the plaintiff is likely to sustain if the injunction were denied compared to the harm that the defendant is likely to suffer if the preliminary injunction were issued."   (*Cohen v. Board of Supervisors* (1985) 40 Cal.3d 277, 286.)

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

34.     Plaintiffs seek and are entitled to an injunction precluding Respondent from seeking information of any of Petitioner's non-unionized employees pursuant to the Neutrality Provision.

35.     Petitioner is likely to succeed on the merits in this matter because the Neutrality Provision is illegal, against public policy and thus unenforceable on grounds that include the following:

    a.    it constitutes a "thing of value" exchanged in violation of section 302 of the Labor Relations Management Act, 29 U.S.C. § 186; and

    b.    it was unlawfully forced upon Petitioner under duress and coercion in that Respondents wrongfully required Petitioner to agree to a non-mandatory term of bargaining in conjunction with and in order to end an economically crippling ten day strike.

36.     Individual Plaintiffs are likely to succeed on the merits in this matter because enforcement of the Neutrality Provision would require disclosure of their private information in violation of their rights under Article I, section 1 of the California Constitution.

37.     Without injunctive relief, Plaintiffs face immediate irreparable harm in that Individual Plaintiffs' privacy rights will be violated, and Petitioner will be required to violate section 302 of the Labor Relations Management Act by illegally providing a "thing of value" to Respondents, and will have been illegally coerced into doing so.

## SECOND CAUSE OF ACTION

## FOR DECLARATORY RELIEF

## (BY ALL PLAINTIFFS/PETITIONER)

## (CCP § 1060 *et seq.*; CALIFORNIA CONSTITUTION, ARTICLE I, SECTION 1; SECTION 302 OF THE LMRA, 29 U.S.C. § 186; DURESS)

38.     Petitioner incorporates and realleges paragraphs 1 through 36 as if fully set forth herein.

39.     An actual controversy exists with respect to the legal rights and duties of Petitioner and Respondent as to whether the Neutrality Provision is enforceable.

40.     Petitioner contends that the Neutrality Provision is illegal and against public policy for the following reasons:

      a.     it requires Petitioner to produce personal information contained in non-union employees' personnel files, in violation of those employees' right to privacy pursuant to the California Constitution, Article I, section 1;

      b.     it constitutes a "thing of value" exchanged in violation of section 302 of the Labor Relations Management Act, 29 U.S.C. § 186; and

      c.     it was unlawfully forced upon Petitioner under duress and coercion in that the unions wrongfully required Petitioner to agree to a non-mandatory term of bargaining in conjunction with and in order to end an economically crippling ten day strike.

41.     Petitioner seeks a declaration that the Neutrality Provision is unenforceable, illegal and against public policy; and that no information pertaining to Petitioner's non-unionized employees, including that of the Individual Plaintiffs, shall be disclosed to Respondent pursuant to the Neutrality Provision.

## THIRD CAUSE OF ACTION

## CONTRACT RESCISSION

## (BY PETITIONER RALEY'S)

## (ILLEGALITY; VOID AS AGAINST PUBLIC POLICY; Civil Code § 1688 *et seq.*; CALIFORNIA CONSTITUTION, ARTICLE I, SECTION 1; SECTION 302 OF THE LABOR MANAGEMENT RELATIONS ACT, 29 U.S.C. § 186; DURESS)

42.     Petitioner incorporates and realleges paragraphs 1 through 40 as if fully set forth herein.

43.     Petitioner alleges that the Neutrality Provision of the Successor CBAs is unenforceable as it (i) was obtained under economic duress; (ii) is illegal; and (iii) is contrary to the public interest.

44.     Respondent wrongfully used economically crippling strike tactics in 2012 to pressure Petitioner into consenting to the Neutrality Provision.

10

1    45.    Petitioner had no reasonable alternative than to consent to the Neutrality

2 Provision, as Petitioner would have been faced with severe financial distress as a result of the

3 strike.

4    46.    The Neutrality Provision is unlawful and against public policy for the additional

5 reason that it constitutes a "thing of value" exchanged in violation of section 302 of the Labor

6 Relations Management Act, 29 U.S.C. § 186.

7    47.    As Petitioner's consent was obtained under duress and protest, Respondent is at

8 fault for insisting on the Neutrality Provision.

9    48.    The public interest will be prejudiced by permitting the contract to stand, as it

10 violates a well-defined public policy against allowing a "thing of value" to be exchanged by an

11 employer and a labor organization and against agreements obtained through duress.

12                          **FOURTH CAUSE OF ACTION**

13                      **VACATUR OF ARBITRATION AWARD**

14                        **(BY PETITIONER RALEY'S)**

15    **(ILLEGALITY AND VOID AS AGAINST PUBLIC POLICY; CCP § 1285 *et seq.*;**

16   **CALIFORNIA CONSTITUTION, ARTICLE I, SECTION 1; SECTION 302 OF THE**

17        **LABOR MANAGEMENT RELATIONS ACT, 29 U.S.C. § 186; DURESS)**

18    49.    Petitioner incorporates and realleges paragraphs 1 through 47 as if fully set forth

19 herein.

20    50.    California Code of Civil Procedure section 1286.2(4) provides that a court shall

21 vacate an arbitration award where "[t]he arbitrators exceeded their powers and the award cannot

22 be corrected without affecting the merits of the decision upon the controversy submitted." Such

23 powers are exceeded and *must be vacated* if the award upholds an illegal contract or violates

24 public policy. (*Loving & Evans v. Blick* (1949) 33 Cal.2d 603, 610; *United Paperworkers Int'l*

25 *Union, AFL-CIO v. Misco, Inc.* (1987) 484 U.S. 29, 43-44.)  "The courts retain the ultimate

26 authority to overturn awards as beyond the arbitrator's powers." (*Advanced Micro Devices*, 9

27 Cal.4th 362, 375.) They "are not bound to defer to an award that actually violates the law or

28

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

any explicit and well defined and dominant public policy." (*Evans Prods. Co. v. Millmen's Union No. 550*, (1984) 159 Cal. App. 3d 815, 819.

51.     The arbitrator exceeded his powers in issuing the June 18, 2015 Arbitration Award purportedly upholding the Neutrality Provision, because the Neutrality Provision is illegal and contrary to public policy on several grounds, including the following:

        a.    it requires Petitioner to produce personal information contained in non-union employees' personnel files, in violation of those employees' right to privacy;

        b.    it constitutes a "thing of value" exchanged in violation of section 302 of the Labor Relations Management Act; and

        c.    it was unlawfully forced upon Petitioner under duress and coercion in that the unions wrongfully required Petitioner to agree to a non-mandatory term of bargaining in conjunction with and in order to end an economically crippling ten day strike.

52.     The Arbitration Award cannot be corrected without affecting the merits of the decision upon the controversy submitted, as the decision purported to uphold the Neutrality Provision, and the Arbitration Award is thus subject to vacatur.

**WHEREFORE, THE** Petitioner prays for relief as hereinafter set forth:

1.     That the Court issue a declaratory judgment pursuant to Code of Civil Procedure Section 1060 that the Neutrality Provision is void and unenforceable;

2.     That the Court issue an Order that the June 18, 2015 arbitration award be vacated;

3.     That the Neutrality Provision be rescinded;

4.     That Respondent be enjoined from seeking information pursuant to the Neutrality Provision of Petitioner's non-unionized employees;

5.     That the Respondents shall bear all jointly incurred arbitration expenses;

6.     That the Petitioner be awarded its attorney fees and costs of suit herein; and

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT FOR DECLARATORY RELIEF

7.    That the Court grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Dated:  September 28, 2015

THE ZAPPIA LAW FIRM
A Professional Corporation

By: _____
    Edward P. Zappia
    Gail E. Wise

Attorneys for Plaintiffs/Petitioners,
RALEY'S; VICKY LYNN LIKES
and LORI LYNN BELGER

13

PETITION TO VACATE CONTRACTUAL ARBITRATION AWARD AND COMPLAINT
FOR DECLARATORY RELIEF

**EXHIBIT A**



# UFCW 8
## GOLDEN STATE
United Food and Commercial Workers

### Jacques Loveall
#### President
#### International Vice President

**COLLECTIVE BARGAINING
AGREEMENT**

**WITH**

**RALEY'S
Food and Meat**

**OCTOBER 7, 2007 - OCTOBER 8, 2011**

**NOTES**

# INDEX

| | SECTION | PAGE |
|---|---|---|
| Adjustment Board and Arbitration of Disputes | 18 | 48 |
| Basic Workday and Week | 6.1 | 21 |
| Classification of Employees | 9 | 26 |
| Clerk's Work | 1.2 | 1 |
| Consecutive Days | 6.3 | 23 |
| Contract Enforcement | 16 | 46 |
| Courtesy Clerk | 9.1.6 | 28 |
| Daily Guarantee | 7.7 | 25 |
| Demonstrators | 9.4 | 33 |
| Discharge and Layoff | 3 | 8 |
| Dues Checkoff | 5.18 | 20 |
| Employment and Union Membership | 2 | 6 |
| Field Administration Trust Funds | 14 | 46 |
| Free Time | 16.3 | 47 |
| Funeral Leaves | 5.16 | 20 |
| General Provisions | 5 | 16 |
| Good Friday | 10.2 | 35 |
| Health and Welfare and Sick Leave | 12 | 38 |
| Holidays | 10 | 35 |
| Holiday Eve | 7.4 | 24 |
| Holiday Pay Eligibility (Regular Employees) | 10.4 | 36 |
| Holiday Workweek | 6.1 | 21 |
| Hours, Overtime, and Sunday Premium | 6 | 21 |
| Job Injury | 5.12 | 18 |
| Job Referral and Nondiscrimination | 2.4 | 6 |
| Jury Duty or Court Appearances | 5.14 | 19 |
| Layoff, Recall, and Promotion | 4.3 | 9 |
| Leaves of Absence | 5.15 | 19 |
| Lie Detector Tests (Polygraphs) | 3.5 | 9 |
| Meal Period | 7.5 | 24 |
| Military Service | 5.3 | 17 |
| Night Premium | Appendix A | 51 |
| Overtime | 6.2 | 22 |
| Owners | 1.7 | 4 |

Continued..........

# INDEX

| | SECTION | PAGE |
|---|---|---|
| Payday and Deductions | 5.8 | 17 |
| Payroll Data | 5.13 | 18 |
| Pension | 13 | 43 |
| Premium Day | 7.9 | 25 |
| Previous Experience | 9.1.3 | 27 |
| Probation Period | 3.1 | 8 |
| Promotion | 4.3.2 | 11 |
| Recognition and Contract Coverage | 1 | 1 |
| Returned Checks | 5.17 | 20 |
| Salesmen | 1.9 | 4 |
| Schedule Selection | 4.5 | 13 |
| Scheduled Work | 6.4 | 23 |
| Senior Clerk | 9.1.3 | 28 |
| Seniority | 4 | 9 |
| Shift Interval | 7.2 | 24 |
| Step-Up Rules | 9.3 | 31 |
| Store Managers | 1.6 | 3 |
| Store Meetings | 15 | 46 |
| Strike or Lockout | 19 | 49 |
| Sunday Rate | 6.2.1 | 22 |
| Term of Agreement | 20 | 49 |
| Termination | 3.2 | 8 |
| Termination Vacation Pay | 11.9 | 38 |
| Transfer | 4.9 | 13 |
| Transfer or Removal of Work | 9.7 | 33 |
| Travel Allowance | 9.5 | 33 |
| Traveling Clerks | 1.10 | 4 |
| Uniforms and Special Wear | 5.6 | 17 |
| Union Business | 5.10 | 18 |
| Union Store Card | 5.11 | 18 |
| Vacations | 11 | 36 |
| Vacation Pay Computation | 11.3 | 36 |
| Wage Rates (all classifications) | Appendix A | 51-57 |
| Weekly Guarantee | 4.10.6 | 15 |
| Work Schedules | 7 | 24 |
| Work Performance | 3.3 | 8 |

# COLLECTIVE BARGAINING AGREEMENT
## BETWEEN
## UNITED FOOD & COMMERCIAL WORKERS UNION
## 8-GOLDEN STATE
## AND
## RALEY'S

**THIS AGREEMENT**, entered into 7th day of October 2007, by and between **RALEY'S**, referred to hereinafter as the "Employer", and **UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**, chartered by the United Food & Commercial Workers International Union, referred to hereinafter as the "Union."

It is the intent and purpose of the Employer and the Union to promote and improve labor-management relations between them and to set forth herein the basic terms of agreement covering wages, hours, and conditions of employment to be observed.

## W I T N E S S E T H:

In consideration of mutual promises and agreements between the parties hereto, and in consideration of their mutual desires in promoting efficient conduct in business and in providing for the orderly settlement of disputes between them, the parties to this Agreement agree as follows:

## SECTION 1.   RECOGNITION AND CONTRACT COVERAGE

**1.1    RECOGNITION:**  The Employer hereby recognizes the Union as the sole collective bargaining agent for an appropriate unit consisting of all employees working in the Employer's stores within the geographical jurisdiction of the Union, except supervisors within the meaning of the National Labor Relations Act, as amended.

Where the Union is only recognized in either the Meat or Retail Department, only those pertinent sections of the Collective Bargaining Agreement will apply.

**1.2    CLERK'S WORK:**  The work covered by this Agreement shall be performed only by members of the appropriate unit as defined in Subsection 1.1 above, and such work shall consist of all work and services connected with or incidental to the handling or selling of all merchandise offered for sale to the public in the Employer's stores including the demonstration of such products, but excluding:

**1.2.1**   Supervisory functions;

**1.2.2**   Work of employees heretofore expressly excluded from the provisions hereof by agreement of the parties;

**1.2.3**   Such work as is performed within the geographical jurisdiction of this Union by a driver/salesman, merchandiser, or rack jobber engaged in servicing the retail food stores with merchandise, an outside supplier, or reset crew.

It is agreed that no Clerk or Senior Clerk on the payroll as of January 7, 2005, shall be laid off or have his hours reduced as a direct result of the changes in the above paragraph.

**1.2.4** Notwithstanding anything herein to the contrary, and except as modified by Subsection 1.14 below, the Employer may, at its discretion on a store-by-store basis, assign members of the bargaining unit to handle merchandise or products which were formerly handled by non-bargaining unit employees of suppliers. After any such assignment to members of the bargaining unit, the Employer may, at its discretion, make further changes in work assignment including, but not limited to, reverting back to the former practice of utilizing the services of outside suppliers.

**1.3    MEAT CUTTER WORK:** It is agreed that all fresh meat shall be cut, prepared, and fabricated on the premises, by a Head Meat Cutter, Journeyman Meat Cutter, or Apprentice Meat Cutter; provided, however, the carcasses may be processed up to and including the maximum reductions listed and described on the attached Exhibit A and may be delivered to the premises in that form but all further processing of these parts shall be performed on the premises.

There shall be a Journeyman or Apprentice Meat Cutter on duty at all times where fresh meat is offered for sale except as otherwise provided for in Subsection 9.1.8 of this Agreement and as follows:

**1.3.1** A Journeyman Meat Cutter or Apprentice Meat Cutter shall not be required to be on duty between the hours of 6 p.m. and 6 a.m. In addition to those subsections set forth above, Meat Departments with one hundred twenty (120) scheduled hours (excluding Clean-up Workers) or less per week shall not be required to have a Journeyman Meat Cutter on duty for a period of three (3) hours per day and/or eighteen (18) hours per week. If the Employer wishes to utilize the above exemption or a special exemption, the Union shall be notified and the hour exemption shall be discussed but in no instance shall there be less than one (1) full Meat Cutter shift scheduled Sunday through Saturday and holidays. If a Meat Department qualifies and utilizes the one hundred twenty (120) hour Journeyman-on-duty exemption, then they are not entitled to the 6 p.m. to 6 a.m. waiver set forth above.

**1.3.2** When fresh meat is offered for sale and a member of the bargaining unit is not on duty in the Meat Department during such hours, no one other than a member of the bargaining unit shall perform work in the Department.

**1.3.3** No employee, presently employed in the jurisdiction of the Union, employed as of November 1, 1985, will have his hours reduced or will be laid off as a direct result of implementing the modification of Exhibit A hereof or modification of Journeyman-on-duty or the introduction of pre-priced products set forth in Subsection 1.3.4 below.

**1.3.4** Lunch meats, pre-sliced bacon, dissected and pre-fabricated fowls, ground beef and pork sausages in visking casing, fish, and/or rabbits which, pursuant to current custom and practices, are presently pre-fabricated and dissected, along with all cooked or pre-cooked meats, or combinations of such meat products, whether in bulk or package form, need not be cut on the premises; but all the above products, along with fresh, frozen, smoked, or cooked sausages, shall be handled, displayed, dispensed, and offered for sale by employees covered by this Agreement. Notwithstanding the above, pre-priced poultry (whole, cut-up, and/or parts), fish, liver, sausage, and smoked or cured meats may be merchandised.

Offal may be brought into the market pre-packaged and pre-priced.

Tortillas may be handled, stocked, and displayed by vendors.

In the event of the deliberate failure of an Employer to schedule an employee to work in accordance with the provisions of this Collective Bargaining Agreement, when fresh meat is offered for sale, the Employer will be required to pay, in accordance with Subsection 1.12.

The parties agree to monitor and evaluate the status of products listed on Exhibit A hereof during the term of this Agreement. A committee of Raley's and the Unions shall have the authority to add to, modify, and/or delete from the list of cuts.

Authority set forth above shall be exercised only by mutual agreement of the members of the Committee. Where disputes arise or mutual agreement cannot be reached, said disputes shall be referred to the procedures set forth in Section 17 New Methods of this Agreement for binding resolution.

Nothing contained herein or in this Agreement shall prevent the Committee from implementing actions and/or modifications, nor shall this provision limit the ability of individual companies and individual Unions to negotiate separate understandings.

**1.4   SUBCONTRACTING AND SUBLEASING:** It is recognized that the Employer and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement. Therefore, except for work which is exclusively inventory or janitorial work (such as washing windows, washing or waxing floors, and cleaning restrooms), or work hereinabove excluded, no work covered by this Agreement as defined in Subsections 1.2 and 1.3 above, shall be performed under any sublease, subcontract, or other agreement unless the terms of said lease, contract, or other agreement specifically provide:

**1.4.1** That all such work shall be performed only by members of the appropriate unit as defined in Subsection 1.1 above;

**1.4.2** That the Employer shall at all times hold and exercise full control of the terms and conditions of employment of all such employees pursuant to the terms of this Agreement.

**1.5** It is recognized that if the terms of the Employer's lease, contract, or other agreement obligates the lessee or other party, as the case may be, to pay the wages and observe the other terms and conditions of this Agreement, then the Union agrees that the sole and entire financial responsibility for meeting the costs of observance of this Agreement shall be upon said lessee or other party and not upon this Employer and that it shall be, and by these presents is, hereby released from any and all financial liability in connection therewith.

**1.6   STORE MANAGERS AND ASSISTANT STORE MANAGERS:** None of the provisions of this Agreement need apply to one (1) overall Supervisory Store Manager, the Assistant Store Manager and, in stores of thirty-five thousand (35,000) square feet or more, a Second (2nd) Assistant Store Manager and their work in each retail food store in which an owner is not actively engaged on the premises. The Store Manager and Assistant Store Manager(s) shall not be restricted as to the amount of non-supervisory work they may perform. Meat Departments - see Store Manager Training below.

No Assistant Store Manager shall be involuntarily reclassified as a direct result of this provision during the term of this Agreement.

**STORE MANAGER TRAINEES (MEAT DEPARTMENT):** Employees who are in bona fide Store Management Training Programs may work in covered employment, including handling the "tools of the trade", so long as said work is for the purpose of familiarizing the Manager Trainee to the Meat Department operations. No Meat Department employee shall have his hours reduced or be laid off as a direct result of the training program. Before any employee commences training in the Meat Department, the Union shall be notified, in writing, of the name(s) of the trainees, the location(s), the training start date, and the expected duration.

**1.7  OWNERS:** There shall be not more than two (2) Employers in any store or group of stores having common ownership. In partnerships, "Employer" as used in this subsection means only bona fide partners who own an interest in the assets and in the profits of the partnership. In corporations, "Employer" as used in this subsection means only two (2) officers of the corporation who own capital stock of the corporation. No more than two (2) shareholders of a corporation or more than two (2) bona fide partners shall be deemed or classified as an Employer within the meaning of this Agreement. Employers as thus defined may do such work as is necessary in the conduct of the business. All other persons performing work under the jurisdiction of the Union shall be members of the Union and shall be governed by the provisions of this Agreement.

**1.8  NEW OWNER:** This Agreement shall be binding upon the successors and assigns of the parties hereto. Except as set forth in Section 11 Vacations, during the life of this Agreement, employee benefits provided for herein shall not be affected by the sale or transfer of the business for those employees who are retained by a new Employer for a period of more than sixty (60) calendar days. For employees who choose to be employed by such new owner, such sixty (60) calendar-day period shall be considered a probationary period during which time employees may be terminated without recourse to the grievance procedure, unless such termination is in violation of Section 2 Employment and Union Membership, Subsection 2.4.2, or Section 3 Discharge and Layoff, Subsection 3.1 of this Agreement.

**1.9  SALESMEN:** The Employer assumes a particular responsibility to require observance of this Agreement on the part of book salesmen. The Employer shall give to one (1) employee on each shift written authorization to request any book salesman performing work in violation of this Agreement to cease such work. If the book salesman does not comply with such request, then the authorized employee shall report the matter to the Employer or Store Manager, who shall then cause the book salesman to cease such work.

**1.10  TRAVELING CLERKS:** It is agreed by the Employer and the Union that employees may be assigned to work in two (2) or more different stores located in the geographical jurisdiction of two (2) or more Local Unions. Each such employee shall be covered by all of the terms and conditions of the Agreement which is in effect in the area in which he works the major portion of his time. In the event that he does not work the major portion of his time in any one (1) area, then the Employer shall designate the area Agreement under which he is working and shall give written notice of the area so designated to the Union.

**1.11  INDIVIDUAL AGREEMENTS:** The Employer agrees that no employee covered by this Agreement shall be compelled or allowed to enter into any individual contract or agreement with said Employer concerning wages, hours of work, and/or working conditions that provides less benefits than the terms and provisions of this Agreement, except by written agreement of the Employer, the employee, and the Union. However, the Union agrees to allow new employees to enter into separate voluntary agreements providing for arbitration of statutory discrimination claims and remedies not covered by this Collective Bargaining Agreement under current case law.

**1.12  ENFORCEMENT:** When the Employer has knowingly permitted non-bargaining unit persons to perform work in violation of this Agreement, it shall be liable in damages payable to a recognized charity mutually agreed to by the parties in the amounts below for each proven violation. On a store-by-store basis:

    **1.12.1** At the time of the first (1st) knowing violation, an amount equal to one (1) day's wages at the regular Clerk's rate plus equivalent Health and Welfare and Pension contributions.

    **1.12.2** At the time of a second (2nd) knowing violation, an amount equal to two (2) days' wages at the regular Clerk's rate plus equivalent Health and Welfare and Pension contributions.

1.12.3 An additional ( )'s wages plus the equivalent Hea_...and Welfare and Pension contributions shall be added cumulatively for each subsequent knowing violation.

**1.13   NEW STORES AND REMODELS:** During any three (3) consecutive days preceding the reopening of an old food market or discount center of the Employer, which has been closed for remodeling for a period of thirty (30) days or less, upon prior notice to the Union, persons not in the bargaining unit may perform any work in such store.

Notwithstanding any language to the contrary contained in this Agreement between the parties, it is agreed this Agreement shall have no application whatsoever to any new food market or discount center until fifteen (15) days following the opening to the public of any such new establishment. Neither shall this Agreement have any application whatsoever to any food market or discount center which is reopened after it has been closed for a period of more than thirty (30) days until the fifteenth (15th) day following the date of such reopening to the public.

The Employer shall staff such new or reopened food market with a combination of both current employees and new hires, in accordance with current industry practices of staffing such stores with a cadre of current employees possessing the necessary skills, ability, and experience, plus sufficient new hires to meet staffing requirements. Employees, who are thus transferred, upon whom contributions are made to the various Trust Funds shall continue to have contributions to the several Trust Funds made on their behalf in the same manner and in the same amount per hour as such contributions were made prior to their transfer.

Notwithstanding anything in this Agreement to the contrary, it is agreed that when the remodeling of an existing location occurs without such store being closed, the Employer shall only be obligated to give the members of the bargaining unit employed by it in such store an opportunity to perform the work required for such remodeling at the applicable contract rate, except that such opportunity to perform such work shall not include any overtime hours. When members of the bargaining unit within such store are not available for such work, such work may be performed by persons not in the bargaining unit.

Notwithstanding anything to the contrary contained in this Agreement between the parties, it is agreed and understood that the probationary period for any new hires in such new or reopened stores referred to above shall not begin until the fifteenth (15th) day following such opening or reopening of such stores to the public.

**1.14**   In the event the Employer creates new jobs or job duties involving the handling or selling of merchandise not heretofore handled or sold by the Employer, such new work shall be deemed Meat or Clerk's work and performed by members of the bargaining unit, except that, for a temporary period of tryout and familiarization not to exceed six (6) months in each store following the introduction of such new category of merchandise, the Employer may contract for the performance of all or part of such work by non-bargaining unit persons. After the six (6) month period has expired, the wage rates and classification for such new jobs or job duties shall be subject to mutual agreement of the parties. Upon request of the Union, the Employer shall meet to discuss the wage rates and classification for such new jobs or job duties no later than ninety (90) days after the introduction of said merchandise. In the event the parties are unable to agree on the above, disputed matters shall be processed in accordance with Section 18 Adjustment Board and Arbitration of Disputes, Subsection 18.3 of this Agreement with a decision being rendered by the end of the six (6) month trial period, unless that time period is extended by mutual agreement.

**1.15   RETAIL SALES MERCHANDISERS:** Employees working under subcontracts for retail sales merchandising services, hired after April 11, 1986, shall be paid the rate of pay of Clerks and shall have the same progression steps. Current employees shall be slotted into the progression steps leading to the experienced Clerk rate of pay.

## SECTION 2 EMPLOYMENT AND UNION MEMBERSHIP

**2.1    UNION SHOP:** On and after thirty (30) days of employment or the date of execution of this Agreement, whichever is later, each employee shall become and remain a member of the Union as a condition of employment; provided, however, that the Employer shall not be obligated to discharge any employee in violation of the National Labor Relations Act, as amended. Upon written notification from the Union that an employee has failed to make timely tender to the Union of initiation fees and/or periodic dues, the Employer agrees to terminate said employee within seven (7) days from such notice.

Following a termination under this provision, there shall be a grace period of thirty (30) days during which time, if the Union presents the Employer with bona fide evidence that the termination demand was improper, the employee shall be reinstated within seven (7) days from such notice. In the event reinstatement occurs, the employee shall be made whole by the Union.

The Union agrees to indemnify and hold the Employer harmless in any and all claims and/or causes of action which arise out of or are in any way connected with the Employer's compliance with this provision.

**2.2    UNEMPLOYED LIST:** The Union agrees to keep an up-to-date list of known unemployed Clerks with an accurate record of their experience or training, and the Employer agrees to notify the Union of vacancies in positions or job openings within the classifications covered by this Agreement in order that the unemployed Clerks on the aforementioned list may be provided with a full opportunity to fill such vacancy. In filling vacancies, the Employer shall give preference to applicants with previous employment experience in the industry in the area covered by this Agreement.

**2.3    REGISTRATIONS:** The Union agrees to accept registrations for employment upon each list so maintained and to dispatch applicants for employment from said list for vacancies or job openings with the Employer in accordance with their specification and this Agreement.

**2.4    JOB REFERRAL AND NONDISCRIMINATION:**

**2.4.1    The Union shall be allowed two (2) days on which its office is open to refer applicants. Selection by the Union of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of union membership.**

The Employer shall retain the right to reject any job applicant referred by the Union, provided such rejection is not a violation of this Agreement. The Union agrees that the Employer may employ persons from other sources when applicants satisfactory to the Employer are not available from the lists maintained by the Union.

**2.4.2    The Employer shall not discriminate against any person in regard to hire, tenure of employment, or job status because of race, creed, religion, color, sex, or national origin, nor shall age, disability unrelated to the job duties, or veteran status under any circumstances be a basis for rejection or termination of an otherwise qualified employee and applicant for employment.**

**SEMANTICS:** When used, the terms "he" and "Journeyman" refer to human beings of either sex and are used only for grammatical simplicity.

**2.4.3    Disputes or disagreements arising out of this section shall be referred to the adjustment board and the arbitration process as provided for in Section 18 of this Agreement.**

**2.5    OTHER HIRING:** Whenever new employees are hired for jobs covered by this Agreement from sources other than the list maintained by the Union or when employees are transferred to jobs covered by this Agreement from outside the jurisdiction of this Union, the Employer shall:

**2.5.1** Promptly notify the Union of such employment, in writing, giving the date, place, and job classification of the employment and the name and address of the new employee; and

**2.5.2** Promptly advise the new employee of the terms and provisions of this Agreement and of his obligations hereunder; and

**2.5.3** The Employer will pass out to and collect from newly hired employees Union application forms. The Union application forms will be provided by the Union. The responsibility to forward the application to the Union will be the responsibility of the employee or the Employer. The application shall be forwarded to the Union no later than forty-five (45) days from the date the new employee was hired.

**2.5.4   EMPLOYMENT:** If the Employer obtains a new employee through a private employment agency or a private training school, the Employer shall pay the employment agency fee or any training fee paid by or required of the employee.

**2.6    NEW EMPLOYEES:** The provisions of this Agreement shall apply to the employment of any person covered by this Agreement while such person is not a member of the Union.

**2.7    EXTRA WORK:** Employees on the payroll of the Employer will be given preference for additional straight-time work before any other person who has worked during the same week on another job outside the retail industry is hired for such work.

**2.8    EXTRA WORKER (Meat Department Only):** An Extra Worker is not considered a new hire and is one who is used on a daily and/or temporary basis and is not subject to the probationary period of Subsection 3.1 hereof, except as set forth below:

An Extra Worker may qualify to become a regular employee if he has completed sixty (60) days of employment within a calendar year with the hiring Employer.

After completion of sixty (60) days of employment, the Employer will, upon request, provide an Extra Worker with an application for employment; and when hired, no further probationary period will be required.

Upon receipt of the application by the Employer, the Employer shall have thirty (30) days to answer the Extra Worker, in writing, as to the availability of employment. Said application shall remain on file for a period of one (1) year.

When an Extra Worker is hired, his seniority date as a regular employee for all purposes under this Agreement shall commence from his date of hire.

Extra Workers shall be entitled only to those benefits and contract rights reserved for Extra Workers within this Collective Bargaining Agreement.

Extra Workers shall receive the Extra Workers rate of pay for all hours worked.

Extra Workers, discharged for cause, shall be paid for time worked.

Extra Workers who report late for work need not be put to work; provided that, if put to work at all, they shall be paid only for the time worked.

In the event the Union dispatches an employee who was previously discharged for cause by the Employer, the employee shall not be entitled to any minimum guarantees of work or pay.

## SECTION 3.   DISCHARGE AND LAYOFF

**3.1**     The Employer shall not discharge or discriminate against an employee for upholding Union principles, for serving on a committee of the Union or any organization affiliated therewith, or for refusing to purchase stocks, bonds, securities, or any interest in the Employer's business should the Employer be operating as an individual, firm, company, partnership, joint stock company, or corporation.

**PROBATION:** There shall be a probationary period of sixty (60) calendar days for all employees. During the probationary period, a probationer may be discharged without right of appeal except if such discharge is in violation of Section 2 Employment and Union Membership, Subsection 2.4 or 2.8 of this Agreement or this Subsection 3.1.

**3.2     TERMINATION:**  Except for reasons beyond the Employer's control, regular employees shall be given three (3) working days' notice of layoff or the equivalent pay, except when such termination has been for cause, such as dishonesty, insobriety, insubordination (as defined in Webster's International Dictionary), fighting on the job, malicious destruction of property, illegal use of narcotics or improper conduct, under circumstances requiring immediate termination. Discharge for failure to comply with Subsection 2.1 above shall be deemed a discharge for cause. Employees who work on two (2) days per week shall be given two (2) working days' notice under like conditions. In all such cases, the day on which such notice is given shall not be counted unless a notice is given before the day's work begins. [A regular employee is one who has been in the continuous employ of the Employer for a period of ninety (90) days or longer.]

The Employer shall provide a list of terminations with social security numbers to the Union monthly.

**3.3     WORK PERFORMANCE:**  The Employer shall have the right to discharge any employee for just cause. Any employee claiming unjust dismissal, demotion, or suspension shall make his claim therefore through the Union, in writing, to the Employer within ten (10) business days of such dismissal, demotion, or suspension, otherwise no action shall be taken by the Union.

Any dispute arising out of any such suspension, demotion, or discharge not settled by the parties shall be subject to the provisions of Section 18 Adjustment Board and Arbitration of Disputes of this Agreement.

   **3.3.1**   Before a regular employee is discharged, suspended, or demoted for incompetency or failure to perform work as required, he shall receive a written warning (with a copy to the Union) and be given an opportunity to improve his work. Notices and warnings shall become null and void after six (6) months from the date of issue.

   **3.3.2**   Upon severance of employment of any employee, the Employer shall, within seven (7) calendar days thereafter, notify the Union of such resignation, layoff, or discharge. If discharge is for cause, the Employer agrees to submit the reasons therefor to the Union upon request.

**3.4     RECORD:**  Any employee who is terminated shall, upon request, be given a statement setting forth the date of hiring and the number of hours worked during his employment.

**3.5   POLYGRAPHS:** No employer shall demand or require any applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector, or similar test or examination as a condition of employment or continued employment.

## SECTION 4.   SENIORITY

**4.1   DEFINITION:**   Seniority shall mean continuous service with the Employer, and no employee shall suffer loss of seniority by reason of approved leave as provided for in this Agreement.

**4.2.   CLASSIFICATION:** Seniority shall be by classification (listed as follows) and in Section 1 Recognition and Contract Coverage Subsection 1.3, and Section 9 Classification of Employees of this Agreement:

(1)   Managing Clerks

(2)   Senior Head Clerks and Senior Produce Clerks

(3)   Head Clerks

(4)   Senior Clerks

(5)   Clerks

(6)   Courtesy Clerks – subject to the restrictions of Section 9 Classification of Employees, Subsection 9.1.5.4 hereof. Seniority of Courtesy Clerks shall be on a store-by-store basis, except that Courtesy Clerks transferred to another location will carry Courtesy Clerk seniority with them to the new location.

In the event that a Clerk who has previously served as a Courtesy Clerk is going to be laid off before the completion of the first (1st) one thousand forty (1,040) hours of the Clerk progression then, in that event, the Clerk may step back temporarily into the Courtesy Clerk classification at the store in which he is currently working until recalled.

(7)   Head Meat Cutters

(8)   Journeyman Meat Cutters and Apprentice Meat Cutters (For the purposes of layoff and recall, Journeyman Meat Cutters and Apprentice Meat Cutters shall be considered as one (1) classification.)

(9)   Meat Clerks, Cashiers, and Delicatessen workers (conventional and self-service)

(10)   Employees employed in classifications covered by addendum agreements shall be deemed separate classifications.

**4.3   LAYOFF, RECALL, AND PROMOTION:** With respect to layoff, recall, and promotion, seniority shall be based upon the length of service with the Employer in each of the areas covered by this Agreement as referred to in Subsection 4.3.1 below; provided, where an employee is transferred by the Employer to such area from another area, the transferred employee shall retain all seniority with the Employer but shall not be entitled to exercise such rights with respect to layoff, recall, or promotion until the expiration of six (6) months after the date of transfer, at which time his seniority shall be based upon the first (1st) day of employment by the Employer regardless of area. However, during such period of six (6) months, the transferred employee shall accrue seniority rights in the new area from the date of transfer and shall retain all seniority rights

with respect to layoff, recall, and promotion in the area from which he was transferred, provided, however, that for the affected retail-only employees in the Fort Bragg, Clearlake, Russian River, Burney, Mt. Shasta, Weed, Yreka, Lake Tahoe Basin, and Truckee areas, the six (6) month period hereinabove provided shall be extended to eight (8) months.

It is recognized that employees must possess the necessary qualifications to perform the available work when asserting their seniority rights into or out of the Employer's Produce Department or for work assignments requiring specialized skills and background.

### 4.3.1   GEOGRAPHICAL AREAS:

**4.3.1.1**   The individual geographical areas referred to in Subsection 4.3 above are as follows (retail only):

(1)   Sacramento County, Yolo County and Western portion of Placer County, including but not limited to the towns of Auburn, Colfax, Rocklin, and Roseville, and Western portion of El Dorado County including, but not limited to, the towns of Placerville, Pollock Pines, Cameron Park, and El Dorado Hills

(2)   Amador County

Existing employees with a Company having only one (1) store in Amador County shall remain with the Western portion of El Dorado County geographical seniority area until a second (2nd) store is added to the Amador County geographical seniority area.

In the event a Company closes a store in Amador County, the existing employees on the job as of March 8, 1983, will be able to assert their seniority in the Western portion of El Dorado County.

(3)   Eastern portion of Placer County, Eastern portion of Nevada County, Western portion of Washoe County, Nevada, including, but not limited to, the towns of Truckee, Tahoe City, Kings Beach, and Incline Village, Nevada

(4)   Eastern portion of El Dorado County and Northwestern portion of Douglas County, Nevada, including, but not limited to, the towns of South Lake Tahoe and Zephyr Cove, Nevada

(5)   Stanislaus County

(6)   Calaveras County

Existing employees with a Company having only one (1) store in Calaveras County shall remain with the Tuolumne County geographical seniority area until a second (2nd) store is added to the Calaveras County geographical seniority area.

In the event a Company closes a store in Calaveras County, the existing employees on the job as of March 8, 1983, will be able to assert their seniority in Tuolumne County.

(7)   Tuolumne County

(8) San Joaquin County

(9) Chico, Oroville, Paradise, and Gridley

(10) Marysville, Yuba City, Grass Valley, Nevada City, and Penn Valley

(11) Shasta and Tehama Counties except Burney

(12) Burney

(13) Siskiyou and Modoc Counties

(14) Trinity County

(15) Mendocino County except Fort Bragg

(16) Fort Bragg

(17) Lake County

(18) Sonoma County

(19) Outlying areas – by town.

4.3.1.2  The individual geographical areas for Head Meat Cutters and Meat Cutters:

(1) Sacramento County and the greater Sacramento area including Auburn, Placerville, and Woodland

(2) Lake Tahoe and vicinity

(3) The area covered by Oroville, Marysville, Yuba City, and Grass Valley

(4) Napa, Solano, and Contra Costa Counties with the exception of El Cerrito, Richmond, San Pablo, El Sobrante, and Kensington of Contra Costa County

(5) The counties of Shasta, Tehama, Siskiyou, Modoc, Lassen, Butte, Glenn, Plumas, and Trinity

(6) The counties of San Joaquin, Stanislaus, Amador, Calaveras, and Tuolumne

(7) Madera County

(8) Merced County

4.3.2  **PROMOTION:** Determination of which employee is to be promoted to Senior Clerk or Meat Cutter will be based upon qualifications and seniority. Qualifications shall include overall retail food experience, job performance, aptitude, attendance, and successful completion of formal training. Training opportunities will be posted and offered to the most senior employees that bid and who have no suspensions in the preceding six (6) months, effective January 7, 2007. Written discipline within the preceding six (6) months may be considered when determining eligibility for training opportunities. Where qualifications are approximately equal, seniority shall control. No trial period shall be required.

All permanent job vacancies above the Senior Clerk or Meat Cutter classification shall be

posted at each store ( the Employer within the seniority   a as specified herein for a period of seven (7) days. The job posting shall specify the job classification and location of the store where the permanent job vacancy exists. Any employee interested in the permanent job vacancy must complete an electronic job bid on or before the expiration of the posting period. In the event the Employer decides to promote an existing employee to fill the permanent job vacancy then, in that event, the selection of the employee to be promoted shall be in accordance with the provisions set forth herein.

Any successful bidder who thereafter declines the promotion or is unable to perform the duties of the job shall be ineligible for any subsequent promotional bid for a period of six (6) months.

All permanent job vacancies below a Meat Cutter or Senior Clerk, except Courtesy Clerks, shall be posted at each store of the Employer, on a store-by-store basis, for a period of seven (7) days. Courtesy Clerks desirous of promotion and who are otherwise reasonably qualified for a promotional opportunity in accordance with provisions below must file a bid. Determination of which employee is to be promoted will be based upon reasonable qualifications and seniority. Qualifications shall include such factors as experience, job performance, aptitude, attendance, etc. Where qualifications are approximately equal, seniority shall control. No trial period shall be required.

The Employer agrees to provide the Union with a list of employees, bimonthly, who have been promoted to positions above Senior Clerk.

There shall be no reduction in pay when a Clerk or Addenda employee is promoted to a Senior Clerk vacancy. Said employee's rate of pay shall be frozen until the employee completes the hours necessary to warrant an increase under the progression steps.

**4.3.3   LAYOFF:** In the reduction of the number of employees due to lack of work, the last employee hired in the classification shall be the first (1st) to be laid off and, in recall, the last employee laid off in the classification shall be the first (1st) recalled until the list of employees previously laid off has been exhausted. For purposes of this section, a layoff is defined as being reduced to zero (0) hours.

**4.3.4   RECALL:** Employees who are laid off due to lack of work shall have seniority rights in recall for jobs subsequently available with the Employer prior to the hiring of new employees. Such employees shall be notified in person by telephone or, if not reached by telephone, such employee shall be notified by certified mail, a copy of which shall concurrently be sent to the Union. The employee shall have three (3) days to report after receipt of a copy of such notice of recall.

**4.3.5** It is further understood that the employee will not be able to claim wages under the provisions of Subsection 4.3.3 above, except for hours lost commencing with the weekly schedule immediately following the Union's notification to the Employer of the claim and thereafter until resolved.

If the employee or the Union gives written notice to the Employer within seven (7) days of his notice of layoff, the above provisions do not apply.

**4.4   LOSS OF SENIORITY:** No employee shall suffer loss of seniority unless he:

(1)     Is discharged for just cause;

(2)     Resigns or voluntarily quits;

**(3)** Is absent from work for six (6) consecutive months due to layoff, provided, however, that for the affected employees in the Fort Bragg, Clearlake, Russian River, Burney, Mt. Shasta, Weed, Yreka, Lake Tahoe Basin, and Truckee areas, the six (6) month period hereinabove provided shall be extended to eight (8) months.

**(4)** Is absent from work for more than thirty (30) days due to death in the immediate family;

**(5)** Fails to return to work upon completion of a leave of absence as defined in Section 5 General Provisions, Subsection 5.14 hereof;

**(6)** Fails to report for work when recalled as provided in Subsection 4.3.4. above.

When personal leaves are granted by the Employer, the employee shall be given written notice thereof specifying the extent of such leave.

**4.5 SCHEDULE SELECTION:** The word "schedule" is interpreted to mean the weekly work schedule including work on premium days and early and late work schedules.

**4.5.1** It is recognized that management has the right to establish such weekly work schedules to meet the requirements of the business; provided, however, such right shall not be utilized in an arbitrary or capricious manner to deprive an employee of his ability to exercise his seniority right to select such work schedule.

**4.5.2** Employees may select such schedules according to seniority by classification, applied on a store basis, provided they possess the necessary qualifications for the schedules selected. Qualifications shall include such factors as experience, job performance, aptitude, attendance, etc.

**4.5.3** It is understood part-time employees and Clerks may not bid for the schedule of other employees.

**4.5.4** The Employer shall not recognize the schedule selection request of any employee if the granting of the request would place the Employer in a position of violating this Agreement or having to pay a penalty for improper scheduling of shift intervals or consecutive workdays.

**4.6 RELIEF WORK:** Employees assigned to regular relief work may, after six (6) months on such work, request the Employer, in writing, to be assigned to work in one (1) store. The rescheduling of such relief work shall be done within thirty (30) days and be based upon inverse seniority. This provision shall not apply to temporary relief work required as a result of illness, injury, vacation, or other like temporary relief work.

**4.7 LISTS:** Upon request by the Union, the Employer agrees to provide a seniority list of its employees semiannually.

**4.8 TEMPORARY ASSIGNMENTS:** The Union will cooperate with the Employer in the scheduling of employees for temporary part-time or relief work outside the geographical jurisdiction of this Agreement. However, no employee shall be discriminated against for refusal to accept such assignment.

**4.9 TRANSFER:** Transfers from one (1) seniority area to another seniority area shall not be compulsory nor shall any employee be disciplined or otherwise discriminated against for refusing to accept such a transfer.

Request for transfer, within the Union's territorial jurisdiction, so employee may work nearer his home will be given proper consideration and will not be refused arbitrarily.

Within an individual seniority area, the Employer agrees that it will not arbitrarily or capriciously transfer employees.

No employee shall be required to accept a permanent transfer outside the jurisdiction of this Union unless approved by the Union.

## 4.10   PART-TIME EMPLOYEES:

### 4.10.1   REQUEST FOR FULL-TIME WORK:
Promotions to full-time will be accomplished by promoting the most senior employee in the affected classification so long as the most senior employee does not have any suspensions in the past six (6) months. Written discipline, within the preceding six (6) months may be considered when determining eligibility for full-time promotions. Promotions will be accomplished by geographical seniority area.

### 4.10.2 REQUEST FOR ADDITIONAL HOURS:
Part-time employees may request additional available hours within their classification on a store-by-store basis, provided they have the previously mentioned qualifications, are available for the hours, and have notified their Store Manager, in writing, of their desire for more hours; and they shall be afforded such hours by seniority.

### 4.10.3 REMOVAL FROM LIST:
Employees refusing an offer of full-time work, requesting part-time work after having been selected for full-time work, indicating their unavailability for continued full-time work, or refusing a job opening with more hours shall not be entitled to exercise rights set forth above until the next request period.

### 4.10.4 REDUCTION IN HOURS:
Reduction in employees' hours due to lack of work shall be accomplished by seniority and by classification on a store-by-store basis in the following manner:

(1)     Notwithstanding the above, before a full-time employee may be reduced in hours on a store-by-store basis, the Employer shall first reduce the hours of part-time employees in the store affected by the lack of work in the order of their seniority. Hours shall be afforded to part-time employees in the store affected by the lack of work in the order of their seniority by classification on a store-by-store basis. It is recognized that management has the right to establish such weekly work schedules to meet the requirements of the business.

(2)     To the extent further reductions of work hours are required in the affected store, excluding the Meat Department, the Employer shall reduce the hours of full-time employees by seniority and by classification. Any full-time employee whose working hours are reduced for more than three (3) weeks (not necessarily consecutive) in a nine (9) month period, commencing with the first (1st) week of reduced hours, shall have a one (1) time option during any said nine (9) month period to request, in writing, during the fourth (4th) week of reduced hours, to remain in the affected store at the reduced working hours or displace the least senior full-time employee in the same classification in the appropriate geographical seniority area. If the full-time employee chooses to replace the least senior full-time employee, his new store becomes his assigned store. Said employee shall be entitled to exercise the option right in his newly assigned store in accordance with the procedures set forth herein.

The displaced full-time employee shall have the right to exercise seniority to displace the least senior employee in the same classification in the geographical seniority area or to remain in his assigned store at the reduced hours in accordance with his seniority. If said employee displaces the least senior employee in the geographical seniority area, he shall be afforded hours in his assigned store by seniority by classification.

(3)    A full-time employee who has been involuntarily reduced to part-time and who chooses to remain in the affected store shall be placed at the top of the bid list referred to in Subsection 4.10.1 above with respect to the affected store and shall have preference over those employees who have requested additional available hours pursuant to Subsection 4.10.2 above.

(4)    A regular full-time employee is:

(a)  One who is hired or designated by the Employer to a regular forty (40) hour job opening, excluding relief for vacations, illnesses, other authorized absences, or business fluctuations.

(b)  An employee that becomes full-time in accordance with Subsection 4.10.1 above.

(c)  Meat Department Heads and Meat Cutters.

(5)    The aforementioned provisions shall not affect the right of the Employer to transfer employees or the right of employees to request transfers pursuant to the provisions of Subsection 4.9 above.

(6)    Full-time Meat Department Heads and Meat Cutters shall be reduced within their store by classification then by seniority within their geographical seniority area.

**4.10.5 WAGE CLAIMS:** It is understood that employees will not be able to claim wages under this interpretation except for hours lost commencing with the weekly schedule immediately following the Union's written notification to the Employer of the claim and thereafter until resolved. If the employee or the Union gives written notice to the Employer within seven (7) days of his layoff, the above provisions do not apply.

**4.10.6 WEEKLY GUARANTEE:** The weekly minimum schedule for part-time employees shall be twenty-four (24) hours, excluding Courtesy Clerks who shall be scheduled for at least sixteen (16) hours per week and Fuel Station employees who shall be scheduled for at least twenty (20) hours per week.

The aforementioned weekly guarantee shall not apply if one (1) or more of the following conditions exist:

(1)    The store is normally open for business six (6) days or less in the workweek;

(2)    A week in which one (1) of the holidays named in this Agreement falls;

(3)    Employees scheduled to work are absent without proper notice;

(4)    Work is not available due to acts of God;

(5)      The part-time employee (excluding Courtesy Clerks and Fuel Station employees), the Employer, and the Union agree that the employee may work less than twenty-four (24) hours per week;

(6)      The part-time Courtesy Clerk, the Employer, and the Union agree that the Courtesy Clerk may work less than sixteen (16) hours per week;

(7)      The Fuel Station employee, the Employer, and the Union agree that the Fuel Station employee may work less than twenty (20) hours per week;

(8)      An unanticipated, significant business fluctuation;

(9)      During the week an employee is recalled from layoff or returns from leave of absence.

**4.11**   Notwithstanding anything to the contrary contained in this Agreement, any employee can perform the work of a lower-paid classification.

## SECTION 5.  GENERAL PROVISIONS

**5.1**    **SAFETY RULES:**   Safety rules pertaining to the conduct of employees shall be conspicuously posted by the Employer in its place of business, and the Employer shall maintain in its Meat Department and in the store a fully equipped first-aid kit.

All first-aid kits shall be maintained so as to contain the following:

**NO COTTON**
(1)    2 packages of 2" compress bandages - 4 per package
(2)    1 package 4" compress bandage - 1 per package
(3)    1 ammonia inhalants (10 tubes)
(4)    Tincture of methylate swabs, 10 packages
(5)    1 sterilized gauze 25 2 x 2 or equal
(6)    1 tube burn ointment
(7)    1 - 4" bandage scissors
(8)    1 - 3½" tweezers
(9)    1 tourniquet
(10)   1 - 1 oz. dropper bottle boric acid solution for eyes
(11)   1 roll adhesive tape ½" or 1"
(12)   First-aid manual

Industrial kit basic content, add as necessary.

Where employees are required to work after dark, the Employer shall provide the use of a lighted parking area in the immediate vicinity of the store.

Working conditions which are injurious to the health or safety of the employees shall be directed to the attention of the Employer, at which time the Employer shall immediately investigate the alleged condition, shall meet with representatives of the Union to discuss the alleged condition, and shall immediately take the necessary steps and measures to correct such condition.

**5.2**    The Employer agrees to comply with prevailing federal and state regulations. Company rules will be furnished to the Union upon request.

**5.3    MILITARY SERVICE:** The Employer agrees to comply with the terms of the Universal Military Training and Service Act, with reference to all provisions providing for the reemployment of persons entering Military Service. These provisions shall be deemed a contractual obligation under the terms of this Agreement.

**5.4    BONDING:** Whenever the Employer requires the bonding of any employee or the carrying of any insurance for the indemnification of the Employer, premiums for the same shall be paid for by the Employer. No cash deposits, cash, or real property bond shall be required of any employee.

**5.5    FLOOR COVERING:** Wood or suitable floor covering shall be provided for on all concrete floors behind check stands and behind the meat counter.

**5.6    UNIFORMS:** Where the Employer desires the wearing of a uniform and/or head covering, the Employer shall furnish the same without cost to the employee. The Employer shall also provide for the maintenance of such wearing apparel, except if the Employer furnishes drip-dry uniforms, the employee shall maintain such uniforms.

Shirts and/or ties will be supplied only if the Employer specifies both the color and the specific style. Specific style shall be defined as collar style, sleeve length, and fabric content. Once implemented, there shall be no change in color unless by mutual agreement.

**SPECIAL WEAR:** It is also understood if an employee is required by the Employer to purchase or rent a special costume or unusual clothing not part of his existing wardrobe, the Employer shall reimburse the employee for any reasonable and necessary cost involved or furnish the required costume or unusual clothing to the employee without cost for the period of time the requirement is in effect.

In each market which utilizes the "sage" sanitation system, protective wearing apparel will be provided by the Employer with the understanding that employees using said protective apparel shall be responsible for returning it to its proper place.

Employees required to work in refrigerated rooms or in and out of cutting rooms or coolers shall be permitted to wear slacks, sweaters, or other suitable clothing to adequately protect them from cold and dampness while working in such rooms. Employees who are assigned to continuous work in freezers will not be required to remain therein more than fifty (50) minutes out of each hour.

Employees who are required by the Employer to use clothing or boots other than those provided for in the preceding paragraph shall have such clothing or boots supplied by the Employer. The Employer shall provide rain jackets.

**5.7    TOOLS AND EQUIPMENT:** The Employer shall furnish all the required equipment and tools, except for meat cutting tools, necessary for the employment, without cost to the employee. All grinding of tools and sharpening of saws shall be at the Employer's expense.

**5.8    PAYDAY AND DEDUCTIONS:** Employees shall be paid Friday of each week. The Employer shall furnish each employee with a weekly wage statement showing his name, hours of work, overtime, if any, total wages paid, and list of deductions made.

Extra Workers who are not paid on the next normal payday will receive their pay by mail or by direct deposit. It shall be the obligation of the Extra Worker to provide his current mailing address and/or direct deposit information to the Employer.

**5.9    BULLETIN BOARD:** The Employer agrees to provide space for the posting of official Union meeting notices.

**5.10   UNION BUSINESS:** On written request of the Union, employees shall be allowed time off without pay for the purposes of attending Agreement negotiations, adjustment or arbitration board hearings, or for other bona fide Union business. In all such instances, the Employer shall be notified not less than three (3) days in advance of such absence and the number of employees requesting such absences shall be so limited by the Union that it will not interfere unreasonably with the Employer's business.

The Employer agrees to schedule any employee who is an officer or a representative of the Union, in any capacity of the Union, hours of work that will permit him to attend the meetings of the Union, provided that it does not exceed one (1) employee per store or two (2) meetings per year.  The Employer further agrees that these representatives will not suffer any loss in their normally scheduled hours in the week that they attend said Union meetings, it being understood that in doing so the Employer shall not be placed in a position of violating this Agreement or having to pay any penalty for improper scheduling.  The Union agrees that it will give the Employer seven (7) days' advance notice of the date and time of the meeting referred to above. This provision shall also apply to new members who are required to attend meetings for the purpose of completing their obligations as members of the Union.

The Employer recognizes the right of the Union to appoint store representatives.  The Employer agrees to schedule up to three (3) store representatives, based on store size and volume, designated by the Union, a day off, at the employee's daily straight-time rate based on the average daily hours worked in the pay period preceding, not to exceed eight (8) hours, to attend an annual education meeting.  The parties agree that such time shall not be considered time worked for purposes of overtime, benefit contributions, or other incidents of time worked.

A store representative will be allowed to perform incidental duties for the Union. Such duties may include answering questions about the Collective Bargaining Agreement for and distributing member materials from the Union to other employees at other than work times. Such activities may not include any campaigning of any kind, whether Union or political, or adjusting or attempting to adjust grievances or discussing grievances with management. All activities undertaken by a store representative must be on his or her own time, may not disrupt store operations, and may not disrupt store employees in the discharge of their duties.

No employee shall be discriminated against for membership in or legal activity on behalf of the Union.

**5.11   UNION EMBLEM:** In consideration of the performance of the covenants herein contained, the Union agrees to lend Union Store Cards and/or decals to Employers entitled hereto under the rules governing Union Store Cards set forth in the Constitution of the United Food & Commercial Workers International Union.  Employers who are entitled to Union Store Cards and/or decals agree to accept and display them in a public space in their stores.  It is understood that such Union Store Cards and/or decals are issued by and remain the property of the United Food & Commercial Workers International Union, and the Employer agrees to surrender said Union Store Cards and/or decals at the Union's request upon its failure to observe the terms of this Agreement or the conditions under which said Union Store Cards and/or decals are issued.

**5.12   JOB INJURY:** When an employee is injured on the job and reports for medical care and it is certified that he is unable to continue work, he shall be paid the basic straight-time rate of pay for the hours not worked on the day of injury.

**5.13   PAYROLL DATA:** In the event the Union has information that the Employer has violated provisions of this Agreement relating to rates of pay or the payment of Health and Welfare, Pension, and Sick Leave contributions, the Employer agrees to supply the Union with the necessary payroll data.

**5.14  JURY DUTY OR COURT APPEARANCES:**  Employees required to perform jury duty or to appear in court or the police department on behalf of their Employer shall receive their regular straight-time pay during such jury duty or such appearances, less jury pay or witness fees received.

Employees performing jury duty shall have their schedule changed so that their shift begins at the time of reporting for such jury duty.

Employees regularly scheduled for night work shall be rescheduled to a day shift for the period of jury duty service.

It is understood that time spent in awaiting impaneling for jury service is to be considered covered time under this provision.

Employees shall immediately report for work after being excused from jury duty service, provided there is sufficient time remaining on the daily work schedule to work for at least half (½) of the daily shift. Failure to so report shall render null and void any claim for jury service for that day.

The rescheduled work shift, when combined with time spent for jury service or court appearances, is not to exceed a total of eight (8) hours when in reasonable control of the Employer.

Otherwise, the overtime rate of one and one-half (1½) times the employee's straight-time hourly rate of pay shall apply for all time in excess of the combined total of eight (8) hours. The employee shall supply the Employer with verification of the time spent and fees paid for jury duty services.

If an employee appears in court or the police department on behalf of the Employer on his days off, he shall receive his basic straight-time rate of pay for the time spent in making such appearance, but such time shall not be considered as part of the workweek under the terms of this Agreement.

**5.15  LEAVES OF ABSENCE:**  Leaves of absence shall be granted as follows:

**5.15.1 SICKNESS AND NONINDUSTRIAL INJURIES:**  Up to twelve (12) months after one (1) year's employment.

**5.15.2 INDUSTRIAL INJURIES:**  Up to twelve (12) months for any employee incurring an industrial injury after his first (1st) sixty (60) days of employment and who has less than three (3) years' seniority at the time said leave of absence commences.

Up to eighteen (18) months for any employee who has three (3) or more years' seniority at the time said leave of absence commences.

**5.15.3 PERSONAL LEAVES:**  Leaves up to thirty (30) days after one (1) year of employment for compelling personal reasons to be agreed upon by the parties.  Such leaves shall be requested and granted in writing.

**5.15.4** At the end of any period of such leave of absence for illness or injury, an employee shall be restored to employment with the Company with full seniority to a position comparable to the one he held immediately prior to such leave of absence.

**5.15.5** The foregoing notwithstanding, no employee shall suffer loss of seniority because of absence due to illness of fifteen (15) working days or less.

## 5.16  FUNERAL LEAVES:

**5.16.1 PART-TIME FUNERAL LEAVE:** Part-time employees shall be entitled to funeral leave pay for the actual day of the funeral if scheduled to work on said day.

**5.16.2 FULL-TIME FUNERAL LEAVE:** When a regular full-time employee on the active payroll is absent from work for the purpose of arranging for or attending the funeral of a member of his immediate family, as defined below, the Employer shall pay him for eight (8) hours at his regular rate of pay for each day of such absence up to a maximum of three (3) days, provided:

    **(1)**    The employee notified the Employer of the purpose of his absence on the first (1st) day of such absence;

    **(2)**    The day of absence is one (1) of the three (3) days commencing with the day of such death or the day immediately following the day of such death;

    **(3)**    The absence occurs on the day during which the employee would have worked but for the absence;

    **(4)**    The day of absence is not later than the day of such funeral except where substantial travel time is required;

    **(5)**    The employee, when requested, furnishes proof satisfactory to the Employer of the death, his relationship to the deceased, the date of the funeral, and the employee's actual attendance at such funeral.

For the purpose of Subsections 5.16.1 and 5.16.2 above, a member of the immediate family means the employee's spouse, child, mother, father, sister, brother, mother-in-law, father-in-law, stepmother, stepfather, stepchildren, grandparents, and grandchildren.

## 5.17  RETURNED CHECKS:

Where the Employer has a posted or published check-cashing policy, the employees shall conduct themselves accordingly; and, when an employee follows such policy, he shall not be held financially responsible for returned checks other than his own personal check nor shall he be expected or required to locate the check-cashing customer.

## 5.18  DUES CHECKOFF:

    **(1)**    The Employer agrees to deduct uniform monthly dues, initiation fees, and assessments, as determined by the Union, and political contributions, on a regular basis from the wages of employees in the bargaining unit who provide the Employer with a voluntary written authorization for such deductions. Such deductions, when authorized, will be transmitted to the office of the Union no later than the fifteenth (15th) day of the month following the month in which deductions are made. No deduction will be made from the wages of any employee until the Employer has received a signed copy of voluntary written authorization for such deductions.

    **(2)**    Authorizations for deductions are to be entirely voluntary upon the part of each such individual employee. Authorizations shall be irrevocable for a period of one (1) year or until the termination of this Agreement, whichever occurs sooner. The authorization shall be automatically renewed or be irrevocable for successive periods of one (1) year each or for the period of each succeeding applicable Collective Bargaining Agreement, whichever shall be shorter, unless written notice is given by the employee to the Employer and the Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year or of each applicable Collective Bargaining Agreement.

(3)    The Union shall indemnify and hold the Employer harmless from any and all actions resulting from the implementation of this provision. However, mistakes by the Employer shall be immediately corrected by the Employer upon notification from the Union.


## SECTION 6.   HOURS, OVERTIME, AND SUNDAY PREMIUM PAY

**PREAMBLE:**  In the event of the application of the Federal Wage and Hour Law as applied to retailing conflicts with the intent of this Agreement, the parties shall meet immediately to renegotiate this Agreement in order to preserve the intended workweek and the rates pertaining thereto.

The industry recognizes the five (5) day, forty (40) hour week provisions except for layoffs and individual cutbacks due to lack of work, acts of God, or circumstances beyond the control of the Employer. This section, however, does not impede the right of the Employer to use part-time help as needed.

**6.1.    BASIC WORKDAY AND WEEK:**  Forty (40) hours, consisting of five (5) days of eight (8) hours each in a calendar week, Sunday through Saturday, shall constitute a week's work as provided in this entire section.  In stores operating seven (7) days per week, all current employees, as of January 7, 2005, who receive two (2) successive days off will continue to receive two (2) successive days off.  Employees promoted after January 7, 2005, to a full-time Senior Clerk or above will also receive two (2) successive days off.  Two (2) successive days off within each calendar week shall not apply to members working in stores located in Butte, Colusa, Glenn, Lake, Lassen, Mendocino, Plumas, Sierra, Sonoma, Sutter, Yuba, Modoc, Shasta, Siskiyou, Tehama, Trinity, Western Nevada (West of Donner Summit), and San Joaquin Counties. In stores operating not more than six (6) days per week, all employees shall receive two (2) days off within each calendar week, and the Employer agrees to make every effort to give the employees successive days off, but reserves the right to designate one (1) other day off for each employee in addition to the day when the store is closed. A day's work shall consist of eight (8) hours within nine (9) consecutive hours with one (1) full uninterrupted hour off for a meal. A one-half (½) hour lunch period for a crew, a shift of employees, or an individual employee may be implemented by mutual agreement of the Employer and the employee(s). No employee shall be required or permitted to work a split shift.

A workweek consisting of four (4), ten (10) hour days may be implemented by mutual agreement of the parties.

**HOLIDAY WORKWEEK:**  Thirty-two (32) hours, consisting of four (4), eight (8) hour days, exclusive of the holiday, shall constitute a week's work in any week in which the holiday falls. Any employee working thirty-two (32) straight-time hours in a holiday week, not including holiday work, shall receive not less than forty (40) hours' pay.  At least two (2) of a full-time employee's days off shall be successive in stores operating six (6) or more days in a holiday week, unless an employee has Saturday and Sunday off prior to the holiday or Saturday and Sunday off following the holiday.  Holiday pay for part-time employees shall in all instances be prorated in accordance with Section 10 Holidays, Subsection 10.5 of this Agreement.

Work shall not be performed without pay prior to the beginning of the scheduled working day. Work may be performed at the end of the working day in completing service to a customer which commenced prior to the end of the working day. It is understood that the checking of produce or shelf prices shall be considered as time worked.

---

6.2    **OVERTIME AND PREMIUM WAGE RATES:** The overtime and premium wage rates of pay shall be as follows:

### 6.2.1  ONE AND ONE-THIRD (1⅓) TIMES THE STRAIGHT-TIME HOURLY RATE:

**(1)**    Work on Sunday, except in excess of eight (8) hours and except for retail employees in the California counties of Sacramento, Yolo, Placer, El Dorado, Amador, Calaveras, Tuolumne, Stanislaus, Eastern Nevada, (east of Donner Summit) and in Southwestern Washoe County, Nevada (Tahoe Basin), and in Northwestern Douglas County, Nevada (Tahoe Basin) where the Sunday premium shall be paid for at the rate of one and one-third (1⅓) times the straight-time hourly rate less thirty-eight cents (38¢) per hour.  Courtesy Clerk employees hired after January 7, 2005, will not be eligible for Sunday pay.

### 6.2.2  ONE AND ONE-HALF (1½) TIMES THE STRAIGHT-TIME HOURLY RATE:

**(1)**    Work in excess of eight (8) hours per day.

**(2)**    Work in excess of forty (40) hours per week.

**(3)**    Work on the sixth (6th) day worked in a calendar week.

**(4)**    Work on the fifth (5th) and sixth (6th) day worked in a week containing one (1) of the holidays named in this Agreement, not including the holiday worked.

**(5)**    Work after the fifth (5th) consecutive day worked without reference to the calendar week by a normal five (5) day employee until consecutive days are broken by a day off, except when the schedule of an employee who has had or who is to have two (2) consecutive days off is changed in accordance with this Agreement.

**(6)**    Work after the sixth (6th) consecutive day worked without reference to the calendar week by a normal six (6) day employee until consecutive days are broken by a day off, except when the schedule is changed in accordance with this Agreement.

**(7)**    Work by a full-time employee called in to work on a scheduled day off and given shorter notice than required by this Agreement shall receive a minimum of eight (8) hours' pay on that day; but if such an employee works six (6) days during that calendar week, work on the scheduled day off shall be paid for at the employee's straight-time rate for that day and that on the sixth (6th) day worked shall be paid for at the overtime rate.

**(8)**    Work within ten (10) hours from the time the last shift ended.

**(9)**    Work where a meal period is not afforded in conformity with Section 7 Work Schedules and Premium Rates, Subsection 7.5 hereof.

### 6.2.3  TWO (2) TIMES THE STRAIGHT-TIME HOURLY RATE:

**(1)**    Work in excess of eight (8) hours on the sixth (6th) day worked in a calendar week.

**(2)**    Work on Sunday which is a day in excess of five (5) consecutive days by a scheduled five (5) day employee, except when the schedule of said employee who has had or is to have two (2) consecutive days off is changed in accordance with this Agreement.

(3)     Work the seventh (7th) day in a calendar week.

(4)     Work on a holiday named in this Agreement (in addition to holiday pay) regardless of which day of the week the holiday falls, except for employees hired after January 7, 2005. Employees hired after January 7, 2005, will receive a premium of one dollar ($1.00) per hour (in addition to holiday pay) for work performed on a holiday in this Agreement.

(5)     Work after five (5) hours on a Sunday until a meal period is taken.

(6)     Work on a Sunday until ten (10) hours between shifts has elapsed.

### 6.2.4   TWO AND ONE-QUARTER (2¼) TIMES THE STRAIGHT-TIME HOURLY RATE:

(1)     Work in excess of eight (8) hours on a Sunday.

### 6.2.5   TWO AND ONE-HALF (2½) TIMES THE STRAIGHT-TIME HOURLY RATE:

(1)     Work by an employee on Sunday when Sunday was a scheduled day off and the employee was given shorter notice than required by this Agreement shall receive a minimum of eight (8) hours pay for that day; but if such employee works six (6) days during that calendar week, work on that Sunday shall be paid at the rate of one and one-half (1½) times the straight-time hourly rate and that on the sixth (6th) day worked shall be paid at the applicable overtime rate.

(2)     Work on Sunday which is in excess of six (6) consecutive days by a six (6) day employee.

(3)     Work after five (5) hours until a meal period is taken on a holiday, except for employees hired after January 7, 2005. Employees hired after January 7, 2005, will receive a premium of one dollar ($1.00) per hour (in addition to holiday pay) for work performed on a holiday in this Agreement.

(4)     Work on a holiday until ten (10) hours between shifts has elapsed.

### 6.2.6   THREE (3) TIMES THE STRAIGHT-TIME HOURLY RATE:

(1)     Work in excess of eight (8) hours on a holiday named in this Agreement.

**6.3     CONSECUTIVE DAYS:** It is understood that consecutive days worked are interrupted by a holiday or a scheduled day off and shall be considered to be interrupted when an employee is required to work on a holiday, or when, by reason of a bona fide emergency, an employee is required to work on his scheduled day off for which he has received the required premium pay for such work.

**6.4     SCHEDULED WORK:** Whenever an employee's schedule is not changed in accordance with the provisions of this Agreement and he is worked outside such schedule, then the hours so worked shall be paid for in accordance with the overtime provisions of this Agreement.

**6.5     NO COMPOUNDING OR PYRAMIDING:** There shall be no pyramiding of overtime and/or premiums and only the highest applicable rate shall apply.

## SECTION 7  WORK SCHEDULES AND PREMIUM RATES

**7.1   POSTING OF WORK SCHEDULE:** The Employer agrees to keep posted, in each store, a weekly schedule, in ink, of the working hours for all employees. Such schedule shall show the full name of each employee, the classification, starting time, mealtime, quitting time, and days off. It is further agreed that any change in this schedule must be made and the employee so notified no later than noon on Thursday of the week preceding the week in which the change is to become effective (emergency excepted). Such schedule shall be posted by noon on Thursday of the week preceding the week in which such schedule is to be effective on the bulletin board or at a place where all employees and representatives of the Union may observe same. If assignment of employees to schedules is inconsistent with the terms of Section 4 Seniority, Subsection 4.5 hereof, employees will have until 3 p.m. on Thursday [or three (3) hours after the schedule is posted] to bring such inconsistency to the Store Manager's attention and seek assignment in accordance with Section 4 Seniority, Subsection 4.5 hereof. When a senior employee obtains such a different schedule, then the displaced junior employee shall be assigned the senior employee's previously assigned schedule for the following week.

If the schedule is not posted timely as stated above, such shall be deemed as a contract violation and subject to the grievance procedure. Due to circumstances beyond the control of the person responsible for posting it, the untimely posting shall not be the basis for any monetary claims.

Time worked by employees on the last shift during the period the store is open for business, for the purpose of serving customers in the store at the closing hour or performing other miscellaneous duties necessary in connection with the closing of the store, shall be properly scheduled in their straight-time shift.

**7.2   SHIFT INTERVAL:** Except in bona fide emergencies, the minimum time off between shifts shall be ten (10) hours and employees called to work sooner than ten (10) hours from the end of their last work period shall be paid one and one-half (1½) times the employee's straight-time hourly rate for all work performed up to the time said ten (10) hour period between shifts shall have elapsed.

**7.3   SCHEDULED TO WORK A HOLIDAY:** Any employee normally scheduled to work five (5) days who is temporarily rescheduled to work on a holiday shall be permitted to work his normal number of working days that week.

**7.4   HOLIDAY EVE:** No employee shall be permitted or required to work after 7 p.m. on Christmas Eve except those employees necessary to service the customers in the store at 7 p.m. and to properly close and secure the store. This shall not apply to employees in the Liquor Department where the Liquor Department may be isolated from the Grocery Department. The holiday premium of two (2) times the employee's straight-time hourly rate of pay shall not apply to any hours worked prior to 12:01 a.m. on the holiday.

On New Year's Eve, the store shall be staffed with volunteers between 7 p.m. and midnight. If insufficient employees volunteer, assignment shall be by inverse seniority.

**7.5   MEAL PERIOD:** Each employee shall be released from work for his meal period within five (5) hours, but no sooner than three (3) hours of the time of his reporting for work. Any employee who is given a meal period prior to three (3) hours into his shift or works in excess of five (5) hours without a meal period shall receive one and one-half (1½) times the employee's straight-time hourly rate for hours worked between the meal period and the completion of the third (3rd) hour or one and one-half (1½) times the employee's straight-time hourly rate for hours worked in excess of five (5) hours until a meal period is given.

During one (1) lunch hour in any workday in a market employing one (1) or more Meat Cutters in work covered in accordance with Subsection 1.3 of this Agreement, Monday through Saturday, there must be a Meat Cutter covered by this Agreement in attendance at all times during which fresh meat is being sold. In such markets where the Meat Cutter is alone, the Employer may also close the market (fresh meat section), use a relief employee, operate for one (1) unattended lunch hour in a day, or require the Meat Cutter to work through the lunch hour, in which event the Meat Cutter shall be paid at the applicable overtime rate for the lunch hour and shall be permitted to eat his lunch on the job.

In the event a Meat Cutter shall work his lunch hour as hereinabove provided and completes the workday, he shall be paid his regular straight-time hourly rate of pay for the ninth (9th) hour.

On Sundays and holidays in self-service markets where only one (1) employee is performing work covered by this Agreement, he shall be provided with a full, uninterrupted hour off for lunch and the Meat Department may remain open; provided that no individual, except the Owner-Employer, not otherwise employed in work covered by this Agreement, shall be permitted to perform work covered by this Agreement during such unattended lunch hour. On Sundays and holidays in a conventional or self-service market, a Meat Cutter may eat on the job and shall receive pay in accordance with the provisions above.

In accordance with state law, the Employer may schedule up to a six (6) hour shift without a lunch period.  Any scheduled or extended shift that is more than five (5) hours up to and including a six (6) hour shift shall not be subject to the overtime rate and shall include two (2) unscheduled ten (10) minute breaks.

**7.6   BREAK:**  No employee shall be denied the right to necessary or required relief. All employees shall be allowed an unscheduled ten (10) minute break in the first (1st) half (½) of their shift prior to the meal period and an unscheduled ten (10) minute break in the last half (½) of their scheduled shift prior to quitting time.

**7.7   DAILY GUARANTEE:**  All employees who work forty (40) or more hours in a calendar week, when ordered to and do report for work and remain available for work, shall receive a full day's pay based on the established rate of pay for that day.

All employees who work less than forty (40) hours in a calendar week, when ordered to and do report for work and remain available for work, shall receive at least four (4) hours' pay based on the established rate of pay for that day.  Where school law conflicts with the four (4) hour daily guarantee on a school day, such employee shall be scheduled for not less than three (3) hours on such days.  It is further agreed that students shall not replace non-student employees. All part-time employees shall be covered by all other provisions of this Agreement.

**7.8   NIGHT PREMIUM:**  Night premiums for all classifications are as set forth in Appendix A Wage Rates, which is incorporated herein as if set forth in full.

**7.9   PREMIUM DAY:**  Employees working any hours on a Sunday or a holiday shall be paid the premium pay as provided for in this Agreement for the hours worked between 12:01 a.m. and midnight on that day.

**7.10 . SEPARATE EMPLOYERS:**  Any employee who works for another Employer in the retail food or liquor industry on his day or days off shall be paid therefor at straight-time, overtime, or premium rates calculated as though he had worked that week for a single Employer. It is understood that if the employee is properly shown on the schedule, the overtime rates shall not be in effect until after the Union notifies the Employer that the employee in question is an employee of another Employer in the industry.

**7.11  EMPLOYEES ON LAST SHIFT:**  Employees on duty at the recognized hour of closing may be required to wait on all customers and perform other duties necessary to closing. Such employees shall be scheduled so that their shifts end at least fifteen (15) minutes after the recognized hour of closing.

## SECTION 8.  WAGES

**8.1**    Appendix A Wage Rates, which sets forth the job classifications, minimum rates of pay, and other terms, is incorporated herein as if set forth in full. In the event the Federal Wage and Hour Law is applied to retailing so as to increase the Employer's obligations hereunder, the parties shall reopen and revise this Agreement so as to preserve the intended workweek and rates of pay pertaining thereto.

**8.2**    The Employer shall provide wage updates to the Union from payroll quarterly.

**8.3**    Non-contractual discretionary bonuses may be modified or discontinued at the Employer's discretion with prior notice to the Union. This exception does not apply to overscale wage rates.

## SECTION 9.   CLASSIFICATION OF EMPLOYEES

**9.1** .  For the purpose of this Agreement, the classification of employees is hereby defined as follows:

**9.1.1  MANAGING CLERK:**  Every store shall have a Managing Clerk unless the Employer or a Supervisor within the meaning of the National Labor Relations Act, as amended, is actively engaged on the premises performing the work of the Managing Clerk. A Managing Clerk is an employee who has charge of and general supervision over not more than one (1) store.

In the event the Employer or Supervisor is absent from the store for one (1) or more eight (8) hour days in a week, a Clerk shall receive the wage scale of a Managing Clerk for said work.

**9.1.2  SENIOR HEAD CLERK, SENIOR PRODUCE CLERK, HEAD MEAT CUTTER, AND HEAD CLERK:**  These are non-supervisory employees who, in addition to their duties of Clerk or Meat Cutter in the course and scope of their employment, perform one (1) or more of the following duties:

**9.1.2.1  SENIOR HEAD CLERK:**  This classification shall apply only to the Senior Head Clerk who acts as Assistant to the Managing Clerk or Owner and is commonly known as the "second man" in the store.

**9.1.2.2  SENIOR PRODUCE CLERK:**   This classification shall apply to an employee who goes to the wholesale produce market to buy produce or who is in charge of the Produce Section or Department. This classification shall apply in all cases where an employee was classified as a Head Clerk in the Employer's Produce Departments or Sections under the 1964-67 contract, but shall not be applicable to Produce Managers or Buyers employed under said contract who shall not be reclassified and who shall receive the same wage increases over their present rates of pay as all other employees.

**9.1.2.3  HEAD MEAT CUTTER:**  A Head Meat Cutter orders, buys, schedules, and overall supervises all operations of the fresh, frozen meat, fish, and packaged meat-deli sections within the entire Meat Department.  A Head Meat Cutter is in charge of all education and training of Apprentice Meat Cutters and Meat Clerks.

Stores shall ha.. .one (1) Head Meat Cutter on duty e..h day whenever fresh meat is available for sale. Only a Journeyman Meat Cutter may perform the duties of a Head Meat Cutter.

### 9.1.2.4  HEAD CLERK:

(1)  Acts as produce buyer at the store or assists management in the operation of a Produce Section or Department, provided that, where there is an employee in the department classified as a Senior Produce Clerk, this provision shall not require the classification of any other employee in the department as a Head Clerk.

(2)  Is engaged the major part of his time in the Receiving Department of the Employer's establishment and is in charge of and responsible for the receiving of merchandise.

In the interpretation of the preceding paragraph, it is agreed that any Clerk who is engaged for four (4) hours or more per day in the Employer's Receiving Department and is in charge of and responsible for the receiving of merchandise shall be classified and paid as a Head Clerk.

(3)  Conducts the operation of the store in the temporary absence of the Supervisory Store Manager, Managing Clerk, Senior Head Clerk, or Owner or is responsible for the opening or closing of a store.

(4)  Has the authority and responsibility of buying or selecting merchandise for a department, section, or area or directs other employees in the performance of their duties in such department, section, or area.

(5)  It is understood that the Employer may so arrange the employees' duties and work shifts in order that the number of Head Clerks may be minimized and, further, that the mere occasional or incidental performance of any of the Head Clerk's duties shall not be construed as a basis for classifying any employee as Head Clerk.

It is agreed, however, that in the absence of the Supervisory Store Manager, Managing Clerk, Senior Head Clerk, or Owner, there shall be at least one (1) Head Clerk on the job at all times.

(6)  When a Clerk, who is not normally classified and paid as a Head Clerk on a weekly basis, performs the duties of a Head Clerk on a day in which either the regular Head Clerk, Senior Head Clerk, Supervisory Manager, Managing Clerk, or Owner is absent, he shall receive the Head Clerk's rate of pay for the day.

### 9.1.3  SENIOR CLERK:
All previously classified Journeyman or Apprentice Clerks will be reclassified as Senior Clerks.

**PREVIOUS EXPERIENCE:** If a Journeyman employee or experienced Senior Clerk has been out of the industry up to five (5) years, he will be allowed to start at least at the experienced Clerk rate of pay.

If a Journeyman Meat Cutter is hired, he or she will be hired at the Journeyman rate of pay.

If an experienced GM/Non-Food Clerk or experienced Clerk has been out of the industry up to five (5) years, he will be allowed to start at the experienced Clerk rate of pay.

**NEW EMPLOYEES:** It is agreed that for new employees who do not qualify for either of the paragraphs above that the employee and the Employer shall determine the appropriate starting rate of pay. In no case will the employee be required to work the hours for the previous steps.

An employee who fails to accurately list, on an employment application, his approximate number of prior hours of experience in the retail food industry and, as a result, is improperly classified by the Employer, shall not be entitled to a retroactive wage adjustment if it is subsequently determined that a classification adjustment is warranted.

Notwithstanding the above, no such retroactive wage claim shall exceed ninety-one (91) days.

**9.1.4   SENIOR CLERK:** Senior Clerks (consisting of current Journeyman Clerks and Bakery/Deli Managers making Journeyman wages) will comprise at least thirty-five percent (35%) of the entire Senior Clerk/Clerk classifications. Forty percent (40%) of the Senior Clerk classification will be full-time.

**9.1.5   CLERK:** A new Clerk classification will be created. All Non-Food/GM Clerks will be reclassified as Clerks. Clerks will be allowed to perform all duties of a Senior Clerk.

The implementation of the Clerk classification shall not cause the replacement of any employee on the payroll as of January 7, 2005.

The following ratio of full-time will apply to the Clerk classification:

Clerks' full-time ratio will be thirty percent (30%).

**9.1.6   COURTESY CLERK:** A Courtesy Clerk is an employee who may not perform the following:

**9.1.6.1   DUTIES:** Courtesy Clerks may not stock, prepare, or price merchandise (except carry-backs), operate cash registers, perform normal janitorial work, perform office work, face shelves, or break down loads. This is not intended to significantly change the duties performed by Courtesy Clerks. Courtesy Clerks are allowed to work one (1) hour before the opening of the store and one (1) hour after the closing of the store.

**9.1.6.2   DAILY GUARANTEE:** Courtesy Clerks shall be subject to all the provisions of this Agreement except that, instead of the minimum work guarantee set forth in this Agreement, when scheduled or called in to work, they shall be provided with at least two (2) hours' work on weekdays and four (4) hours' work on Saturday, Sunday, or on holidays as set forth in this Agreement.

**9.1.6.3   WEEKLY GUARANTEE:** Each Courtesy Clerk shall be offered at least sixteen (16) hours' work in each week. In the event said Courtesy Clerk cannot be scheduled to work or cannot work sixteen (16) hours in the week, he shall not work at all during that particular week.

**9.1.6.4   NO REDUCTION:** The employment or continuation of employment of a Courtesy Clerk shall not cause the replacement of an existing regular full-time or part-time Senior Clerk, nor shall it cause a reduction in the number of hours of work of such Clerks.

**9.1.6.5  BADGES:** Courtesy Clerks shall wear badges on their person designating them as a Courtesy Clerk at all times during working hours, and their failure to wear such badge while working shall be considered a violation of these provisions. The Union will submit to the Employer and employee involved a written warning; and, in the event of a second (2nd) violation with the same Employer by the same employee, the Employer agrees to suspend said employee for six (6) calendar months following written notice from the Union to the employee and Employer involved. If the Employer does not furnish the badges, the Union may furnish them.

**9.1.6.6  PENALTY FOR VIOLATION:** The Employer agrees that Courtesy Clerks shall not perform duties other than those listed in this Collective Bargaining Agreement. In the event of a violation of this section, the Union shall notify the Employer, in writing, of such violation and it shall be corrected.

In the event any of the same persons are involved in a second (2nd) violation within one (1) year from the first (1st) infraction, the person performing the work, unless directed to do so by a person in charge, shall be suspended for one (1) week and the person who directed that the work be performed shall also be suspended for one (1) week or the sum of five hundred dollars ($500) shall be paid into the UFCW Northern California Employers Pension Trust Fund.

In the event of a third (3rd) violation within one (1) year from the first (1st) infraction by any of the same persons, the person performing the work, unless directed to do so by a person in charge, and the person directing that the work be performed will be suspended for one (1) month or the sum of one thousand five hundred dollars ($1500) will be paid into the UFCW Northern California Employers Pension Trust Fund.

**9.1.7  MEAT CUTTER:**

**9.1.7.1  REGULAR FULL-TIME EMPLOYEE:** An employee who has completed the sixty (60) day probationary period and is hired to work at least forty (40) straight-time hours per week in five (5), eight (8) hour days.

**9.1.7.2**  Journeymen replacing Head Meat Cutters on their days off shall receive Head Meat Cutter's rate of pay.  Only Journeymen shall operate a market as a Head Meat Cutter.

**9.1.8  APPRENTICE MEAT CUTTER:**

**9.1.8.1**  One (1) Apprentice shall be allowed to every four (4) Journeymen or fraction over four (4).  Markets employing less than four (4) Journeymen shall be entitled to one (1) Apprentice.  A Journeyman Meat Cutter shall continue to be defined as an Apprentice who has completed four thousand one hundred sixty hours (4160) hours with the understanding that this definition will have no application to the New Hire/Promoted wage progression.

**9.1.8.2**  An Apprentice can work without Journeyman supervision for no more than three (3) hours during his first (1st) six (6) months' apprenticeship period or for more than four (4) hours during his second (2nd) six (6) months' apprenticeship period, exclusive of meal periods.

An Employer may establish its own apprenticeship program which can be implemented by mutual agreement of the Company and the Union.

**9.1.8.3**  On-the-job training of Apprentices shall be in accordance with the California Apprenticeship Law (Shelly-Maloney Act) as set forth in the California Labor Code. Both the Union and the Employer will assist in developing sound and uniform retail industry-wide apprenticeship training programs.

**9.1.8.4**  Tests to judge the competency of an Apprentice shall be set up by the industry Joint Labor-Management Apprenticeship Committee and, by majority vote, its decision shall be final. Said tests shall be conducted jointly by one (1) representative of the industry and one (1) representative of the Union.

**9.1.8.5**  A Joint Advisory Committee consisting of a representative of the State of California, Division of Apprenticeship Standards, and an equal number of representatives appointed by the Food Employers Council, Inc., representing the Employers and an equal number of representatives appointed by each Local Union as follows: 5, 8-Golden State, and 101 to represent all segments of the retail meat industry in Northern California, shall be charged with the responsibility of preparing a uniform Northern California-wide program prior to February 1, 1974, to develop procedures, guidelines, and standards to train Apprentices in compliance with the California Apprenticeship Law (Shelly-Maloney Act), Title VII of the Civil Rights Act, and any other applicable federal statutes.

The procedures, guidelines, and standards as developed by the Joint Advisory Committee shall be used by Joint Apprenticeship Committees to train Apprentice Meat Cutters working under contracts with UFCW 8-Golden State. If the Joint Advisory Committee is unable to reach mutual agreement, matters in dispute shall be referred to the Regional Director, Region 9, Apprenticeship and Training Division, United States Department of Labor, for settlement.

## 9.1.9   MEAT CLERK:

**9.1.9.1**  Meat Clerks may wrap, weigh, price, and stock fresh, chilled, or frozen meat; fresh, chilled, or frozen poultry; fresh, chilled, or frozen fish as well as cold and smoked meats and, in addition thereto, may display and dispense frozen meat; fresh, chilled, or frozen poultry; fresh, chilled, or frozen rabbits; fresh, chilled, or frozen fish, as well as cold and smoked meat, provide relief in the Fish Department, and may also act as Demonstrator.

**9.1.9.2**  Meat Clerks may take bell calls (contact the customer, serve the customer, relay the orders to the Meat Cutter, wrap the merchandise, and give it to the customer), and may also keep the meat cases tidy, clean the glass, empty cases, and empty trays.

In addition, the Meat Clerk may keep the counter neat and clean, fill the counter, replace trays of meat including boating, wait on the trade, collect money, give change, cut a steak or roast which has already been processed by a Meat Cutter to size in order to serve a customer, modify any prepared cut to suit a customer, and use slicing machine, cube steak machine, and grinder to serve the customers.

Any employees that are currently performing these described duties at whatever rate of pay they are currently receiving will not be reduced by virtue of this expansion of duties.

**9.1.9.3** Meat Clerks desirous of entering the Meat Cutter Apprenticeship Program shall make their desires known to the Company, in writing, and such employees shall receive consideration for such training and, if selected, attend the Apprenticeship Training Program. Said Meat Clerks entering the Apprenticeship Training Program shall be given a thirty (30) day trial period. To the extent permitted by law, and in compliance with the terms of this Agreement, it is the intent of the parties to see that all minorities are given an opportunity to move into all classifications of work covered by this Agreement. Consistent with this objective, qualified Meat Clerks will be given preference by seniority over other applicants for such work.

A Meat Clerk covered under this Agreement who enters the Apprenticeship Training Program or is promoted to the Meat Cutter classification will move to the closest step progression that represents an increase from their current rate of pay and the employee will not be required to make up the hours of the previous steps. Said Apprentice will then progress through the Apprentice steps to Journeyman. After completing the thirty (30) day trial period, all acquired Company seniority shall be applied to the employee's new classification.

**9.1.9.4** Meat Clerks may perform Clerk's work. Clerks may also perform Meat Clerk work. No Meat Clerk on the payroll as of the merging of the Agreements shall be laid off or have hours reduced as a direct result of the merging of the classifications. Meat Clerks or Clerks who work a majority of their hours in the Meat Department will not be counted towards the Senior Clerk/Clerk ratio.

**9.1.9.5** New employees hired after November 17, 2007, to do "Meat Clerk" work will be hired into the Clerk classification.

**9.2   TWO CLASSIFICATIONS:** Unless otherwise provided herein, the Employer may require any employee to do work within the duties of any classification, in which event such employee shall be classified and paid for the entire shift under that classification which pays the highest wage; except that, where any employee of a higher classification is relieved for a meal period or the mere occasional or incidental performance of the duties of a higher classification, it shall not be construed as entitling the employee to the pay of the higher classification.

**9.3   STEP-UP RULES:** The following rules are applicable at stores where Managing Clerks, Senior Head Clerks, Senior Produce Clerks, and Head Clerks are employed.

**9.3.1   MANAGING CLERK, SENIOR HEAD CLERK, AND HEAD CLERK:**

**9.3.1.1** When the Managing Clerk is absent for one (1) shift [eight (8) within nine (9) hours] or more and the store is open beyond the hours during which the Senior Head Clerk (acting as Managing Clerk) is present, another regular employee on duty during such hours shall be paid at the Senior Head Clerk's rate for his entire shift except that, where there is a regularly employed Head Clerk [forty (40) hours per week] in the store during such hours, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.2** On the Senior Head Clerk's day or days off, another regular employee on duty during said days shall receive the Senior Head Clerk's rate for each such shift worked except that, where there is a regularly employed Head Clerk [forty (40) hours per week] on duty in the store during said days, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.3** On any day when the store is open beyond the regular shifts [eight (8) within nine (9) hours] of both the Managing Clerk and the Senior Head Clerk, another regular employee on duty during such hours shall receive the Senior Head Clerk's rate for his entire shift; except that, where there is a regularly employed Head Clerk [forty (40) hours per week] in the store during such hours, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.4** When the Senior Head Clerk is absent for any period because of illness, vacation, or other reasons, another regular employee or a Head Clerk, as the case may be, shall be paid at the Senior Head Clerk's rate for all such time worked during the said absence of the Senior Head Clerk.

### 9.3.2 SENIOR PRODUCE CLERK:

**9.3.2.1** On the Senior Produce Clerk's day or days off, another regular employee shall be paid at the Senior Produce Clerk's rate for all hours worked in the absence of the Senior Produce Clerk; except that, if the Senior Produce Clerk has Sunday as a day off, no other employee on duty on Sunday need be paid at the Senior Produce Clerk's rate unless he performs the Senior Produce Clerk's duties on said day.

**9.3.2.2** When the Senior Produce Clerk is absent for any period because of illness, vacation, or other reasons, another regular employee shall be paid at the Senior Produce Clerk's rate for all such time worked during the said absence of the Senior Produce Clerk.

**9.3.2.3** It is understood by the parties that "small stores" should be exempt from the application of these rules. It should be noted that we have been unsuccessful in an effort to define a "small store." However, through agreement with various Local Unions or otherwise, certain Employers in this category have not been following the step-up rules; and they shall continue to be exempt. Certain other Employers in this category have been following step-up rules, and they shall continue to adhere to the rules. In the event the Union protests failure to adhere to these rules by Companies who have not been following them, there should be a joint committee established to determine whether or not the Employer falls in the "small store" category. Likewise, for any Employer who has been following the rules, the Employer may protest the application of those rules to its operation and this same joint committee shall endeavor to determine whether the Employer's operation falls in the "small store" category. In the event a Company who has not been following the rules is determined to be ineligible for the "small store" exemption, application of the rules shall be prospective only.

### 9.3.3 MEAT CUTTER (STEP-UP):

**9.3.3.1** A Step-Up Meat Cutter will normally perform Meat Clerk work and be compensated at the Meat Clerk rate. A Step-Up Meat Cutter will be allowed to step up (for an entire shift) to the Meat Cutter classification because of illness, days off, vacation, or leaves of absence. All time served working as a Meat Cutter will be credited at the time of promotion to a Meat Cutter. A Step-Up Meat Cutter will be compensated at the appropriate Meat Cutter rate.

No current or future Meat Cutter will be laid off or reduced in hours because of the use of Step-Up Meat Cutters. The use of Step-Up Meat Cutters is not intended to avoid scheduling Meat Cutters on premium days.

Promotion to Step-Up Meat Cutter will be according to the Promotion section of this Agreement.

**9.4   DEMONSTRATORS:** All work connected with or incidental to the demonstration of merchandise offered for sale in the Employer's retail store (except merchandise referred to in Section 1 Recognition and Contract Coverage, Subsection 1.2 hereof as being excluded from this Agreement) shall be covered by this Agreement; and all such work shall be performed only by members of the appropriate unit as defined in Section 1 Recognition and Contract Coverage, Subsection 1.1 hereof. It is understood that the handling of coupons is not Demonstrator's work. No Demonstrator may perform such work in the Employer's retail store unless said Demonstrator is on the payroll of the Employer and, unless the Employer, at all times, holds and exercises full control of the terms and conditions of employment of any such Demonstrators while such work is being performed in the Employer's retail store. Demonstrators shall be covered by all the terms of this Agreement, except Health and Welfare and Pension.

The hourly rate of pay for Demonstrators shall be as follows:

Currently, twelve dollars and seventy-five cents ($12.75).

**9.5   TRAVEL ALLOWANCE:** An employee who is hired to work on a full-time basis in one (1) store, who is temporarily assigned to relief work in another store, shall be entitled to reimbursement for the following travel expenses:

(1)   Mileage for the extra travel resulting from such assignment, or established bus or taxi fare if so designated by the Employer, according to the amount provided for under the Internal Revenue Service regulations. Increase in the amount provided for under Internal Revenue Service regulations shall be effective the date such increase is to be effective under the Internal Revenue Service regulations or the week following notification to the Employer by the Union, whichever is later; and

(2)   Reasonable allowance for board and lodging, not to exceed sixty dollars ($60.00) per day, when required to stay away from home overnight however, if authorized in advance or if the reservation is made by the Employer, the entire cost for board and lodging shall be paid by the Employer; and

(3)   Necessary out-of-pocket expenses such as bridge tolls and parking fees.

The above provisions shall not apply to an employee who is hired for or regularly assigned to relief work or to work in different stores on different days of the week in order to achieve additional available hours.

**9.6   TRANSPORTATION:** Any employee who is required by the Employer to perform his regular duties in more than one (1) store in any day shall be reimbursed for necessary out-of-pocket and mileage expenses as provided for above. No such transfer shall be made in a manner to interfere with the lunch hour of the employee so transferred, and all time consumed in travel from one (1) store to another shall constitute a part of the regular day's work of the employee.

**9.7   TRANSFER OR REMOVAL OF WORK:** No work now being performed by employees in the unit covered by this Collective Bargaining Agreement shall be transferred or removed from the unit without consultation and negotiation with the Union and unless the transfer or removal of such work is required for the purpose of promoting improved operating techniques, technological changes, automation, or other factors connected with more efficient operations, as distinguished from reasons connected with securing the performance of such work at lower rates of pay or under less favorable employment conditions.

**9.7.1**   Where, as a result of such consultation and negotiation, it is determined that the transfer or removal of any work is justified upon the considerations set forth above, the parties shall seek to determine the extent of the work transferred or removed and the number of jobs or hours of work to be lost by the Union members affected. Based upon such findings, the following remedies shall be applied:

**9.7.1.1**   Any employee losing hours of employment by reason of such transfer or removal of work shall either be compensated at his regular rate of pay for such hours or he shall be given other comparable employment by the Employer in the area covered by this Agreement at compensation equal to that received by him prior to the work transfer. If the comparable employment is within the bargaining unit, then he shall retain his seniority and other benefits under this Agreement.

**9.7.1.2**   The Employer shall attempt to provide any employee losing his job as a result of any such transfer or removal of work with other comparable employment in the area covered by this Agreement without loss of pay, status, seniority, or other benefits. Any employee not receiving such other employment shall receive one (1) week's severance pay for each year of service with the Employer; provided that, if an employee receives such comparable employment outside the bargaining unit and does not remain in such employment for at least thirty (30) days, he shall receive the full severance pay provided for herein.

**9.7.2**   Any employees who lose work or employment as a result of the failure of the Employer to observe the requirement provided for herein for consultation and negotiation concerning transfer or removal of work shall be entitled to full pay at their regular rate of pay for all such loss of work or employment.

**9.8**   Notwithstanding the above, it is agreed that should the Employer intend to institute electronic checkout systems which would have direct, material impact on employment covered by this Agreement, the Employer shall give the Union at least sixty (60) days' written, advance notice by certified or registered mail setting forth the nature of such intended changes and/or methods of operation.

**9.8.1**   Upon written request by the Union, negotiations shall commence with respect to the following subjects: rates of pay for new jobs which might be created; transfer to comparable work, within or outside the bargaining unit; or the disposition of displaced employees resulting from the institution of such new methods.

**9.8.2**   In the event the parties do not reach agreement within such period, then all unresolved issues as set forth above shall be submitted to final and binding arbitration. It is not the intent of the parties that such negotiations or arbitration will in any way jeopardize the efficiencies and increased productivity to be gained by the installation of such systems. The arbitrator shall be selected in accordance with the provisions of Section 18 Adjustment Board and Arbitration of Disputes hereof.

**9.8.3**   The parties further agree that the arbitrator's decision shall be final and binding, and that there will be no strike, work stoppages, lockout, or economic action of any sort or form employed by either party in connection with or arising out of any dispute concerning or related in any way to the operation of this section.

**9.8.4**   It is agreed and expected that the parties will exert every effort to accomplish the foregoing within the sixty (60) day allotted period, but failing to do so shall not prohibit or in any way impede the Employer from installing or effectuating any such new methods, systems, or equipment upon the expiration of the allotted sixty (60) day time period, unless such period is extended by mutual written agreement. The decision of the arbitrator or the parties shall be effective on or retroactive to the date such new methods are installed. The cost of the impartial arbitrator shall be borne equally by the parties.

**9.8.5   SELF-CHECKOUT:**   The Employer may have at its discretion a multi-unit self-checkout check stand per store.  If the Employer wants to introduce a second (2nd) multi-unit self-checkout check stand, the parties agree to negotiate over the effects of the introduction of a second (2nd) unit per store.

## SECTION 10.  HOLIDAYS

10.1   The following days shall be recognized as paid holidays:

New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas Day, Employee's Birthday, Employee's Anniversary Date of Employment, and a floating holiday. It is understood that the day of observance for Memorial Day shall be the date established by federal statute.

**10.1.1 NO WORK:**  No employee shall be permitted to work on Christmas Day except in resort areas.

**10.1.2 VIOLATION:**  In the event any Employer violates this provision by allowing anyone to work in the store on the holiday(s) set forth in Subsection 10.1.1 above, the Union will be allowed to place pickets at the store as soon as possible and to continue their activities for a maximum of three (3) days following each violation.

**10.1.3  WORK:**  In the event the employees shall be obligated to work on any of the above holidays, they shall be paid at the rate of two (2) times the straight-time hourly rate of pay, in addition to the normal holiday pay regardless of the day of the week upon which the holiday falls.

If the Employer elects to open on New Year's Day, Labor Day, or Thanksgiving Day, the store shall be staffed with volunteers. If more employees than are needed volunteer, assignment shall be by seniority. If an insufficient number of employees volunteer, assignment shall be by inverse seniority.

**10.1.4 EMPLOYEE'S BIRTHDAY:**  Employees shall receive pay for said holiday as if worked. Each employee shall give his Employer notice of his birthday at least two (2) weeks prior to the week in which the birthday occurs.

Such birthday holiday shall be enjoyed by the employee on the actual day of his birthday or on another day mutually agreeable to the employee and the Employer.

If an employee's birthday falls on a day which is otherwise considered as a holiday, he shall receive an additional day off for the birthday in addition to the holiday on which it falls.

**10.1.5 ANNIVERSARY DATE OF EMPLOYMENT AND FLOATING HOLIDAY:**  The anniversary date of employment holiday and the floating holiday shall be enjoyed by regular employees in accordance with the observance procedures governing the employee's birthday holiday. Upon entitlement, the floating holiday shall be taken by mutual agreement of the Employer and employee.

**10.1.6** All earned personal holidays not taken within a calendar year will be paid at termination or at the end of each calendar year, whichever occurs first.

**10.2  GOOD FRIDAY:** No employee will be refused time off between the hours of noon and 3 p.m. on Good Friday for the purpose of attending religious services. An employee taking such time off will receive straight-time pay for scheduled working time during this period and shall not be required or permitted to make up such time off.

**10.3   OTHER HOLIDAY OBSERVANCE:** Where the Employer closes its store to the public on any day of special religious significance or on any legal holiday other than those listed above, it is understood that the Employer shall reschedule its regular full-time employees to work their normal number of working hours that week.

**10.4   HOLIDAY WEEK:** Any employee who has reported for work on his scheduled working day immediately preceding and his scheduled working day immediately following a recognized holiday, except when permission to be absent has been granted by the Employer or when the absence is due to a bona fide illness of the employee, shall receive holiday pay at his regular rate of pay. It is understood that in order to qualify for holiday pay an employee must work at least one (1) workday during the week in which the holiday falls.

**10.5   PART-TIME EMPLOYEES:** Holiday pay for employees who work less than forty (40) hours shall be based on twenty percent (20%) of the employee's average hours worked per week in the six (6) weeks immediately preceding the holiday or the number of weeks worked if less than six (6); except that in computing pay for the New Year's holiday, the same period of time used in computing pay for the Christmas holiday shall be used.

**10.6   PROBATIONARY EMPLOYEES:** Probationary employees are not entitled to any paid holidays. Entitlement to the birthday holiday shall commence with the employee's first (1st) birthday following completion of twelve (12) months of employment with the Company. An employee hired after January 7, 2005, shall not be entitled to the floating and anniversary date of employment holiday until the completion of three (3) years of employment.

**10.7** Employees with at least twenty-five (25) years of service with the Employer will receive two (2) additional holidays each year. The first (1st) holiday will be earned on May 1 and the second (2nd) holiday will be earned on September 1 of each year.

**10.8   EXTRA WORKERS:** Extra Workers are not entitled to holiday pay; except when an Extra Worker works the four (4) days in the week of a holiday, he shall be paid for the holiday, but in such event, the day of the holiday shall be paid eight (8) hours at the regular scale and not the Extra scale.

## SECTION 11.   VACATIONS

**11.1** All employees who have been in the service of the Employer for one (1) year, twelve (12) consecutive months, shall be granted a minimum of two (2) weeks' vacation annually with pay, except employees hired after January 7, 2005, who will earn one (1) week of vacation after one (1) year, twelve (12) consecutive months, and two (2) weeks of vacation annually after three (3) years of employment. Such employees who have been in the service of the Employer for five (5) years or more shall receive three (3) weeks' vacation annually with pay. Such employees who have been in the service of the Employer for fifteen (15) years or more shall receive four (4) weeks' vacation annually with pay. Such employees who have been in the service of the Employer for twenty (20) years or more shall receive five (5) weeks' vacation annually with pay.

**11.2   CONTINUITY:** All loss from employment because of reasonable absence from work through sickness or other emergencies, or temporary layoff, not exceeding thirty (30) calendar days, shall be considered as time worked for the purpose of determining the length of employment.

**11.3   PAY AND SPECIAL PROVISIONS:** For the purpose of computing or prorating vacation earnings, four percent (4%) of the employee's earnings for the previous year equals two (2) weeks' vacation pay; six percent (6%) of the employee's earnings for the previous year equals

three (3) weeks' vacation pay; eight percent (8%) of the employee's earnings for the previous year equals four (4) weeks' vacation pay; and ten percent (10%) of the employee's earnings for the previous year equals five (5) weeks' vacation pay.

**NOTE:** Vacation pay shall be computed on the employee's W-2 form earnings for the prior calendar year from which it was earned; except for the first (1st) year of employment, it shall be computed on total earnings during the first (1st) anniversary year of employment; and when an employee terminates, it shall be computed on his earnings from the employee's anniversary date of employment to his termination date.

**11.4   VACATION PAY:** The parties agree that they will take the appropriate steps to wind down and terminate the Vacation Fund and that the Employer will continue to recognize and pay all industry-earned vacation benefits directly to employees as previously provided for in the Vacation Trust Fund after benefits from the Vacation Fund have been exhausted. All earned and unused vacation shall be paid out on the employee's anniversary date of employment following the year it is earned.

> **11.4.1** Employees hired after January 7, 2005, with over ten (10) years of industry time will receive three (3) weeks of vacation after twelve (12) months of employment with the Employer; four (4) weeks of vacation after five (5) years of employment with the Employer; and five (5) weeks of vacation after ten (10) years of employment with the Employer.

**11.5   NEW EMPLOYER:** Vacation seniority, defined as the length of an employee's service which determines the length of vacation to which he is entitled, shall not be affected by the sale or transfer of the store in which he works. Employees who continue in employment with a new Employer acquiring a store shall have their service prior to the time of acquisition credited by the new Employer.

The new Employer shall be obligated to make vacation payments after the acquisition in accordance with the employee's service with the new Employer.

The former Employer shall pay each of its employees earned vacation prorated to the time of the sale or transfer of the business.

However, if the selling or transferring Employer fails to comply, then the Employer who takes over or purchases the store shall assume the pro rata obligations.

**11.6   SCHEDULE:** The Employer agrees to post the available vacation dates for each classification by January 1st of each year. If an employee fails to exercise his vacation selection right by February 1st or has lost his prior selection by reason of less seniority, the employee may select from the remaining available periods. The selection of vacation periods must be completed by March 1st of each year. If an employee fails to select his vacation by March 1st, that employee's vacation period will be assigned by the Employer. The Employer shall reserve the right to designate the number of employees that may be on vacation at any time, but in no event less than one (1) employee in any one (1) week.

Whenever a holiday falls during a vacation period of an employee, such employee shall receive an additional day's vacation with full pay however, by mutual agreement between the Employer and the employee, the employee may be paid out the additional day without an extra day being taken off.

**11.7   SELECTION:** The selection of vacations shall be on a store basis by seniority except:

> (1)    The vacation of an employee shall not be changed if it was scheduled prior to his transfer from one (1) store to another.

(2)      If an employee does not have a scheduled vacation at the time of such transfer, the scheduling of his vacation shall be based solely upon his seniority status in the store to which he is transferred.

(3)      For the selection of vacations, the Head Meat Cutter and Meat Cutter classifications shall be considered as one (1) classification and will be based on geographical area.

**11.8  PERIOD:** Vacation periods shall be granted between January 1 and December 31 of each year or at other times if mutually agreeable to the Employer and employees affected, but, in all cases, at least ten (10) days' notice of the date of vacation shall be given each employee.

Notwithstanding the above, the Employer may block out five (5) weeks between the months of November 1 and March 1.  However, in the case of Meat Cutters, the Employer may block out five (5) weeks throughout the entire year with no more than one (1) week blocked out in any month.

After the completion of one (1) year of employment, if the employee is scheduled to take his time off prior to his anniversary date then, in that event, a pro rata payment based upon Company service shall be made at that time; and the additional amount will be paid at the time of his anniversary date.

**11.9  PRO RATA:** Any employee who is discharged, laid off, or who resigns after twelve (12) months or more of employment shall receive vacation wages prorated on the basis of the period worked at the time of said interruption or termination of employment.

**11.10 CONTINUOUS:** All vacations shall be taken in one (1) continuous period. All employees entitled to a vacation shall receive their vacation pay allowance in advance immediately preceding the employee's vacation. Employees, at their option, shall be entitled to an additional week's vacation without pay; in all such cases, however, the employee shall give the Employer at least ten (10) days' notice prior to leaving for the paid vacation.

**11.11 VARIATION:**  Notwithstanding the above provisions, employees entitled to three (3), four (4), or five (5) week vacations shall be allowed to take them in one (1) or two (2) periods such as: two (2) two (2) week periods; two (2) week and one (1) week periods; three (3) week and one (1) week periods; three (3) week and two (2) week periods; four (4) week and one (1) week periods; provided such vacation schedule shall be approved by the Employer, the employee involved, and the Union.

Employees who earn four (4) or five (5) weeks of vacation per year will, at their option, be able to convert one (1) week of vacation into five (5) individual days.

**11.12 EXTRA WORKERS:**  Extra Workers are not entitled to vacation accumulation or credit for any purpose.


## SECTION 12.  HEALTH AND WELFARE AND SICK LEAVE

**12.1  EMPLOYER ACCEPTANCE:**  The Employer agrees to accept and be bound fully by the terms of that certain Declaration of Trust dated August 26, 1963, providing for the UFCW Northern California Health and Welfare Trust Fund as the same may be applicable to the Welfare Plan therein provided for, and any amendments thereto. The Employer hereby acknowledges receipt of a copy of said Declaration of Trust.

The Trustees are directed to ( ...rge the UFCW Northern California H...lth and Welfare Trust Fund and the UFCW Bay Area Health and Welfare Trust Fund. The merged Fund shall be called the UFCW Benefits Trust Fund ("Fund"). The Employer and the Union agree that the merger shall occur by January 1, 2008, or as soon thereafter as is practicable in the exercise of due speed and diligence. As part of the merged Plan, the Employer and the Union agree to equalize benefits as described in Schedule 2.

**12.2 EMPLOYER CONTRIBUTIONS:**   The contribution rate is five dollars and fifty-two cents ($5.52 Nor Cal) for all classifications effective through hours worked in November 2007 and payable in December 2007. Effective with hours worked in December 2007 and payable in January 2008, the Employer agrees to contribute five dollars and twenty-five cents ($5.25) for all classifications through hours worked in November 2008 and payable in December 2008. Effective with hours worked in December 2008 and payable in January 2009, the Employer agrees to contribute five dollars and ninety cents ($5.90) for all classifications through hours worked in November 2009 and payable in December 2009. Effective with hours worked in December 2009 and payable in January 2010, the Employer agrees to contribute six dollars and fifteen cents ($6.15) for all classifications through hours worked in November 2010. Effective with hours worked in December 2010 and payable in January 2011, the Employer agrees to contribute six dollars and twenty cents ($6.20) until the expiration of this Agreement.

Apply the Side Letter on the "Funding of the Merged UFCW Northern California and UFCW Bay Area Health and Welfare Trust Fund."

Such contributions shall be made on all straight-time hours worked, including Sundays, and/or compensated, such as vacations and holidays. Contributions shall be made on or before the twentieth (20th) of the month for covered hours worked during the previous month. It is understood that the contributions required on behalf of any employee shall not exceed forty (40) straight-time hours per week or two thousand eighty (2,080) straight-time hours in any calendar year.

Notwithstanding the foregoing, the Employer will not be required to make any contributions for Fuel Station employees during the first (1st) twelve (12) months from their date of hire.

**12.3 PROMPT PAYMENT:** The parties recognize and acknowledge that the regular and prompt payment of Employer contributions to the Fund is essential to the maintenance of the Health and Welfare Plan, and inasmuch as beneficiaries under the Plan are entitled to benefits for the period of time that they may have worked while covered by the Plan even though contributions have not been paid on their behalf by their Employer, that it would be extremely difficult, if not impractical, to fix the actual expense and damage to the Fund and to the Plan which would result from the failure of an individual Employer to pay such monthly contributions in full within the time provided. Therefore, the amount of damage to the Fund and Health and Welfare Plan resulting from any such failure shall be presumed to be the sum of twenty dollars ($20.00) per delinquency, or ten percent (10%) of the amount of the contribution or contributions due, whichever is the greater, not to exceed the sum of one hundred dollars ($100.00) per delinquency, which amount shall become due and payable to the Fund as liquidated damages, and not as a penalty, upon the day immediately following the date upon which the contributions became delinquent, and shall be in addition to said delinquent contribution or contributions.

Notwithstanding the above, interest on unpaid contributions will accrue at the rate of ten percent (10%) per annum, commencing with the first (1st) day of the month following the month in which the contribution is due. In addition, if legal action is pursued to collect delinquent contributions, the statutory provisions in ERISA will apply and liquidated damages shall be assessed in an amount equal to the greater of twenty percent (20%) of the unpaid contributions at the time the legal action is commenced or interest at the above rate on the unpaid contributions from the due date through the date the contributions are paid. The Trustees shall have the

authority to adopt and to am[...]d from time to time written delinquen[...]collection procedures which shall specify the interest, liquidated damages, and other amounts to be assessed on any delinquency, and the procedures for collecting same, and such procedures shall be binding on the Employer.

**12.4 BENEFITS:** The Trustees are authorized and directed to modify benefits, for active employees, in the manner as enumerated below. The Trustees shall implement and maintain over time a schedule of benefits and plan design, including a prudent operating reserve that can be supported by the applicable hourly contribution rate. These changes shall be made by the Trustees to be effective January 1, 2008, or as soon thereafter as may be adopted and implemented by the UFCW Benefits Trust Fund.

(1)    Eliminate annual prescription deductible.

(2)    Eliminate the annual dental deductible in Plan A and Plan B.

(3)    Increase annual dental maximum in Plan A to $2,500 and in Plan B to $2,000.

(4)    Increase the orthodontic combined lifetime maximum to an aggregate of $2,000 in Plan A and Plan B.

(5)    One hundred percent (100%) coverage for participants for preventative care in Plan A and Plan B based on Schedule 1 as modified by guidance from nationally recognized experts.

(6)    First dollar coverage for preventative and diagnostic dental care in Plan C and coverage for well-baby care in Plan C (as described in Schedule 1).

(7)    Reduce co-pays for maintenance drugs for conditions such as diabetes, high blood pressure, etc. as such maintenance drugs may be identified by the PBM from time to time:

| | |
|---|---|
| Retail: | $7/$15/$25 |
| Mail Order or retail for a 90-day supply for maintenance medications only: | $14/$30/$50 |

When no generic or formulary is available, based on the PBM's list as of October 6, 2007, as reviewed and modified from time to time, the formulary co-pay will apply for these prescriptions.

Furthermore, effective January 1, 2008, the initial eligibility rule will be modified to require four (4) months of qualifying hours, of which the first (1st) two (2) months must be met consecutively. Coverage will begin the first (1st) day of the second (2nd) month following the fourth (4th) month of qualifying hours.

• Plan C shall cover the employee and dependent children only.

• Courtesy Clerks hired after November 17, 2007, will be eligible for employee-only coverage. If a Courtesy Clerk is promoted, they will be given credit for the purpose of eligibility back to their date of hire.

• Effective the month following the twenty-fifth (25th) month from date of hire, employees, their spouse, and dependents will be eligible for Plan B coverage.

• Effective the month following the seventy-second (72nd) month from date of hire, employees, their spouse, and dependents will be eligible for Plan A coverage.

The Plan's current monthly straight-time work hours' requirements for each classification of employment, as they relate to eligibility, shall continue to apply.

Any Employer that desires to cover all of its employees under Plan A shall pay an Employer contribution rate for those additional employees sufficient to cover the projected cost of the Plan as determined by the co-consultants during the term of this Agreement.

**12.5   LEGISLATION:**  In the event of legislation providing Health and Welfare or Sick Leave benefits, which are also provided for under this Agreement, the Trustees are directed to amend the Plan Document immediately deleting duplicated benefits.  If, by reason of the elimination of duplicated benefits, there is a savings to the Employer and the Fund, after the cost thereof is set off against the cost required of the Employer to finance said benefits, the Trustees shall meet no later than thirty (30) days from the effective date of the legislation to determine how said savings shall be used by the Fund. If the Trustees fail to reach an agreement, they shall proceed, under the Trust Agreement, to decide such deadlock within seventy-five (75) days of the effective date of the legislation. Any cost reductions to the Employer and the Fund attributable to a cost required of the employee under the legislation will be passed on to the employee through other Health and Welfare changes. In the event Medicare becomes secondary in the application of the retiree benefit plan, the Trustees will take immediate and remedial action to protect the financial integrity of the Plan.

**12.6   COST CONTAINMENT:**  The Trustees are authorized and directed to study and expand cost containment programs where appropriate, for both the active and retiree plans.

**12.7   RETIREE BENEFITS:**  The collective bargaining parties recognize that retiree Health and Welfare benefits are not vested benefits. Pursuant to this Agreement, a contributing Employer's sole and only obligation is to contribute, during the term of this Agreement, the specific contributions required under this Agreement. Despite the adoption of a plan of benefits that currently may be available to Plan participants, the Employer's liability for any and all Health and Welfare benefits including retiree Health and Welfare benefits shall be limited to the contribution specified in this section and for the period of this Agreement. The parties authorize and direct the Trustees of the Health and Welfare Plan to take the necessary action to assure compliance with the terms of this paragraph.

The Trustees are authorized and directed to require that retirees contribute seventy dollars ($70.00) per month per retiree toward the cost of retiree health care benefits.  This provision shall not impact the retirees' cost for the self-pay retiree plan. Any retiree who does not make the required monthly premium shall lose coverage under the Plan in accordance with such rules and regulations adopted by the Trustees.

Current retirees in Plan IV will be placed in Plan B and treated the same as current Plan B retiree participants.

The Trustees will establish a Retiree Health and Welfare Committee to be effective January 2008 in accordance with the Retiree Health and Welfare Committee Side Letter to this Agreement.

**12.8   BUSINESS EXPENSE:**  It is understood that the provision for a Health and Welfare, Dental, Vision Care, Drug, and Sick Leave Plan(s) is being entered into and continued upon the condition that all payments shall be deductible in the year in which the contribution is made as a business expense under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar state revenue or tax laws.

    **12.8.1** The obligation to make any contribution specified in Section 12 Health and Welfare and Sick Leave and Section 13 Pension of this Agreement is expressly conditioned on the deductibility of that contribution by the Employer as an ordinary and necessary business expense, or otherwise, in the year which the contribution is made. In the event that any Employer contribution is not deductible as an ordinary necessary business expense, or

otherwise, in the yea(   )hich the contribution is to be mad(   )ne Employer's obligation to make such contribution shall be permanently suspended for any month in which the contribution is not deductible. Such obligation shall not resume until such contribution becomes deductible as herein described. An Employer shall also be entitled to a refund of any contribution actually made, if that contribution is not deductible by the Employer as an ordinary necessary business expense, or otherwise, in the year in which it is made.

**12.9   SICK LEAVE BENEFITS:**

(a)   **ACCRUAL:** Employees in Plan A and B accrue sick leave monthly as follows:

| | |
|---|---|
| Less than 64 hours | 0 hours |
| At least 64 hours but less than 120 hours | 3 hours |
| 120 hours or more | 6 hours |

Employees that are in neither Plan A or B accrue sick leave monthly as follows:

| | |
|---|---|
| Less than 64 hours | 0 hours |
| At least 64 hours but less than 120 hours | 2 hours |
| 120 hours or more | 4 hours |

(b)   **SICK LEAVE USE:** New employees will be eligible to use sick leave once they are eligible for Health and Welfare benefits.

(c)   **SICK LEAVE PAYOUT:**

(1)   **ELIGIBILITY:** In order to be eligible for a sick leave payout, an employee must have the maximum of three hundred and sixty (360) hours accumulated sick leave as of December 31.

(2)   **AMOUNT OF PAYOUT:** Each employee who is eligible for a sick leave payout in accordance with paragraph (1) shall receive four hundred dollars ($400), less ten dollars ($10) for each hour of sick leave used during that calendar year.

Payments shall be made as soon after the end of the calendar year as administratively feasible.

(d)   **MEAT EMPLOYEES:** Effective January 1, 2008, Employer-paid sick leave banks will be frozen at their current levels. Meat Department employees will begin accumulating sick leave benefits through the UFCW Benefits Trust Fund as described in 12.9 above.

During the transition, the employee will continue to draw from his or her sick leave bank through the Employer, as necessary, until the bank with the Employer is exhausted, at which time the Fund will be notified that the employee no longer has any sick leave time remaining.

The Employer agrees to pay out, beginning January 1, 2008, and each January thereafter, to each Meat Department employee up to eight (8) days per year, minus any sick leave day(s) taken, from the sick leave bank at the rate of one-half (½) of the sick leave in cash, until the entire sick leave bank has been exhausted.

A Meat Department employee who retires during the sick leave transition shall be eligible for the remaining banked sick leave at a one-half (½) cash payout through the Employer.

## SECTION 13. PENSION

**13.1  EMPLOYER ACCEPTANCE:**  The Employer agrees to accept and be bound fully by the terms of that certain Declaration of Trust dated April 1, 1957, providing for the UFCW–Northern California Employers Joint Pension Trust Fund as the same may be applicable to the Pension Plan therein provided for and any amendments thereto. The Employer hereby acknowledges receipt of a copy of said Declaration of Trust.

**13.2  EMPLOYER CONTRIBUTIONS:** Effective with hours worked January 2008, the Employer agrees to contribute to the Trust Fund for the term of the Agreement the following composite rate of one dollar and seventy-two cents ($1.72) per straight-time hour on all employees.

The seven (7) month deferral of contributions for accounting and actuarial purposes, first implemented for the Trust Fund's 1999 fiscal year, continues to be in effect.

Such contributions shall be made on all straight-time hours worked by all employees covered by the Collective Bargaining Agreement, including Sundays, and/or all hours compensated, such as vacations and holidays.  Contributions shall be made on or before the twentieth (20th) of the month for covered hours worked during the preceding calendar month.  It is understood that the contributions required on behalf of any employee shall not exceed forty (40) straight-time hours per week or two thousand and eighty (2,080) straight-time hours in any calendar year.

An employee shall receive both vesting and benefit accrual credit for all hours compensated (including those for which no contribution is due to the Trust) to a maximum of forty (40) hours per week and two thousand and eighty (2,080) hours per year.  For employees who are hired on or after January 7, 2005, their benefit accrual credits will not begin until they have met the eligibility requirements described below:

In the event that the contributing Employers are required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the contributing Employers will receive a dollar-for-dollar credit for additional contributions in any subsequent Plan year where there is sufficient excess funding exceeding the minimum funding level required to offset the additional contribution provided this offset does not create a minimum funding deficiency the following Plan year.    In other words, the Employer payments in excess of the negotiated contributions will create future contribution suspensions that will be taken as soon as possible as long as the minimum funding concerns outlined above are met.

**13.3  TERMINAL VACATION PAY:**  Upon retirement, no Trust Fund contributions will be required of the Employer on terminal vacation pay made to an employee at retirement. The employee's retirement benefits will not be delayed, and he will receive credit for hours even though contributions are not required.

**13.4  PROMPT PAYMENT:** The parties recognize and acknowledge that the regular and prompt payment of Employer contributions to the Fund is essential to the maintenance of the Pension Plan, and inasmuch as beneficiaries under the Plan are entitled to Pension benefits for the period of time that they may have worked while covered by the Plan, even though contributions have not been paid on their behalf by their Employer, that it would be extremely difficult, if not impractical, to fix the actual expense and damage to the Fund and Pension Plan which would result from the failure of an individual Employer to pay such monthly contributions in full within the time above provided.  Therefore, the amount of damage to the Fund and Pension Plan resulting from any such failure shall be presumed to be the sum of twenty dollars ($20.00) per delinquency, or ten percent (10%) of the amount of the contribution or contributions due, whichever is the greater, not to exceed the sum of one hundred dollars ($100.00) per delinquency, which amount shall become due and payable to the Fund as liquidated damages, and not as a penalty, upon the day immediately following the date upon which the contributions became delinquent, and shall be in addition to said delinquent contribution or contributions.

**13.5  BENEFITS:** The Trustees are authorized and directed to modify benefits in accordance with the following provisions, and otherwise in accordance with the provisions of this Agreement:

In the event that there has been a green-zone certification in each year of the Agreement and in conjunction with the 2011 certification, the Plan co-actuaries are to conduct the PPA certification process and simultaneously determine when a green-zone certification can be achieved while also providing a Pension accrual increase retroactive to January 1, 2007.

The maximum Pension accrual increase that will be provided is fifteen point thirty-eight percent (15.38%) and will apply for accruals earned during the Plan years beginning during the term of this Agreement (i.e. 2007, 2008, 2009, and 2010). In order to determine the level of a possible Pension accrual increase, a two (2) stage process will be implemented.

First, a maximum of a seven point sixty-nine percent (7.69%) accrual increase will be provided when the co-actuaries certify that the Plan is able to obtain a PPA green-zone certification in 2011.

Second, a maximum additional seven point sixty-nine percent (7.69%) Pension accrual increase will be provided when the co-actuaries project that the Funding Standard Account Credit Balance will remain positive through December 31, 2019.

The Trustees are directed to adopt these possible accrual changes in 2011.

**13.6  APPLICATION FOR EXTENDED AMORTIZATION EXTENSIONS UNDER INTERNAL REVENUE CODE SECTION 431:**

The Trustees shall cause the Trust Fund to apply for an amortization extension under Internal Revenue Code § 431(d); if necessary to avoid a certification of the Trust Fund as either "critical" or "endangered" under the provisions of the Pension Protection Act.

In making such application, the required "plan" to improve the Trust Fund's funding status under ERISA Section 431(d)(1)(B) shall be the long-term funding policy set forth below.

In the event that the application under Internal Revenue Code § 431 is approved by the reviewing government agency, the Trustees will adopt the following long-term funding policy.

**UFCW – NORTHERN CALIFORNIA EMPLOYERS JOINT PENSION TRUST FUND LONG-TERM FUNDING POLICY**

The co-consultants will produce with the annual actuarial valuations a seven (7) year actuarial projection with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

(1)     Projections will take into account only negotiated contributions

(2)     Using the assumptions and actuarial methods in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants

(3)     No unanticipated actuarial gains or losses during the projection time period

If the annual projection indicates any future funding deficiencies during the seven (7) year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the contributing Employers are required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the contributing Employers will receive a dollar-for-dollar credit for additional contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies, it shall take into account that these contribution credits will be taken as reductions in the negotiated contributions in the next Plan year. In other words, the Employer payments in excess of the negotiated contributions will create future contribution suspensions that will be taken as soon as possible and the co-consultants will reflect this with the annual seven (7) year projections.

In the event that the application under Internal Revenue Code § 431 is denied by the reviewing government agency, the Trustees shall not be required to adopt the above long-term funding policy.

Any deadlocked Trustee motion relating to a reduction in benefits required under the long-term funding policy shall be arbitrated on an expedited basis with the arbitration to take place no later than sixty (60) days following the Trust meeting in which the deadlock occurs.

**13.7   OTHER PLANS:** The Employer retains the exclusive right to alter, amend, cancel, or terminate any presently existing Company-sponsored Pension Plan or employee retirement plan which existed prior to the establishment of the Pension Fund, provided that the effective date of such alteration, amendment, cancellation, or termination shall not occur prior to the acceptance of this Plan.

**13.8   REGULATIONS:** The Trust and the benefits to be provided from the Pension Trust Fund and all acts pursuant to this Agreement and pursuant to such Trust Agreement and Pension Plan shall conform in all respects to the requirements of the Treasury Department, Internal Revenue Service, and to any other applicable state or federal laws and regulations.

**13.9   BUSINESS EXPENSE:** It is understood that this provision for a Pension Plan is being entered into upon the condition that all payments made by the Employer hereunder shall be deductible in the year in which the contribution is made as business expenses under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar applicable state revenue or tax laws.

**13.10 LIMITATION:** The Employer's sole and only obligation shall be limited to the contribution requirements outlined in 13.2 of this section.

**13.11 LEGISLATION:** In the event of legislation requiring the restructuring of any of the essential elements of the Pension Plan, including, but not limited to, the benefit formula, amortization period, actuarial assumptions, vesting, or administration of the benefits, the Trustees are instructed to comply immediately with such legislation in adjusting the elements on a sound actuarial basis with no change in the existing Employer contribution rate.

**13.12 DEFINED CONTRIBUTION PENSION PLAN:** The Trustees have established a Defined Contribution Pension Plan and Trust effective March 1, 1987, in addition to and supplemental to the Pension Plan described in this section.

The Employers agree that they will not oppose a motion by the Unions to create self-directed accounts in the IAP, so long as such accounts may legally be created and the Trust Fund will incur no additional costs as the result of the creation of such. Furthermore, the Unions and the Employers agree to authorize and direct the Trust Fund to establish a subcommittee with the power to act to carry out the foregoing purpose. Moreover and subject to the foregoing, no such accounts will be established sooner than January 1, 2009.

**13.13 USE OF CONTRIBUTIONS:** The Employer contributions shall be for the sole purpose of providing the Pension benefits and for the administration of said program. The Trustees are not authorized to use any of the contributions or Plan assets for benefit improvements or any other purpose except as specifically provided here in Section 13.

**13.14 OPERATIONAL PLAN RULES:** The Trustees are instructed to follow these operational Plan rules, and the Plan shall be amended as necessary to implement such rules:

(1)   Where an Employer is contributing at a rate that is less than the maximum allowed contribution level and later increases their contribution rate (but only up to the maximum contribution rate accepted by the Pension Fund), such increase will only increase future benefit accrual rates. Benefits accrued prior to the date that Employer increases their Pension contribution rate will not be affected, and will remain at the level based on the earlier Employer contribution level.

(2)   The Board of Trustees will instruct the co-consultants to look at situations such as, but not limited to, if an Employer attempts to decrease their contribution rate after a period of contribution suspension. Such review and approval shall include a consideration of whether the contribution rate is sufficient to support the benefits promised, as well as any subsidy or equity issues, all as may be identified by the co-consultants to the Fund.

## SECTION 14.   FIELD ADMINISTRATION TRUST FUNDS

**14.1** The Unions have determined that they are no longer willing to provide administrative functions, as distinguished from the usual and normal Union services, at Union expense to persons covered by the terms of the various benefit plans provided for by the Collective Bargaining Agreements. It is agreed that the portion of these functions determined to be Trust Fund functions are properly chargeable to the Trust Funds under which said Plans are established and maintained.

All expenses of the sub-administrative offices shall be paid for by the respective Funds according to the formula established by the parties pursuant to the 1974 Joint Study.

## SECTION 15.   STORE MEETINGS AND CHARITABLE DRIVES

**15.1** Time spent in store meetings or in meetings called by the Employer before the commencement of the day's work or after the day's work shall be considered as time worked and shall be paid for in accordance with the provisions of this Agreement.

**15.2** All employee contributions to charity shall be voluntary.

## SECTION 16.   CONTRACT ENFORCEMENT AND STORE VISITS

**16.1 VISITS:** It is agreed by both parties hereto that the District Union Representative shall have the right and shall be allowed by the Employer to visit any and all stores and shall have free access to the employees during such visits for the purpose of making inquiries from the employees relative to information concerning working conditions, complaints of members of the Union, and other matters pertaining to the enforcement of this Agreement, provided said investigation may be accomplished without interfering with the duties of the employees.

**16.2 RECORDING OF TIME:** The parties agree to observe the following procedures in enforcing the terms of this Agreement with respect to authorized work and reporting of working time:

**16.2.1** The Employer all post the following notice in all s _ es:

> The law and the Union Agreement require that all time worked shall be recorded daily, including starting and stopping time. All employees shall comply strictly with these requirements, and any employee failing to so comply shall be subject to discipline on the same basis as is followed with respect to any other violation of store rules or procedure.

**16.2.2** The Union shall promptly report, in writing, to the Employer any observed violation by an employee of this reporting time provision or the working of unauthorized time, and the Employer will take the necessary steps with the employee to correct such violation.

**16.2.3** Upon notification by the Union of a second (2nd) such violation by the same employee, the Employer shall pay to the Welfare Fund provided for herein an amount equal to the overtime pay due and payable the employee. In such case, the employee involved shall be subject to discharge, retaining, however, his right to appeal any such discharge under the terms of this Agreement.

**16.3   FREE TIME:** When an employee willfully violates the provisions of this Agreement by working free time without the knowledge of the Employer, after a second (2nd) written notice by the Union of this employee's repeated contract violation, the Employer agrees to discharge said employee within seven (7) days after receiving written notice of such violation.

## SECTION 17.   NEW METHODS (MEAT DEPARTMENT)

**17.1**   It is agreed that should the Employer intend to initiate a major change in method of operation which is not presently in the industry within the area of operation covered by this Agreement that would result in a substantial change in the content of any job presently covered by this Agreement, the Employer shall give notice of the nature of such suggested new method of operation to the Union, following which, the matter of job classifications, wages, working conditions, and/or the disposition of employees potentially to be displaced shall then become a matter of negotiation with the Union for a period of forty-five (45) days.

Pending negotiations by the parties during the above-mentioned forty-five (45) day period, no change of operations as above set forth shall be placed into effect.

In the event the parties have not arrived at agreement within the above forty-five (45) day period, the Employer may elect to place such changed method of operation, as above defined, into effect, and all unresolved issues in regard to job classifications, wages, working conditions, and/or the disposition of displaced employees shall be submitted to final and binding arbitration in accordance with Section 18 Adjustment Board and Arbitration of Disputes of this Agreement.

The remedy, if any, shall be effective with the date of the arbitrator's award.

Any Company that seeks to introduce "case-ready" cuts of meat must notify the Union(s) in advance of a change in the method of operations and proceed in accordance with this section of this Collective Bargaining Agreement.

A committee shall be formed to negotiate a merger of the Valley and the Bay Meat Addendum language.

## SECTION 18.  ADJUSTMENT BOARD AND ARBITRATION OF DISPUTES

**18.1**  Upon the request of either party hereto, a Board of Adjustment shall be created, to be composed of two (2) representatives of each party to this Agreement, for the purpose of passing on all claims, disputes, and grievances arising between the parties during the term of this Agreement over the construction and application of this Agreement or relating to working conditions arising out of this Agreement, when such cannot be settled directly between the Union and the Employer. Said Board shall meet for consideration of any such matter referred to it within seven (7) calendar days subsequent to a request therefore by either party. For cases other than those which are disciplinary in nature, the convening of the Adjustment Board may be waived. The request of either party to extend the time limit for the convening of the Board of Adjustment due to extenuating circumstances will not be unreasonably denied. If the matter is not adjusted and is at an impasse, the moving party shall communicate, in writing, to the other party within twenty (20) business days following the meeting of the Board of Adjustment their desire to proceed to arbitration. Failure of the moving party to comply with the twenty (20) business day time limit herein specified shall be deemed to be a conclusive waiver of the grievance.

**18.2**  Disciplinary arbitrations (meaning a matter concerning a suspension, demotion, or termination) will be heard without the use of a court reporter or briefs. The parties will present their evidence and witnesses and argue orally. At the conclusion of the arbitration hearing but before issuance of the bench decision, the Union and the Employer will meet and in good faith attempt to resolve the grievance. If the parties are unable to settle the grievance, the arbitrator will announce his/her decision within fourteen (14) business days and subsequently will reduce his/her decision to writing. The parties may mutually agree to waive or modify any or all of the provisions of this expedited procedure.

**18.3   INTERPRETATION OR APPLICATION DISPUTES:** For contract interpretation disputes which proceed to arbitration, the parties will mutually select an impartial arbitrator. If the parties are unable to agree upon the selection of an arbitrator, they shall request a panel of arbitrators from the United States Federal Mediation and Conciliation Service; and they shall select an arbitrator there from by the strike-off method.

The award of the Adjustment Board or arbitrator shall be final and binding upon the Employer, the Union, and the employee.

**18.4**  Each party shall in good faith divulge to the other party all available material facts at the time said party acquires knowledge thereof concerning the matter in dispute. Nothing contained herein shall require either party to supply documents which are irrelevant.

**18.5**  All jointly incurred arbitration expenses shall be borne by the losing party. In the event of a dispute concerning the application of this section, the arbitrator shall be empowered to determine the allocation of expenses.

In termination cases, it is agreed that if a grievant is reinstated to employment with full back pay, the Company shall pay the jointly incurred costs of the arbitration. If a grievant is not reinstated, the Union shall pay the jointly incurred costs of the arbitration. If a grievant is reinstated with partial or no back pay, the parties shall split the jointly incurred costs of the arbitration.

If either party fails or refuses (1) to constitute a Board of Adjustment as required by Subsection 18.1 above; (2) to observe the time limits provided in Subsection 18.1 above for the consideration of complaints by the Adjustment Board or the submission thereof to arbitration; or (3) to select an arbitrator within a reasonable time after the Adjustment Board has failed to agree on any question referred to it, then, in any such event, the other party shall be free to proceed to arbitration, whether or not the other party chooses to participate; provided, however,

that prior written notice of such intent is given to the other party. In any case, where one (1) party proceeds to arbitration without the participation of the other party, as herein provided, the arbitrator shall be selected by the participating party from a panel furnished by the United States Federal Mediation and Conciliation Service, and any award rendered by an arbitrator so selected shall be final and binding upon both parties.

**18.6** The arbitrator shall not have the right to alter, amend, delete, or add to any of the terms of this Agreement.

**18.7** Interest at seven percent (7%) shall be payable on all money claims awarded by the Adjustment Board or by an arbitrator, and such interest shall commence as of the date the complaint is first submitted to the Adjustment Board.

**18.8 CLAIMS:** In the case of a direct wage claim or a claim for contributions to employee benefit plans which does not involve an interpretation of any of the provisions of this Agreement, either party may submit such claim for settlement to either the grievance procedure provided for herein or to any other tribunal or agency which is authorized and empowered to effect such a settlement.

The Employer is not required to pay any wage claim or portion thereof retroactively for a period of more than ninety-one (91) days immediately prior to the date of the Employer's receipt of written notice from the Union of such claim.

## SECTION 19.   STRIKE OR LOCKOUT

**19.1** During the life of this Agreement, the Union agrees not to engage in any stoppage of work. Furthermore, the Union and its representatives, including store representatives, agree not to boycott, handbill, publicly disparage, or engage in any adverse economic action against the Employer's stores covered by this Agreement. This provision does not apply in any of the Employer's stores where the Union has not been recognized by the Employer as the employees' bargaining representative.

**19.2** During the life of this Agreement, the Employer agrees not to engage in any lockout.

**19.3** Refusal of any employee covered by the terms of this Agreement to pass through any picket line which has been sanctioned by the Central Labor Council of proper jurisdiction and/or the United Food & Commercial Workers International Union shall not constitute a violation of this Agreement.

## SECTION 20.   TERM OF AGREEMENT

**20.1** Except as otherwise indicated herein, this Agreement shall be effective October 7, 2007, and shall remain in full force and effect in all areas to and including October 8, 2011, and shall be considered as renewed from year to year thereafter unless either party hereto gives written notice to the other of its desire to have the same modified or terminated. Such notice shall be given at least sixty (60) days prior to such expiration date during which period negotiations for a new Agreement shall be conducted with all conditions agreed to by the parties to become effective on the first (1st) day of the week nearest the expiration date of this Agreement. If after opening, as provided herein, the parties fail to reach an agreement within the period so provided, then the provisions of Section 19 Strike or Lockout of this Agreement shall not be binding on either party.

20.2   The provisions of this agreement are deemed to be separable to the extent that if and when a court of last resort adjudges any provision of this Agreement in its application between the Union and the undersigned Employer to be in conflict with any law, such decision shall not affect the validity of the remaining provisions of this Agreement, but such remaining provisions shall continue in full force and effect, provided further, that in the event any provision or provisions are so declared to be in conflict with a law, both parties shall meet within thirty (30) days for the purpose of renegotiation and agreement on the provision or provisions so invalidated.

20.3   It is understood and agreed between the parties that all prior Agreements between them are hereby terminated and canceled and that this Agreement supersedes and replaces all such prior Agreements.

This Agreement shall be binding upon the heirs, executors, and assigns of the parties hereto.

**IN WITNESS WHEREOF**, the parties hereto by their duly constituted representative officers affixed their signatures this _____ day of _____, 20____.

**FOR THE EMPLOYER:**

**RALEY'S**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

## APPENDIX A - WAGE RATES

**A.1**   Notwithstanding any schedule of minimum wages, employees now receiving a higher wage than indicated in said schedule for the particular classification of work performed shall not have their wages reduced due to the signing and effect of this Agreement.

Where the basis for amounts paid over the wage rates provided in A.5 Wages of this Agreement have been specifically set forth, in writing, to the employee, they may be discontinued when the reason for their payment ceases to exist and the employee has been so advised, in writing, with a copy to the Union.

The schedule of minimum wages shall be maintained by the parties hereto during the period of this Agreement, and the Employer shall and hereby agrees to pay wages in compliance therewith.

**A.2   NIGHT PREMIUM:** All employees shall receive extra compensation in addition to their regular scale herein set forth as follows:

**(1)**   All employees, except Meat Cutters and Apprentice Meat Cutters, shall receive extra compensation, in addition to the regular scale herein set forth, of sixty-five cents (65¢) per hour for all work performed between the hours of 10 p.m. and 6 a.m.  Courtesy Clerks shall not receive night premium.

**(2)**   Any Meat Cutter or Apprentice Meat Cutter who may be required to work any part of his workday prior to 8 a.m. or after 6 p.m. shall be paid two dollars ($2.00) in addition to his regular rate of pay. Employees who are scheduled to work a regular eight (8) hour shift which commences before 8 a.m. or ends after 6 p.m. on any day shall receive overtime pay at the appropriate rate for any time worked in excess of such eight (8) hours in addition to the two dollar ($2.00) shift premium required in Section 3 Hours, Subsection 3.5 of this Agreement. Employees who are scheduled to work a regular eight (8) hour shift between the hours of 8 a.m. and 6 p.m. on any day and who are required to work in excess of such eight (8) hours after 6 p.m. by reason of an emergency shall receive overtime pay at the appropriate rate but shall not be entitled to the two dollar ($2.00) shift premium required above.

**A.3**   Non-contractual discretionary bonuses may be modified or discontinued at the Employer's discretion with prior notice to the Union.  This exception does not apply to overscale wage rates.

**A.4   ANNUAL LUMP-SUM BONUS:** Bargaining unit employees in the designated experienced classifications (who are overscale) and on the payroll for each October's increase for this contract, and actively employed on the date of payment of this bonus, shall receive a lump-sum bonus, as provided below:

Designated classifications known as rates of pay that exceed the highest pay rate per classification shall receive the requisite wage increase per hour for each calendar year's increase for which the employee was compensated (excluding overtime) for the fifty-two (52) calendar weeks preceding September 1st of the year.

This bonus will be paid on the week following the effective date of the contractual wage increase and will only be paid to employees who are actively employed on that date or thirty (30) days from when an employee returns to work from an approved leave of absence or layoff.  Consistent with past practice, this bonus will not be calculated to include derived overtime.

This provision will apply to employees on approved leave of absence or layoff at the time of reinstatement who are actively employed at the time payment is due.  This payment also will be made no later than thirty (30) days following the expiration of the employee's recall rights under the term of this Agreement.

A.5   WAGES: See Wage Tables A.5.1, A.5.2, A.5.3, A.5.4, A.5.5, A.5.6, and A.5.7.

A.5.1   The following minimum scale of wages shall be paid, except in Zone B as set forth in Appendix A.5.4 hereof:

### ZONE A

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| Managing Clerks | 21.16 | 21.58 | 21.95 | 22.32 |
| Senior Head Clerks and Senior Produce Clerks | 20.73 | 21.15 | 21.51 | 21.87 |
| Head Clerks | 20.63 | 21.04 | 21.40 | 21.76 |
| Senior Clerks | | | | |
| Experienced | 20.03 | 20.43 | 20.78 | 21.13 |
| 6th 1040 hours | 19.30 | 19.90 | 20.25 | 20.60 |
| 5th 1040 hours | 18.70 | 19.20 | 19.75 | 20.25 |
| 4th 1040 hours | 18.20 | 18.60 | 19.25 | 19.85 |
| 3rd 1040 hours | 17.20 | 17.60 | 18.25 | 18.85 |
| 2nd 1040 hours | 16.20 | 16.60 | 17.25 | 17.85 |
| 1st 1040 hours | 15.20 | 15.60 | 16.25 | 16.85 |
| Combo Bakery/Deli Manager | 16.06 | 16.66 | 17.26 | 17.86 |
| Department Head Clerk (optional) | 14.96 | 15.56 | 16.16 | 16.76 |
| Clerks | | | | |
| Experienced | | | 15.76 | 16.36 |
| 10th Step (10th 1040 hours) | | 15.16 | 15.16 | 15.16 |
| 9th Step (9th 1040 hours) | 14.56 | 14.56 | 14.56 | 14.56 |
| 8th Step (8th 1040 hours) | 13.96 | 13.96 | 13.96 | 13.96 |
| 7th Step (7th 1040 hours) | 11.70 | 11.70 | 11.85 | 12.00 |
| 6th Step (6th 1040 hours) | 11.30 | 11.30 | 11.35 | 11.50 |
| 5th Step (5th 1040 hours) | 10.80 | 10.80 | 10.90 | 11.05 |
| 4th Step (4th 1040 hours) | 10.25 | 10.40 | 10.55 | 10.70 |
| 3rd Step (3rd 1040 hours) | 10.00 | 10.15 | 10.30 | 10.45 |
| 2nd Step (2nd 1040 hours) | 9.75 | 9.90 | 10.05 | 10.20 |
| 1st Step (1st 1040 hours) | 9.50 | 9.65 | 9.80 | 9.95 |
| Fuel Station | | | | |
| Experienced | 12.15 | 12.40 | 12.65 | 12.90 |
| 6th Step (1040 hours) | 11.20 | 11.35 | 11.50 | 11.65 |
| 5th Step (1040 hours) | 10.70 | 10.85 | 11.00 | 11.15 |
| 4th Step (1040 hours) | 10.25 | 10.40 | 10.55 | 10.70 |
| 3rd Step (1040 hours) | 9.80 | 10.00 | 10.20 | 10.40 |
| 2nd Step (1040 hours) | 9.30 | 9.50 | 9.70 | 9.90 |
| 1st Step (1040 hours) | 9.00 | 9.20 | 9.40 | 9.60 |
| Courtesy Clerks | | | | |
| Experienced | 9.00 | 9.20 | 9.40 | 9.60 |
| 1st 1040 hours | 8.50 | 8.70 | 8.90 | 9.10 |

NOTE:   Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

**A.5.2** The following minimum scale of wages shall be paid, Zone B: Stockton and south; cities of Burney, Corning, Gridley, Quincy, Susanville, Willows, and counties of Colusa, Modoc, Trinity, Siskiyou, and Sierra:

## ZONE B

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| Managing Clerks | 20.81 | 21.23 | 21.60 | 21.97 |
| Senior Head Clerks and Senior Produce Clerks | 20.42 | 20.84 | 21.20 | 21.56 |
| Head Clerks | 20.33 | 20.74 | 21.10 | 21.46 |
| Senior Clerks | | | | |
| Experienced | 19.73 | 20.13 | 20.48 | 20.83 |
| 6th 1040 hours | 18.70 | 19.30 | 19.65 | 20.00 |
| 5th 1040 hours | 17.95 | 18.45 | 19.00 | 19.50 |
| 4th 1040 hours | 17.20 | 17.60 | 18.25 | 18.85 |
| 3rd 1040 hours | 16.45 | 16.85 | 17.50 | 18.10 |
| 2nd 1040 hours | 15.70 | 16.10 | 16.75 | 17.35 |
| 1st 1040 hours | 14.95 | 15.35 | 16.00 | 16.60 |
| Combo Bakery/Deli Manager | 15.75 | 16.35 | 16.95 | 17.55 |
| Department Head Clerk (optional) | 14.65 | 15.25 | 15.85 | 16.45 |
| Clerks | | | | |
| Experienced | | | 15.45 | 16.05 |
| 10th Step (10th 1040 hours) | | 14.85 | 14.85 | 14.85 |
| 9th Step (9th 1040 hours) | 14.25 | 14.25 | 14.25 | 14.25 |
| 8th Step (8th 1040 hours) | 12.60 | 12.75 | 12.90 | 13.05 |
| 7th Step (7th 1040 hours) | 11.70 | 11.70 | 11.80 | 11.95 |
| 6th Step (8th 1040 hours) | 11.30 | 11.30 | 11.30 | 11.45 |
| 5th Step (5th 1040 hours) | 10.80 | 10.80 | 10.90 | 11.05 |
| 4th Step (4th 1040 hours) | 10.20 | 10.35 | 10.50 | 10.65 |
| 3rd Step (3rd 1040 hours) | 9.90 | 10.05 | 10.20 | 10.35 |
| 2nd Step (2nd 1040 hours) | 9.60 | 9.75 | 9.90 | 10.05 |
| 1st Step (1st 1040 hours) | 9.30 | 9.45 | 9.60 | 9.75 |
| Fuel Station | | | | |
| Experienced | 11.85 | 12.10 | 12.35 | 12.60 |
| 6th Step (1040 hours) | 10.90 | 11.05 | 11.20 | 11.35 |
| 5th Step (1040 hours) | 10.40 | 10.55 | 10.70 | 10.85 |
| 4th Step (1040 hours) | 9.95 | 10.15 | 10.35 | 10.50 |
| 3rd Step (1040 hours) | 9.50 | 9.70 | 9.90 | 10.10 |
| 2nd Step (1040 hours) | 9.00 | 9.30 | 9.50 | 9.70 |
| 1st Step (1040 hours) | 8.70 | 9.00 | 9.20 | 9.40 |
| Courtesy Clerks | | | | |
| Experienced | 8.70 | 8.90 | 9.10 | 9.30 |
| 1st 1040 hours | 8.20 | 8.40 | 8.60 | 8.80 |

NOTE:   Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

A.5.3 The following minimum scale of wages shall be paid, except as set forth in Appendix A.5.4 Trinity and Modoc Counties (Zone B) Wage Rates hereof:

## ZONE A

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| Head Meat Cutters | 21.974 | 22.374 | 22.724 | 23.074 |
| Journeyman Meat Cutters | 20.474 | 20.874 | 21.224 | 21.574 |
| **Apprentice Meat Cutters** | | | | |
| 8th Step (1040 hours) | 18.65 | 18.80 | 18.95 | 19.10 |
| 7th Step (1040 hours) | 17.65 | 17.80 | 17.95 | 18.10 |
| 6th Step (1040 hours) | 16.65 | 16.80 | 16.95 | 17.10 |
| 5th Step (1040 hours) | 15.95 | 16.10 | 16.25 | 16.40 |
| 4th Step (1040 hours) | 15.34 | 15.49 | 15.64 | 15.79 |
| 3rd Step (1040 hours) | 13.58 | 13.73 | 13.88 | 14.03 |
| 2nd Step (1040 hours) | 11.81 | 11.96 | 12.11 | 12.26 |
| 1st Step (1040 hours) | 10.15 | 10.30 | 10.45 | 10.60 |
| Meat Clerks – hired prior to 11/02/79 | 17.68 | 17.68 | 17.68 | 17.68 |
| Meat Clerks – hired after 11/02/79 but prior to 12/12/85 | 15.68 | 16.08 | 16.36 | 16.36 |
| **Meat Clerk* – hired prior to 11/17/07** | | | | |
| Experienced | 15.68 | 16.08 | 16.36 | 16.36 |
| 10th Step  (1040 hours) | | 15.16 | 15.16 | 15.16 |
| 9th Step  (1040 hours) | 14.56 | 14.56 | 14.56 | 14.56 |
| 8th Step  (1040 hours) | 13.96 | 13.96 | 13.96 | 13.96 |
| 7th Step  (1040 hours) | 12.18 | 12.18 | 12.18 | 12.18 |
| 6th Step  (1040 hours) | 11.68 | 11.68 | 11.68 | 11.68 |
| 5th Step  (1040 hours) | 11.18 | 11.18 | 11.18 | 11.18 |
| 4th Step (1040 hours) | 10.55 | 10.55 | 10.55 | 10.70 |
| 3rd Step (1040 hours) | 10.00 | 10.15 | 10.30 | 10.45 |
| 2nd Step (1040 hours) | 9.75 | 9.90 | 10.05 | 10.20 |
| 1st Step (1040 hours) | 9.50 | 9.65 | 9.80 | 9.95 |

*Discontinued (All new hired Meat Clerks will be hired and progress through the Clerk classification.) Existing Meat Clerks at Steps 4, 5, 6, and 7 have been moved to the next highest step and will start at zero (0) hours towards next progression step.

NOTES:   Extra Worker's pay is two dollars ($2.00) per hour above the straight-time hourly rate for the appropriate classification.

Head Meat Cutters, Journeyman Meat Cutters, Apprentice Meat Cutters, and Meat Clerks in Livermore and Pleasanton will be included in Zone A Meat rates.

Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

A.5.4   The following minimum scale of wages shall be paid Trinity and Modoc Counties (Zone B):

### ZONE B

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| Head Meat Cutters | 21.374 | 21.774 | 22.124 | 22.474 |
| Journeyman Meat Cutters | 19.874 | 20.274 | 20.624 | 20.974 |
| Apprentice Meat Cutters | | | | |
| 8th Step (1040 hours) | 18.15 | 18.30 | 18.45 | 18.60 |
| 7th Step (1040 hours) | 17.15 | 17.30 | 17.45 | 17.60 |
| 6th Step (1040 hours) | 16.25 | 16.40 | 16.55 | 16.70 |
| 5th Step (1040 hours) | 15.35 | 15.50 | 15.65 | 15.80 |
| 4th Step (1040 hours) | 14.82 | 14.97 | 15.12 | 15.27 |
| 3rd Step (1040 hours) | 13.12 | 13.27 | 13.42 | 13.57 |
| 2nd Step (1040 hours) | 11.51 | 11.66 | 11.81 | 11.96 |
| 1st Step (1040 hours) | 10.15 | 10.30 | 10.45 | 10.60 |
| Meat Clerks – hired prior to 11/02/79 | 17.19 | 17.19 | 17.19 | 17.198 |
| Meat Clerks – hired after 11/02/79 but prior to 12/12/85 | 15.40 | 15.80 | 16.05 | 16.05 |
| Meat Clerks** – hired prior to 11/17/07 | | | | |
| Experienced | 15.40 | 15.80 | 16.05 | 16.05 |
| 10th Step  (1040 hours) | | 14.85 | 14.85 | 14.85 |
| 9th Step (1040 hours) | 14.25 | 14.25 | 14.25 | 14.25 |
| 8th Step  (1040 hours) | 12.60 | 12.75 | 12.90 | 13.05 |
| 7th Step (1040 hours) | 12.00 | 12.00 | 12.00 | 12.00 |
| 6th Step (1040 hours) | 11.71 | 11.71 | 11.71 | 11.71 |
| 5th Step (1040 hours) | 11.20 | 11.20 | 11.20 | 11.20 |
| 4th Step (1040 hours) | 10.58 | 10.58 | 10.58 | 10.65 |
| 3rd Step (1040 hours) | 9.95 | 10.05 | 10.20 | 10.35 |
| 2nd Step (1040 hours) | 9.60 | 9.75 | 9.90 | 10.05 |
| 1st Step (1040 hours) | 9.30 | 9.45 | 9.60 | 9.75 |

**Discontinued (All new hired Meat Clerks will be hired and progress through the Clerk classification.) Existing Meat Clerks at Steps 3, 4, 5, 6, and 7 have been moved to the next highest step and will start at zero (0) hours towards next progression step.

NOTES:   Extra Worker's pay is two dollars ($2.00) per hour above the straight-time hourly rate for the appropriate classification.

Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

**A.5.5** San Joaquin County, Stanislaus County, Amador County, Calaveras County, Tuolumne County, Merced County, and Madera County:

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| Head Meat Cutters | 21.674 | 22.074 | 22.424 | 22.774 |
| Journeyman Meat Cutters | 20.174 | 20.574 | 20.924 | 21.274 |
| Apprentice Meat Cutters | | | | |
| 8th Step (1040 hours) | 17.75 | 17.85 | 17.95 | 18.05 |
| 7th Step (1040 hours) | 16.75 | 16.85 | 16.95 | 17.05 |
| 6th Step (1040 hours) | 16.00 | 16.10 | 16.20 | 16.30 |
| 5th Step (1040 hours) | 15.10 | 15.20 | 15.30 | 15.40 |
| 4th Step (1040 hours) | 14.06 | 14.06 | 14.06 | 14.06 |
| 3rd Step (1040 hours) | 12.50 | 12.60 | 12.70 | 12.80 |
| 2nd Step (1040 hours) | 11.60 | 11.70 | 11.80 | 11.90 |
| 1st Step (1040 hours) | 11.00 | 11.00 | 11.00 | 11.00 |

Meat Clerks in stores located in Zone A as represented in A.5.1 will be laterally transferred to the equivalent step in the Clerk classification. Meat Clerks in stores located in Zone B as represented in A.5.2 will be laterally transferred to the equivalent step in the Clerk classification.

Existing Meat Clerks at Step 4 have been moved to the next highest step and will start at zero (0) hours towards next progression step.

NOTES: Extra Worker's pay is two dollars ($2.00) per hour above the straight-time hourly rate for the appropriate classification.

Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

**A.5.6** Zone A - Lodi/Jackson:

| MEAT CLERKS TRANSITIONING TO CLERKS | | | | |
|---|---|---|---|---|
| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
| Experienced | | | 15.76 | 16.36 |
| 10th Step (10th 1040 hours) | | 15.16 | 15.16 | 15.16 |
| 9th Step (9th 1040 hours) | 14.56 | 14.56 | 14.56 | 14.56 |
| 8th Step (8th 1040 hours) | 13.96 | 13.96 | 13.96 | 13.96 |
| 7th Step (7th 1040 hours) | 11.70 | 11.70 | 11.85 | 12.00 |
| 6th Step (8th 1040 hours) | 11.30 | 11.30 | 11.35 | 11.50 |
| 5th Step (5th 1040 hours) | 10.80 | 10.80 | 10.90 | 11.05 |
| 4th Step (4th 1040 hours) | 10.25 | 10.40 | 10.55 | 10.70 |
| 3rd Step (3rd 1040 hours) | 10.00 | 10.15 | 10.30 | 10.45 |
| 2nd Step (2nd 1040 hours) | 9.75 | 9.90 | 10.05 | 10.20 |
| 1st Step (1st 1040 hours) | 9.50 | 9.65 | 9.80 | 9.95 |

Existing Meat Clerks at Steps 5, 6, and 7 have been moved to the next highest step and will start at zero (0) hours towards next progression step.

NOTE: Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

**A.5.7**  Zone B – Stockton and south, San Joaquin County, Stanislaus County, Calaveras County, Merced County, and Madera County:

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| **MEAT CLERKS TRANSITIONING TO CLERKS** | | | | |
| Experienced | | | 15.45 | 16.05 |
| 10th Step (10th 1040 hours) | | 14.85 | 14.85 | 14.85 |
| 9th Step (9th 1040 hours) | 14.25 | 14.25 | 14.25 | 14.25 |
| 8th Step (8th 1040 hours) | 12.60 | 12.75 | 12.90 | 13.05 |
| 7th Step (7th 1040 hours) | 11.70 | 11.70 | 11.80 | 11.95 |
| 6th Step (8th 1040 hours) | 11.30 | 11.30 | 11.30 | 11.45 |
| 5th Step (5th 1040 hours) | 10.80 | 10.80 | 10.90 | 11.05 |
| 4th Step (4th 1040 hours) | 10.20 | 10.35 | 10.50 | 10.65 |
| 3rd Step (3rd 1040 hours) | 9.90 | 10.05 | 10.20 | 10.35 |
| 2nd Step (2nd 1040 hours) | 9.60 | 9.75 | 9.90 | 10.05 |
| 1st Step (1st 1040 hours) | 9.30 | 9.45 | 9.60 | 9.75 |

Existing Meat Clerks at Steps 5, 6, and 7 have been moved to the next highest step and will start at zero (0) hours towards next progression step.

NOTE:   Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

# EXHIBIT A

## BEEF

### FOREQUARTER

Blade Chuck
Full Standing Rib, Chine bone off (7 inches)
Full Standing Rib, boneless
Whole Fore Shank
English Shortribs
Shoulder Clod
Shortrib
Brisket, boneless
Plate*
Blade Chuck, neck on, boneless
Blade Chuck, neck off
Chuck Roll
Skirt Steak
Neck, bone in or boneless
Fore Shank, squared
Regular Chuck
Arm Chuck
Shin and Shoulder
Ground Meat
Boneless Meat, normal trim which
   would include Flap Meat, Bull,
   Cow Meat
Rib Eye
Boneless Rib Eye
Beef Back Ribs
Boneless Chuck – unnetted or netted
Cross Rib Roast – unnetted or netted
Stew Beef
Beef Chuck, Stack Pac
Beef Ribs, Stack Pac

### HINDQUARTER

Semi-boneless Round
   (Aitch and Shank bone removed)
Sirloin Tip, boneless
Boneless Head Loin
Short Loin
Full Round, Shank off
Top Round
Bottom Round
Head Loin, bone in
Flank Meat
Flank Steaks
Shank, bone in, boneless
Top Sirloin
Filet
New York
New York Strip
Boneless Meat, normal trim
   which would include Flank
   Meat, Heel, and trimmings
Boneless Round
Whole Sirloin Tips-unnetted
   or netted
Tenderloin
Short Loin, Stack Pac

*Not vacuum packed

Offal:      All beef, pork, lamb, and veal, eatable internal organs, such as liver, heart, tongue,
kidney, tripe.

Sausages:   Include fresh, smoked, or frozen beef, pork, veal, and poultry sausages.

## VEAL, LAMB, AND PORK

Carcasses, primal cuts, and all standard wholesale cuts.

## APPENDIX B - FUEL STATION EMPLOYEES

**B.1　WAGES:**　See Appendix A

**B.2　EXCLUSION:**　There shall be one (1) exclusion from the bargaining unit for each Fuel Station operation.

**B.3　HEALTH AND WELFARE:**　In accordance with Section 12, Fuel Station employees' Health and Welfare eligibility shall be at seventy-six (76) hours per month. For employees who were hired on, or were recognized after, January 7, 2005, no Health and Welfare contributions will be made for the first (1st) twelve (12) months of employment.

**B.4　PENSION:**　A Pension contribution of fifty cents (50¢) per straight-time hour worked will be made on behalf of eligible Fuel Station employees for the first (1st) thirty-six (36) months of employment and at the full Pension rate thereafter.

**B.5　HOURS:**　Part-time Fuel Station employees shall be scheduled for at least twenty (20) hours per week.

## CASE-READY MEAT JOB-PROTECTION ADDENDUM

The parties recognize that the competition has been introducing prepackaged case-ready meat products for some time.  The parties further recognize the importance of being able to effectively compete with these measures while at the same time addressing the job security concerns of potentially impacted meat employees.

Although the contract recognizes the conditional right of the Employer to introduce case-ready meats as provided in Section 20 of the Agreement, the parties recognize that an Employer may not wish to comply with all the provisions of that section before introducing case-ready meats.  Accordingly, without waiving any Employer rights to introduce case-ready meats and any Union rights to challenge such introduction as provided in Section 20 of the Agreement, the parties agree as follows:

Notwithstanding anything contained in the Meat Agreement to the contrary, pursuant to this Addendum, the Employer shall not be restricted in, or prohibited from, obtaining and offering for sale fresh, smoked, cured, cooked, and frozen meats, poultry, fish, or seafood which have been cut, prepared, processed, packaged, weighed, and/or priced off the Employer's premises and it is expressly understood and agreed that such shall not constitute a violation of this Agreement.

Should the Employer wish to utilize this Addendum, the Employer shall notify the affected Unions in writing by certified mail of its intention and the effective date of when case-ready meats will be introduced in the stores.  In utilizing this Addendum, the Employer agrees that no Head Meat Cutter, Journeyman Meat Cutter, or Apprentice Meat Cutter employed as of July 1, 2001, and assigned to one (1) of the aforementioned classifications by the Employer shall be laid off, reclassified, or reduced in hours or full-time status.  The Employer still maintains the right to discipline or discharge employees consistent with Section 2 of the Agreement.  The Employer shall have the right to transfer and/or schedule Meat Cutters by seniority to the extent provided for in the contract in more than one (1) store within the geographical seniority area and/or adjacent geographical seniority area(s) as may be necessary to fulfill this obligation, except that the Employer shall not schedule such employee for split shifts. The Employer shall be obligated to provide a minimum of eight (8) hours per calendar day when such Journeyman Meat Cutter is scheduled to work in each store.  Other meat shop manning requirements will be suspended given these job securities in the event the Employer utilizes this Addendum.

The Employer shall continue to have the right to lay off meat employees other than Head Meat Cutters, Journeyman Meat Cutters, or Apprentice Meat Cutters in accordance with the seniority provisions of this Agreement, provided that the layoff of any Meat Wrapper, Butcher Block, Meat Clerk, or Meat Clean-up Clerk assigned to such classification on or before July 1, 2001, is for reasons other than the Employer's utilization of the products set forth above.  The Employer agrees it will demonstrate that said layoff was for such unrelated reasons.  It is understood and agreed that in meeting the job guarantees contained herein, the Employer shall have the right to assign any higher classified employee to perform work in a lower classification.

**Addendum re: Case-ready Meats**
**Page 2**

In the event of a store closure, resulting in the layoff of any Head Meat Cutter, Journeyman Meat Cutter, Apprentice Meat Cutter, or Meat Clerk, such affected employee shall be permitted to exercise his seniority to displace the least senior Meat Cutter or Meat Clerk in the involved bargaining unit's seniority area as provided for herein, or, at the affected employee's discretion, the least senior Meat Cutter or Meat Clerk in the Local Union's jurisdiction. Such least senior Meat Cutter or Meat Clerk affected by the exercise of the most senior Meat Cutter's or Meat Clerk's seniority shall be laid off. This store closure exception shall not apply in the event the Employer closes a store and opens a replacement store within thirty (30) days within three (3) square miles of the closed store. It is understood that in applying this Addendum, Meat Cutters may only displace Meat Cutters and Meat Clerks may only displace Meat Clerks.

**FOR THE EMPLOYER:**

**RALEY'S**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

**LETTER OF UNDERSTANDING**
**BETWEEN**
**UNITED FOOD & COMMERCIAL WORKERS UNION**
**8-GOLDEN STATE**
**AND**
**RALEY'S**
**FOOD DIVISION**

**THIS AGREEMENT** is entered into by and between **UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**, hereinafter referred to as the Union, and **RALEY'S**, hereinafter referred to as the Employer.

The following understanding will apply to the current Collective Bargaining Agreement which is effective October 7, 2007, through October 8, 2011:

> The parties agree that during the merging of the Meat and Retail Agreements that there may have been inadvertent omissions, deletions, or other unintended consequences as a result of the merger. The parties agree to meet and attempt to resolve any such issues

**FOR THE EMPLOYER:**

**RALEY'S**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

## LETTER OF UNDERSTANDING
### BETWEEN
### UNITED FOOD & COMMERCIAL WORKERS UNION
### 8-GOLDEN STATE
### AND
### RALEY'S

## RETIREE HEALTH AND WELFARE COMMITTEE

In order to continue to provide retiree Health and Welfare benefits, the Unions and Employers agree to establish a joint Retiree Health and Welfare Committee for the purpose of redesigning the retiree Health and Welfare plan to provide the best plan/lowest monthly premiums to those participants that have the longest years of credited service.

The committee shall consist of a representative from Save Mart, Raley's, and Safeway and a representative from each Union Local. The committee will have power to act. Each side will have one (1) vote. The Employer committee will be voting as a unit vote.

The committee's charter shall be, at a minimum, to create a multi-level benefit that rewards the participant who retires with more years of credited service. The Union and Employer agree that the multi-level benefit structure will feature some version of a good, better, best approach so that those who retiree with fewer years of credited service receive fewer benefits than those who retire with more.

The Union and Employer acknowledge that there is an inequity in the amount paid for retiree Health and Welfare by those participants who are pre-Medicare as to those who are on Medicare, as a result of Medicare Part B premiums. The Union and Employer agree that it is an objective of this committee to analyze this inequity. Among other things, Unions and Employers will consider graduated premium payments with employees who retire with fewer years of credited service paying a higher premium than those who retire with more years of credited service. Any such premiums shall include a plan for retirees who become affiliate members of a UFCW Local that participates in the Trust Plan. The Union and Employer agree that the projected revenues from the redesigned plans and other sources of realized income will yield at least as much income to the Trust Plan as the current design.

This committee is authorized and directed to consider and develop additional changes to some or all of the Trust Plan and/or eligibility provisions that relate to the following issues:

(1)     Suspension of retiree health care benefits for retirees who become re-employed in any industry, trade or craft (except for temporary industry employment, such as vacation relief), including retirees authorizing the Trust to obtain social security records as a condition to receiving retiree benefits;

(2)     Limiting surviving spouse benefits for future retirees, such as the rule applicable to the Southern California UFCW Unions and Employers Benefit Fund;

(3)     For retirees who suffer a termination of benefits due to an event experienced by their last Employer, develop rules to recognize such retiree's total industry service in order to define the additional work requirement, if any, for such person to re-establish their eligibility for retiree health benefits. For the purposes of this Agreement, an event means the cessation of contributions by an Employer for a bargaining unit of employees, regardless of whether that Employer is continuing to make contributions for other of its bargaining units covered by the Trust Fund, for any of the following or similar reasons:

(4)     Negotiating out the Trust Fund, reaching impasse, decertification from the Union by its employees, filing for bankruptcy, or going out of business; and

(5)     Establishing a withdrawal liability provision for any Employer for which an event, as defined above, occurs.

The committee will have until June 30, 2008, to complete the objectives as described above for implementation by January 1, 2009.   If the parties are unable to reach agreement by June 30, 2008, or another mutually agreeable date, the issue will be directed to binding arbitration.

**FOR THE EMPLOYER:**

**RALEY'S**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

## LETTER OF AGREEMENT
### BETWEEN
### UNITED FOOD & COMMERCIAL WORKERS UNION
### 8-GOLDEN STATE
### AND
### RALEY'S

### SUPER CARD

The bargaining parties hereby agree to cooperate mutually to create and implement what is known as the Super Card. The Super Card may cover the following functions depending on what the parties might agree upon and what might be technologically feasible for any or all parties: Health Fund ID card, HRA card, Employer ID card, time/attendance card, direct deposit card, debit/banking card, Union membership ID card, discount card, money transfer card, related functions, and such other functions and purposes as the parties may mutually agree are desirable or advisable.

The parties acknowledge that the exact legal structure by which the Super Card will be owned, operated, and used is as yet not determined. The parties agree that the ownership, operation, and use of the Super Card will be implemented in a manner consistent with all legal requirements and in a manner that would be most tax efficient. Additionally, the parties agree to create a joint labor-management committee that is empowered to agree on the legal structure of the Super Card. The committee shall comprise a representative from Safeway, Raley's, and Save Mart for management, and a representative from UFCW 8, Local 5, Local 101, and Local 648 for the Unions. The parties agree that the ownership, operation, and use of the Super Card is yet to be determined. Voting shall be by unit vote for management and the Unions.

The parties recognize that one (1) of the purposes of the Super Card is to generate income. The parties agree that any income from the card will be allocated first to offset the cost and expense of the card. If there is any income residue after offsetting such costs and expenses, then fifty percent (50%) of the remaining income will be divided among Employers participating in the UFCW Health Fund prorated based on the amount each Employer has contributed to the Fund during the time period that the income was generated. The other half of any income residue shall be used as directed by the Unions that have signed up for the Super Card program for the exclusive benefit of the bargaining unit employees.

The parties will endeavor to complete their work on the Super Card as outlined above by the end of the first (1st) quarter of 2008.

FOR THE EMPLOYER:

**RALEY'S**

FOR THE UNION:

**UNITED FOOD & COMMERCIAL
WORKERS UNION
8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

**EXHIBIT B**



# UFCW 8
## GOLDEN STATE
United Food and Commercial Workers

### Jacques Loveall
#### President
#### International Vice President

## COLLECTIVE BARGAINING AGREEMENT

## WITH

## BEL AIR MARKETS
### Food and Meat

### NOVEMBER 17, 2007-DECEMBER 8, 2011

**NOTES**

# INDEX

| | SECTION | PAGE |
|---|---|---|
| Adjustment Board and Arbitration of Disputes. | 18 | 47 |
| Basic Workday and Week. | 6.1 | 19 |
| Classification of Employees. | 9 | 24 |
| Clerk's Work. | 1.2 | 1 |
| Contract Enforcement. | 16 | 46 |
| Courtesy Clerk. | 9.1.6 | 27 |
| Consecutive Days. | 6.3 | 22 |
| Daily Guarantee. | 7.7 | 23 |
| Demonstrators. | 9.4 | 32 |
| Discharge and Layoff. | 3 | 8 |
| Dues Checkoff. | 5.18 | 19 |
| Employment and Union Membership. | 2 | 6 |
| Field Administration Trust Funds. | 14 | 45 |
| Free Time. | 16.3 | 46 |
| Funeral Leaves. | 5.16 | 18 |
| Clerk. | 9.1.5 | 26 |
| General Provisions. | 5 | 14 |
| Good Friday. | 10.2 | 35 |
| Health Insurance, Dental, and Sick Leave. | 12 | 38 |
| Holidays. | 10 | 34 |
| Holiday Eve. | 7.4 | 23 |
| Holiday Pay Eligibility (Regular Employees). | 10.4 | 35 |
| Holiday Workweek. | 6.1 | 20 |
| Hours, Overtime, and Sunday Premium. | 6 | 19 |
| Job Injury. | 5.12 | 17 |
| Job Referral and Nondiscrimination. | 2.4 | 6 |
| Jury Duty or Court Appearances. | 5.14 | 17 |
| Layoff, Recall, and Promotion. | 4.3 | 10 |
| Leaves of Absence. | 5.15 | 18 |
| Lie Detector Tests (Polygraphs). | 3.5 | 9 |
| Meal Period. | 7.5 | 23 |
| Military Service. | 5.3 | 15 |
| Night Premium. | Appendix A | 50 |
| Owners. | 1.7 | 4 |
| Overtime. | 6.2 | 20 |

Continued..........

# INDEX

| | SECTION | PAGE |
|---|---|---|
| Payroll Data | 5.13 | 17 |
| Payday and Deductions | 5.8 | 16 |
| Pension | 13 | 42 |
| Pharmacy Technician | 9.1.10 | 29 |
| Previous Experience | 9.1.3 | 26 |
| Probation Period | 3.1 | 8 |
| Promotion | 4.3.1 | 10 |
| Recognition and Contract Coverage | 1 | 1 |
| Returned Checks | 5.17 | 19 |
| Salesmen | 1.9 | 4 |
| Schedule Selection | 4.5 | 11 |
| Scheduled Work | 6.4 | 22 |
| Senior Clerk Ratio | 9.1.4 | 26 |
| Seniority | 4 | 9 |
| Shift Interval | 7.2 | 22 |
| Step-Up Rules | 9.3 | 30 |
| Store Managers | 1.6 | 3 |
| Store Meetings | 15 | 45 |
| Strike or Lockout | 19 | 48 |
| Sunday Rate | 6.2.1 | 20 |
| Term of Agreement | 20 | 49 |
| Termination | 3.2 | 8 |
| Termination Vacation Pay | 11.9 | 37 |
| Transfer | 4.9 | 12 |
| Transfer or Removal of Work | 9.7 | 33 |
| Travel Allowance | 9.5 | 32 |
| Traveling Clerks | 1.10 | 4 |
| Uniforms and Special Wear | 5.6 | 15 |
| Union Business | 5.10 | 16 |
| Union Store Card | 5.11 | 17 |
| Vacations | 11 | 35 |
| Vacation Pay Computation | 11.3 | 36 |
| Wage Rates (All Classifications) | Appendix A | 50-52 |
| Work Schedules | 7 | 22 |
| Work Performance | 3.3 | 8 |

# COLLECTIVE BARGAINING AGREEMENT
## BETWEEN
## UNITED FOOD & COMMERCIAL WORKERS UNION
## 8-GOLDEN STATE
## AND
## BEL AIR MARKETS

**THIS AGREEMENT**, entered into this 17th day of November 2007, by and between **BEL AIR MARKETS**, referred to hereinafter as the "Employer", and **UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**, chartered by the United Food & Commercial Workers International Union, referred to hereinafter as the "Union."

It is the intent and purpose of the Employer and the Union to promote and improve labor-management relations between them and to set forth herein the basic terms of agreement covering wages, hours, and conditions of employment to be observed.

## W I T N E S S E T H :

In consideration of mutual promises and agreements between the parties hereto, and in consideration of their mutual desires in promoting efficient conduct in business and in providing for the orderly settlement of disputes between them, the parties to this Agreement agree as follows:

## SECTION 1.  RECOGNITION AND CONTRACT COVERAGE

**1.1    RECOGNITION:**  The Employer hereby recognizes the Union as the sole collective bargaining agent for an appropriate unit consisting of all employees working in the Employer's stores within the geographical jurisdiction of the Union, except supervisors within the meaning of the National Labor Relations Act, as amended.

Where the Union is only recognized in either the Meat or Retail Department, only those pertinent sections of the Collective Bargaining Agreement will apply.

**1.2    CLERK'S WORK:**  The work covered by this Agreement shall be performed only by members of the appropriate unit as defined in Subsection 1.1 above, and such work shall consist of all work and services connected with or incidental to the handling or selling of all merchandise offered for sale to the public in the Employer's stores including the demonstration of such products, but excluding:

   **1.2.1**   Supervisory functions;

   **1.2.2**   Work of employees heretofore expressly excluded from the provisions hereof by agreement of the parties;

   **1.2.3**   Such work as is performed within the geographical jurisdiction of this Union by a driver/salesman, merchandiser, or rack jobber engaged in servicing the retail food stores with merchandise, an outside supplier, or reset crew.

   It is agreed that no Clerk or Senior Clerk on the payroll as of January 7, 2005, shall be laid off or have his hours reduced as a direct result of the changes in the above paragraph.

**1.2.4**  Notwithstanding anything herein to the contrary, and except as modified by Subsection 1.14 below, the Employer may, at its discretion on a store-by-store basis, assign members of the bargaining unit to handle merchandise or products which were formerly handled by non-bargaining unit employees of suppliers. After any such assignment to members of the bargaining unit, the Employer may, at its discretion, make further changes in work assignment including, but not limited to, reverting back to the former practice of utilizing the services of outside suppliers.

**1.3     MEAT CUTTER WORK:**  It is agreed that all fresh meat shall be cut, prepared, and fabricated on the premises, by a Head Meat Cutter, Journeyman Meat Cutter, or Apprentice Meat Cutter; provided, however, the carcasses may be processed up to and including the maximum reductions listed and described on the attached Exhibit A and may be delivered to the premises in that form but all further processing of these parts shall be performed on the premises.

There shall be a Journeyman or Apprentice Meat Cutter on duty at all times where fresh meat is offered for sale except as otherwise provided for in Subsection 9.1.8 of this Agreement and as follows:

**1.3.1**  A Journeyman Meat Cutter or Apprentice Meat Cutter shall not be required to be on duty between the hours of 6 p.m. and 6 a.m.  In addition to those sections set forth above, Meat Departments with one hundred twenty (120) scheduled hours (excluding Clean-up Workers) or less per week shall not be required to have a Journeyman Meat Cutter on duty for a period of three (3) hours per day and/or eighteen (18) hours per week. If the Employer wishes to utilize the above exemption or a special exemption, the Union shall be notified and the hour exemption shall be discussed but in no instance shall there be less than one (1) full Meat Cutter shift scheduled Sunday through Saturday and holidays.  If a Meat Department qualifies and utilizes the one hundred twenty (120) hour Journeyman-on-duty exemption, then they are not entitled to the 6 p.m. to 6 a.m. waiver set forth above.

**1.3.2**  When fresh meat is offered for sale and a member of the bargaining unit is not on duty in the Meat Department during such hours, no one other than a member of the bargaining unit shall perform work in the Department.

**1.3.3**  No employee, presently employed in the jurisdiction of the Union, employed as of November 1, 1985, will have his hours reduced or will be laid off as a direct result of implementing the modification of Exhibit A hereof or modification of Journeyman-on-duty or the introduction of pre-priced products set forth in Subsection 1.3.4 below.

**1.3.4**  Lunch meats, pre-sliced bacon, dissected and pre-fabricated fowls, ground beef and pork sausages in visking casing, fish, and/or rabbits which, pursuant to current custom and practices, are presently pre-fabricated and dissected, along with all cooked or pre-cooked meats, or combinations of such meat products, whether in bulk or package form, need not be cut on the premises; but all the above products, along with fresh, frozen, smoked, or cooked sausages, shall be handled, displayed, dispensed, and offered for sale by employees covered by this Agreement.   Notwithstanding the above, pre-priced poultry (whole, cut-up, and/or parts), fish, liver, sausage, and smoked or cured meats may be merchandised.

Offal may be brought into the market pre-packaged and pre-priced.

Tortillas may be handled, stocked, and displayed by vendors.

In the event of the deliberate failure of an Employer to schedule an employee to work in accordance with the provisions of this Collective Bargaining Agreement, when fresh meat is offered for sale, the Employer will be required to pay, in accordance with Section 1.12.

The parties agree to monitor and evaluate the status of products listed on Exhibit A hereof during the term of this Agreement. A committee of Bel Air Markets and the Local Unions, shall have the authority to add to, modify, and/or delete from the list of cuts.

Authority set forth above shall be exercised only by mutual agreement of the members of the Committee. Where disputes arise or mutual agreement cannot be reached, said disputes shall be referred to the procedures set forth in Section 17 New Methods of this Agreement for binding resolution.

Nothing contained herein or in this Agreement shall prevent the Committee from implementing actions and/or modifications, nor shall this provision limit the ability of individual companies and individual Unions to negotiate separate understandings.

**1.4    SUBCONTRACTING AND SUBLEASING:** It is recognized that the Employer and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement. Therefore, except for work which is exclusively inventory or janitorial work (such as washing windows, washing or waxing floors, and cleaning restrooms), or work hereinabove excluded, no work covered by this Agreement, as defined in Subsection 1.2 and 1.3 above, shall be performed under any sublease, subcontract, or other agreement unless the terms of said lease, contract, or other agreement specifically provide:

    **1.4.1**   That all such work shall be performed only by members of the appropriate unit as defined in Subsection 1.1 above;

    **1.4.2**   That the Employer shall at all times hold and exercise full control of the terms and conditions of employment of all such employees pursuant to the terms of this Agreement.

**1.5**    It is recognized that if the terms of the Employer's lease, contract, or other agreement obligates the lessee or other party, as the case may be, to pay the wages and observe the other terms and conditions of this Agreement, then the Union agrees that the sole and entire financial responsibility for meeting the costs of observance of this Agreement shall be upon said lessee or other party and not upon this Employer and that it shall be, and by these presents is, hereby released from any and all financial liability in connection therewith.

**1.6    STORE MANAGERS AND ASSISTANT STORE MANAGERS:** None of the provisions of this Agreement need apply to one (1) overall Supervisory Store Manager, the Assistant Store Manager and, in stores of thirty-five thousand (35,000) square feet or more, a Second Assistant Store Manager and their work in each retail food store in which an owner is not actively engaged on the premises. The Store Manager and Assistant Store Manager(s) shall not be restricted as to the amount of non-supervisory work they may perform. Meat Departments see Store Manager Training below.

No Assistant Store Manager shall be involuntarily reclassified as a direct result of this provision during the term of this Agreement.

**STORE MANAGER TRAINEES (MEAT DEPARTMENT):** Employees who are in bona fide Store Management Training Programs may work in covered employment, including handling the "tools of the trade", so long as said work is for the purpose of familiarizing the Manager Trainee to the Meat Department operations. No Meat Department employee shall have his hours reduced or be laid off as a direct result of the training program. Before any employee commences training in the Meat Department, the Union shall be notified, in writing, of the name(s) of the trainees, the location(s), the training start date, and the expected duration.

**1.7  OWNERS:** There shall be not more than two (2) Employers in any store or group of stores having common ownership. In partnerships, "Employer" as used in this subsection means only bona fide partners who own an interest in the assets and in the profits of the partnership. In corporations, "Employer" as used in this subsection means only two (2) officers of the corporation who own capital stock of the corporation. No more than two (2) shareholders of a corporation or more than two (2) bona fide partners shall be deemed or classified as an Employer within the meaning of this Agreement. Employers as thus defined may do such work as is necessary in the conduct of the business. All other persons performing work under the jurisdiction of the Union shall be members of the Union and shall be governed by the provisions of this Agreement.

**1.8  NEW OWNER:** This Agreement shall be binding upon the successors and assigns of the parties hereto. Except as set forth in Section 11 Vacations, during the life of this Agreement, employee benefits provided for herein shall not be affected by the sale or transfer of the business for those employees who are retained by a new Employer for a period of more than sixty (60) calendar days. For employees who choose to be employed by such new owner, such sixty (60) calendar-day period shall be considered a probationary period during which time employees may be terminated without recourse to the grievance procedure, unless such termination is in violation of Section 2 Employment and Union Membership, Subsection 2.4.2, or Section 3 Discharge and Layoff, Subsection 3.1 of this Agreement.

**1.9  SALESMEN:** The Employer assumes a particular responsibility to require observance of this Agreement on the part of book salesmen. The Employer shall give to one (1) employee on each shift written authorization to request any book salesman performing work in violation of this Agreement to cease such work. If the book salesman does not comply with such request, then the authorized employee shall report the matter to the Employer or Store Manager, who shall then cause the book salesman to cease such work.

**1.10  TRAVELING CLERKS:** It is agreed by the Employer and the Union that employees may be assigned to work in two (2) or more different stores located in the geographical jurisdiction of two (2) or more Local Unions. Each such employee shall be covered by all of the terms and conditions of the Agreement which is in effect in the area in which he works the major portion of his time. In the event that he does not work the major portion of his time in any one (1) area, then the Employer shall designate the area Agreement under which he is working and shall give written notice of the area so designated to the Union.

**1.11  INDIVIDUAL AGREEMENTS:** The Employer agrees that no employee covered by this Agreement shall be compelled or allowed to enter into any individual contract or agreement with said Employer concerning wages, hours of work, and/or working conditions that provides less benefits than the terms and provisions of this Agreement, except by written agreement of the Employer, the employee, and the Union. However, the Union agrees to allow new employees to enter into separate voluntary agreements providing for arbitration of statutory discrimination claims and remedies not covered by this Collective Bargaining Agreement under current case law.

**1.12  ENFORCEMENT:** When the Employer has knowingly permitted non-bargaining unit persons to perform work in violation of this Agreement, it shall be liable in damages payable to a recognized charity mutually agreed to by the parties in the amounts below for each proven violation. On a store-by-store basis:

**1.12.1** At the time of the first (1st) knowing violation, an amount equal to one (1) day's wages at the regular Clerk's rate plus equivalent Health and Welfare and Pension contributions.

**1.12.2** At the time of a second (2nd) knowing violation, an amount equal to two (2) days' wages at the regular Clerk's rate plus equivalent Health and Welfare and Pension contributions.

**1.12.3** An additional day's wages plus the equivalent Health and Welfare and Pension contributions shall be added cumulatively for each subsequent knowing violation.

**1.13   NEW STORES AND REMODELS:** During any three (3) consecutive days preceding the reopening of an old food market or discount center of the Employer, which has been closed for remodeling for a period of thirty (30) days or less, upon prior notice to the Union, persons not in the bargaining unit may perform any work in such store.

Notwithstanding any language to the contrary contained in this Agreement between the parties, it is agreed this Agreement shall have no application whatsoever to any new food market or discount center until fifteen (15) days following the opening to the public of any such new establishment. Neither shall this Agreement have any application whatsoever to any food market or discount center which is reopened after it has been closed for a period of more than thirty (30) days until the fifteenth (15th) day following the date of such reopening to the public.

The Employer shall staff such new or reopened food market with a combination of both current employees and new hires, in accordance with current Industry practices of staffing such stores with a cadre of current employees possessing the necessary skills, ability, and experience, plus sufficient new hires to meet staffing requirements. Employees, who are thus transferred, upon whom contributions are made to the various Trust Funds shall continue to have contributions to the several Trust Funds made on their behalf in the same manner and in the same amount per hour as such contributions were made prior to their transfer.

Notwithstanding anything in this Agreement to the contrary, it is agreed that when the remodeling of an existing location occurs without such store being closed, the Employer shall only be obligated to give the members of the bargaining unit employed by it in such store an opportunity to perform the work required for such remodeling at the applicable contract rate, except that such opportunity to perform such work shall not include any overtime hours. When members of the bargaining unit within such store are not available for such work, such work may be performed by persons not in the bargaining unit.

Notwithstanding anything to the contrary contained in this Agreement between the parties, it is agreed and understood that the probationary period for any new hires in such new or reopened stores referred to above shall not begin until the fifteenth (15th) day following such opening or reopening of such stores to the public.

**1.14   In the event the Employer creates new jobs or job duties involving the handling or selling of merchandise not heretofore handled or sold by the Employer, such new work shall be deemed Meat or Clerk's work and performed by members of the bargaining unit, except that, for a temporary period of tryout and familiarization not to exceed six (6) months in each store following the introduction of such new category of merchandise, the Employer may contract for the performance of all or part of such work by non-bargaining unit persons. After the six (6) month period has expired, the wage rates and classification for such new jobs or job duties shall be subject to mutual agreement of the parties. Upon request of the Union, the Employer shall meet to discuss the wage rates and classification for such new jobs or job duties no later than ninety (90) days after the introduction of said merchandise. In the event the parties are unable to agree on the above, disputed matters shall be processed in accordance with Section 18 Adjustment Board and Arbitration of Disputes, Subsection 18.3 of this Agreement with a decision being rendered by the end of the six (6) month trial period, unless that time period is extended by mutual agreement.  This paragraph does not apply to Bel Air's Guest Service Center.

**1.15   RETAIL SALES MERCHANDISERS:** Employees working under subcontracts for Retail Sales Merchandising Services, hired after April 11, 1986, shall be paid the rate of pay of Clerks and shall have the same progression steps. Current employees shall be slotted into the progression steps leading to the experienced Clerk rate of pay.

## SECTION 2. EMPLOYMENT AND UNION MEMBERSHIP

**2.1   UNION SHOP:** On and after thirty (30) days of employment or the date of execution of this Agreement, whichever is later, each employee shall become and remain a member of the Union as a condition of employment; provided, however, that the Employer shall not be obligated to discharge any employee in violation of the National Labor Relations Act, as amended. Upon written notification from the Union that an employee has failed to make timely tender to the Union of initiation fees and/or periodic dues, the Employer agrees to terminate said employee within seven (7) days from such notice.

Following a termination under this provision, there shall be a grace period of thirty (30) days during which time, if the Union presents the Employer with bona fide evidence that the termination demand was improper, the employee shall be reinstated within seven (7) days from such notice. In the event reinstatement occurs, the employee shall be made whole by the Union.

The Union agrees to indemnify and hold the Employer harmless in any and all claims and/or causes of action which arise out of or are in any way connected with the Employer's compliance with this provision.

**2.2   UNEMPLOYED LIST:** The Union agrees to keep an up-to-date list of known unemployed Clerks with an accurate record of their experience or training, and the Employer agrees to notify the Union of vacancies in positions or job openings within the classifications covered by this Agreement in order that the unemployed Clerks on the aforementioned list may be provided with a full opportunity to fill such vacancy. In filling vacancies, the Employer shall give preference to applicants with previous employment experience in the Industry in the area covered by this Agreement.

**2.3   REGISTRATIONS:** The Union agrees to accept registrations for employment upon each list so maintained and to dispatch applicants for employment from said list for vacancies or job openings with the Employer in accordance with their specification and this Agreement.

**2.4   JOB REFERRAL AND NONDISCRIMINATION:**

**2.4.1**   The Union shall be allowed two (2) days, on which its office is open, to refer applicants. Selection by the Union of applicants for referral to jobs shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of Union membership.

The Employer shall retain the right to reject any job applicant referred by the Union, provided such rejection is not a violation of this Agreement. The Union agrees that the Employer may employ persons from other sources when applicants satisfactory to the Employer are not available from the lists maintained by the Union.

**2.4.2**   The Employer shall not discriminate against any person in regard to hire, tenure of employment, or job status because of race, creed, religion, color, sex, or national origin, nor shall age, disability unrelated to the job duties, or veteran status under any circumstances be a basis for rejection or termination of an otherwise qualified employee and applicant for employment.

**SEMANTICS:**  When used, the terms "he" and "Journeyman" refer to human beings of either sex and are used only for grammatical simplicity.

**2.4.3**  Disputes or disagreements arising out of this section shall be referred to the Adjustment Board and the arbitration process as provided for in Section 18 of this Agreement.

**2.5  OTHER HIRING:**  Whenever new employees are hired for jobs covered by this Agreement from sources other than the list maintained by the Union or when employees are transferred to jobs covered by this Agreement from outside the jurisdiction of this Union, the Employer shall:

**2.5.1**  Promptly notify the Union of such employment, in writing, giving the date, place, and job classification of the employment and the name and address of the new employee; and

**2.5.2**  Promptly advise the new employee of the terms and provisions of this Agreement and of his obligations hereunder; and

**2.5.3**  The Employer will pass out to and collect from newly hired employees Union application forms.  The Union application forms will be provided by the Union.  The responsibility to forward the application to the Union will be the responsibility of the employee or the Employer.  The application shall be forwarded to the Union no later than forty-five (45) days from the date the new employee was hired.

**2.5.4  EMPLOYMENT:**  If the Employer obtains a new employee through a private employment agency or a private training school, the Employer shall pay the employment agency fee or any training fee paid by or required of the employee.

**2.6  NEW EMPLOYEES:**  The provisions of this Agreement shall apply to the employment of any person covered by this Agreement while such person is not a member of the Union.

**2.7  EXTRA WORK:**  Employees on the payroll of the Employer will be given preference for additional straight-time work before any other person who has worked during the same week on another job outside the Retail Industry is hired for such work.

**2.8  EXTRA WORKER (Meat Department Only):**  An Extra Worker is not considered a new hire and is one who is used on a daily and/or temporary basis and is not subject to the probationary period of Section 3.1 hereof, except as set forth below:

An Extra Worker may qualify to become a regular employee if he has completed sixty (60) days of employment within a calendar year with the hiring Employer.

After completion of sixty (60) days of employment, the Employer will, upon request, provide an Extra Worker with an application for employment; and when hired, no further probationary period will be required.

Upon receipt of the application by the Employer, the Employer shall have thirty (30) days to answer the Extra Worker, in writing, as to the availability of employment. Said application shall remain on file for a period of one (1) year.

When an Extra Worker is hired, his seniority date as a regular employee for all purposes under this Agreement shall commence from his date of hire.

Extra Workers shall be entitled only to those benefits and contract rights reserved for Extra Workers within this Collective Bargaining Agreement.

Extra Workers shall receive the Extra rate of pay for all hours worked.

Extra Workers, discharged for cause, shall be paid for time worked.

Extra Workers who report late for work need not be put to work; provided that, if put to work at all, they shall be paid only for the time worked.

In the event the Union dispatches an employee who was previously discharged for cause by the Employer, the employee shall not be entitled to any minimum guarantees of work or pay.

## SECTION 3.  DISCHARGE AND LAYOFF

**3.1**    The Employer shall not discharge or discriminate against an employee for upholding Union principles, for serving on a committee of the Union or any organization affiliated therewith, or for refusing to purchase stocks, bonds, securities, or any interest in the Employer's business should the Employer be operating as an individual, firm, company, partnership, joint stock company, or corporation.

**PROBATION:** There shall be a probationary period of sixty (60) calendar days for all employees. During the probationary period, a probationer may be discharged without right of appeal except if such discharge is in violation of Section 2 Employment and Union Membership, Subsection 2.4 or 2.8 of this Agreement or this Subsection 3.1.

**3.2    TERMINATION:**  Except for reasons beyond the Employer's control, regular employees shall be given three (3) working days' notice of layoff or the equivalent pay, except when such termination has been for cause, such as dishonesty, insobriety, insubordination, (as defined in Webster's International Dictionary), fighting on the job, malicious destruction of property, illegal use of narcotics or improper conduct, under circumstances requiring immediate termination. Discharge for failure to comply with Subsection 2.1 above shall be deemed a discharge for cause. Employees who work on two (2) days per week shall be given two (2) working days' notice under like conditions. In all such cases, the day on which such notice is given shall not be counted unless notice is given before the day's work begins. [A regular employee is one who has been in the continuous employ of the Employer for a period of ninety (90) days or longer.]

The Employer shall provide a list of terminations with social security numbers to the Union monthly.

**3.3    WORK PERFORMANCE:**  The Employer shall have the right to discharge any employee for just cause. Any employee claiming unjust dismissal, demotion, or suspension shall make his claim therefore through the Union, in writing, to the Employer within ten (10) business days of such dismissal, demotion, or suspension, otherwise no action shall be taken by the Union.

Any dispute arising out of any such suspension, demotion, or discharge not settled by the parties shall be subject to the provisions of Section 18 Adjustment Board and Arbitration of Disputes of this Agreement.

**3.3.1**   Before a regular employee is discharged, suspended, or demoted for incompetency or failure to perform work as required, he shall receive a written warning (with a copy to the Union) and be given an opportunity to improve his work. Notices and warnings shall become null and void after six (6) months from the date of issue.

**3.3.2** Upon severance of employment of any employee, the Employer shall, within seven (7) calendar days thereafter, notify the Union of such resignation, layoff, or discharge. If discharge is for cause, the Employer agrees to submit the reasons therefor to the Union upon request.

**3.4    RECORD:** Any employee who is terminated shall, upon request, be given a statement setting forth the date of hiring and the number of hours worked during his employment.

**3.5    POLYGRAPHS:** No Employer shall demand or require any applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector, or similar test or examination as a condition of employment or continued employment.

## SECTION 4. SENIORITY

**4.1    DEFINITION:** Seniority shall mean continuous service with the Employer, and no employee shall suffer loss of seniority by reason of approved leave as provided for in this Agreement.

**4.2    CLASSIFICATION:** Seniority shall be by classification listed as follows and in Section 1 Recognition and Contract Coverage, Subsection 1.3, and Section 9 Classification of Employees of this Agreement:

    **(1)**    Managing Clerks

    **(2)**    Senior Head Clerks and Senior Produce Clerks

    **(3)**    Head Clerks

    **(4)**    Senior Clerks

    **(5)**    Clerks

    **(6)**    Courtesy Clerks – subject to the restrictions of Section 9 Classification of Employees, Subsection 9.1.5.4 hereof. Seniority of Courtesy Clerks shall be on a store-by-store basis, except that Courtesy Clerks transferred to another location will carry Courtesy Clerk seniority with them to the new location.

In the event that a Clerk who has previously served as a Courtesy Clerk is going to be laid off before the completion of the first (1st) one thousand forty (1,040) hours of the Clerk progression then, in that event, the Clerk may step back temporarily into the Courtesy Clerk classification at the store in which he is currently working until recalled.

    **(7)**    Head Meat Cutters

    **(8)**    Journeyman Meat Cutters and Apprentice Meat Cutters – [For the purposes of layoff and recall, Journeyman Meat Cutter and Apprentice Meat Cutter shall be considered as one (1) classification.]

    **(9)**    Meat Clerks, Cashiers, and Delicatessen Workers (conventional and self-service)

    **(10)**    Employees employed in classifications covered by addendum agreements shall be deemed separate classifications.

**4.3    LAYOFF, RECALL, AND PROMOTION:** With respect to layoff, recall, and promotion, seniority shall be based upon the length of service with the Employer in each of the areas covered by this Agreement as referred to in Subsection 4.3.1 below; provided, where an employee is transferred by the Employer to such area from another area, the transferred employee shall retain all seniority with the Employer but shall not be entitled to exercise such rights with respect to layoff, recall, or promotion until the expiration of six (6) months after the date of transfer, at which time his seniority shall be based upon the first (1st) day of employment by the Employer regardless of area. However, during such period of six (6) months, the transferred employee shall accrue seniority rights in the new area from the date of transfer and shall retain all seniority rights with respect to layoff, recall, and promotion in the area from which he was transferred, provided, however, that for the affected retail-only employees in the Fort Bragg, Clearlake, Russian River, Burney, Mt. Shasta, Weed, Yreka, Lake Tahoe Basin, and Truckee areas, the six (6) month period hereinabove provided shall be extended to eight (8) months.

It is recognized that employees must possess the necessary qualifications to perform the available work when asserting their seniority rights into or out of the Employer's Produce Department or for work assignments requiring specialized skills and background.

**4.3.1    PROMOTION:** Determination of which employee is to be promoted to Senior Clerk or Meat Cutter will be based upon qualifications and seniority. Qualifications shall include overall retail food experience, job performance, aptitude, attendance, and successful completion of formal training. Training opportunities will be posted and offered to the most senior employees that bid and who have no suspensions in the preceding six (6) months, effective January 7, 2007. Written discipline within the preceding six (6) months may be considered when determining eligibility for training opportunities. Where qualifications are approximately equal, seniority shall control. No trial period shall be required.

All permanent job vacancies above the Senior Clerk or Meat Cutter classification shall be posted at each store of the Employer within the seniority area as specified herein for a period of seven (7) days. The job posting shall specify the job classification and location of the store where the permanent job vacancy exists. Any employee interested in the permanent job vacancy must complete an electronic job bid on or before the expiration of the posting period. In the event the Employer decides to promote an existing employee to fill the permanent job vacancy then, in that event, the selection of the employee to be promoted shall be in accordance with the provisions set forth herein.

Any successful bidder who thereafter declines the promotion or is unable to perform the duties of the job shall be ineligible for any subsequent promotional bid for a period of six (6) months.

All permanent job vacancies below a Meat Cutter or Senior Clerk, except Courtesy Clerks, shall be posted at each store of the Employer, on a store-by-store basis, for a period of seven (7) days. Courtesy Clerks desirous of promotion and who are otherwise reasonably qualified for a promotional opportunity in accordance with provisions below must file a bid. Determination of which employee is to be promoted will be based upon reasonable qualifications and seniority. Qualifications shall include such factors as experience, job performance, aptitude, attendance, etc. Where qualifications are approximately equal, seniority shall control. No trial period shall be required.

The Employer agrees to provide the Union with a list of employees, bimonthly, who have been promoted to positions above Senior Clerk.

There shall be no reduction in pay when a Clerk or Addenda employee is promoted to a Senior Clerk vacancy. Said employee's rate of pay shall be frozen until the employee completes the hours necessary to warrant an increase under the progression steps.

**4.3.2   LAYOFF:** In the reduction of the number of employees due to lack of work, the last employee hired in the classification shall be the first (1st) to be laid off and, in recall, the last employee laid off in the classification shall be the first (1st) recalled until the list of employees previously laid off has been exhausted. For purposes of this section, a layoff is defined as being reduced to zero (0) hours.

**4.3.3   RECALL:** Employees who are laid off due to lack of work shall have seniority rights in recall for jobs subsequently available with the Employer prior to the hiring of new employees. Such employees shall be notified in person by telephone or, if not reached by telephone, such employee shall be notified by certified mail, a copy of which shall concurrently be sent to the Union. The employee shall have three (3) days to report after receipt of a copy of such notice of recall.

**4.3.4** It is further understood that the employee will not be able to claim wages under the provisions of Subsection 4.3.3 above, except for hours lost commencing with the weekly schedule immediately following the Union's notification to the Employer of the claim and thereafter until resolved.

If the employee or the Union gives written notice to the Employer within seven (7) days of his notice of layoff, the above provisions do not apply.

**4.4     LOSS OF SENIORITY:** No employee shall suffer loss of seniority unless he:

(1)     Is discharged for just cause;

(2)     Resigns or voluntarily quits;

(3)     Is absent from work for six (6) consecutive months due to layoff, provided, however, that for the affected employees in the Fort Bragg, Clearlake, Russian River, Burney, Mt. Shasta, Weed, Yreka, Lake Tahoe Basin, and Truckee areas, the six (6) month period hereinabove provided shall be extended to eight (8) months;

(4)     Is absent from work for more than thirty (30) days due to death in the immediate family;

(5)     Fails to return to work upon completion of a leave of absence as defined in Section 5 General Provisions, Subsection 5.14 hereof;

(6)     Fails to report for work when recalled as provided in Subsection 4.3.3 above.

When personal leaves are granted by the Employer, the employee shall be given written notice thereof specifying the extent of such leave.

**4.5     SCHEDULE SELECTION:** The word "schedule" is interpreted to mean the weekly work schedule including work on premium days and early and late work schedules.

**4.5.1** It is recognized that management has the right to establish such weekly work schedules to meet the requirements of the business; provided, however, such right shall not be utilized in an arbitrary or capricious manner to deprive an employee of his ability to exercise his seniority right to select such work schedule.

**4.5.2** Employees may select such schedules according to seniority by classification, applied on a store basis, provided they possess the necessary qualifications for the schedules selected. Qualifications shall include such factors as experience, job performance, aptitude, attendance, etc.

**4.5.3**   It is understood part-time employees and Clerks may not bid for the schedule of other employees.

**4.5.4**   The Employer shall not recognize the schedule selection request of any employee if the granting of the request would place the Employer in a position of violating this Agreement or having to pay a penalty for improper scheduling of shift intervals or consecutive workdays.

**4.6   RELIEF WORK:** Employees assigned to regular relief work may, after six (6) months on such work, request the Employer, in writing, to be assigned to work in one (1) store. The rescheduling of such relief work shall be done within thirty (30) days and be based upon inverse seniority. This provision shall not apply to temporary relief work required as a result of illness, injury, vacation, or other like temporary relief work.

**4.7   LISTS:** Upon request by the Union, the Employer agrees to provide a seniority list of its employees semiannually.

**4.8   TEMPORARY ASSIGNMENTS:** The Union will cooperate with the Employer in the scheduling of employees for temporary part-time or relief work outside the geographical jurisdiction of this Agreement. However, no employee shall be discriminated against for refusal to accept such assignment.

**4.9   TRANSFER:** Transfers from one (1) seniority area to another seniority area shall not be compulsory nor shall any employee be disciplined or otherwise discriminated against for refusing to accept such a transfer.

Request for transfer, within the Union's territorial jurisdiction, so an employee may work nearer his home will be given proper consideration and will not be refused arbitrarily.

Within an individual seniority area, the Employer agrees that it will not arbitrarily or capriciously transfer employees.

No employee shall be required to accept a permanent transfer outside the jurisdiction of this Union unless approved by the Union.

**4.10   PART-TIME EMPLOYEES:**

**4.10.1 REQUEST FOR FULL-TIME WORK:** Promotions to full-time will be accomplished by promoting the most senior employee in the affected classification so long as the most senior employee does not have any suspensions in the past six (6) months.   Written discipline, within the preceding six (6) months may be considered when determining eligibility for full-time promotions.   Promotions will be accomplished by geographical seniority area.

**4.10.2 REQUEST FOR ADDITIONAL HOURS:**   Part-time employees may request additional available hours within their classification on a store-by-store basis, provided they have the previously mentioned qualifications, are available for the hours, and have notified their Store Manager, in writing, of their desire for more hours; and they shall be afforded such hours by seniority.

**4.10.3 REMOVAL FROM LIST:** Employees refusing an offer of full-time work, requesting part-time work after having been selected for full-time work, indicating their unavailability for continued full-time work, or refusing a job opening with more hours shall not be entitled to exercise rights set forth above until the next request period.

**4.10.4 REDUCTION IN HOURS:** Reduction in employees' hours due to lack of work shall be accomplished by seniority and by classification on a store-by-store basis in the following manner:

(1)     Notwithstanding the above, before a full-time employee may be reduced in hours on a store-by-store basis, the Employer shall first (1st) reduce the hours of part-time employees in the store affected by the lack of work in the order of their seniority. Hours shall be afforded to part-time employees in the store affected by the lack of work in the order of their seniority by classification on a store-by-store basis. It is recognized that management has the right to establish such weekly work schedules to meet the requirements of the business.

(2)     To the extent further reductions of work hours are required in the affected store, excluding the Meat Department, the Employer shall reduce the hours of full-time employees by seniority and by classification. Any full-time employee whose working hours are reduced for more than three (3) weeks (not necessarily consecutive) in a nine (9) month period, commencing with the first (1st) week of reduced hours, shall have a one (1) time option during any said nine (9) month period to request, in writing, during the fourth (4th) week of reduced hours, to remain in the affected store at the reduced working hours or displace the least senior full-time employee in the same classification in the appropriate geographical seniority area. If the full-time employee chooses to replace the least senior full-time employee, his new store becomes his assigned store. Said employee shall be entitled to exercise the option right in his newly assigned store in accordance with the procedures set forth herein.

The displaced full-time employee shall have the right to exercise seniority to displace the least senior employee in the same classification in the geographical seniority area or to remain in his assigned store at the reduced hours in accordance with his seniority. If said employee displaces the least senior employee in the geographical seniority area, he shall be afforded hours in his assigned store by seniority by classification.

(3)     A full-time employee who has been involuntarily reduced to part-time and who chooses to remain in the affected store shall be placed at the top of the bid list referred to in Subsection 4.10.1 above with respect to the affected store and shall have preference over those employees who have requested additional available hours pursuant to Subsection 4.10.2 above.

(4)     A regular full-time employee is:

(a)   One who is hired or designated by the Employer to a regular forty (40) hour job opening, excluding relief for vacations, illnesses, other authorized absences, or business fluctuations.

(b)   An employee that becomes full time in accordance with Subsection 4.10.1 above.

(c)   Meat Department Heads and Meat Cutters.

(5)     The aforementioned provisions shall not affect the right of the Employer to transfer employees or the right of employees to request transfers pursuant to the provisions of Subsection 4.9 above.

(6)     Full-time Meat Department Heads and Meat Cutters shall be reduced within their store by classification then by seniority within their geographical seniority area.

**4.10.5 WAGE CLAIMS:** It is understood that employees will not be able to claim wages under this interpretation except for hours lost commencing with the weekly schedule immediately following the Union's written notification to the Employer of the claim and thereafter until resolved. If the employee or the Union gives written notice to the Employer within seven (7) days of his layoff, the above provisions do not apply.

**4.10.6 WEEKLY GUARANTEE:** The weekly minimum schedule for part-time employees shall be twenty-four (24) hours, excluding Courtesy Clerks who shall be scheduled for at least sixteen (16) hours per week and Fuel Station employees who shall be scheduled for at least twenty (20) hours per week.

The aforementioned weekly guarantee shall not apply if one (1) or more of the following conditions exist:

(1)     The store is normally open for business six (6) days or less in the workweek;

(2)     A week in which one (1) of the holidays named in this Agreement falls;

(3)     Employees scheduled to work are absent without proper notice;

(4)     Work is not available due to acts of God;

(5)     The part-time employee (excluding Courtesy Clerks and Fuel Station employees), the Employer, and the Union agree that the employee may work less than twenty-four (24) hours per week;

(6)     The part-time Courtesy Clerk, the Employer, and the Union agree that the Courtesy Clerk may work less than sixteen (16) hours per week;

(7)     The Fuel Station employee, the Employer, and the Union agree that the Fuel Station employee may work less than twenty (20) hours per week;

(8)     An unanticipated, significant business fluctuation;

(9)     During the week an employee is recalled from layoff or returns from leave of absence.

**4.11** Notwithstanding anything to the contrary contained in this Agreement, any employee can perform the work of a lower-paid classification.


## SECTION 5.  GENERAL PROVISIONS

**5.1   SAFETY RULES:**   Safety rules pertaining to the conduct of employees shall be conspicuously posted by the Employer in its place of business, and the Employer shall maintain in its Meat Department and in the store a fully equipped first-aid kit.

All first-aid kits shall be maintained so as to contain the following:

**NO COTTON**
(1) 2 packages of 2" compress bandages - 4 per package
(2) 1 package 4" compress bandage - 1 per package
(3) 1 ammonia inhalants (10 tubes)
(4) Tincture of methylate swabs, 10 packages
(5) 1 sterilized gauze 25 2 x 2 or equal
(6) 1 tube burn ointment
(7) 1 - 4" bandage scissors
(8) 1 - 3½" tweezers
(9) 1 tourniquet
(10) 1 - 1 oz. dropper bottle boric acid solution for eyes
(11) 1 roll adhesive tape ½" or 1"
(12) First-aid manual

Industrial kit basic content, add as necessary.

Where employees are required to work after dark, the Employer shall provide the use of a lighted parking area in the immediate vicinity of the store.

Working conditions which are injurious to the health or safety of the employees shall be directed to the attention of the Employer, at which time the Employer shall immediately investigate the alleged condition, shall meet with representatives of the Union to discuss the alleged condition, and shall immediately take the necessary steps and measures to correct such condition.

**5.2** The Employer agrees to comply with prevailing federal and state regulations. Company rules will be furnished to the Union upon request.

**5.3   MILITARY SERVICE:**  The Employer agrees to comply with the terms of the Universal Military Training and Service Act, with reference to all provisions providing for the reemployment of persons entering Military Service. These provisions shall be deemed a contractual obligation under the terms of this Agreement.

**5.4   BONDING:** Whenever the Employer requires the bonding of any employee or the carrying of any insurance for the indemnification of the Employer, premiums for the same shall be paid for by the Employer. No cash deposits, cash, or real property bond shall be required of any employee.

**5.5   FLOOR COVERING:** Wood or suitable floor covering shall be provided for on all concrete floors behind check-stands and behind the meat counter.

**5.6   UNIFORMS:** Where the Employer desires the wearing of a uniform and/or head covering, the Employer shall furnish the same without cost to the employee. The Employer shall also provide for the maintenance of such wearing apparel, except if the Employer furnishes drip-dry uniforms, the employee shall maintain such uniforms.

Shirts and/or ties will be supplied only if the Employer specifies both the color and the specific style. Specific style shall be defined as collar style, sleeve length, and fabric content.  Once implemented, there shall be no change in color unless by mutual agreement.

**SPECIAL WEAR:** It is also understood if an employee is required by the Employer to purchase or rent a special costume or unusual clothing not part of his existing wardrobe, the Employer shall reimburse the employee for any reasonable and necessary cost involved or furnish the required costume or unusual clothing to the employee without cost for the period of time the requirement is in effect.

In each market which utilizes the "sage" sanitation system, protective wearing apparel will be provided by the Employer with the understanding that employees using said protective apparel shall be responsible for returning it to its proper place.

Employees required to work in refrigerated rooms or in and out of cutting rooms or coolers shall be permitted to wear slacks, sweaters, or other suitable clothing to adequately protect them from cold and dampness while working in such rooms. Employees who are assigned to continuous work in freezers will not be required to remain therein more than fifty (50) minutes out of each hour.

Employees who are required by the Employer to use clothing or boots other than those provided for in the preceding paragraph shall have such clothing or boots supplied by the Employer. The Employer shall provide rain jackets.

**5.7   TOOLS AND EQUIPMENT:** The Employer shall furnish all the required equipment and tools, except for meat cutting tools, necessary for the employment, without cost to the employee. All grinding of tools and sharpening of saws shall be at the Employer's expense.

**5.8   PAYDAY AND DEDUCTIONS:** Employees shall be paid Friday of each week. The Employer shall furnish each employee with a weekly wage statement showing his name, hours of work, overtime, if any, total wages paid, and list of deductions made.

Extra Workers who are not paid on the next normal payday will receive their pay by mail or by direct deposit. It shall be the obligation of the Extra Worker to provide his current mailing address and/or direct deposit information to the Employer.

**5.9   BULLETIN BOARD:** The Employer agrees to provide space for the posting of official Union meeting notices.

**5.10 UNION BUSINESS:** Upon written request of the Union, employees shall be allowed time off without pay for the purposes of attending Agreement negotiations, adjustment or arbitration board hearings, or for other bona fide Union business. In all such instances, the Employer shall be notified not less than three (3) days in advance of such absence and the number of employees requesting such absences shall be so limited by the Union that it will not interfere unreasonably with the Employer's business.

The Employer agrees to schedule any employee who is an officer or a representative of the Union, in any capacity of the Union, hours of work that will permit him to attend the meetings of the Union, provided that it does not exceed one (1) employee per store or two (2) meetings per year. The Employer further agrees that these representatives will not suffer any loss in their normally scheduled hours in the week that they attend said Union meetings. It being understood that in doing so the Employer shall not be placed in a position of violating this Agreement or having to pay any penalty for improper scheduling. The Union agrees that it will give the Employer seven (7) days' advance notice of the date and time of the meeting referred to above. This provision shall also apply to new members who are required to attend meetings for the purpose of completing their obligations as members of the Union.

The Employer recognizes the right of the Union to appoint store representatives. The Employer agrees to schedule up to three (3) store representatives, based on store size and volume, designated by the Union, a day off, at the employee's daily straight-time rate based on the average daily hours worked in the pay period preceding, not to exceed eight (8) hours, to attend an annual education meeting. The parties agree that such time shall not be considered time worked for purposes of overtime, benefit contributions, or other incidents of time worked.

A store representative will be allowed to perform incidental duties for the Union. Such duties may include answering questions about the Collective Bargaining Agreement for and distributing member materials from the Union to other employees at other than work times. Such activities may not include any campaigning of any kind, whether Union or political, or adjusting or attempting to adjust grievances or discussing grievances with management. All activities undertaken by a store representative must be on his or her own time, may not disrupt store operations, and may not disrupt store employees in the discharge of their duties.

No employee shall be discriminated against for membership in or legal activity on behalf of the Union.

**5.11   UNION EMBLEM:** In consideration of the performance of the covenants herein contained, the Union agrees to lend Union Store Cards and/or decals to Employers entitled hereto under the rules governing Union Store Cards set forth in the constitution of the United Food & Commercial Workers International Union.  Employers who are entitled to Union Store Cards and/or decals agree to accept and display them in a public space in their stores.  It is understood that such Union Store Cards and/or decals are issued by and remain the property of the United Food & Commercial Workers International Union, and the Employer agrees to surrender said Union Store Cards and/or decals at the Union's request upon its failure to observe the terms of this Agreement or the conditions under which said Union Store Cards and/or decals are issued.

**5.12   JOB INJURY:** When an employee is injured on the job and reports for medical care and it is certified that he is unable to continue work, he shall be paid the basic straight-time rate of pay for the hours not worked on the day of injury.

**5.13   PAYROLL DATA:** In the event the Union has information that the Employer has violated provisions of this Agreement relating to rates of pay or the payment of Health and Welfare, Pension, and Sick Leave contributions, the Employer agrees to supply the Union with the necessary payroll data.

**5.14   JURY DUTY OR COURT APPEARANCES:** Employees required to perform jury duty or to appear in court or the police department on behalf of their Employer shall receive their regular straight-time pay during such jury duty or such appearances, less jury pay or witness fees received.

Employees performing jury duty shall have their schedule changed so that their shift begins at the time of reporting for such jury duty.

Employees regularly scheduled for night work shall be rescheduled to a day shift for the period of jury duty service.

It is understood that time spent in awaiting impaneling for jury service is to be considered covered time under this provision.

Employees shall immediately report for work after being excused from jury duty service, provided there is sufficient time remaining on the daily work schedule to work for at least half (½) of the daily shift. Failure to so report shall render null and void any claim for jury service for that day.

The rescheduled work shift, when combined with time spent for jury service or court appearances, is not to exceed a total of eight (8) hours when in reasonable control of the Employer.

Otherwise, the overtime rate of one and one-half (1½) times the employee's straight-time hourly rate of pay shall apply for all time in excess of the combined total of eight (8) hours. The employee shall supply the Employer with verification of the time spent and fees paid for jury duty services.

If an employee appears in court or the police department on behalf of the Employer on his days off, he shall receive his basic straight-time rate of pay for the time spent in making such appearance, but such time shall not be considered as part of the workweek under the terms of this Agreement.

**5.15   LEAVES OF ABSENCE:**  Leaves of absence shall be granted as follows:

**5.15.1 SICKNESS AND NONINDUSTRIAL INJURIES:**  Up to twelve (12) months after one (1) year's employment.

**5.15.2 INDUSTRIAL INJURIES:**  Up to twelve (12) months for any employee incurring an industrial injury after his first (1st) sixty (60) days of employment and who has less than three (3) years' seniority at the time said leave of absence commences.

Up to eighteen (18) months for any employee who has three (3) or more years' seniority at the time said leave of absence commences.

**5.15.3 PERSONAL LEAVES:**  Leaves up to thirty (30) days after one (1) year of employment for compelling personal reasons to be agreed upon by the parties, such leaves shall be requested and granted in writing.

**5.15.4** At the end of any period of such leave of absence for illness or injury, an employee shall be restored to employment with the Company with full seniority to a position comparable to the one he held immediately prior to such leave of absence.

**5.15.5** The foregoing notwithstanding, no employee shall suffer loss of seniority because of absence due to illness of fifteen (15) working days or less.

**5.16   FUNERAL LEAVES:**

**5.16.1 PART-TIME FUNERAL LEAVE:**  Part-time employees shall be entitled to funeral leave pay for the actual day of the funeral if scheduled to work on said day.

**5.16.2 FULL-TIME FUNERAL LEAVE:**  When a regular full-time employee on the active payroll is absent from work for the purpose of arranging for or attending the funeral of a member of his immediate family, as defined below, the Employer shall pay him for eight (8) hours at his regular rate of pay for each day of such absence up to a maximum of three (3) days, provided:

**(1)** The employee notified the Employer of the purpose of his absence on the first (1st) day of such absence;

**(2)** The day of absence is one (1) of the three (3) days commencing with the day of such death or the day immediately following the day of such death;

**(3)** The absence occurs on the day during which the employee would have worked but for the absence;

**(4)** The day of absence is not later than the day of such funeral except where substantial travel time is required;

**(5)** The employee, when requested, furnishes proof satisfactory to the Employer of the death, his relationship to the deceased, the date of the funeral, and the employee's actual attendance at such funeral.

For the purpose of Subsections 5.16.1 and 5.16.2 above, a member of the immediate family means the employee's spouse, child, mother, father, sister, brother, mother-in-law, father-in-law, stepmother, stepfather, stepchildren, grandparents, and grandchildren.

**5.17   RETURNED CHECKS:**  Where the Employer has a posted or published check-cashing policy, the employees shall conduct themselves accordingly; and, when an employee follows such policy, he shall not be held financially responsible for returned checks other than his own personal check nor shall he be expected or required to locate the check-cashing customer.

**5.18   DUES CHECKOFF:**

(1)      The Employer agrees to deduct uniform monthly dues, initiation fees, and assessments, as determined by the Union, and political contributions, on a regular basis from the wages of employees in the bargaining unit who provide the Employer with a voluntary written authorization for such deductions. Such deductions, when authorized, will be transmitted to the office of the Union no later than the fifteenth (15th) day of the month following the month in which deductions are made. No deduction will be made from the wages of any employee until the Employer has received a signed copy of voluntary written authorization for such deductions.

(2)      Authorizations for deductions are to be entirely voluntary upon the part of each such individual employee. Authorizations shall be irrevocable for a period of one (1) year or until the termination of this Agreement, whichever occurs sooner. The authorization shall be automatically renewed or be irrevocable for successive periods of one (1) year each or for the period of each succeeding applicable Collective Bargaining Agreement, whichever shall be shorter, unless written notice is given by the employee to the Employer and the Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year or of each applicable Collective Bargaining Agreement.

(3)      The Union shall indemnify and hold the Employer harmless from any and all actions resulting from the implementation of this provision. However, mistakes by the Employer shall be immediately corrected by the Employer upon notification from the Union.

## SECTION 6.  HOURS, OVERTIME, AND SUNDAY PREMIUM PAY

**PREAMBLE:**  In the event of the application of the Federal Wage and Hour Law as applied to retailing conflicts with the intent of this Agreement, the parties shall meet immediately to renegotiate this Agreement in order to preserve the intended workweek and the rates pertaining thereto.

The Industry recognizes the five (5) day, forty (40) hour week provisions except for layoffs and individual cutbacks due to lack of work, acts of God, or circumstances beyond the control of the Employer. This section, however, does not impede the right of the Employer to use part-time help as needed.

**6.1   BASIC WORKDAY AND WEEK:**  Forty (40) hours, consisting of five (5) days of eight (8) hours each in a calendar week, Sunday through Saturday, shall constitute a week's work as provided in this entire section.  In stores operating seven (7) days per week, all current employees, as of January 7, 2005, who receive two (2) successive days off will continue to receive two (2) successive days off.  Employees promoted after January 7, 2005, to a full-time Senior Clerk or above will also receive two (2) successive days off. Two (2) successive days off within each calendar week shall not apply to members working in stores located in Butte, Colusa, Glenn, Lake, Lassen, Mendocino, Plumas, Sierra, Sonoma, Sutter, Yuba, Modoc, Shasta, Siskiyou, Tehama, Trinity, Western Nevada (West of Donner Summit), and San Joaquin

Counties. In stores operating not more than six (6) days per week, all employees shall receive two (2) days off within each calendar week, and the Employer agrees to make every effort to give the employees successive days off, but reserves the right to designate one (1) other day off for each employee in addition to the day when the store is closed. A day's work shall consist of eight (8) hours within nine (9) consecutive hours with one (1) full uninterrupted hour off for a meal. A one-half (½) hour lunch period for a crew, a shift of employees, or an individual employee may be implemented by mutual agreement of the Employer and the employee(s). No employee shall be required or permitted to work a split shift.

A workweek consisting of four (4), ten (10) hour days may be implemented by mutual agreement of the parties.

**HOLIDAY WORKWEEK:** Thirty-two (32) hours, consisting of four (4) eight (8) hour days, exclusive of the holiday, shall constitute a week's work in any week in which the holiday falls. An employee working thirty-two (32) straight-time hours in a holiday week not including holiday work, shall receive not less than forty (40) hours' pay. At least two (2) of a full-time employee's days off shall be successive in stores operating six (6) or more days in a holiday week, unless an employee has Saturday and Sunday off prior to the holiday or Saturday and Sunday off following the holiday. Holiday pay for part-time employees shall in all instances be prorated in accordance with Section 10 Holidays, Subsection 10.5 of this Agreement.

Work shall not be performed without pay prior to the beginning of the scheduled working day. Work may be performed at the end of the working day in completing service to a customer which commenced prior to the end of the working day. It is understood that the checking of produce or shelf prices shall be considered as time worked.

**6.2     OVERTIME AND PREMIUM WAGE RATES:** The overtime and premium wage rates of pay shall be as follows:

**6.2.1   ONE AND ONE-THIRD (1⅓) TIMES THE STRAIGHT-TIME HOURLY RATE:**

    **(1)**     Work on Sunday, except in excess of eight (8) hours and except for retail employees in the California counties of Sacramento, Yolo, Placer, El Dorado, Amador, Calaveras, Tuolumne, Stanislaus, Eastern Nevada, (east of Donner Summit) and in Southwestern Washoe County, Nevada (Tahoe Basin), and in Northwestern Douglas County, Nevada (Tahoe Basin) where the Sunday premium shall be paid for at the rate of one and one-third (1⅓) times the straight-time hourly rate less thirty-eight cents (38¢) per hour. Courtesy Clerk employees hired after January 7, 2005, will not be eligible for Sunday pay.

**6.2.2   ONE AND ONE-HALF (1½) TIMES THE STRAIGHT-TIME HOURLY RATE:**

    **(1)**     Work in excess of eight (8) hours per day.

    **(2)**     Work in excess of forty (40) hours per week.

    **(3)**     Work on the sixth (6th) day worked in a calendar week.

    **(4)**     Work on the fifth (5th) and sixth (6th) day worked in a week containing one (1) of the holidays named in this Agreement, not including the holiday worked.

    **(5)**     Work after the fifth (5th) consecutive day worked without reference to the calendar week by a normal five (5) day employee until consecutive days are broken by a day off, except when the schedule of an employee who has had or who is to have two (2) consecutive days off is changed in accordance with this Agreement.

(6)     Work after the sixth (6th) consecutive day worked without reference to the calendar week by a normal six (6) day employee until consecutive days are broken by a day off, except when the schedule is changed in accordance with this Agreement.

(7)     Work by a full-time employee called in to work on a scheduled day off and given shorter notice than required by this Agreement shall receive a minimum of eight (8) hours' pay on that day; but if such an employee works six (6) days during that calendar week, work on the scheduled day off shall be paid for at the employee's straight-time rate for that day and that on the sixth (6th) day worked shall be paid for at the overtime rate.

(8)     Work within ten (10) hours from the time the last shift ended.

(9)     Work where a meal period is not afforded in conformity with Section 7 Work Schedules and Premium Rates, Subsection 7.5 hereof.

### 6.2.3   TWO (2) TIMES THE STRAIGHT-TIME HOURLY RATE:

(1)     Work in excess of eight (8) hours on the sixth (6th) day worked in a calendar week.

(2)     Work on Sunday which is a day in excess of five (5) consecutive days by a scheduled five (5) day employee, except when the schedule of said employee who has had or is to have two (2) consecutive days off is changed in accordance with this Agreement.

(3)     Work on the seventh (7th) day in a calendar week.

(4)     Work on a holiday named in this Agreement (in addition to holiday pay) regardless of which day of the week the holiday falls, except for employees hired after January 7, 2005.  Employees hired after January 7, 2005, will receive a premium of one dollar ($1.00) per hour (in addition to holiday pay) for work performed on a holiday in this Agreement.

(5)     Work after five (5) hours on a Sunday until a meal period is taken.

(6)     Work on a Sunday until ten (10) hours between shifts has elapsed.

### 6.2.4   TWO AND ONE-QUARTER (2¼) TIMES THE STRAIGHT-TIME HOURLY RATE:

(1)     Work in excess of eight (8) hours on a Sunday.

### 6.2.5   TWO AND ONE-HALF (2½) TIMES THE STRAIGHT-TIME HOURLY RATE:

(1)     Work by an employee on Sunday when Sunday was a scheduled day off and the employee was given shorter notice than required by this Agreement shall receive a minimum of eight (8) hours pay for that day; but if such employee works six (6) days during that calendar week, work on that Sunday shall be paid at the rate of one and one-half (1½) times the straight-time hourly rate and that on the sixth (6th) day worked shall be paid at the applicable overtime rate.

(2)     Work on Sunday which is in excess of six (6) consecutive days by a six (6) day employee.

(3)    Work after five (5) hours until a meal period is taken on a holiday, except for employees hired after January 7, 2005. Employees hired after January 7, 2005, will receive a premium of one dollar ($1.00) per hour (in addition to holiday pay) for work performed on a holiday in this Agreement.

(4)    Work on a holiday until ten (10) hours between shifts has elapsed.

### 6.2.6   THREE (3) TIMES THE STRAIGHT-TIME HOURLY RATE:

(1)    Work in excess of eight (8) hours on a holiday named in this Agreement.

**6.3    CONSECUTIVE DAYS:** It is understood that consecutive days worked are interrupted by a holiday or a scheduled day off and shall be considered to be interrupted when an employee is required to work on a holiday or when, by reason of a bona fide emergency, an employee is required to work on his scheduled day off for which he has received the required premium pay for such work.

**6.4    SCHEDULED WORK:** Whenever an employee's schedule is not changed in accordance with the provisions of this Agreement and he is worked outside such schedule, then the hours so worked shall be paid for in accordance with the overtime provisions of this Agreement.

**6.5    NO COMPOUNDING OR PYRAMIDING:** There shall be no pyramiding of overtime and/or premiums and only the highest applicable rate shall apply.

## SECTION 7.  WORK SCHEDULES AND PREMIUM RATES

**7.1    POSTING OF WORK SCHEDULE:** The Employer agrees to keep posted, in each store, a weekly schedule, in ink, of the working hours for all employees. Such schedule shall show the full name of each employee, the classification, starting time, mealtime, quitting time, and days off. It is further agreed that any change in this schedule must be made and the employee so notified no later than noon on Thursday of the week preceding the week in which the change is to become effective (emergency excepted). Such schedule shall be posted by noon on Thursday of the week preceding the week in which such schedule is to be effective on the bulletin board or at a place where all employees and representatives of the Union may observe same. If assignment of employees to schedules is inconsistent with the terms of Section 4 Seniority, Subsection 4.5 hereof, employees will have until 3 p.m. on Thursday [or three (3) hours after the schedule is posted] to bring such inconsistency to the Store Manager's attention and seek assignment in accordance with Section 4 Seniority, Subsection 4.5 hereof. When a senior employee obtains such a different schedule, then the displaced junior employee shall be assigned the senior employee's previously assigned schedule for the following week.

If the schedule is not posted timely as stated above, such shall be deemed as a contract violation and subject to the grievance procedure. Due to circumstances beyond the control of the person responsible for posting it, the untimely posting shall not be the basis for any monetary claims.

Time worked by employees on the last shift during the period the store is open for business, for the purpose of serving customers in the store at the closing hour or performing other miscellaneous duties necessary in connection with the closing of the store, shall be properly scheduled in their straight-time shift.

**7.2    SHIFT INTERVAL:** Except in bona fide emergencies, the minimum time off between shifts shall be ten (10) hours and employees called to work sooner than ten (10) hours from the end of their last work period shall be paid one and one-half (1½) times the employee's straight-time hourly rate for all work performed up to the time said ten (10) hour period between shifts shall have elapsed.

**7.3   SCHEDULED TO WORK A HOLIDAY:** Any employee normally scheduled to work five (5) days who is temporarily rescheduled to work on a holiday shall be permitted to work his normal number of working days that week.

**7.4   HOLIDAY EVE:** No employee shall be permitted or required to work after 7 p.m. on Christmas Eve except those employees necessary to service the customers in the store at 7 p.m. and to properly close and secure the store. This shall not apply to employees in the Liquor Department where the Liquor Department may be isolated from the Grocery Department. The holiday premium of two (2) times the employee's straight-time hourly rate of pay shall not apply to any hours worked prior to 12:01 a.m. on the holiday.

On New Year's Eve, the store shall be staffed with volunteers between 7 p.m. and midnight. If insufficient employees volunteer, assignment shall be by inverse seniority.

**7.5   MEAL PERIOD:** Each employee shall be released from work for his meal period within five (5) hours, but no sooner than three (3) hours of the time of his reporting for work. Any employee who is given a meal period prior to three (3) hours into his shift or works in excess of five (5) hours without a meal period shall receive one and one-half (1½) times the employee's straight-time hourly rate for hours worked between the meal period and the completion of the third (3rd) hour or one and one-half (1½) times the employee's straight-time hourly rate for hours worked in excess of five (5) hours until a meal period is given.

During one (1) lunch hour in any workday in a market employing one (1) or more Meat Cutters in work covered in accordance with Subsection 1.3 of this Agreement, Monday through Saturday, there must be a Meat Cutter covered by this Agreement in attendance at all times during which fresh meat is being sold. In such markets where the Meat Cutter is alone, the Employer may also close the market (fresh meat section), use a relief employee, operate for one (1) unattended lunch hour in a day, or require the Meat Cutter to work through the lunch hour, in which event the Meat Cutter shall be paid at the applicable overtime rate for the lunch hour and shall be permitted to eat his lunch on the job.

In the event a Meat Cutter shall work his lunch hour as hereinabove provided and completes the workday, he shall be paid his regular straight-time hourly rate of pay for the ninth (9th) hour.

On Sundays and holidays in self-service markets where only one (1) employee is performing work covered by this Agreement, he shall be provided with a full, uninterrupted hour off for lunch and the Meat Department may remain open; provided that no individual, except the Owner-Employer, not otherwise employed in work covered by this Agreement, shall be permitted to perform work covered by this Agreement during such unattended lunch hour. On Sundays and holidays in a conventional or self-service market, a Meat Cutter may eat on the job and shall receive pay in accordance with the provisions above.

In accordance with state law, the Employer may schedule up to a six (6) hour shift without a lunch period. Any scheduled or extended shift that is more than five (5) hours up to and including a six (6) hour shift shall not be subject to the overtime rate and shall include two (2) unscheduled ten (10) minute breaks.

**7.6   BREAK:** No employee shall be denied the right to necessary or required relief. All employees shall be allowed an unscheduled ten (10) minute break in the first (1st) half of their shift prior to the meal period and an unscheduled ten (10) minute break in the last half of their scheduled shift prior to quitting time.

**7.7   DAILY GUARANTEE:** All employees who work forty (40) or more hours in a calendar week, when ordered to and do report for work and remain available for work, shall receive a full day's pay based on the established rate of pay for that day.

All employees who work less than forty (40) hours in a calendar week, when ordered to and do report for work and remain available for work, shall receive at least four (4) hours' pay based on the established rate of pay for that day.  Where school law conflicts with the four (4) hour daily guarantee on a school day, such employee shall be scheduled for not less than three (3) hours on such days.  It is further agreed that students shall not replace non-student employees. All part-time employees shall be covered by all other provisions of this Agreement.

**7.8   NIGHT PREMIUM:**  Night premiums for all classifications are as set forth in Appendix A Wage Rates, which is incorporated herein as if set forth in full.

**7.9   PREMIUM DAY:**  Employees working any hours on a Sunday or a holiday shall be paid the premium pay as provided for in this Agreement for the hours worked between 12:01 a.m. and midnight on that day.

**7.10   SEPARATE EMPLOYERS:**  Any employee who works for another Employer in the Retail Food or Liquor Industry on his day or days off shall be paid therefor at straight-time, overtime, or premium rates calculated as though he had worked that week for a single Employer. It is understood that if the employee is properly shown on the schedule, the overtime rates shall not be in effect until after the Union notifies the Employer that the employee in question is an employee of another Employer in the Industry.

**7.11   EMPLOYEES ON LAST SHIFT:**   Employees on duty at the recognized hour of closing may be required to wait on all customers and perform other duties necessary to closing. Such employees shall be scheduled so that their shifts end at least fifteen (15) minutes after the recognized hour of closing.

## SECTION 8.  WAGES

**8.1**   Appendix A Wage Rates, which sets forth the job classifications, minimum rates of pay, and other terms, is incorporated herein as if set forth in full. In the event the Federal Wage and Hour Law is applied to retailing so as to increase the Employer's obligations hereunder, the parties shall reopen and revise this Agreement so as to preserve the intended workweek and rates of pay pertaining thereto.

**8.2**   The Employer shall provide wage updates to the Union from payroll quarterly.

**8.3**   Non-contractual discretionary bonuses may be modified or discontinued at the Employer's discretion with prior notice to the Union.  This exception does not apply to overscale wage rates.

## SECTION 9.  CLASSIFICATION OF EMPLOYEES

**9.1**   For the purpose of this Agreement, the classification of employees is hereby defined as follows:

**9.1.1  MANAGING CLERK:**   Every store shall have a Managing Clerk unless the Employer or a Supervisor within the meaning of the National Labor Relations Act, as amended, is actively engaged on the premises performing the work of the Managing Clerk. A Managing Clerk is an employee who has charge of and general supervision over not more than one (1) store.

In the event the Employer or Supervisor is absent from the store for one (1) or more eight (8) hour days in a week, a Clerk shall receive the wage scale of a Managing Clerk for said work.

**9.1.2   SENIOR HEAD CLERK, SENIOR PRODUCE CLERK, HEAD MEAT CUTTER, AND HEAD CLERK:** These are non-supervisory employees who, in addition to their duties of Clerk or Meat Cutter in the course and scope of their employment, perform one (1) or more of the following duties:

**9.1.2.1   SENIOR HEAD CLERK:** This classification shall apply only to the Senior Head Clerk who acts as Assistant to the Managing Clerk or Owner and is commonly known as the "second man" in the store.

**9.1.2.2   SENIOR PRODUCE CLERK:** This classification shall apply to an employee who goes to the wholesale produce market to buy produce or who is in charge of the produce section or department. This classification shall apply in all cases where an employee was classified as a Head Clerk in the Employer's produce departments or sections under the 1964-67 contract, but shall not be applicable to Produce Managers or Buyers employed under said contract who shall not be reclassified and who shall receive the same wage increases over their present rates of pay as all other employees.

**9.1.2.3   HEAD MEAT CUTTER:** A Head Meat Cutter orders, buys, schedules, and overall supervises all operations of the fresh, frozen meat, fish, and packaged meat-deli sections within the entire Meat Department. A Head Meat Cutter is in charge of all education and training of Apprentice Meat Cutters and Meat Clerks.

Stores shall have one (1) Head Meat Cutter on duty each day whenever fresh meat is available for sale. Only a Journeyman Meat Cutter may perform the duties of a Head Meat Cutter.

**9.1.2.4   HEAD CLERK:**

(1)   Acts as Produce Buyer at the store or assists management in the operation of a produce section or department, provided that, where there is an employee in the department classified as a Senior Produce Clerk, this provision shall not require the classification of any other employee in the department as a Head Clerk.

(2)   Is engaged the major part of his time in the Receiving Department of the Employer's establishment and is in charge of and responsible for the receiving of merchandise.

In the interpretation of the preceding paragraph, it is agreed that any Clerk who is engaged for four (4) hours or more per day in the Employer's Receiving Department and is in charge of and responsible for the receiving of merchandise shall be classified and paid as a Head Clerk.

(3)   Conducts the operation of the store in the temporary absence of the Supervisory Store Manager, Managing Clerk, Senior Head Clerk, or Owner or is responsible for the opening or closing of a store.

(4)   Has the authority and responsibility of buying or selecting merchandise for a department, section, or area or directs other employees in the performance of their duties in such department, section, or area.

(5)   It is understood that the Employer may so arrange the employees' duties and work shifts in order that the number of Head Clerks may be minimized and, further, that the mere occasional or incidental performance of any of the Head Clerk's duties shall not be construed as a basis for classifying any employee as Head Clerk.

It is agreed, however, that in the absence of the Supervisory Store Manager, Managing Clerk, Senior Head Clerk, or Owner, there shall be at least one (1) Head Clerk on the job at all times.

(6)  When a Clerk, who is not normally classified and paid as a Head Clerk on a weekly basis, performs the duties of a Head Clerk on a day in which either the regular Head Clerk, Senior Head Clerk, Supervisory Manager, Managing Clerk, or Owner is absent, he shall receive the Head Clerk's rate of pay for the day.

**9.1.3  SENIOR CLERK:**  All previously classified Journeyman or Apprentice Clerks will be reclassified as Senior Clerks.

**PREVIOUS EXPERIENCE:**  If a Journeyman employee or experienced Senior Clerk has been out of the Industry up to five (5) years, he will be allowed to start at least at the experienced Clerk rate of pay.

If a Journeyman Meat Cutter is hired, he or she will be hired at the Journeyman rate of pay.

If an experienced GMC/Non-Food Clerk or experienced Clerk has been out of the Industry up to five (5) years, he will be allowed to start at the experienced Clerk rate of pay.

**NEW EMPLOYEES:**  It is agreed that for new employees who do not qualify for either of the paragraphs above, that the employee and the Employer shall determine the appropriate starting rate of pay.  In no case will the employee be required to work the hours for the previous steps.

An employee who fails to accurately list, on an employment application, his approximate number of prior hours of experience in the Retail Food Industry and, as a result, is improperly classified by the Employer, shall not be entitled to a retroactive wage adjustment if it is subsequently determined that a classification adjustment is warranted.

Notwithstanding the above, no such retroactive wage claim shall exceed ninety-one (91) days.

**9.1.4  SENIOR CLERK RATIO:**  Senior Clerks (consisting of current Journeyman Clerks and Bakery/Deli Managers making Journeyman wages) will comprise at least thirty-five percent (35%) of the entire Senior Clerk/Clerk classifications.  Forty percent (40%) of the Senior Clerk classification will be full-time.

**9.1.5  CLERK:**  A new Clerk classification will be created.  All Non-Food/GM Clerks will be reclassified as Clerks.  Clerks will be allowed to perform all duties of a Senior Clerk.

The implementation of the Clerk classification shall not cause the replacement of any employee on the payroll as of January 7, 2005.

The following ratio of full-time will apply to the Clerk classification:

Clerks' full-time ratio will be thirty percent (30%).

Current employees classified as General Clerks will be reclassified to the Senior Clerk classification and will be moved up to the next highest wage rate.

**9.1.6   COURTESY CLERK:** A Courtesy Clerk is an employee who may not perform the following:

**9.1.6.1  DUTIES:** Courtesy Clerks may not stock, prepare or price merchandise (except carry-backs), operate cash registers, perform normal janitorial work, perform office work, face shelves, or break down loads. This is not intended to significantly change the duties performed by Courtesy Clerks. Courtesy Clerks are allowed to work one (1) hour before the opening of the store and one (1) hour after the closing of the store.

**9.1.6.2  DAILY GUARANTEE:** Courtesy Clerks shall be subject to all the provisions of this Agreement except that, instead of the minimum work guarantee set forth in this Agreement, when scheduled or called in to work, they shall be provided with at least two (2) hours' work on weekdays and four (4) hours' work on Saturday, Sunday, or on holidays as set forth in this Agreement.

**9.1.6.3  WEEKLY GUARANTEE:** Each Courtesy Clerk shall be offered at least sixteen (16) hours' work in each week. In the event said Courtesy Clerk cannot be scheduled to work or cannot work sixteen (16) hours in the week, he shall not work at all during that particular week.

**9.1.6.4  NO REDUCTION:** The employment or continuation of employment of a Courtesy Clerk shall not cause the replacement of an existing regular full-time or part-time Senior Clerk, nor shall it cause a reduction in the number of hours of work of such Clerks.

**9.1.6.5  BADGES:** Courtesy Clerks shall wear badges on their person designating them as a Courtesy Clerk at all times during working hours, and their failure to wear such badge while working shall be considered a violation of these provisions. The Union will submit to the Employer and employee involved a written warning; and, in the event of a second (2nd) violation with the same Employer by the same employee, the Employer agrees to suspend said employee for six (6) calendar months following written notice from the Union to the employee and Employer involved. If the Employer does not furnish the badges, the Union may furnish them.

**9.1.6.6  PENALTY FOR VIOLATION:** The Employer agrees that Courtesy Clerks shall not perform duties other than those listed in this Collective Bargaining Agreement. In the event of a violation of this section, the Union shall notify the Employer, in writing, of such violation and it shall be corrected.

In the event any of the same persons are involved in a second (2nd) violation within one (1) year from the first (1st) infraction, the person performing the work, unless directed to do so by a person in charge, shall be suspended for one (1) week and the person who directed that the work be performed shall also be suspended for one (1) week or the sum of five hundred dollars ($500.00) shall be paid into the UFCW Northern California Employers Pension Trust Fund.

In the event of a third (3rd) violation within one (1) year from the first (1st) infraction by any of the same persons, the person performing the work, unless directed to do so by a person in charge, and the person directing that the work be performed will be suspended for one (1) month or the sum of one thousand five hundred dollars ($1500.00) will be paid into the UFCW Northern California Employers Pension Trust Fund.

### 9.1.7  MEAT CUTTER:

**9.1.7.1  REGULAR FULL-TIME EMPLOYEE:**  An employee who has completed the sixty (60) day probationary period and is hired to work at least forty (40) straight-time hours per week in five (5), eight (8) hour days.

**9.1.7.2**  Journeymen replacing Head Meat Cutters on their days off shall receive Head Meat Cutter's rate of pay.  Only Journeymen shall operate a market as a Head Meat Cutter.

### 9.1.8  APPRENTICE MEAT CUTTER:

**9.1.8.1**  One (1) Apprentice shall be allowed to every four (4) Journeymen or fraction over four (4).  Markets employing less than four (4) Journeymen shall be entitled to one (1) Apprentice.  A Journeyman Meat Cutter shall continue to be defined as an Apprentice who has completed four thousand one hundred sixty hours (4160) hours with the understanding that this definition will have no application to the New Hire/Promoted wage progression.

**9.1.8.2**  An Apprentice can work without Journeyman supervision for no more than three (3) hours during his first (1st) six (6) months' apprenticeship period or for more than four (4) hours during his second six (6) months' apprenticeship period, exclusive of meal periods.

An Employer may establish its own apprenticeship program which can be implemented by mutual agreement of the Company and the Union.

**9.1.8.3**  On-the-job training of Apprentices shall be in accordance with the California Apprenticeship Law (Shelly-Maloney Act) as set forth in the California Labor Code. Both the Union and the Employer will assist in developing sound and uniform Retail Industry-wide Apprenticeship Training Programs.

**9.1.8.4**  Tests to judge the competency of an Apprentice shall be set up by the Industry Joint Labor-Management Apprenticeship Committee and, by majority vote, its decision shall be final. Said tests shall be conducted jointly by one (1) representative of the Industry and one (1) representative of the Union.

**9.1.8.5**  A Joint Advisory Committee consisting of a representative of the State of California, Division of Apprenticeship Standards, and an equal number of representatives appointed by the Food Employers Council, Inc., representing the Employers and an equal number of representatives appointed by each Local Union as follows: 5, 8-Golden State, and 101 to represent all segments of the Retail Meat Industry in Northern California, shall be charged with the responsibility of preparing a uniform Northern California-wide program prior to February 1, 1974, to develop procedures, guidelines, and standards to train Apprentices in compliance with the California Apprenticeship Law (Shelly-Maloney Act), Title VII of the Civil Rights Act, and any other applicable federal statutes.

The procedures, guidelines, and standards as developed by the Joint Advisory Committee shall be used by Joint Apprenticeship Committees to train Apprentice Meat Cutters working under contracts with 8-Golden State.  If the Joint Advisory Committee is unable to reach mutual agreement, matters in dispute shall be referred to the Regional Director, Region 9, Apprenticeship and Training Division, United States Department of Labor, for settlement.

### 9.1.9   MEAT CLERK:

9.1.9.1   Meat Clerks may wrap, weigh, price, and stock fresh, chilled, or frozen meat; fresh, chilled, or frozen poultry; fresh, chilled, or frozen fish as well as cold and smoked meats and, in addition thereto, may display and dispense frozen meat; fresh, chilled, or frozen poultry; fresh, chilled, or frozen rabbits; fresh, chilled, or frozen fish, as well as cold and smoked meats, provide relief in the Fish Department, and may also act as Demonstrator.

9.1.9.2   Meat Clerks may take bell calls (contact the customer, serve the customer, relay the orders to the Meat Cutter, wrap the merchandise, and give it to the customer), and may also keep the meat cases tidy, clean the glass, empty cases, and empty trays.

In addition, the Meat Clerk may keep the counter neat and clean, fill the counter, replace trays of meat, including boating, wait on the trade, collect money, give change, cut a steak or roast which has already been processed by a Meat Cutter to size in order to serve a customer, modify any prepared cut to suit a customer, and use slicing machine, cube steak machine, and grinder to serve the customers.

Any employees that are currently performing these described duties at whatever rate of pay they are currently receiving will not be reduced by virtue of this expansion of duties.

9.1.9.3   Meat Clerks desirous of entering the Meat Cutter Apprenticeship Training Program shall make their desires known to the Company, in writing, and such employees shall receive consideration for such training and, if selected, attend the Apprenticeship Training Program.   Said Meat Clerks entering Apprenticeship Training shall be given a thirty (30) day trial period. To the extent permitted by law, and in compliance with the terms of this Agreement, it is the intent of the parties to see that all minorities are given an opportunity to move into all classifications of work covered by this Agreement. Consistent with this objective, qualified Meat Clerks will be given preference by seniority over other applicants for such work.

A Meat Clerk covered under this Agreement who enters the Apprenticeship Training Program or is promoted to the Meat Cutter classification will move to the closest step progression that represents an increase from their current rate of pay and the employee will not be required to make up the hours of the previous steps.   Said Apprentice will then progress through the Apprentice steps to Journeyman.   After completing the thirty (30) day trial period, all acquired Company seniority shall be applied to the employee's new classification.

9.1.9.4   Meat Clerks may perform Clerk's work. Clerks may also perform Meat Clerk work. No Meat Clerk on the payroll as of the merging of the Agreements shall be laid off or have his hours reduced as a direct result of the merging of the classifications. Meat Clerks or Clerks who work a majority of their hours in the Meat Department will not be counted towards the Senior Clerk/Clerk ratio.

9.1.9.5   New employees hired after November 17, 2007, to do "Meat Clerk" work will be hired into the Clerk classification.

### 9.1.10 PHARMACY TECHNICIAN:

9.1.10.1 Employees considered for this classification must have met the following requirements:

(1)   Have obtained a Pharmacy Technician certification from the California State Board of Pharmacy.  Employees will also be required to maintain an active certification by the means dictated by the California State Board of Pharmacy

(2)   Successfully passed the Bel Air Market's Pharmacy Technician test.

**9.1.10.2** The Employer will have sole discretion in the selection of Pharmacy Technicians.

**9.1.10.3** Employees in the Pharmacy Technician classification will be required to maintain an active Pharmacy Technician certification.

**9.1.10.4** Because of safety and quality control factors, the Pharmacy Technician will be subject to the immediate and personal supervision of a Registered Pharmacist. Immediate and personal supervision in the case of a Pharmacy Technician requires that a Pharmacist verify and document any function performed by a Pharmacy Technician in connection with all activities surrounding the dispensing of prescriptions. It is understood and agreed that Pharmacists, as trained professionals, have the ultimate responsibility for dispensing prescriptions.

**9.1.10.5** A Pharmacy Technician may perform any and all duties of a Clerk.

**9.1.10.6** The following rules apply when a Clerk is stepped up on a temporary basis to the Pharmacy Technician classification.

(1)   Employees stepped up to the Pharmacy Technician classification will be compensated at the Pharmacy Technician Stage 1 rate of pay for all hours worked in the classification.

(2)   Employees being stepped up must possess a Pharmacy Technician certification from the California State Board of Pharmacy.

(3)   It is understood that the hours worked as a Pharmacy Technician on a stepped up basis will not be credited to the four thousand one hundred sixty-one (4,161) hours needed to become a Journey-level Pharmacy Technician.

**9.2    TWO CLASSIFICATIONS:** Unless otherwise provided herein, the Employer may require any employee to do work within the duties of any classification, in which event such employee shall be classified and paid for the entire shift under that classification which pays the highest wage; except that, where any employee of a higher classification is relieved for a meal period or the mere occasional or incidental performance of the duties of a higher classification, it shall not be construed as entitling the employee to the pay of the higher classification.

**9.3    STEP-UP RULES:** The following rules are applicable at stores where Managing Clerks, Senior Head Clerks, Senior Produce Clerks, and Head Clerks are employed:

**9.3.1   MANAGING CLERK, SENIOR HEAD CLERK, AND HEAD CLERK:**

**9.3.1.1** When the Managing Clerk is absent for one (1) shift [eight (8) within nine (9) hours] or more and the store is open beyond the hours during which the Senior Head Clerk (acting as Managing Clerk) is present, another regular employee on duty during such hours shall be paid at the Senior Head Clerk's rate for his entire shift except that, where there is a regularly employed Head Clerk [forty (40) hours per week] in the store during such hours, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.2**  On the Senior Head Clerk's day or days off, another regular employee on duty during said days shall receive the Senior Head Clerk's rate for each such shift worked except that, where there is a regularly employed Head Clerk [forty (40) hours per week] on duty in the store during said days, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.3**  On any day when the store is open beyond the regular shifts [eight (8) within nine (9) hours] of both the Managing Clerk and the Senior Head Clerk, another regular employee on duty during such hours shall receive the Senior Head Clerk's rate for his entire shift; except that, where there is a regularly employed Head Clerk [forty (40) hours per week] in the store during such hours, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.4**  When the Senior Head Clerk is absent for any period because of illness, vacation, or other reasons, another regular employee or a Head Clerk, as the case may be, shall be paid at the Senior Head Clerk's rate for all such time worked during the said absence of the Senior Head Clerk.

**9.3.2**   **SENIOR PRODUCE CLERK:**

**9.3.2.1**  On the Senior Produce Clerk's day or days off, another regular employee shall be paid at the Senior Produce Clerk's rate for all hours worked in the absence of the Senior Produce Clerk; except that, if the Senior Produce Clerk has Sunday as a day off, no other employee on duty on Sunday need be paid at the Senior Produce Clerk's rate unless he performs the Senior Produce Clerk duties on said day.

**9.3.2.2**  When the Senior Produce Clerk is absent for any period because of illness, vacation, or other reasons, another regular employee shall be paid at the Senior Produce Clerk's rate for all such time worked during the said absence of the Senior Produce Clerk.

**9.3.2.3**  It is understood by the parties that "small stores" should be exempt from the application of these rules. It should be noted that we have been unsuccessful in an effort to define a "small store." However, through agreement with various Local Unions or otherwise, certain Employers in this category have not been following the step-up rules; and they shall continue to be exempt. Certain other Employers in this category have been following step-up rules, and they shall continue to adhere to the rules.  In the event the Union protests failure to adhere to these rules by Companies who have not been following them, there should be a joint committee established to determine whether or not the Employer falls in the "small store" category. Likewise, for any Employer who has been following the rules, the Employer may protest the application of those rules to its operation and this same joint committee shall endeavor to determine whether the Employer's operation falls in the "small store" category.  In the event a Company who has not been following the rules is determined to be ineligible for the "small store" exemption, application of the rules shall be prospective only.

**9.3.3**   **MEAT CUTTER (STEP-UP):**

**9.3.3.1**  A Step-Up Meat Cutter will normally perform Meat Clerk work and be compensated at the Meat Clerk rate. A Step-Up Meat Cutter will be allowed to step up (for an entire shift) to the Meat Cutter classification because of illness, days off, vacation, or leaves of absence.  All time served working as a Meat Cutter will be credited at the time of promotion to a Meat Cutter.  A Step-Up Meat Cutter will be compensated at the appropriate Meat Cutter rate.

No current or future Meat Cutter will be laid off or reduced in hours because of the use of Step-Up Meat Cutters. The use of Step-Up Meat Cutters is not intended to avoid scheduling Meat Cutters on premium days.

Promotion to Step-Up Meat Cutter will be according to the Promotion section of this Agreement.

**9.4   DEMONSTRATORS:**  All work connected with or incidental to the demonstration of merchandise offered for sale in the Employer's retail store (except merchandise referred to in Section 1 Recognition and Contract Coverage, Subsection 1.2 hereof, as being excluded from this Agreement) shall be covered by this Agreement; and all such work shall be performed only by members of the appropriate unit as defined in Section 1 Recognition and Contract Coverage, Subsection 1.1 hereof. It is understood that the handling of coupons is not Demonstrator's work. No Demonstrator may perform such work in the Employer's retail store unless said Demonstrator is on the payroll of the Employer and, unless the Employer, at all times, holds and exercises full control of the terms and conditions of employment of any such Demonstrators while such work is being performed in the Employer's retail store. Demonstrators shall be covered by all the terms of this Agreement, except Health and Welfare and Pension.

The hourly rate of pay for Demonstrators shall be as follows:

Currently, twelve dollars and seventy-five cents ($12.75).

**9.5   TRAVEL ALLOWANCE:**  An employee who is hired to work on a full-time basis in one (1) store, who is temporarily assigned to relief work in another store, shall be entitled to reimbursement for the following travel expenses:

(1)    Mileage for the extra travel resulting from such assignment, or established bus or taxi fare if so designated by the Employer, according to the amount provided for under the Internal Revenue Service regulations. Increase in the amount provided for under Internal Revenue Service regulations shall be effective the date such increase is to be effective under the Internal Revenue Service regulations or the week following notification to the Employer by the Union, whichever is later; and

(2)    Reasonable allowance for board and lodging, not to exceed sixty dollars ($60.00) per day, when required to stay away from home overnight however, if authorized in advance or if the reservation is made by the Employer, the entire cost for board and lodging shall be paid by the Employer; and

(3)    Necessary out-of-pocket expenses such as bridge tolls and parking fees.

The above provisions shall not apply to an employee who is hired for or regularly assigned to relief work or to work in different stores on different days of the week in order to achieve additional available hours.

**9.6   TRANSPORTATION:**  Any employee who is required by the Employer to perform his regular duties in more than one (1) store in any day shall be reimbursed for necessary out-of-pocket and mileage expenses as provided for above. No such transfer shall be made in a manner to interfere with the lunch hour of the employee so transferred, and all time consumed in travel from one (1) store to another shall constitute a part of the regular day's work of the employee.

**9.7     TRANSFER OR REMOVAL OF WORK:** No work now being performed by employees in the unit covered by this Collective Bargaining Agreement shall be transferred or removed from the unit without consultation and negotiation with the Union and unless the transfer or removal of such work is required for the purpose of promoting improved operating techniques, technological changes, automation, or other factors connected with more efficient operations, as distinguished from reasons connected with securing the performance of such work at lower rates of pay or under less favorable employment conditions.

**9.7.1**   Where, as a result of such consultation and negotiation, it is determined that the transfer or removal of any work is justified upon the considerations set forth above, the parties shall seek to determine the extent of the work transferred or removed and the number of jobs or hours of work to be lost by the Union members affected. Based upon such findings, the following remedies shall be applied:

**9.7.1.1**  Any employee losing hours of employment by reason of such transfer or removal of work shall either be compensated at his regular rate of pay for such hours or he shall be given other comparable employment by the Employer in the area covered by this Agreement at compensation equal to that received by him prior to the work transfer. If the comparable employment is within the bargaining unit, then he shall retain his seniority and other benefits under this Agreement.

**9.7.1.2**  The Employer shall attempt to provide any employee losing his job as a result of any such transfer or removal of work with other comparable employment in the area covered by this Agreement without loss of pay, status, seniority, or other benefits. Any employee not receiving such other employment shall receive one (1) week's severance pay for each year of service with the Employer; provided that, if an employee receives such comparable employment outside the bargaining unit and does not remain in such employment for at least thirty (30) days, he shall receive the full severance pay provided for herein.

**9.7.2**   Any employees who lose work or employment as a result of the failure of the Employer to observe the requirement provided for herein for consultation and negotiation concerning transfer or removal of work shall be entitled to full pay at their regular rate of pay for all such loss of work or employment.

**9.8**    Notwithstanding the above, it is agreed that should the Employer intend to institute electronic checkout systems which would have direct, material impact on employment covered by this Agreement, the Employer shall give the Union at least sixty (60) days' written, advance notice by certified or registered mail setting forth the nature of such intended changes and/or methods of operation.

**9.8.1**   Upon written request by the Union, negotiations shall commence with respect to the following subjects: rates of pay for new jobs which might be created; transfer to comparable work, within or outside the bargaining unit; or the disposition of displaced employees resulting from the institution of such new methods.

**9.8.2**   In the event the parties do not reach agreement within such period, then all unresolved issues as set forth above shall be submitted to final and binding arbitration. It is not the intent of the parties that such negotiations or arbitration will in any way jeopardize the efficiencies and increased productivity to be gained by the installation of such systems. The arbitrator shall be selected in accordance with the provisions of Section 18 Adjustment Board and Arbitration of Disputes hereof.

**9.8.3**   The parties further agree that the arbitrator's decision shall be final and binding, and that there will be no strike, work stoppages, lockout, or economic action of any sort or form employed by either party in connection with or arising out of any dispute concerning or related in any way to the operation of this section.

**9.8.4** It is agreed and expected that the parties will exert every effort to accomplish the foregoing within the sixty (60) day allotted period, but failing to do so shall not prohibit or in any way impede the Employer from installing or effectuating any such new methods, systems, or equipment upon the expiration of the allotted sixty (60) day time period, unless such period is extended by mutual written agreement. The decision of the arbitrator or the parties shall be effective on or retroactive to the date such new methods are installed. The cost of the impartial arbitrator shall be borne equally by the parties.

**9.8.5 SELF-CHECKOUT:** The Employer may have at its discretion a multi-unit self-checkout check stand per store. If the Employer wants to introduce a second multi-unit self-checkout check stand, the parties agree to negotiate over the effects of the introduction of a second unit per store.

## SECTION 10. HOLIDAYS

**10.1** The following days shall be recognized as paid holidays:

New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, Christmas Day, employee's birthday, employee's anniversary date of employment, and a floating holiday. It is understood that the day of observance for Memorial Day shall be the date established by federal statute.

**10.1.1 NO WORK:** No employee shall be permitted to work on Christmas Day except in resort areas.

**10.1.2 VIOLATION:** In the event any Employer violates this provision by allowing anyone to work in the store on the holiday(s) set forth in Subsection 10.1.1 above, the Union will be allowed to place pickets at the store as soon as possible and to continue their activities for a maximum of three (3) days following each violation.

**10.1.3 WORK:** In the event the employees shall be obligated to work on any of the above holidays, they shall be paid at the rate of two (2) times the straight-time hourly rate of pay, in addition to the normal holiday pay regardless of the day of the week upon which the holiday falls.

If the Employer elects to open on New Year's Day, Labor Day, or Thanksgiving Day, the store shall be staffed with volunteers. If more employees than are needed volunteer, assignment shall be by seniority. If an insufficient number of employees volunteer, assignment shall be by inverse seniority.

**10.1.4 EMPLOYEE'S BIRTHDAY:** Employees shall receive pay for said holiday as if worked. Each employee shall give his Employer notice of his birthday at least two (2) weeks prior to the week in which the birthday occurs.

Such birthday holiday shall be enjoyed by the employee on the actual day of his birthday or on another day mutually agreeable to the employee and the Employer.

If an employee's birthday falls on a day which is otherwise considered as a holiday, he shall receive an additional day off for the birthday in addition to the holiday on which it falls.

**10.1.5 ANNIVERSARY DATE OF EMPLOYMENT AND FLOATING HOLIDAY:** The anniversary date of employment holiday and the floating holiday shall be enjoyed by regular employees in accordance with the observance procedures governing the employee's birthday holiday. Upon entitlement, the floating holiday shall be taken by mutual agreement of the Employer and employee.

**10.1.6** All earned personal holidays not taken within a calendar year will be paid at termination or at the end of each calendar year, whichever occurs first.

**10.2   GOOD FRIDAY:** No employee will be refused time off between the hours of noon and 3 p.m. on Good Friday for the purpose of attending religious services. An employee taking such time off will receive straight-time pay for scheduled working time during this period and shall not be required or permitted to make up such time off.

**10.3   OTHER HOLIDAY OBSERVANCE:** Where the Employer closes its store to the public on any day of special religious significance or on any legal holiday other than those listed above, it is understood that the Employer shall reschedule its regular full-time employees to work their normal number of working hours that week.

**10.4   HOLIDAY WEEK:** Any employee who has reported for work on his scheduled working day immediately preceding and his scheduled working day immediately following a recognized holiday, except when permission to be absent has been granted by the Employer or when the absence is due to a bona fide illness of the employee, shall receive holiday pay at his regular rate of pay. It is understood that in order to qualify for holiday pay an employee must work at least one (1) workday during the week in which the holiday falls.

**10.5   PART-TIME EMPLOYEES:** Holiday pay for employees who work less than forty (40) hours shall be based on twenty percent (20%) of the employee's average hours worked per week in the six (6) weeks immediately preceding the holiday or the number of weeks worked if less than six (6); except that in computing pay for the New Year's holiday, the same period of time used in computing pay for the Christmas holiday shall be used.

**10.6   PROBATIONARY EMPLOYEES:** Probationary employees are not entitled to any paid holidays. Entitlement to the birthday holiday shall commence with the employee's first (1st) birthday following completion of twelve (12) months of employment with the Company. An employee hired after January 7, 2005, shall not be entitled to the floating and anniversary date of employment holiday until the completion of three (3) years of employment.

**10.7** Employees with at least twenty-five (25) years of service with the Employer will receive two (2) additional holidays each year. The first (1st) holiday will be earned on May 1 and the second (2nd) holiday will be earned on September 1 of each year.

**10.8   EXTRA WORKERS:** Extra Workers are not entitled to holiday pay; except when an Extra Worker works the four (4) days in the week of a holiday, he shall be paid for the holiday, but in such event, the day of the holiday shall be paid eight (8) hours at the regular scale and not the Extra scale.

# SECTION 11.  VACATIONS

**11.1** All employees who have been in the service of the Employer for one (1) year, twelve (12) consecutive months, shall be granted a minimum of two (2) weeks' vacation annually with pay, except employees hired after January 7, 2005, who will earn one (1) week of vacation after one (1) year, twelve (12) consecutive months and two (2) weeks of vacation annually after three (3) years of employment. Such employees who have been in the service of the Employer for five (5) years or more shall receive three (3) weeks' vacation annually with pay. Such employees who have been in the service of the Employer for fifteen (15) years or more shall receive four (4) weeks' vacation annually with pay. Such employees who have been in the service of the Employer for twenty (20) years or more shall receive five (5) weeks' vacation annually with pay.

**11.2.  CONTINUITY:**  All loss from employment because of reasonable absence from work through sickness or other emergencies, or temporary layoff, not exceeding thirty (30) calendar days, shall be considered as time worked for the purpose of determining the length of employment.

**11.3  PAY AND SPECIAL PROVISIONS:**  For the purpose of computing or prorating vacation earnings, four percent (4%) of the employee's earnings for the previous year equals two (2) weeks' vacation pay; six percent (6%) of the employee's earnings for the previous year equals three (3) weeks' vacation pay; eight percent (8%) of the employee's earnings for the previous year equals four (4) weeks' vacation pay; and ten percent (10%) of the employee's earnings for the previous year equals five (5) weeks' vacation pay.

**NOTE:** Vacation pay shall be computed on the employee's W-2 form earnings for the prior calendar year from which it was earned; except for the first (1st) year of employment, it shall be computed on total earnings during the first (1st) anniversary year of employment; and when an employee terminates, it shall be computed on his earnings from the employee's anniversary date of employment to his termination date.

**11.4  VACATION PAY:**  The parties agree that they will take the appropriate steps to wind down and terminate the Vacation Fund and that the Employer will continue to recognize and pay all Industry-earned vacation benefits directly to employees as previously provided for in the Vacation Trust Fund after benefits from the Vacation Fund have been exhausted. All earned and unused vacation shall be paid out on the employee's anniversary date of employment following the year it is earned.

    **11.4.1** Employees hired after January 7, 2005, with over ten (10) years of Industry time will receive three (3) weeks of vacation after twelve (12) months of employment with the Employer; four (4) weeks of vacation after five (5) years of employment with the Employer; and five (5) weeks of vacation after ten (10) years of employment with the Employer.

**11.5  NEW EMPLOYER:**  Vacation seniority, defined as the length of an employee's service which determines the length of vacation to which he is entitled, shall not be affected by the sale or transfer of the store in which he works. Employees who continue in employment with a new Employer acquiring a store shall have their service prior to the time of acquisition credited by the new Employer.

The new Employer shall be obligated to make vacation payments after the acquisition in accordance with the employee's service with the new Employer.

The former Employer shall pay each of its employees earned vacation prorated to the time of the sale or transfer of the business.

However, if the selling or transferring Employer fails to comply, then the Employer who takes over or purchases the store shall assume the pro rata obligations.

**11.6  SCHEDULE:**  The Employer agrees to post the available vacation dates for each classification by January 1st of each year. If an employee fails to exercise his vacation selection right by February 1st or has lost his prior selection by reason of less seniority, the employee may select from the remaining available periods. The selection of vacation periods must be completed by March 1st of each year. If an employee fails to select his vacation by March 1st, that employee's vacation period will be assigned by the Employer. The Employer shall reserve the right to designate the number of employees that may be on vacation at any time, but in no event less than one (1) employee in any one (1) week.

Whenever a holiday falls during a vacation period of an employee, such employee shall receive an additional day's vacation with full pay however, by mutual agreement between the Employer and the employee, the employee may be paid out the additional day without an extra day being taken off.

**11.7   SELECTION:** The selection of vacations shall be on a store basis by seniority except:

**(1)**   The vacation of an employee shall not be changed if it was scheduled prior to his transfer from one (1) store to another.

**(2)**   If an employee does not have a scheduled vacation at the time of such transfer, the scheduling of his vacation shall be based solely upon his seniority status in the store to which he is transferred.

**(3)**   For the selection of vacations, the Head Meat Cutter and Meat Cutter classifications shall be considered as one (1) classification and will be based on geographical area.

**11.8   PERIOD:** Vacation periods shall be granted between January 1 and December 31 of each year or at other times if mutually agreeable to the Employer and employees affected, but, in all cases, at least ten (10) days' notice of the date of vacation shall be given each employee.

Notwithstanding the above, the Employer may block out five (5) weeks between the months of November 1 and March 1.  However, in the case of Meat Cutters, the Employer may block out five (5) weeks throughout the entire year with no more than one (1) week blocked out in any month.

After the completion of one (1) year of employment, if the employee is scheduled to take his time off prior to his anniversary date then, in that event, a pro rata payment based upon Company service shall be made at that time; and the additional amount will be paid at the time of his anniversary date.

**11.9   PRO RATA:** Any employee who is discharged, laid off, or who resigns after twelve (12) months or more of employment shall receive vacation wages prorated on the basis of the period worked at the time of said interruption or termination of employment.

**11.10 CONTINUOUS:** All vacations shall be taken in one (1) continuous period. All employees entitled to a vacation shall receive their vacation pay allowance in advance immediately preceding the employee's vacation. Employees, at their option, shall be entitled to an additional week's vacation without pay; in all such cases, however, the employee shall give the Employer at least ten (10) days' notice prior to leaving for the paid vacation.

**11.11 VARIATION:** Notwithstanding the above provisions, employees entitled to three (3), four (4), or five (5) week vacations shall be allowed to take them in one (1) or two (2) periods such as: two (2) two week periods; two (2) week and one (1) week periods; three (3) week and one (1) week periods; three (3) week and two (2) week periods; four (4) week and one (1) week periods; provided such vacation schedule shall be approved by the Employer, the employee involved, and the Union.

Employees who earn four (4) or five (5) weeks of vacation per year will, at their option, be able to convert one (1) week of vacation into five (5) individual days.

**11.12 EXTRA WORKERS:** Extra Workers are not entitled to vacation accumulation or credit for any purpose.

## SECTION 12. HEALTH AND WELFARE AND SICK LEAVE

**12.1  EMPLOYER ACCEPTANCE:**  The Employer agrees to accept and be bound fully by the terms of that certain Declaration of Trust dated August 26, 1963, providing for the UFCW Northern California Health and Welfare Trust Fund as the same may be applicable to the Welfare Plan therein provided for, and any amendments thereto. The Employer hereby acknowledges receipt of a copy of said Declaration of Trust.

The Trustees are directed to merge the UFCW Northern California Health and Welfare Trust Fund and the UFCW Bay Area Health and Welfare Trust Fund. The merged Fund shall be called the UFCW Benefits Trust Fund ("Fund"). The Employer and the Union agree that the merger shall occur by January 1, 2008, or as soon thereafter as is practicable in the exercise of due speed and diligence. As part of the merged Plan, the Employer and the Union agree to equalize benefits as described in Schedule 2.

**12.2  EMPLOYER CONTRIBUTIONS:**  The contribution rate is five dollars and fifty-two cents ($5.52 Nor Cal) for all classifications effective through hours worked in November 2007 and payable in December 2007.  Effective with hours worked in December 2007 and payable in January 2008, the Employer agrees to contribute five dollars and twenty-five cents ($5.25) for all classifications through hours worked in November 2008 and payable in December 2008. Effective with hours worked in December 2008, and payable in January 2009, the Employer agrees to contribute five dollars and ninety cents ($5.90) for all classifications through hours worked in November 2009 and payable in December 2009.  Effective with hours worked in December 2009 and payable in January 2010, the Employer agrees to contribute six dollars and fifteen cents ($6.15) for all classifications through hours worked in November 2010. Effective with hours worked in December 2010 and payable in January 2011, the Employer agrees to contribute six dollars and twenty cents ($6.20) until the expiration of this Agreement.

Apply the Side Letter on the "Funding of the Merged UFCW Northern California and UFCW Bay Area Health and Welfare Trust Fund."

Such contributions shall be made on all straight-time hours worked, including Sundays, and/or compensated, such as vacations and holidays.  Contributions shall be made on or before the twentieth (20th) of the month for covered hours worked during the previous month.  It is understood that the contributions required on behalf of any employee shall not exceed forty (40) straight-time hours per week or two thousand eighty (2,080) straight-time hours in any calendar year.

Notwithstanding the foregoing, the Employer will not be required to make any contributions for Fuel Station employees during the first (1st) twelve (12) months from their date of hire.

**12.3  PROMPT PAYMENT:**  The parties recognize and acknowledge that the regular and prompt payment of Employer contributions to the Fund is essential to the maintenance of the Health and Welfare Plan, and inasmuch as beneficiaries under the Plan are entitled to benefits for the period of time that they may have worked while covered by the Plan even though contributions have not been paid on their behalf by their Employer, that it would be extremely difficult, if not impractical, to fix the actual expense and damage to the Fund and to the Plan which would result from the failure of an individual Employer to pay such monthly contributions in full within the time provided. Therefore, the amount of damage to the Fund and Health and Welfare Plan resulting from any such failure shall be presumed to be the sum of twenty dollars ($20.00) per delinquency, or ten percent (10%) of the amount of the contribution or contributions due, whichever is the greater, not to exceed the sum of one hundred dollars ($100.00) per delinquency, which amount shall become due and payable to the Fund as liquidated damages, and not as a penalty, upon the day immediately following the date upon which the contributions became delinquent, and shall be in addition to said delinquent contribution or contributions.

Notwithstanding the above, interest on unpaid contributions will accrue at the rate of ten percent (10%) per annum, commencing with the first (1st) day of the month following the month in which the contribution is due. In addition, if legal action is pursued to collect delinquent contributions, the statutory provisions in ERISA will apply and liquidated damages shall be assessed in an amount equal to the greater of twenty percent (20%) of the unpaid contributions at the time the legal action is commenced or interest at the above rate on the unpaid contributions from the due date through the date the contributions are paid. The Trustees shall have the authority to adopt and to amend from time to time written delinquency collection procedures which shall specify the interest, liquidated damages, and other amounts to be assessed on any delinquency and the procedures for collecting same, and such procedures shall be binding on the Employer.

**12.4   BENEFITS:** The Trustees are authorized and directed to modify benefits, for active employees, in the manner as enumerated below. The Trustees shall implement and maintain over time a schedule of benefits and plan design, including a prudent operating reserve that can be supported by the applicable hourly contribution rate. These changes shall be made by the Trustees to be effective January 1, 2008, or as soon thereafter as may be adopted and implemented by the UFCW Benefits Trust Fund.

(1)      Eliminate annual prescription deductible.

(2)      Eliminate the annual dental deductible in Plan A and Plan B.

(3)      Increase annual dental maximum in Plan A to $2,500 and in Plan B to $2,000.

(4)      Increase the orthodontic combined lifetime maximum to an aggregate of $2,000 in Plan A and Plan B.

(5)      One hundred percent (100%) coverage for participants for preventative care in Plan A and Plan B based on Schedule 1 as modified by guidance from nationally recognized experts.

(6)      First dollar coverage for preventative and diagnostic dental care in Plan C and coverage for well-baby care in Plan C (as described in Schedule 1).

(7)      Reduce co-pays for maintenance drugs for conditions such as diabetes, high blood pressure, etc. as such maintenance drugs may be identified by the PBM from time to time:

| | |
|---|---|
| Retail: | $7/$15/$25 |
| Mail Order or Retail for a 90-day supply for maintenance medications only: | $14/$30/$50 |

When no generic or formulary is available, based on the PBM's list as of November 17, 2007, as reviewed and modified from time to time, the formulary co-pay will apply for these prescriptions.

Furthermore, effective January 1, 2008, the initial eligibility rule will be modified to require four (4) months of qualifying hours, of which the first two (2) months must be met consecutively. Coverage will begin the first (1st) day of the second (2nd) month following the fourth (4th) month of qualifying hours.

        Plan C shall cover the employee and dependent children only.

        Courtesy Clerks hired after November 17, 2007, will be eligible for employee-only coverage. If a Courtesy Clerk is promoted, they will be given credit, for the purpose of eligibility, back to their date of hire.

- Effective the month following the twenty-fifth (25th) month from date of hire, employees, their spouse, and dependents will be eligible for Plan B coverage.

- Effective the month following the seventy-second (72nd) month from date of hire, employees, their spouse, and dependents will be eligible for Plan A coverage.

The Plan's current monthly straight-time work hours' requirements for each classification of employment, as they relate to eligibility, shall continue to apply.

Any Employer that desires to cover all of its employees under Plan A shall pay an Employer contribution rate for those additional employees sufficient to cover the projected cost of the Plan as determined by the co-consultants during the term of this Agreement.

**12.5   LEGISLATION:**  In the event of legislation providing Health and Welfare or Sick Leave benefits, which are also provided for under this Agreement, the Trustees are directed to amend the Plan document immediately deleting duplicated benefits.  If, by reason of the elimination of duplicated benefits, there is a savings to the Employer and the Fund, after the cost thereof is set off against the cost required of the Employer to finance said benefits, the Trustees shall meet no later than thirty (30) days from the effective date of the legislation to determine how said savings shall be used by the Fund. If the Trustees fail to reach an agreement, they shall proceed, under the Trust Agreement, to decide such deadlock within seventy-five (75) days of the effective date of the legislation. Any cost reductions to the Employer and the Fund attributable to a cost required of the employee under the legislation will be passed on to the employee through other Health and Welfare changes. In the event Medicare becomes secondary in the application of the retiree benefit plan, the Trustees will take immediate and remedial action to protect the financial integrity of the Plan.

**12.6   COST CONTAINMENT:**  The Trustees are authorized and directed to study and expand cost containment programs where appropriate, for both the active and retiree plans.

**12.7   RETIREE BENEFITS:**  The collective bargaining parties recognize that retiree Health and Welfare benefits are not vested benefits. Pursuant to this Agreement, a contributing Employer's sole and only obligation is to contribute, during the term of this Agreement, the specific contributions required under this Agreement. Despite the adoption of a plan of benefits that currently may be available to Plan participants, the Employer's liability for any and all Health and Welfare benefits including retiree Health and Welfare benefits shall be limited to the contribution specified in this section and for the period of this Agreement. The parties authorize and direct the Trustees of the Health and Welfare Plan to take the necessary action to assure compliance with the terms of this paragraph.

The Trustees are authorized and directed to require that retirees contribute seventy dollars ($70.00) per month per retiree toward the cost of retiree health care benefits.  This provision shall not impact the retirees' cost for the self-pay retiree plan. Any retiree who does not make the required monthly premium shall lose coverage under the Plan in accordance with such rules and regulations adopted by the Trustees.

Current retirees in Plan IV will be placed in Plan B and treated the same as current Plan B retiree participants.

The Trustees will establish a Retiree Health and Welfare Committee to be effective January 2008 in accordance with the Retiree Health and Welfare Committee Side Letter to this Agreement.

**12.8  BUSINESS EXPENSE:**  It is understood that the provision for a Health and Welfare, Dental, Vision Care, Drug, and Sick Leave Plan(s) is being entered into and continued upon the condition that all payments shall be deductible in the year in which the contribution is made as a business expense under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar state revenue or tax laws.

**12.8.1** The obligation to make any contribution specified in Section 12 Health and Welfare and Sick Leave and 13 Pension of this Agreement is expressly conditioned on the deductibility of that contribution by the Employer as an ordinary and necessary business expense, or otherwise, in the year which the contribution is made. In the event that any Employer contribution is not deductible as an ordinary necessary business expense, or otherwise, in the year which the contribution is to be made, the Employer's obligation to make such contribution shall be permanently suspended for any month in which the contribution is not deductible. Such obligation shall not resume until such contribution becomes deductible as herein described. An Employer shall also be entitled to a refund of any contribution actually made, if that contribution is not deductible by the Employer as an ordinary necessary business expense, or otherwise, in the year in which it is made.

**12.9  SICK LEAVE BENEFITS:**

(a)  **ACCRUAL:** Employees in Plan A and B accrue sick leave monthly as follows:

| | |
|---|---|
| Less than 64 hours | 0 hours |
| At least 64 hours but less than 120 hours | 3 hours |
| 120 hours or more | 6 hours |

Employees that are in neither Plan A or B accrue sick leave monthly as follows:

| | |
|---|---|
| Less than 64 hours | 0 hours |
| At least 64 hours but less than 120 hours | 2 hours |
| 120 hours or more | 4 hours |

(b)  **SICK LEAVE USE:** New employees will be eligible to use sick leave once they are eligible for Health and Welfare benefits.

(c)  **SICK LEAVE PAYOUT:**

(1)  **ELIGIBILITY:** In order to be eligible for a sick leave payout, an employee must have the maximum of three hundred and sixty (360) hours accumulated sick leave as of December 31.

(2)  **AMOUNT OF PAYOUT:** Each employee who is eligible for a sick leave payout in accordance with paragraph (1) shall receive four hundred dollars ($400), less ten dollars ($10) for each hour of sick leave used during that calendar year.

Payments shall be made as soon after the end of the calendar year as administratively feasible.

(d)  **MEAT EMPLOYEES:** Effective January 1, 2008, Employer-paid sick leave banks will be frozen at their current levels. Meat Department employees will begin accumulating sick leave benefits through the UFCW Benefits Trust Fund as described in 12.9 above.

During the transition, the employee will continue to draw from his or her sick leave bank through the Employer, as necessary, until the bank with the Employer is exhausted, at which time the Fund will be notified that the employee no longer has any sick leave time remaining.

The Employer agrees to pay out, beginning January 1, 2008, and each January thereafter, to each Meat Department employee up to eight (8) days per year, minus any sick leave day(s) taken, from the sick leave bank at the rate of one-half (½) of the sick leave in cash, until the entire sick leave bank has been exhausted.

A Meat Department employee who retires during the sick leave transition shall be eligible for the remaining banked sick leave at a one-half (½) cash payout through the Employer.

## SECTION 13. PENSION

**13.1   EMPLOYER ACCEPTANCE:** The Employer agrees to accept and be bound fully by the terms of that certain Declaration of Trust dated April 1, 1957, providing for the UFCW–Northern California Employers Joint Pension Trust Fund as the same may be applicable to the Pension Plan therein provided for and any amendments thereto. The Employer hereby acknowledges receipt of a copy of said Declaration of Trust.

**13.2   EMPLOYER CONTRIBUTIONS:** Effective with hours worked January 2008, the Employer agrees to contribute to the Trust Fund for the term of the Agreement the following composite rate of one dollar and seventy-two cents ($1.72) per straight-time hour on all employees.

The seven (7) month deferral of contributions for accounting and actuarial. purposes, first implemented for the Trust Fund's 1999 fiscal year, continues to be in effect.

Such contributions shall be made on all straight-time hours worked by all employees covered by the Collective Bargaining Agreement, including Sundays, and/or all hours compensated, such as vacations and holidays.   Contributions shall be made on or before the twentieth (20th) of the month for covered hours worked during the preceding calendar month. It is understood that the contributions required on behalf of any employee shall not exceed forty (40) straight-time hours per week or two thousand and eighty (2,080) straight-time hours in any calendar year.

An employee shall receive both vesting and benefit accrual credit for all hours compensated (including those for which no contribution is due to the Trust) to a maximum of forty (40) hours per week and two thousand and eighty (2,080) hours per year. For employees who are hired on or after January 7, 2005, their benefit accrual credits will not begin until they have met the eligibility requirements.

In the event that the contributing Employers are required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the contributing Employers will receive a dollar-for-dollar credit for additional contributions in any subsequent Plan year where there is sufficient excess funding exceeding the minimum funding level required to offset the additional contribution provided this offset does not create a minimum funding deficiency the following Plan year.    In other words, the Employer payments in excess of the negotiated contributions will create future contribution suspensions that will be taken as soon as possible as long as the minimum funding concerns outlined above are met.

**13.3   TERMINAL VACATION PAY:**   Upon retirement, no Trust Fund contributions will be required of the Employer on terminal vacation pay made to an employee at retirement. The employee's retirement benefits will not be delayed, and he will receive credit for hours even though contributions are not required.

**13.4   PROMPT PAYMENT:** The parties recognize and acknowledge that the regular and prompt payment of Employer contributions to the Fund is essential to the maintenance of the Pension Plan, and inasmuch as beneficiaries under the Plan are entitled to Pension benefits for the period of time that they may have worked while covered by the Plan, even though contributions have not

been paid on their behalf by their Employer, that it would be extremely difficult, if not impractical, to fix the actual expense and damage to the Fund and Pension Plan which would result from the failure of an individual Employer to pay such monthly contributions in full within the time above provided. Therefore, the amount of damage to the Fund and Pension Plan resulting from any such failure shall be presumed to be the sum of twenty dollars ($20) per delinquency, or ten percent (10%) of the amount of the contribution or contributions due, whichever is the greater, not to exceed the sum of one hundred dollars ($100) per delinquency, which amount shall become due and payable to the Fund as liquidated damages, and not as a penalty, upon the day immediately following the date upon which the contributions became delinquent, and shall be in addition to said delinquent contribution or contributions.

**13.5   BENEFITS:** The Trustees are authorized and directed to modify benefits in accordance with the following provisions, and otherwise in accordance with the provisions of this Agreement:

In the event that there has been a green-zone certification in each year of the Agreement and in conjunction with the 2011 certification, the Plan co-actuaries are to conduct the PPA certification process and simultaneously determine when a green-zone certification can be achieved while also providing a Pension accrual increase retroactive to January 1, 2007.

The maximum Pension accrual increase that will be provided is fifteen point thirty-eight percent (15.38%) and will apply for accruals earned during the Plan years beginning during the term of this Agreement (i.e. 2007, 2008, 2009, and 2010). In order to determine the level of a possible Pension accrual increase, a two (2) stage process will be implemented.

First, a maximum of a seven point sixty-nine percent (7.69%) accrual increase will be provided when the co-actuaries certify that the Plan is able to obtain a PPA green-zone certification in 2011.

Second, a maximum additional seven point sixty-nine percent (7.69%) Pension accrual increase will be provided when the co-actuaries project that the Funding Standard Account Credit Balance will remain positive through December 31, 2019.

The Trustees are directed to adopt these possible accrual changes in 2011.

**13.6   APPLICATION FOR EXTENDED AMORTIZATION EXTENSIONS UNDER INTERNAL REVENUE CODE SECTION 431:**

The Trustees shall cause the Trust Fund to apply for an amortization extension under Internal Revenue Code § 431(d); if necessary to avoid a certification of the Trust Fund as either "critical" or "endangered" under the provisions of the Pension Protection Act.

In making such application, the required "plan" to improve the Trust Fund's funding status under ERISA Section 431(d)(1)(B) shall be the long-term funding policy set forth below.

In the event that the application under Internal Revenue Code § 431 is approved by the reviewing government agency, the Trustees will adopt the following long-term funding policy.

**UFCW – NORTHERN CALIFORNIA EMPLOYERS JOINT PENSION TRUST FUND LONG-TERM FUNDING POLICY:**

The co-consultants will produce with the annual actuarial valuations a seven (7) year actuarial projection with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

- Projections will take into account only negotiated contributions

- Using the assumptions and actuarial methods in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants

- No unanticipated actuarial gains or losses during the projection time period

If the annual projection indicates any future funding deficiencies during the seven (7) year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the contributing Employers are required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the contributing Employers will receive a dollar-for-dollar credit for additional contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies, it shall take into account that these contribution credits will be taken as reductions in the negotiated contributions in the next Plan year. In other words, the Employer payments in excess of the negotiated contributions will create future contribution suspensions that will be taken as soon as possible and the co-consultants will reflect this with the annual seven (7) year projections.

In the event that the application under Internal Revenue Code § 431 is denied by the reviewing government agency, the Trustees shall not be required to adopt the above long-term funding policy.

Any deadlocked Trustee motion relating to a reduction in benefits required under the long-term funding policy shall be arbitrated on an expedited basis with the arbitration to take place no later than sixty (60) days following the Trust meeting in which the deadlock occurs.

**13.7   OTHER PLANS:**  The Employer retains the exclusive right to alter, amend, cancel, or terminate any presently existing Company-sponsored Pension Plan or employee retirement plan which existed prior to the establishment of the Pension Fund, provided that the effective date of such alteration, amendment, cancellation, or termination shall not occur prior to the acceptance of this Plan.

**13.8   REGULATIONS:**  The Trust and the benefits to be provided from the Pension Trust Fund and all acts pursuant to this Agreement and pursuant to such Trust Agreement and Pension Plan shall conform in all respects to the requirements of the Treasury Department, Internal Revenue Service, and to any other applicable state or federal laws and regulations.

**13.9   BUSINESS EXPENSE:**  It is understood that this provision for a Pension Plan is being entered into upon the condition that all payments made by the Employer hereunder shall be deductible in the year in which the contribution is made as business expenses under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar applicable state revenue or tax laws.

**13.10  LIMITATION:**  The Employer's sole and only obligation shall be limited to the contribution requirements outlined in 13.2 of this section.

**13.11 LEGISLATION:**  In the event of legislation requiring the restructuring of any of the essential elements of the Pension Plan, including, but not limited to, the benefit formula, amortization period, actuarial assumptions, vesting, or administration of the benefits, the Trustees are instructed to comply immediately with such legislation in adjusting the elements on a sound actuarial basis with no change in the existing Employer contribution rate.

**13.12 DEFINED CONTRIBUTION PENSION PLAN:** The Trustees have established a Defined Contribution Pension Plan and Trust effective March 1, 1987, in addition to and supplemental to the Pension Plan described in this section.

The Employers agree that they will not oppose a motion by the Unions to create self-directed accounts in the IAP, so long as such accounts may legally be created and the Trust Fund will incur no additional costs as the result of the creation of such. Furthermore, the Unions and the Employers agree to authorize and direct the Trust Fund to establish a subcommittee with the power to act to carry out the foregoing purpose. Moreover and subject to the foregoing, no such accounts will be established sooner than January 1, 2009.

**13.13 USE OF CONTRIBUTIONS:** The Employer contributions shall be for the sole purpose of providing the Pension benefits and for the administration of said program. The Trustees are not authorized to use any of the contributions or Plan assets for benefit improvements or any other purpose except as specifically provided here in Section 13.

**13.14 OPERATIONAL PLAN RULES:** The Trustees are instructed to follow these operational Plan rules, and the Plan shall be amended as necessary to implement such rules:

    (1)    Where an Employer is contributing at a rate that is less than the maximum allowed contribution level and later increases their contribution rate (but only up to the maximum contribution rate accepted by the Pension Fund), such increase will only increase future benefit accrual rates. Benefits accrued prior to the date that Employer increases their Pension contribution rate will not be affected and will remain at the level based on the earlier Employer contribution level.

    (2)    The Board of Trustees will instruct the co-consultants to look at situations such as, but not limited to, if an Employer attempts to decrease their contribution rate after a period of contribution suspension. Such review and approval shall include a consideration of whether the contribution rate is sufficient to support the benefits promised, as well as any subsidy or equity issues, all as may be identified by the co-consultants to the Fund.

## SECTION 14.   FIELD ADMINISTRATION TRUST FUNDS

**14.1**  The Unions have determined that they are no longer willing to provide administrative functions, as distinguished from the usual and normal Union services, at Union expense to persons covered by the terms of the various benefit plans provided for by the Collective Bargaining Agreements. It is agreed that the portion of these functions determined to be Trust Fund functions are properly chargeable to the Trust Funds under which said Plans are established and maintained.

All expenses of the sub-administrative offices shall be paid for by the respective Funds according to the formula established by the parties pursuant to the 1974 Joint Study.

## SECTION 15.   STORE MEETINGS AND CHARITABLE DRIVES

**15.1**  Time spent in store meetings or in meetings called by the Employer before the commencement of the day's work or after the day's work shall be considered as time worked and shall be paid for in accordance with the provisions of this Agreement.

**15.2**  All employee contributions to charity shall be voluntary.

## SECTION 16.  CONTRACT ENFORCEMENT AND STORE VISITS

**16.1  VISITS:**  It is agreed by both parties hereto that the District Union Representative shall have the right and shall be allowed by the Employer to visit any and all stores and shall have free access to the employees during such visits for the purpose of making inquiries from the employees relative to information concerning working conditions, complaints of members of the Union, and other matters pertaining to the enforcement of this Agreement, provided said investigation may be accomplished without interfering with the duties of the employees.

**16.2  RECORDING OF TIME:**  The parties agree to observe the following procedures in enforcing the terms of this Agreement with respect to authorized work and reporting of working time:

**16.2.1** The Employer shall post the following notice in all stores:

The law and the Union Agreement require that all time worked shall be recorded daily, including starting and stopping time. All employees shall comply strictly with these requirements, and any employee failing to so comply shall be subject to discipline on the same basis as is followed with respect to any other violation of store rules or procedure.

**16.2.2** The Union shall promptly report, in writing, to the Employer any observed violation by an employee of this reporting time provision or the working of unauthorized time, and the Employer will take the necessary steps with the employee to correct such violation.

**16.2.3** Upon notification by the Union of a second (2nd) such violation by the same employee, the Employer shall pay to the Welfare Fund provided for herein an amount equal to the overtime pay due and payable the employee. In such case, the employee involved shall be subject to discharge, retaining, however, his right to appeal any such discharge under the terms of this Agreement.

**16.3  FREE TIME:**  When an employee willfully violates the provisions of this Agreement by working free time without the knowledge of the Employer, after a second (2nd) written notice by the Union of this employee's repeated contract violation, the Employer agrees to discharge said employee within seven (7) days after receiving written notice of such violation.

## SECTION 17.  NEW METHODS (MEAT DEPARTMENT)

**17.1**  It is agreed that should the Employer intend to initiate a major change in method of operation which is not presently in the industry within the area of operation covered by the Union that would result in a substantial change in the content of any job presently covered by this Agreement, the Employer shall give notice of the nature of such suggested new method of operation to the Union, following which, the matter of job classifications, wages, working conditions, and/or the disposition of employees potentially to be displaced shall then become a matter of negotiation with the Union for a period of forty-five (45) days.

Pending negotiations by the parties during the above-mentioned forty-five (45) day period, no change of operations as above set forth shall be placed into effect.

In the event the parties have not arrived at agreement within the above forty-five (45) day period, the Employer may elect to place such changed method of operation, as above defined, into effect, and all unresolved issues in regard to job classifications, wages, working conditions, and/or the disposition of displaced employees shall be submitted to final and binding arbitration in accordance with Section 18 Adjustment Board and Arbitration of Disputes of this Agreement.

The remedy, if any, shall be effective with the date of the arbitrator's award.

Any Company that seeks to introduce "case-ready" cuts of meat must notify the Union(s) in advance of a change in the method of operations and proceed in accordance with this section of this Collective Bargaining Agreement.

A committee shall be formed to negotiate a merger of the Valley and the Bay Meat Addendum language.

## SECTION 18. ADJUSTMENT BOARD AND ARBITRATION OF DISPUTES

**18.1**  Upon the request of either party hereto, a Board of Adjustment shall be created, to be composed of two (2) representatives of each party to this Agreement, for the purpose of passing on all claims, disputes, and grievances arising between the parties during the term of this Agreement over the construction and application of this Agreement or relating to working conditions arising out of this Agreement, when such cannot be settled directly between the Union and the Employer. Said Board shall meet for consideration of any such matter referred to it within seven (7) calendar days subsequent to a request therefore by either party. For cases other than those which are disciplinary in nature, the convening of the Adjustment Board may be waived. The request of either party to extend the time limit for the convening of the Board of Adjustment due to extenuating circumstances will not be unreasonably denied. If the matter is not adjusted and is at an impasse, the moving party shall communicate, in writing, to the other party within twenty (20) business days following the meeting of the Board of Adjustment their desire to proceed to arbitration. Failure of the moving party to comply with the twenty (20) business day time limit herein specified shall be deemed to be a conclusive waiver of the grievance.

**18.2**  Disciplinary arbitrations (meaning a matter concerning a suspension, demotion, or termination) will be heard without the use of a court reporter or briefs. The parties will present their evidence and witnesses and argue orally. At the conclusion of the arbitration hearing but before issuance of the bench decision, the Union and the Employer will meet and in good faith attempt to resolve the grievance. If the parties are unable to settle the grievance, the arbitrator will announce his/her decision within fourteen (14) business days and subsequently will reduce his/her decision to writing. The parties may mutually agree to waive or modify any or all of the provisions of this expedited procedure.

**18.3  INTERPRETATION OR APPLICATION DISPUTES:** For contract interpretation disputes which proceed to arbitration, the parties will mutually select an impartial arbitrator. If the parties are unable to agree upon the selection of an arbitrator, they shall request a panel of arbitrators from the United States Federal Mediation and Conciliation Service; and they shall select an arbitrator therefrom by the strike-off method.

The award of the Adjustment Board or arbitrator shall be final and binding upon the Employer, the Union, and the employee.

**18.4**  Each party shall in good faith divulge to the other party all available material facts at the time said party acquires knowledge thereof concerning the matter in dispute. Nothing contained herein shall require either party to supply documents which are irrelevant.

18.5   All jointly incurred arbitration expenses shall be borne by the losing party. In the event of a dispute concerning the application of this section, the arbitrator shall be empowered to determine the allocation of expenses.

In termination cases, it is agreed that if a grievant is reinstated to employment with full back pay, the Company shall pay the jointly incurred costs of the arbitration. If a grievant is not reinstated, the Union shall pay the jointly incurred costs of the arbitration. If a grievant is reinstated with partial or no back pay, the parties shall split the jointly incurred costs of the arbitration.

If either party fails or refuses (1) to constitute a Board of Adjustment as required by Subsection 18.1 above; (2) to observe the time limits provided in Subsection 18.1 above for the consideration of complaints by the Adjustment Board or the submission thereof to arbitration; or (3) to select an arbitrator within a reasonable time after the Adjustment Board has failed to agree on any question referred to it, then, in any such event, the other party shall be free to proceed to arbitration, whether or not the other party chooses to participate; provided, however, that prior written notice of such intent is given to the other party. In any case, where one (1) party proceeds to arbitration without the participation of the other party, as herein provided, the arbitrator shall be selected by the participating party from a panel furnished by the United States Federal Mediation and Conciliation Service, and any award rendered by an arbitrator so selected shall be final and binding upon both parties.

18.6   The arbitrator shall not have the right to alter, amend, delete, or add to any of the terms of this Agreement.

18.7   Interest at seven percent (7%) shall be payable on all money claims awarded by the Adjustment Board or by an arbitrator, and such interest shall commence as of the date the complaint is first submitted to the Adjustment Board.

18.8   CLAIMS:   In the case of a direct wage claim or a claim for contributions to employee benefit plans which does not involve an interpretation of any of the provisions of this Agreement, either party may submit such claim for settlement to either the grievance procedure provided for herein or to any other tribunal or agency which is authorized and empowered to effect such a settlement.

The Employer is not required to pay any wage claim or portion thereof retroactively for a period of more than ninety-one (91) days immediately prior to the date of the Employer's receipt of written notice from the Union of such claim.

## SECTION 19.  STRIKE OR LOCKOUT

19.1   During the life of this Agreement, the Union agrees not to engage in any stoppage of work. Furthermore, the Union and its representatives, including store representatives, agree not to boycott, handbill, publicly disparage, or engage in any adverse economic action against the Employer's stores covered by this Agreement. This provision does not apply in any of the Employer's stores where the Union has not been recognized by the Employer as the employees' bargaining representative.

19.2   During the life of this Agreement, the Employer agrees not to engage in any lockout.

19.3   Refusal of any employee covered by the terms of this Agreement to pass through any picket line which has been sanctioned by the Central Labor Council of proper jurisdiction and/or the United Food & Commercial Workers International Union shall not constitute a violation of this Agreement.

## SECTION 20.  TERM OF AGREEMENT

**20.1**  Except as otherwise indicated herein, this Agreement shall be effective November 17, 2007, and shall remain in full force and effect in all areas to and including December 8, 2011, and shall be considered as renewed from year to year thereafter unless either party hereto gives written notice to the other of its desire to have the same modified or terminated. Such notice shall be given at least sixty (60) days prior to such expiration date during which period negotiations for a new Agreement shall be conducted with all conditions agreed to by the parties to become effective on the first (1st) day of the week nearest the expiration date of this Agreement.  If after opening, as provided herein, the parties fail to reach an agreement within the period so provided, then the provisions of Section 19 Strike or Lockout of this Agreement shall not be binding on either party.

**20.2**.  The provisions of this Agreement are deemed to be separable to the extent that if and when a court of last resort adjudges any provision of this Agreement in its application between the Union and the undersigned Employer to be in conflict with any law, such decision shall not affect the validity of the remaining provisions of this Agreement, but such remaining provisions shall continue in full force and effect, provided further, that in the event any provision or provisions are so declared to be in conflict with a law, both parties shall meet within thirty (30) days for the purpose of renegotiation and agreement on the provision or provisions so invalidated.

**20.3**  It is understood and agreed between the parties that all prior Agreements between them are hereby terminated and canceled and that this Agreement supersedes and replaces all such prior Agreements.

This Agreement shall be binding upon the heirs, executors, and assigns of the parties hereto.

**IN WITNESS WHEREOF**, the parties hereto by their duly constituted representative officers affixed their signatures this _____ day of _____, 20_____.

**FOR THE EMPLOYER:**

**BEL AIR MARKETS**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

# APPENDIX A - WAGE RATES

**A.1**   Notwithstanding any schedule of minimum wages, employees now receiving a higher wage than indicated in said schedule for the particular classification of work performed shall not have their wages reduced due to the signing and effect of this Agreement.

Where the basis for amounts paid over the wage rates provided in A.5 Wages of this Agreement have been specifically set forth, in writing, to the employee, they may be discontinued when the reason for their payment ceases to exist and the employee has been so advised, in writing, with a copy to the Union.

The schedule of minimum wages shall be maintained by the parties hereto during the period of this Agreement, and the Employer shall and hereby agrees to pay wages in compliance therewith.

**A.2**   **NIGHT PREMIUM:**  All employees shall receive extra compensation in addition to their regular scale herein set forth as follows:

    **(1)**   All employees, except Meat Cutters and Apprentice Meat Cutters, shall receive extra compensation, in addition to the regular scale herein set forth, of sixty-five cents (65¢) per hour for all work performed between the hours of 10 p.m. and 6 a.m.  Courtesy Clerks shall not receive night premium.

    **(2)**   Any Meat Cutter or Apprentice Meat Cutter who may be required to work any part of his workday prior to 8 a.m. or after 6 p.m. shall be paid two dollars ($2.00) in addition to his regular rate of pay.  Employees who are scheduled to work a regular eight (8) hour shift which commences before 8 a.m. or ends after 6 p.m. on any day shall receive overtime pay at the appropriate rate for any time worked in excess of such eight (8) hours in addition to the two dollar ($2.00) shift premium required in Section 3 Hours, Subsection 3.5 of this Agreement. Employees who are scheduled to work a regular eight (8) hour shift between the hours of 8 a.m. and 6 p.m. on any day and who are required to work in excess of such eight (8) hours after 6 p.m. by reason of an emergency shall receive overtime pay at the appropriate rate but shall not be entitled to the two dollar ($2.00) shift premium required above.

**A.3**   Non-contractual discretionary bonuses may be modified or discontinued at the Employer's discretion with prior notice to the Union.  This exception does not apply to overscale wage rates.

**A.4**   **ANNUAL LUMP-SUM BONUS:** Bargaining unit employees in the designated experienced classifications (that are overscale) and on the payroll for each October's increase for this contract, and actively employed on the date of payment of this bonus, shall receive a lump-sum bonus, as provided below:

    Designated classifications known as rates of pay that exceed the highest pay rate per classification shall receive the requisite wage increase per hour for each calendar year's increase for which the employee was compensated (excluding overtime) for the fifty-two (52) calendar weeks preceding September 1st of the year.

    This bonus will be paid on the week following the effective date of the contractual wage increase and will only be paid to employees who are actively employed on that date or thirty (30) days from when an employee returns to work from an approved leave of absence or layoff.  Consistent with past practice, this bonus will not be calculated to include derived overtime.

    This provision will apply to employees on approved leave of absence or layoff at the time of reinstatement who are actively employed at the time payment is due.  This payment also will be made no later than thirty (30) days following the expiration of the employee's recall rights under the term of this Agreement.

**A.5   WAGES:** See Wage Tables A.5.1 and A.5.2:

**A.5.1** The following minimum scale of wages shall be paid:

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| Managing Clerks | 21.16 | 21.58 | 21.95 | 22.32 |
| Senior Head Clerks and Senior Produce Clerks | 20.73 | 21.15 | 21.51 | 21.87 |
| Head Clerks | 20.63 | 21.04 | 21.40 | 21.76 |
| **Senior Clerks** | | | | |
| Experienced | 20.03 | 20.43 | 20.78 | 21.13 |
| 6th 1040 hours | 19.30 | 19.90 | 20.25 | 20.60 |
| 5th 1040 hours | 18.70 | 19.20 | 19.75 | 20.25 |
| 4th 1040 hours | 18.20 | 18.60 | 19.25 | 19.85 |
| 3rd 1040 hours | 17.20 | 17.60 | 18.25 | 18.85 |
| 2nd 1040 hours | 16.20 | 16.60 | 17.25 | 17.85 |
| 1st 1040 hours | 15.20 | 15.60 | 16.25 | 16.85 |
| Combo Bakery/Deli Managers | 16.06 | 16.66 | 17.26 | 17.86 |
| Department Head Clerks | 14.96 | 15.56 | 16.16 | 16.76 |
| **Clerks** | | | | |
| Experienced | | | 15.76 | 16.36 |
| 10th Step (10th 1040 hours) | | 15.16 | 15.16 | 15.16 |
| 9th Step (9th 1040 hours) | 14.56 | 14.56 | 14.56 | 14.56 |
| 8th Step (8th 1040 hours) | 13.96 | 13.96 | 13.96 | 13.96 |
| 7th Step (7th 1040 hours) | 11.70 | 11.70 | 11.85 | 12.00 |
| 6th Step (8th 1040 hours) | 11.30 | 11.30 | 11.35 | 11.50 |
| 5th Step (5th 1040 hours) | 10.80 | 10.80 | 10.90 | 11.05 |
| 4th Step (4th 1040 hours) | 10.25 | 10.40 | 10.55 | 10.70 |
| 3rd Step (3rd 1040 hours) | 10.00 | 10.15 | 10.30 | 10.45 |
| 2nd Step (2nd 1040 hours) | 9.75 | 9.90 | 10.05 | 10.20 |
| 1st Step (1st 1040 hours) | 9.50 | 9.65 | 9.80 | 9.95 |
| **Fuel Station** | | | | |
| Experienced | 12.15 | 12.40 | 12.65 | 12.90 |
| 6th Step (1040 hours) | 11.20 | 11.35 | 11.50 | 11.65 |
| 5th Step (1040 hours) | 10.70 | 10.85 | 11.00 | 11.15 |
| 4th Step (1040 hours) | 10.25 | 10.40 | 10.55 | 10.70 |
| 3rd Step (1040 hours) | 9.80 | 10.00 | 10.20 | 10.40 |
| 2nd Step (1040 hours) | 9.30 | 9.50 | 9.70 | 9.90 |
| 1st Step (1040 hours) | 9.00 | 9.20 | 9.40 | 9.60 |
| **Pharmacy Technicians** | | | | |
| Journey-level (4160 plus hours) | 16.20 | 16.60 | 16.95 | 17.35 |
| Stage 2 (2081 – 4160) | 15.11 | 15.51 | 15.86 | 16.21 |
| Stage 1 (0 – 2080) | 14.56 | 14.96 | 15.31 | 15.66 |
| **Courtesy Clerks** | | | | |
| Experienced | 9.00 | 9.20 | 9.40 | 9.60 |
| 1st 1040 hours | 8.50 | 8.70 | 8.90 | 9.10 |

NOTE:   Overtime and Sunday rates of pay are as set forth in Section 6 Hours, Overtime, and Sunday Premium Pay, Subsection 6.2 hereof.

**A.5.2**   The following minimum scale of wages shall be paid:

| CLASSIFICATION | 10/07/07 | 10/05/08 | 10/04/09 | 10/03/10 |
|---|---|---|---|---|
| Head Meat Cutters | 21.97 | 22.37 | 22.72 | 23.07 |
| Journeyman Meat Cutters | 20.47 | 20.87 | 21.22 | 21.57 |
| Apprentice Meat Cutters | | | | |
| 8th Step (1040 hours) | 18.65 | 18.80 | 18.95 | 19.10 |
| 7th Step (1040 hours) | 17.65 | 17.80 | 17.95 | 18.10 |
| 6th Step (1040 hours) | 16.65 | 16.80 | 16.95 | 17.10 |
| 5th Step (1040 hours) | 15.95 | 16.10 | 16.25 | 16.40 |
| 4th Step (1040 hours) | 15.34 | 15.49 | 15.64 | 15.79 |
| 3rd Step (1040 hours) | 13.58 | 13.73 | 13.88 | 14.03 |
| 2nd Step (1040 hours) | 11.81 | 11.96 | 12.11 | 12.26 |
| 1st Step (1040 hours) | 10.15 | 10.30 | 10.45 | 10.60 |
| Meat Clerks B hired prior to 11/02/79 | 17.68 | 17.68 | 17.68 | 17.68 |
| Meat Clerks B hired after 11/02/79 but prior to 12/12/85 | 15.68 | 16.08 | 16.36 | 16.36 |
| Meat Clerks* – hired prior 11/17/07 | | | | |
| Experienced | 15.68 | 16.08 | 16.36 | 16.36 |
| 10th Step (1040 hours) | | 15.16 | 15.16 | 15.16 |
| 9th Step (1040 hours) | 14.56 | 14.56 | 14.56 | 14.56 |
| 8th Step (1040 hours) | 13.96 | 13.96 | 13.96 | 13.96 |
| 7th Step (1040 hours) | 12.18 | 12.18 | 12.18 | 12.18 |
| 6th Step (1040 hours) | 11.68 | 11.68 | 11.68 | 11.68 |
| 5th Step (1040 hours) | 11.18 | 11.18 | 11.18 | 11.18 |
| 4th Step (1040 hours) | 10.55 | 10.55 | 10.55 | 10.70 |
| 3rd Step (1040 hours) | 10.00 | 10.15 | 10.30 | 10.45 |
| 2nd Step (1040 hours) | 9.75 | 9.90 | 10.05 | 10.20 |
| 1st Step (1040 hours) | 9.50 | 9.65 | 9.80 | 9.95 |

*Discontinued (All new hired Meat Clerks will be hired and progress through the Clerk classification.)

NOTES:   Extra Worker's pay is two dollars ($2.00) per hour above the straight-time hourly rate for the appropriate classification.

Meat Clerks will be moved to the step that represents an increase from the current pay scale.  Employees will not be required to back fill hours.

# EXHIBIT A

## BEEF

**FOREQUARTER**
Blade Chuck
Full Standing Rib, Chine bone off (7 inches)
Full Standing Rib, boneless
Whole Fore Shank
English Shortribs
Shoulder Clod
Shortrib
Brisket, boneless
Plate*
Blade Chuck, neck on, boneless
Blade Chuck, neck off
Chuck Roll
Skirt Steak
Neck, bone in or boneless
Fore Shank, squared
Regular Chuck
Arm Chuck
Shin and Shoulder
Ground Meat
Boneless Meat, normal trim which
    would include Flap Meat, Bull,
    Cow Meat
Rib Eye
Boneless Rib Eye
Beef Back Ribs
Boneless Chuck – unnetted or netted
Cross Rib Roast – unnetted or netted
Stew Beef
Beef Chuck, Stack Pac
Beef Ribs, Stack Pac

**HINDQUARTER**
Semi-boneless Round
    (Aitch and Shank bone removed)
Sirloin Tip, boneless
Boneless Head Loin
Short Loin
Full Round, Shank off
Top Round
Bottom Round
Head Loin, bone in
Flank Meat
Flank Steaks
Shank, bone in, boneless
Top Sirloin
Filet
New York
New York Strip
Boneless Meat, normal trim
    which would include Flank
    Meat, Heel, and trimmings
Boneless Round
Whole Sirloin Tips-unnetted
    or netted
Tenderloin
Short Loin, Stack Pac

*Not vacuum packed

**Offal:**      All beef, pork, lamb, and veal, eatable internal organs, such as liver, heart, tongue, kidney, tripe.

**Sausages:**   Include fresh, smoked, or frozen beef, pork, veal, and poultry sausages.

## VEAL, LAMB, AND PORK

Carcasses, primal cuts, and all standard wholesale cuts.

## APPENDIX B - FUEL STATION EMPLOYEES

**B.1    WAGES:**  See Appendix A.

**B.2    EXCLUSION:**  There shall be one (1) exclusion from the bargaining unit for each Fuel Station operation.

**B.3    HEALTH AND WELFARE:**  In accordance with Section 12, Fuel Station employees' Health and Welfare eligibility shall be at seventy-six (76) hours per month.  For employees hired on, or were recognized after, January 7, 2005, no Health and Welfare contributions will be made for the first (1st) twelve (12) months of employment.

**B.4    PENSION:**  A Pension contribution of fifty cents (50¢) per straight-time hour worked will be made on behalf of eligible Fuel Station employees for the first (1st) thirty-six (36) months of employment and at the full Pension rate thereafter.  Fuel Station employees will be entitled to an Individual Account Plan contribution in accordance with the new hires provision of Section 13.11 of this Agreement.

**B.5    HOURS:**  Part-time Fuel Station employees shall be scheduled for at least twenty (20) hours per week.

## CASE-READY MEAT JOB-PROTECTION ADDENDUM

The parties recognize that the competition has been introducing prepackaged case-ready meat products for some time. The parties further recognize the importance of being able to effectively compete with these measures while at the same time addressing the job security concerns of potentially impacted meat employees.

Although the contract recognizes the conditional right of the Employer to introduce case-ready meats as provided in Section 20 of the Agreement, the parties recognize that an Employer may not wish to comply with all the provisions of that section before introducing case-ready meats. Accordingly, without waiving any Employer rights to introduce case-ready meats and any Union rights to challenge such introduction as provided in Section 20 of the Agreement, the parties agree as follows:

Notwithstanding anything contained in the Meat Agreement to the contrary, pursuant to this Addendum, the Employer shall not be restricted in, or prohibited from, obtaining and offering for sale fresh, smoked, cured, cooked and frozen meats, poultry, fish or seafood which have been cut, prepared, processed, packaged, weighed, and/or priced off the Employer's premises and it is expressly understood and agreed that such shall not constitute a violation of this Agreement.

Should the Employer wish to utilize this Addendum, the Employer shall notify the affected Unions in writing by certified mail of its intention and the effective date of when case-ready meats will be introduced in the stores. In utilizing this Addendum, the Employer agrees that no Head Meat Cutter, Journeyman Meat Cutter, or Apprentice Meat Cutter employed as of July 1, 2001, and assigned to one of the aforementioned classifications by the Employer shall be laid off, reclassified, or reduced in hours or full-time status. The Employer still maintains the right to discipline or discharge employees consistent with Section 2 of the Agreement. The Employer shall have the right to transfer and/or schedule Meat Cutters by seniority to the extent provided for in the contract in more than one (1) store within the geographical seniority area and/or adjacent geographical seniority area(s) as may be necessary to fulfill this obligation, except that the Employer shall not schedule such employee for split shifts. The Employer shall be obligated to provide a minimum of eight (8) hours per calendar day when such Journeyman Meat Cutter is scheduled to work in each store. Other meat shop manning requirements will be suspended given these job securities in the event the Employer utilizes this Addendum.

The Employer shall continue to have the right to lay off meat employees other than Head Meat Cutters, Journeyman Meat Cutters, or Apprentice Meat Cutters in accordance with the seniority provisions of this Agreement, provided that the layoff of any Meat Wrapper, Butcher Block, Meat Clerk, or Meat Clean-up Clerk assigned to such classification on or before July 1, 2001, is for reasons other than the Employer's utilization of the products set forth above. The Employer agrees it will demonstrate that said layoff was for such unrelated reasons. It is understood and agreed that in meeting the job guarantees contained herein, the Employer shall have the right to assign any higher classified employee to perform work in a lower classification.

**Addendum re: Case-ready Meats**
**Page 2**

In the event of a store closure resulting in the layoff of any Head Meat Cutter, Journeyman Meat Cutter, Apprentice Meat Cutter, or Meat Clerk, such affected employee shall be permitted to exercise his seniority to displace the least senior Meat Cutter or Meat Clerk in the involved bargaining unit's seniority area as provided for herein, or, at the affected employee's discretion, the least senior Meat Cutter or Meat Clerk in the Local Union's jurisdiction. Such least senior Meat Cutter or Meat Clerk affected by the exercise of the most senior Meat Cutter's or Meat Clerk's seniority shall be laid off. This store closure exception shall not apply in the event the Employer closes a store and opens a replacement store within thirty (30) days within three (3) square miles of the closed store. It is understood that in applying this Addendum, Meat Cutters may only displace Meat Cutters and Meat Clerks may only displace Meat Clerks.

**FOR THE EMPLOYER:**

**BEL AIR MARKETS**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL**
**WORKERS UNION**
**8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

DATE _____

BY _____

DATE _____

## LETTER OF UNDERSTANDING
## BETWEEN
## UNITED FOOD & COMMERCIAL WORKERS UNION
## 8-GOLDEN STATE
## AND
## BEL AIR MARKETS

**THIS AGREEMENT** is entered into by and between **UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**, hereinafter referred to as the Union, and **BEL AIR MARKETS**, hereinafter referred to as the Employer.

The following understanding will apply to the current Collective Bargaining Agreement which is effective November 17, 2007, through December 8, 2011:

> The parties agree that during the merging of the Meat and Retail Agreements that there may have been inadvertent omissions, deletions, or other unintended consequences as a result of the merger. The parties agree to meet and attempt to resolve any such issues

**FOR THE EMPLOYER:**

**BEL AIR MARKETS**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

**LETTER OF UNDERSTANDING**
**BETWEEN**
**UNITED FOOD & COMMERCIAL WORKERS UNION**
**8-GOLDEN STATE**
**AND**
**BEL AIR MARKETS**

**RETIREE HEALTH AND WELFARE COMMITTEE**

In order to continue to provide retiree Health and Welfare benefits, the Unions and Employers agree to establish a joint retiree Health and Welfare committee for the purpose of redesigning the retiree Health and Welfare Plan to provide the best plan/lowest monthly premiums to those participants who have the longest years of credited service.

The committee shall consist of a representative from Save Mart, Raley's (Bel Air Markets), and Safeway and a representative from each Union Local. The committee will have power to act. Each side will have one (1) vote. The Employer committee will be voting as a unit vote.

The committee's charter shall be, at a minimum, to create a multi-level benefit that rewards the participant who retires with more years of credited service. The Unions and the Employers agree that the multi-level benefit structure will feature some version of a good, better, best approach so that those who retire with fewer years of credited service receive fewer benefits than those who retire with more.

The Unions and the Employers acknowledge that there is an inequity in the amount paid for retiree Health and Welfare by those participants who are pre-Medicare as to those who are on Medicare, as a result of Medicare Part B premiums. The Unions and the Employers agree that it is an objective of this committee to analyze this inequity. Among other things, the Unions and the Employers will consider graduated premium payments with employees who retire with fewer years of credited service paying a higher premium than those who retire with more years of credited service. Any such premiums shall include a plan for retirees who become affiliate members of a UFCW Local that participates in the Trust Plan. The Unions and the Employers agree that the projected revenues from the redesigned plans and other sources of realized income will yield at least as much income to the Trust Plan as the current design.

This committee is authorized and directed to consider and develop additional changes to some or all of the Trust Plan and/or eligibility provisions that relate to the following issues:

(1)     Suspension of retiree health care benefits for retirees who become re-employed in any industry, trade, or craft (except for temporary Industry employment, such as vacation relief), including retirees authorizing the Trust to obtain social security records as a condition to receiving retiree benefits;

(2)     Limiting surviving spouse benefits for future retirees, such as the rule applicable to the Southern California UFCW Unions and Employers Benefit Fund;

(3)     For retirees who suffer a termination of benefits due to an event experienced by their last Employer, develop rules to recognize such retiree's total Industry service in order to define the additional work requirement, if any, for such person to re-establish their eligibility for retiree health benefits. For the purposes of this Agreement, an event means the cessation of contributions by an Employer for a bargaining unit of employees, regardless of whether that Employer is continuing to make contributions for other of its bargaining units covered by the Trust Fund, for any of the following or similar reasons:

(4)      Negotiating out of the Trust Fund; reaching impasse, decertification from the Union by its employees, filing for bankruptcy, or going out of business; and

Establishing a withdrawal liability provision for any Employer for which an event, as defined above, occurs.

The committee will have until June 30, 2008, to complete the objectives as described above for implementation by January 1, 2009. If the parties are unable to reach agreement by June 30, 2008, or another mutually agreeable date, the issue will be directed to binding arbitration.

**FOR THE EMPLOYER:**

**BEL AIR MARKETS**

**FOR THE UNION:**

**UNITED FOOD & COMMERCIAL WORKERS UNION 8-GOLDEN STATE**

**JACQUES LOVEALL, PRESIDENT**

BY _____

BY _____

DATE _____

DATE _____

## LETTER OF AGREEMENT
### BETWEEN
### UNITED FOOD & COMMERCIAL WORKERS UNION
### 8-GOLDEN STATE
### AND
### BEL AIR MARKETS

### SUPER CARD

The bargaining parties hereby agree to cooperate mutually to create and implement what is known as the Super Card. The Super Card may cover the following functions depending on what the parties might agree upon and what might be technologically feasible for any or all parties: health fund ID card, HRA card, Employer ID card, time/attendance card, direct deposit card, debit/banking card, Union membership ID card, discount card, money transfer card, related functions, and such other functions and purposes as the parties may mutually agree are desirable or advisable.

The parties acknowledge that the exact legal structure by which the Super Card will be owned, operated, and used is as yet not determined. The parties agree that the ownership, operation, and use of the Super Card will be implemented in a manner consistent with all legal requirements and in a manner that would be most tax efficient. Additionally, the parties agree to create a joint labor-management committee that is empowered to agree on the legal structure of the Super Card. The committee shall comprise a representative from Safeway, Raley's (Bel Air Markets), and Save Mart for management, and a representative from UFCW 8-Golden State, Local 5, Local 101, and Local 648 for the Unions. The parties agree that the ownership, operation, and use of the Super Card is yet to be determined. Voting shall be by unit vote for management and the Unions.

The parties recognize that one (1) of the purposes of the Super Card is to generate income. The parties agree that any income from the card will be allocated first (1st) to offset the cost and expense of the card. If there is any income residue after offsetting such costs and expenses, then fifty percent (50%) of the remaining income will be divided among the Employers participating in the UFCW Health Fund prorated based on the amount each Employer has contributed to the Fund during the time period that the income was generated. The other half of any income residue shall be used as directed by the Local Unions that have signed up for the Super Card program for the exclusive benefit of the bargaining unit employees.

The parties will endeavor to complete their work on the Super Card as outlined above by the end of the first quarter of 2008.

FOR THE EMPLOYER:

BEL AIR MARKETS

FOR THE UNION:

UNITED FOOD & COMMERCIAL
WORKERS UNION
8-GOLDEN STATE

JACQUES LOVEALL, PRESIDENT

BY _____

BY _____

DATE _____

DATE _____