**EXHIBIT C**

DRAFT – LOCAL 5'S DOC – 8/7/08

# UFCW 8
## GOLDEN STATE
### United Food and Commercial Workers

## Jacques Loveall
### President
### International Vice President

## COLLECTIVE BARGAINING
## AGREEMENT

## WITH

## NOB HILL GENERAL STORES, INC.
## MEAT DIVISION

## JANUARY 18, 2005 - OCTOBER 6, 2007
## OCTOBER 7, 2007 – OCTOBER 8, 2011

# INDEX

Index not updated on drafts

|  | SECTION | PAGE |
|---|---|---|
| Apprentices | 9.1 | 13 |
| Discharge | 2.6 | 4 |
| Dues Checkoff | 12.13 | 26 |
| Employment | 2.4 | 3 |
| Extension and Scope | 23 | 32 |
| Funeral Leave | 11.4 | 24 |
| General Benefits | 12 | 25 |
| Grievance and Arbitration | 16 | 29 |
| Health and Welfare | 11.1 | 16 |
| Holidays | 6 | 8 |
| Hours | 3 | 5 |
| Jurisdiction | 1 | 1 |
| Jury Duty | 13 | 26 |
| Kosher Markets | 21 | 32 |
| Leaves of Absence | 15 | 29 |
| Meat Clerks | 9.2 | 14 |
| Meat Sales Clerks & Fish Cutters (Part-Time) | 9.3 | 15 |
| New Methods | 20 | 31 |
| Overtime | 4 | 7 |
| Pension | 11.3 | 20 |
| Seniority | 14 | 26 |
| Separability | 19 | 31 |
| Service Fish Department Operation | 9.4 | 16 |
| Sick Leave | 11.2 | 19 |
| Superannuated Employees | 10 | 16 |
| Transfer of Ownership | 22 | 32 |
| Travel Pay | 5 | 8 |
| Union Affairs | 17 | 30 |
| Union Recognition | 2.1 | 2 |
| Union Security | 2.3 | 2 |
| Vacations | 7 | 10 |
| Wages (For Rates See Exhibit B) | 8 | 12 |
| Working Conditions and Safety | 18 | 31 |
| Exhibit A | | 34 |
| Exhibit B (Wage Rates | 35 | 37 |

# COLLECTIVE BARGAINING AGREEMENT
## BETWEEN
## UNITED FOOD & COMMERCIAL WORKERS UNION
## LOCALS 5, 8-GOLDEN STATE, AND 101
## AND
## NOB HILL GENERAL STORES

THIS AGREEMENT, entered into this 11th day of June 2008, by and between NOB HILL GENERAL STORE, INC., a Corporation, First Party, referred to hereinafter as the "Employer", and UNITED FOOD & COMMERCIAL WORKERS UNION, LOCALS 5, 8-GOLDEN STATE, and 101, chartered by the United Food and Commercial Workers International Union, referred to hereinafter as the "Union,".

It is the intent and purpose of the Employer and the Union to promote and improve labor-management relations between them and to set forth herein the basic terms of agreement covering wages, hours, and conditions of employment to be observed.


## WITNESSETH:

In consideration of mutual promises and agreements between the parties hereto, and in consideration of their mutual desires in promoting efficient conduct in business and in providing for the orderly settlement of disputes between them, the parties to this Agreement agree as follows:


## SECTION 1.  RECOGNITION AND CONTRACT COVERAGE

**1.1    RECOGNITION:**  The 'Employer hereby recognizes the Union as the sole collective bargaining agency for an appropriate unit consisting of all employees working in the Employer's stores within the geographical jurisdiction of the Union, supervisors within the meaning of the National Labor Relations Act, as amended.

Where the Union is only recognized in either the Meat or Retail Department, only those pertinent sections of the Collective Bargaining Agreement will apply.

**1.2    CLERK'S WORK:**  The work covered by this Agreement shall be performed only by members of the appropriate unit as defined in Section 1.1 hereof and such work shall consist of all work and services connected with or incidental to the handling or selling of all merchandise offered for sale to the public in the Employer's retail food stores including the demonstration of such products, but excluding:

    1.2.1   Supervisory functions;

    1.2.2   Such work as may be performed by Meat Cutters as described in Section 1.4;

    1.2.3   Work of employees heretofore expressly excluded from the provisions hereof by agreement of the parties;

    1.2.4   Such work as is performed under Industry practice, prevailing and existing as of April 11, 2005, within the geographical jurisdiction of this Union by a driver/salesman

DRAFT

engaged in servicing the retail food stores at the point of delivery, soft drink merchandisers, ice cream merchandisers, cookie/cracker merchandisers, chips/salty snacks merchandisers, frozen pizza merchandisers, Hispanic foods merchandisers, beer merchandisers, and outside supplier or reset crew.

Notwithstanding anything herein to the contrary, and except as modified by Section 1.14, each Employer may, at its discretion on a store-by-store basis, assign members of the bargaining unit to handle merchandise or products which are' permitted by the terms of this Subsection to be handled by non-bargaining unit persons. After any such assignment to members of the bargaining unit, the Employer may, at its discretion, return to the former practice of utilizing the services of such non-bargaining unit persons.

**1.3    NON-FOODS AND GENERAL MERCHANDISE:** It is agreed that in the event the Employer, after the execution of this Agreement, institutes a non-food or general merchandise classification or department, either directly or by departmental concession, or creates work of a non-food or general merchandise nature as hereinafter defined, in any retail food store or stores within the geographical jurisdiction of this Agreement, then a non-food or general merchandise clerk classification and rates of pay therefore shall be established under the conditions hereinafter set forth.

**DEFINITION OF A NON-FOOD OR GENERAL MERCHANDISE LEASED DEPARTMENT:** Non-food or general merchandise leased departments shall consist of a physically separated and distinctly defined section of the food store where only non-food or general merchandise is displayed.

**1.3.1    DEFINITION OF FOOD AND NON-FOOD OR GENERAL MERCHANDISE:** In interpreting and applying all references to "non-food or general merchandise" in this Agreement, the following are the agreed upon definitions of food and non-food or general merchandise:

**FOOD MERCHANDISE:** Food merchandise shall consist of all foodstuffs, including pet food (excluding pet supplies), non-alcoholic beverages, nursery items, all household paper goods, and all household cleaning and laundry supplies excluding cleaning equipment. None of the named categories of food merchandise may be handled or sold by Non-Food or General Merchandise Clerks.

**NON-FOOD OR GENERAL MERCHANDISE:** Non-Food and/or general merchandise shall consist of any merchandise other than that included in the definition of food merchandise. This includes, delicatessen merchandise, health food merchandise contained in the health food department, floral merchandise, bakery merchandise (including checking in bakery driver salesmen), plastic wrap, sandwich bags, plastic trash bags, aluminum foil, wax paper, paper bags, diapers, feminine hygiene items, gum, candy, and tobacco product in any location within the store except bakery products delivered and displayed by a driver salesman, alcoholic beverages, and magazines. Non-food or general merchandise work may include utility or cleaning work.

**1.3.2    DEFINITION OF NON-FOOD OR GENERAL MERCHANDISE WORK:** All work and services connected with or incidental to the handling or selling of non-food or general merchandise offered for sale to the public shall be performed by a Non-Food or General Merchandise Clerk within the bargaining unit. A Non-Food or General Merchandise Clerk shall spend his time exclusively in the performance of work and services connected with or incidental to the handling or selling of the non-food or general merchandise offered for sale to the public. A Non-Food or General Merchandise Clerk (except Utility Clerks) shall wear a distinctive uniform at all times.

DRAFT

---

Whenever an Employer utilizes a Non-Food or General Merchandise Clerk, there shall be up to one (1) full-time forty (40) hour week employee so employed before additional persons are utilized.

**1.3.3   NON-FOOD OR GENERAL MERCHANDISE AND UTILITY CLERKS RATES OF PAY:** In the Deli/Bakery there shall be one (1) employee paid at no less than the Non-Food and General Merchandise Head Clerk rate of pay, providing the employee has moved through the full progression.

**1.3.3.1** General Merchandise Clerks/Non-Food Clerks shall receive credit for previous experience when going to work for a new Company as follows:

**GENERAL MERCHANDISE/NON-FOOD CLERK:** An experienced General Merchandise Clerk/Non-Food Clerk is an employee that has gained 7,800 hours' experience in the Retail Food Industry.

**PREVIOUS EXPERIENCE:** If an experienced GMC/Non-Food clerk has been out of the Industry between five (5) and ten (10) years, he will be allowed to start at the 5th Apprentice Non-Food/General Merchandise Clerk rate of pay.

If an experienced Non-Food/General Merchandise Clerk has been out of the Industry ten (10) or more years, he will be allowed to start at the 3rd Apprentice Non-Food/General Merchandise Clerk rate of pay.

If a person has been out of the Industry for five (5) years or more, who has not reached experienced status, he will be allowed to start at the 1st Apprentice Non-Food/General Merchandise Clerk rate of pay.

**1.3.4** A Non-Food/General Merchandise Head Clerk has the authority and responsibility of buying or selecting merchandise for a department, section, or area, or directs other employees in the performance of their duties in such department, section, or area. It is understood that the mere occasional or incidental performance of any of the Non-Food/General Merchandise Head Clerk's duties shall not be construed as a basis for classifying any employee as a Non-Food/General Merchandise Head Clerk.

**1.3.5** The services offered by rack-jobbing concerns may be used without the limitation for non-food or general merchandise as herein defined. It is agreed that no Non-Food Clerk on the payroll as of March 23, 1986, shall be laid off or have his hours reduced as a direct result of the expanded utilization of rackjobbers.

**1.3.6   CONTRACT COVERAGE AND ENFORCEMENT:** All persons performing non-food or general merchandise work shall be covered by this Agreement, except only that a single owner or lessee of a non-food or general merchandise department shall be exempt.

Except for the Non-Food or General Merchandise Clerk's compensation, as hereinafter provided, all other terms of this Agreement shall be fully applicable to Non-Food or General Merchandise Clerks. No employee shall suffer any reduction in pay as a direct result of this Agreement of the parties as to Non-Food or General Merchandise Clerks.

In the event the Employer fails to observe the terms of this section in any respect, the Union shall notify the Employer in writing of such violation and it shall be corrected. Following such notice, if the Employer again, within six (6) months, violates the terms

DRAFT

hereof and it is so determined by the Adjustment Board or an Arbitrator, then in such event, such Employer shall no longer be entitled to a Non-Food or General Merchandise Clerk classification, and the Food Clerk rates shall thereafter become applicable to all non-food or general merchandise work in the Employer's store where the violation occurred.

1.3.7   Employees who are performing work in the non-food or general merchandise category and who are classified as Food Clerks will not have their hours reduced or be laid off as a direct result of the introduction of this classification, nor will they be reclassified to a Non-Food or General Merchandise Clerk if the Employer chooses to have them continue performing such work.

1.3.8   With respect to the application of Section 4. Seniority of the basic Agreement, employees designated as Non-Food or General Merchandise Clerks, or Utility Clerks, will be treated as a separate classification on a store-by-store basis with respect to all seniority questions, except for layoffs and promotions and except that employees so classified will be eligible for promotional opportunities and will be evaluated in accordance with the language set forth in Section 4.3.1 Promotion. Section 4.3, with respect to layoffs of employees in this classification, shall be applied in a manner which recognizes the qualifications required of employees in each of the following groups within this classification: bakery, delicatessen, floral, utility, or non-food. Except as hereinabove specifically modified, all other terms of Section 4. Seniority shall be fully applicable to employees in this classification.

1.3.9   Office Addendum – see APPENDIX "B."

1.4   MEAT CUTTER WORK: It is agreed that all fresh meat shall be cut, prepared, and fabricated on the premises, by a Head Meat Cutter, Journeyman Meat Cutter, or Apprentice Meat Cutter; provided, however, the carcasses may be processed up to and including the maximum reductions listed and described on the attached Exhibit A and may be delivered to the premises in that form but all further processing of these parts shall be performed on the premises.

There shall be a Journeyman or Apprentice Meat Cutter on duty at all times where fresh meat is offered for sale except as otherwise provided for in Section 9 Apprentices-Meat Clerks, Subsection 9.1.8 Meat Cutter (Step-up) – UFCW 8-Golden State Only of this Agreement and as follows:

1.4.1   A Journeyman Meat Cutter or Apprentice Meat Cutter shall not be required to be on duty between the hours of 6 p.m. and 6 a.m. In addition to those sections set forth above, Meat Departments with one hundred twenty (120) scheduled hours (excluding Clean-up Workers) or less per week shall not be required to have a Journeyman Meat Cutter on duty for a period of three (3) hours per day and/or eighteen (18) hours per week. If the Employer wishes to utilize the above exemption or a special exemption, the Union shall be notified and the hour exemption shall be discussed but in no instance shall there be less than one (1) full Meat Cutter shift scheduled Sunday through Saturday and holidays. If a Meat Department qualifies and utilizes the one hundred twenty (120) hour Journeyman-on-duty exemption, then they are not entitled to the 6 p.m. to 6 a.m. waiver set forth above.

1.4.2   When fresh meat is offered for sale and a member of the bargaining unit is not on duty in the Meat Department during such hours, no one other than a member of the bargaining unit shall perform work in the Department.

DRAFT

**1.4.3**   No employee, presently employ6ed in the jurisdiction of the Union, employed as of November 1, 1985, will have his hours reduced or will be laid off as a direct result of implementing the modification of Exhibit A hereof or modification of Journeyman-on-duty or the introduction of pre-priced products set forth in Subsection 1.4.4 below.

**1.4.4**   Lunch meats, pre-sliced bacon, dissected and pre-fabricated fowls, ground beef and pork sausages in visking casing, fish, and/or rabbits which, pursuant to current custom and practices, are presently pre-fabricated and dissected, along with all cooked or pre-cooked meats, or combinations of such meat products, whether in bulk or package form, need not be cut on the premises; but all the above products, along with fresh, frozen, smoked, or cooked sausages, shall be handled, displayed, dispensed, and offered for sale by employees covered by this Agreement. Notwithstanding the above, pre-priced poultry (whole, cut-up, and/or parts), fish, offal, liver, sausage, and smoked or cured meats may be merchandised.

Offal may be brought into the market pre-packaged and pre-priced.

Tortillas may be handled, stocked, and displayed by vendors.

In the event of the deliberate failure of an Employer to schedule an employee to work in accordance with the provisions of this Collective Bargaining Agreement when fresh meat is offered for sale, the Employer will be required to pay the remedy in accordance with Section 1.13.

The parties agree to monitor and evaluate the status of products listed on Exhibit A hereof during the term of this Agreement. A committee of Raley's and the Local Unions shall have the authority to add to, modify, and/or delete from the list of cuts.

Authority set forth above shall be exercised only by mutual agreement of the members of the Committee. Where disputes arise or mutual agreement cannot be reached, said disputes shall be referred to the procedures set forth in Section 17 New Methods of this Agreement for binding resolution.

Nothing contained herein or in this Agreement shall prevent the Committee from implementing actions and/or modifications, nor shall this provision limit the ability of individual companies and individual Unions to negotiate separate understandings.

**1.5**   **SUBCONTRACTING AND SUBLEASING:** It is recognized that the Employer and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement. Therefore, except for work which is exclusively inventory or janitorial work (such as washing windows, washing or waxing floors, and cleaning restrooms) or work hereinabove excluded, no work covered by this Agreement, as defined in Section 1.2, hereof, shall be performed under any sublease, subcontract, or other agreement unless the terms of said lease, contract, or other agreement specifically provide:

**1.5.1**   That all such work shall be performed only by members of the appropriate unit as defined in Section 1.1 hereof;

**1.5.2**   That the Employer, party hereto, shall at all times hold and exercise full control of the terms and conditions of employment of all such employees pursuant to the terms of this Agreement.

**1.6**   It is recognized that if the terms of the Employer's lease, contract or other agreement obligate the lessee or other party, as the case may be, to pay the wages and observe the other

DRAFT

terms and conditions of this Agreement, then the Union agrees that the sale and entire financial responsibility for meeting the costs of observance of this Agreement shall be upon said lessee or other party and not upon this Employer and that he shall be, and by these presents is, hereby released from any and all financial liability in connection therewith.

**1.7    STORE MANAGERS AND ASSISTANT STORE MANAGERS:** None of the provisions of this Agreement need apply to one overall supervisory Store Manager, the Assistant Store Manager, and a second Assistant Store Manager and their work in each retail food store in which an owner is not actively engaged on the premises. The Store Manager and Assistant Store Managers shall not be restricted as to the amount of non-supervisory work they may perform.

No Assistant Store Manager or second Assistant Store Manager shall be involuntarily reclassified as a direct result of this provision during the term of this Agreement.

**1.8    OWNERS:** There shall be not more than two (2) Employers in any store or group of stores having common ownership. In partnerships, "Employers" as used in this subsection means only bona fide partners who own an interest in the assets and in the profits of the partnership. In corporations, "Employer" as used in this subsection means only two (2) officers of the corporation who own capital stock of the corporation. No more than two (2) shareholders of a corporation or more than two (2) bona fide partners shall be deemed or classified as an Employer within the meaning of this Agreement. Employers as thus defined may do such other work as is necessary in the conduct of the business. All other persons performing work under the jurisdiction of the Union shall be members of the Union and shall be governed by the provisions of this Agreement.

**1.9    NEW OWNER:** This Agreement shall be binding upon the successors and assigns of the parties hereto. Except as set forth in Section 11 Vacations, during the life of this Agreement, employee benefits provided for herein shall not be affected by the sale or transfer of the business for those employees who are retained by a new Employer for a period of more than sixty (60) calendar days. For employees who choose to be employed by such new owner, such sixty (60) calendar day period shall be considered a probationary period during which time employees may be terminated without recourse to the grievance procedure, unless such termination is in violation of Section 2.4.2 or Section 3.1 of this Agreement.

**1.10    SALESMEN:** The Employer assumes a particular responsibility to require observance of this Agreement on the part of book-salesmen. The Employer shall give to one (1) Clerk on each shift written authorization to request any book-salesman performing work in violation of this Agreement to cease such work. If the book-salesman does not comply with such request, then the authorized Clerk shall report the matter to the Employer or Store Manager, who shall then cause the book-salesman to cease such work.

**1.11    TRAVELING CLERKS:** It is agreed by the Employer and the Union that employees may be assigned to work in two (2) or more different stores located in the geographical jurisdiction of two (2) or more Local Unions. Each such employee shall be covered by all of the terms and conditions of the Agreement which is in effect in the area in which he works the major portion of his time. In the event that he does not work the major portion of his time in anyone area, then the Employer shall designate the area Agreement under which he is working and shall give written notice of the area so designated to the Union.

**1.12    INDIVIDUAL AGREEMENTS:** The Employer agrees that no employee covered by this Agreement shall be compelled or allowed to enter into any individual contract or agreement with said Employer concerning wages, hours of work, and/or working conditions that provides less benefits than the terms and provisions of this Agreement, except by written agreement of the

DRAFT

Employer, the employee, and the Union.

The Union agrees to allow new employees to enter into separate voluntary agreements providing for arbitration of statutory discrimination claims and remedies not covered by the Collective Bargaining Agreement under current case law.

1.13 ENFORCEMENT: In the event of a violation of Section 1.2.4, the Union shall notify the Store Manager and the Company's Labor Relations Department in writing of such violation and it shall be corrected. If there are any further violations by the same vendor/non-bargaining unit person, the Store shall be liable in damages payable to a recognized charity mutually agreed to by the parties in the amounts below for each proven violation, on a store-by-store basis:

    1.13.1 At the time of the first violation, an amount equal to one (1) day's wages at the experienced Clerk's rate plus Health and Welfare and Pension contributions.

    1.13.2 At the time of a second violation, an amount equal to two (2) day's wages at the experienced Clerk's rate plus Health and Welfare and Pension contributions.

    1.13.3 An additional day's wages plus the equivalent Health and Welfare and Pension contributions shall be added cumulatively for each subsequent violation.

1.14 NEW STORES AND REMODELS: During any three (3) consecutive days preceding the reopening of an old food market or discount center of the Employer, which has been closed for remodeling for a period of thirty (30) days or less, upon prior notice to the Union, persons not in the bargaining unit may perform any work in such store.

Notwithstanding any language to the contrary contained in this Agreement between the parties, it is agreed this Agreement shall have no application whatsoever to any new food market or discount center until fifteen (15) days following the opening to the public of any new establishment. Neither shall this agreement have any application whatsoever to any food market or discount center which is reopened after it has been closed for a period of more than thirty (30) days until the fifteenth (15th) day following the date of such reopening to the public.

The Employer shall staff such new or reopened food market with a combination of both current employees and new hires, in accordance with current industry practices of staffing such stores with a cadre of current employees possessing the necessary skills, ability and experience, plus sufficient new hires to meet staffing requirements. Employees, who are thus transferred, upon whom contributions are made to the various trust funds, shall continue to have contributions to the several trust funds made on their behalf in the same manner and in the same amount per hour as such contributions were made prior to their transfer.

Notwithstanding anything in this Agreement to the contrary, it is agreed that when the remodeling of an existing location occurs without such store being closed, the Employer shall only be obligated to give the members of the bargaining unit employed by him in such store an opportunity to perform the work required for such remodeling at the applicable contract rate, except that such opportunity to perform such work shall not include any overtime hours. When members of the bargaining unit within such store are not available for such work, such work may be performed by persons not in the bargaining unit.

Notwithstanding anything to the contrary contained in this Agreement between the parties, it is agreed and understood that the probationary period for any new hires in such new or reopened stores referred to above shall not begin until the fifteenth (15th) day following such opening or reopening of such stores to the public.

DRAFT

**1.15   NEW JOBS:** In the event the Employer creates new jobs or job duties involving the handling or selling of merchandise not heretofore handled or sold by the Employer, such new work shall be deemed Clerk's work and performed by members of the bargaining unit, except that, for a temporary period of tryout and familiarization, not to exceed six (6) months in each store following the introduction of such new category of merchandise, the Employer may contract for the performance for all or part of such work by non-bargaining unit persons. The wage rates and classification for such new jobs or job duties shall be subject to mutual agreement of the parties. In the event the parties are unable to agree on the above, disputed matters shall be processed in accordance with Section 18.3 of this Agreement.

**1.16   RETAIL SALES MERCHANDISERS:** Employees working under subcontracts for Merchandising Services for BDI hired after March 25, 1986, shall be paid as follows:

The rate of pay and progression steps for the Retail Sales Merchandisers shall be the same as the Non-Food/General Merchandise classification. Current employees shall be slotted into the progression steps leading to the experienced Non-Food/General Merchandise rate of pay.

## SECTION 2.   EMPLOYMENT AND UNION MEMBERSHIP

**2.1   UNION SHOP:** On and after thirty (30) days of employment or the date of execution of this Agreement, whichever is later, each employee shall become and remain a member of the Union as a condition of employment; provided, however, that the Employer shall not be obligated to discharge any employee in violation of the National Labor Relations Act, as amended. Upon written notification from the Union that an employee has failed to make timely tender to the Union of initiation fees and/or periodic dues, the Employer agrees to terminate said employee on the eighth (8th) day from such notice unless the Union notifies the Employer in writing that the employee has complied with the provisions hereof.

If the Union discovers within thirty (30) days after the discharge of an employee that the discharge was in error, the Union shall so advise the Employer, provide the Employer with bona fide evidence that the termination demand was improper, and the Employer shall then reinstate the employee with full seniority on the first weekly schedule posted by the Employer after being so notified by the Union in writing.

The Union agrees to indemnify and hold the Employer harmless in any and all claims and/or causes of action which arise out of or are in any way connected with the Employer's compliance with this provision.

**2.2   UNEMPLOYED LIST:** The Union agrees to keep an up-to-date list of known unemployed Clerks with an accurate record of their experience or training; and the Employer agrees to notify the Union of vacancies in positions or job openings within the classifications covered by this Agreement in order that the unemployed Clerks on the aforementioned list may be provided with a full opportunity to fill such vacancy. In filling vacancies, the Employer shall give preference to applicants with previous employment experience in the industry in the area covered by this Agreement.

**2.3   REGISTRATIONS:** The Union agrees to accept registrations for employment upon each list so maintained and to dispatch applicants for employment from said list for vacancies or job openings with the Employer in accordance with the specifications and this Agreement.

**2.4   JOB REFERRAL AND NON-DISCRIMINATION:**

**2.4.1**   The Union shall be allowed two (2) days, on which its office is open, to refer

DRAFT

applicants. Selection by the Union of applicants for referral to jobs shall be on a non-discriminatory basis and shall not be based on, or in any way affected by, Union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect or obligation of Union membership.

The Employer shall retain the right to reject any job applicant referred by the Union, provided such rejection is not a violation of this Agreement. The Union agrees that the Employer may employ persons from other sources when applicants satisfactory to the Employer are not available from the lists maintained by the Union.

2.4.2 The Employer shall not discriminate against any person in regard to hire, tenure of employment, or job status because of race, creed, religion, sexual orientation, sex, color, or national origin, nor shall age, disability unrelated to the job duties, or veteran status under any circumstances, be a basis for rejection or termination of an otherwise qualified employee and applicant for employment.

SEMANTICS: When used, the term "he" and "Journeyman" refer to human beings of either sex and are used only for grammatical simplicity.

2.4.3 Disputes or disagreements arising out of this section shall be referred to the Adjustment Board and the Arbitration process as provided for in this Agreement.

2.5 OTHER HIRING: Whenever new employees are hired for jobs covered by this Agreement from sources other than the list maintained by the Union, or when employees are transferred to jobs covered by this Agreement from outside the jurisdiction of this Union, the Employer shall:

2.5.1 Promptly notify the Union of such employment in writing, giving the date, place, job classification of the employee, and the name, social security number, and address of the new employee; and

2.5.2 Promptly advise the new employee of the terms and provisions of this Agreement and of his obligations hereunder; and

2.5.3 The Employers will pass out and collect Union application forms to newly hired employees. The Union application forms will be provided by the Union. The responsibility to forward the application to the Union will be the responsibility of the employee or the Employer. The application shall be forwarded to the Union no later than forty-five (45) days from the date the new employee was hired.

2.5.4 EMPLOYMENT: If the Employer obtains a new employee through a private employment agency or a private training school, he shall pay the employment agency fee, or any training fee paid by or required of the employee.

2.6 NEW EMPLOYEES: The provisions of this Agreement shall apply to the employment of any person covered by this Agreement while such person is not a member of the Union.

2.7 EXTRA WORK: Employees on the payroll of the Employer will be given preference for additional straight-time work before any other person who has worked during the same week on another job outside the Retail Industry is hired for such work.

2.8 EXTRA WORKER (Meat Department Only): An Extra Worker is an employee who is scheduled on a daily and/or weekly basis and is not subject to the probationary period of this Contract, except as set forth below.

DRAFT

An Extra Worker may qualify to become a regular employee if he has completed sixty (60) days of employment, within a calendar year, with the hiring Employer.

After completion of sixty (60) days of employment, the Employer will, upon request, provide an Extra Worker with an application for employment; and when hired, no further probationary period will be required.

Upon receipt of the application by the Employer, the Employer shall have thirty (30) days to answer the Extra Worker, in writing, as to the availability of employment. Said application shall remain on file for a period of one (1) year.

When an Extra Worker is hired, his seniority date as a regular employee for all purposes under this Agreement shall commence from his date of hire.

Extra Workers shall be entitled only to those benefits and contract rights reserved for Extra Workers within this Collective Bargaining Agreement.

Extra Workers shall receive the Extra rate of pay for all hours worked.

Extra Workers, discharged for cause, shall be paid for time worked.

Extra Workers who report late for work need not be put to work; provided that, if put to work at all, they shall be paid only for the time worked.

In the event the Union dispatches an employee who was previously discharged for cause by the Employer, the employee shall not be entitled to any minimum guarantees of work or pay.

## SECTION 3. DISCHARGES AND LAYOFFS

**3.1**     The Employer shall not discharge or discriminate against an employee for upholding Union principles, for serving on a committee of the Union or any organization affiliated therewith, or for refusing to purchase stocks, bonds, securities, or any interest in the Employer's business should the Employer be operating as an individual, firm, company, partnership, joint stock company, or corporation.

**PROBATION:** There shall be a probationary period of sixty (60) calendar days for all employees. During the probationary period, a probationer may be discharged without right of appeal except if such discharge is in violation of Section 2.4, Section 2.8, or Section 3.1 of this Agreement.

**3.2     TERMINATION:** Except for reasons beyond the Employer's control, regular employees who work on three (3) days per week or more shall be given three (3) working days' notice of layoff, dismissal, or discharge, or the equivalent pay, except when such termination has been for cause, such as insubordination, disorderly or improper conduct, under circumstances requiring immediate termination. Employees who work on two (2) days per week shall be given two (2) working days' notice under like conditions. In all such cases, the day on which such notice is given shall not be counted unless notice is given before the day's work begins. [A regular employee is one who has been in the continuous employ of the Employer for a period of sixty (60) days or longer.]

**3.3     WORK PERFORMANCE:** The Employer shall have the right to discharge any employee for just cause. If the employee feels that he has been unjustly discharged, he shall have the

DRAFT

right of appeal in writing to the Adjustment Board through action of the Union, within ten (10) business days after the date of said discharge.

> **3.3.1** Before a regular employee is discharged, suspended, or demoted for incompetence or failure to perform work as required, he shall receive a written warning (with a copy to the Union) and be given an opportunity to improve his work. Notices and warnings shall become null and void after six (6) months from the date of issue.

> Written warnings need not be processed beyond the Union filing a grievance in order to preserve the Union's right to challenge the warning if it is used as progressive discipline in the future.

> **3.3.2** Upon severance of employment of any employee, the Employer shall within seven (7) calendar days thereafter, notify the Union of such resignation, layoff, or discharge. If the discharge is for cause, the Employer agrees to submit the reasons for discharge, upon request from the Union, as soon as practicable but no later than three (3) days prior to a duly convened Board of Adjustment.

**3.4** RECORD: Any employee who is terminated shall, upon request, be given a statement setting forth the date of hiring and the number of hours worked during his employment.

**3.5** POLYGRAPHS: No Employer shall demand or require any applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector or similar test or examination as a condition of employment or continued employment.

**3.6** COMPANY RULES: In the event the Employer establishes rules for its employees, such rules shall be reasonable, not inconsistent with the terms of the Collective Bargaining Agreement, and shall be furnished to the Union upon request.

When Company rules are changed or modified, a copy of such changes shall be supplied to the Union within ten (10) days following the implementation of any changes or modifications. For the purpose of this section, the changed or modified rules, which are to be provided to the Union, are those rules contained in the Employee Handbook, which is typically distributed to newly hired employees. These rules include, but are not limited to, dress code, attendance, conduct at work, employee purchases, insubordination, tobacco and alcohol sales, harassment, and other similar rules as set forth in the Employer's handbook.

Rules or policies promulgated by the Employer shall not be construed or enforced to unlawfully prohibit or restrict employee rights under Section 7 of the National Labor Relations Act, as amended, as they relate to this bargaining unit during the term of this Agreement.

## SECTION 4.  SENIORITY

**4.1** DEFINITION: Seniority shall mean continuous service with the Employer and no employee shall suffer loss of seniority by reason of approved leave as provided for in this Agreement.

**4.2** CLASSIFICATION: Seniority shall be by classification listed as follows in Sections 1.3 and 9 of this Agreement.

> **4.2.1** Managing Clerks

> **4.2.2** Senior Head Clerks and Senior Produce Clerks

DRAFT

**4.2.3**   Head Clerks

**4.2.4**   Head Meat Cutter

**4.2.5**   Experienced and Apprentice Clerks and All Purpose Clerks

**4.2.6**   Journeyman Meat Cutter and Apprentice Meat Cutter. (For the purposes of layoff and recall, Journeyman Meat Cutter and Apprentice Meat Cutter shall be considered as one (1) classification.)

**4.2.7**   Non-Food, Meat Clerks and General Merchandise Clerks

**4.2.8**   Utility Clerks

**4.2.9**   Courtesy Clerks subject to the restrictions of Section 9.1.8.4 hereof. Seniority of Courtesy Clerks shall be on a store-by-store basis, except that Courtesy Clerks transferred to another location will carry Courtesy Clerk seniority with them to the new location.

In the event that an Apprentice Clerk who had previously served as a Courtesy Clerk is going to be laid off before the completion of the first 520 hours of the Apprentice progression then, in that event, the Apprentice Clerk may step back temporarily into the Courtesy Clerk classification at the store in which they are currently working until recalled.

**4.2.10**   Employees employed in classifications covered by addendum agreements shall be deemed separate classifications.

**4.2.11**   It is recognized that employees must posses the necessary qualifications to perform the available work when asserting their seniority rights into or out of the Employer's produce department or for work assignments requiring specialized skills and background.

**4.3**   APPLICATION: With respect to layoff, recall, and promotion, seniority shall be based upon the length of service with the Employer in each of the areas covered by this Agreement; provided where an employee is transferred by the Employer to such area from another area, the transferred employee shall retain all seniority rights with the Employer but shall not be entitled to exercise such rights with respect to layoff, recall, or promotion until the expiration of six (6) months after the date of transfer, at which time his seniority shall be based upon the first day of employment by the Employer regardless of area. However, during such period of six (6) months, the transferred employee shall accrue seniority rights in the new area, from the date of transfer and shall retain all seniority rights with respect to layoff, recall and promotion in the area from which he was transferred.

**4.3.1**   PROMOTION: Determination of which employee is to be promoted will be based upon seniority and reasonable qualifications. Qualifications shall include such factors as experience, job performance, aptitude, attendance, etc. Where merit and ability are approximately equal, seniority shall control. No trial period shall be required. Where an employee who has been promoted is unable to perform the duties of the higher classification or is being laid off from a classification above Experienced Food Clerk or Meat Cutter, he shall have the right to be demoted to his former or equivalent position without loss of seniority; and his right to such employment shall not be jeopardized by reason of such demotion.

DRAFT

The foregoing promotion process will not be applicable to employees transitioning from Courtesy Clerk, General Clerk, General Merchandise Clerk or Meat Clerk to the All Purpose Clerk classification through assignment by the Employer, or through the bidding procedure as described in Section 4.3.3.

All permanent job vacancies, except Courtesy Clerks, shall be posted for a period of five (5) days by the time clocks. Those vacancies above Journeyman Food Clerk or Meat Cutter shall be posted at each store of the Employer within the seniority areas as specified herein. Those vacancies below Journeyman Food Clerk or Meat Cutter shall be on a store-by-store basis. The job posting shall specify the job classification and location of the store where the permanent job vacancy exists. Any employee interested in the permanent job vacancy must complete a job bid form and return it to the Store Manager on or before the expiration of the posting period. In the event the Employer decides to promote an existing employee to fill the permanent job vacancy, then in that event the selection of the employee to be promoted shall be in accordance with the provision set forth herein. Any successful bidder who thereafter declines the promotion or is unable to perform the duties of the job shall be ineligible for any subsequent promotional bid for a period of six (6) months. However, regardless of any self-demotion permitted under the foregoing, the Employer may impose disciplinary action for conduct preceding an employee's decision to self-demote.

**4.3.2   ALL PURPOSE CLERK TRANSITION:** For each reduction in the number of Journeyman or Apprentice Food Clerks there shall be two (2) employees from the following classifications transitioned or offered through the bidding procedure, the All Purpose Clerk (APC) Classification by seniority: Courtesy Clerk, General Merchandise Clerk or Meat Clerk. The Employer will be allowed to promote or hire one (1) GMC or one (1) Meat Clerk for every two (2) employees transitioned to the APC classification.

The most senior employee from the aforementioned classifications replacing the Food Clerk position will be reclassified to an APC. Only the most senior General Merchandise Clerk or Meat Clerk will have the option to immediately fill the Food Clerk vacancy or remain in their current department as an APC. The second APC opening will be posted, describing the primary department in which the opening is available.

Courtesy Clerks will not have this option. If they are the most senior to fill a Food Clerk vacancy, they must accept the APC position and fill the Food Clerk opening or they may reject the APC position and remain as a Courtesy Clerk. No more than one (1) Courtesy Clerk shall be eligible for APC acceptance per vacancy. It is also understood that an employee must be, at least, eighteen (18) years of age to be promoted. If a Courtesy Clerk rejects the APC position to fill a Food Clerk vacancy, they may not then bid on the second APC position available.

If the Employer needs to fill a vacancy in the APC classification, it shall be filled through the bidding process by seniority as described within this Section 4.3.2. In no instance will the ratio of GMCs to APCs and Food Clerks increase. The Employer may replace a GMC or Meat Clerk separating their employment until which time the GMC and Meat Clerk classifications are eliminated as outlined below.

This process will be accomplished on a store-by-store basis. A transfer of a Food Clerk to another store will not be considered a reduction in the number of Journeyman or Apprentice Food Clerks for the purpose of this section. Notwithstanding the above, the Employer may post for additional APC positions through the bidding procedure and the selection of the APC position is to be filled by seniority.

It is the intent of the parties to eventually eliminate the Food Clerk, General Merchandise Clerk, and Meat Clerk classifications. When the ratio of Food Clerks to APC Clerks reaches twenty five percent (25%), all current General Merchandise Clerks and Meat Clerks as of the date of ratification of this Agreement will be reclassified as APC Clerks and placed in the step above their present wage rate. When the number of Food Clerks in any store reaches zero (0), all remaining Non-Food/General Merchandise/Meat Clerks in that store shall be reclassified as All Purpose Clerks and the Employer will no longer be able to hire or promote employees into the GMC or Meat Clerk classifications in that store.

The Employer agrees to provide the Union with a list of employees, bimonthly, who have been promoted to positions above Journeyman Food Clerk.

Employees transitioned or promoted to the All Purpose Clerk classification from the GMC and Meat Clerk classifications will be moved to the step that represents an increase from their present wage rate and will not be required to backfill hours.

4.3.3   LAYOFF: In the reduction of the number of employees due to lack of work, the last employee hired in the classification shall be the first to be laid off and, in recall, the last employee laid off in the classification shall be the first recalled until the list of employees previously laid off has been exhausted. For purposes of this section, a layoff is defined as being reduced to zero (0) hours.

4.3.4   RECALL: Employees who are laid off due to lack of work shall have seniority rights in recall for jobs subsequently available with the Employer prior to the hiring of new employees. Such employee shall concurrently be notified by telegram or certified mail, a copy of which shall be sent to the Union, and shall have three (3) days to report after receipt of a copy of such notice of recall by the Union.

4.3.5   It is further understood that the employee will not be able to claim wages under the provisions of Subsection 4.3.3 hereof, except for hours lost commencing with the weekly schedule immediately following the Union's notification to the Employer of the claim, and thereafter until resolved.

If the employee or the Union gives written notice to the Employer within seven (7) days of his notice of layoff, the above provisions do not apply.

4.4   LOSS OF SENIORITY: No employee shall suffer loss of seniority unless he:

4.4.1   Is discharged for just cause;

4.4.2   Resigns or voluntarily quits;

4.4.3   Is absent from work for six (6) consecutive months due to layoff;

4.4.4   Is absent from work for more than thirty (30) days due to a death in the immediate family;

4.4.5   Fails to return to work upon completion of a leave of absence as defined in Section 5.14;

4.4.6   Fails to report for work when recalled as provided in Section 4.3.4 of this Agreement.

DRAFT

**4.5     SHIFT SELECTION:** The word "shift" is interpreted to mean the weekly work schedule including work on premium days, early and late work schedules.

4.5.1   It is recognized that management has the right to establish such weekly work schedules to meet the requirements of the business; provided, however, such right shall not be utilized in an arbitrary or capricious manner to deprive an employee of his ability to exercise his seniority right to select such work schedule.

4.5.2   Employees may select such schedules according to seniority by classification, applied on a store basis, by department, provided they possess the necessary qualifications for the schedules selected. Qualifications shall include such factors as experience, job performance, aptitude, attendance, etc. The departments are (1) Grocery, Night Crew and GM, (2) Produce and Floral, (3) Bakery and Deli, (4) Meat, (5) Bookkeeping, and (6) Pharmacy.

4.5.3   It is understood part-time employees may not bid for the schedule of other employees. Part-time employees, except Courtesy Clerks, may submit written requests, on "Work Choice", for shift preferences.

The Employer will give due consideration to such requests based on seniority and shall not deny requests unreasonably or arbitrarily. Requests for shift preferences shall be made available through the Employer with a copy forwarded to the Union.

4.5.4   The Employer shall not recognize the shift selection request of any employee if the granting of the request would place the Employer in a position of violating the contract or having to pay a penalty for improper scheduling of shift intervals or consecutive work days.

**4.6     RELIEF WORK:** Employees assigned to regular relief work may, after six (6) months on such work, request the Employer, in writing, to be assigned to work in one (1) store. The rescheduling of such relief work shall be done within thirty (30) days and be based upon inverse seniority. This provision shall not apply to temporary relief work required as a result of illness, injury, vacation, or other like temporary relief work.

**4.7     LISTS:** The Employer agrees to provide a seniority list of employees semiannually. Such list shall be by seniority, listing the employee's date of hire, name, social security number, work location, classification, current rate of pay, and indicate if they are part-time or full-time.

It is understood that part-time and full-time status shall be provided on these lists as soon as administratively feasible for the Employer. Upon request by the Union, the Employer will provide a legend of Company job titles and what classification they fall within the Collective Bargaining Agreement.

**4.8     TEMPORARY ASSIGNMENTS:** The Union will cooperate with the Employer in the scheduling of employees for temporary part-time or relief work outside the geographical jurisdiction of this Agreement. However, no employee shall be discriminated against for refusal to accept such assignment.

**4.9     TRANSFERS:** No employee shall be required to accept a permanent transfer outside the jurisdiction of this Local Union unless approved by the Union. Requests for transfers, within the Union's geographical jurisdiction, so an employee may work nearer his home will be given proper consideration and will not be refused arbitrarily. Similarly, an employee will not be arbitrarily or capriciously transferred. Management will give proper consideration to transfer

DRAFT

requests.

**4.10    PART-TIME EMPLOYEES:**

**4.10.1   REQUEST FOR FULL-TIME WORK:** Part-time experienced Clerks may bid for full-time, forty (40) hour job openings or part-time job openings with more hours, excluding relief for vacations, illnesses, or other authorized absences within the employee's assigned store, based upon said employee's seniority, provided that he makes his desire for such work known, in writing, concurrently to the Union and to the Store Manager. Request may be made at any time through the Company's "Work Choice" system.

The Employer shall thereupon place the name of the employee on a list maintained by the Company for such purpose. The names of the employees shall be placed upon the list according to seniority. A copy of said list shall be forwarded to the Union once a quarter.

Provided the experienced Clerk possesses the necessary qualifications and has complied with the requirement above, he shall be offered any job opening, except as restricted by the above, which might occur within the employee's assigned store before any employee is hired into said store.

A vacancy is created in an existing full-time classified Food or All Purpose Clerk position due to retirement, resignation, or transfer outside the Union's seniority area or to a new store will be filled from the full-time bid list. A full time vacancy is not created when a full-time employee is transferred out of the Union's jurisdiction and a full-time employee is simultaneously transferred back into the Union's jurisdiction.

**4.10.2   REQUEST FOR ADDITIONAL HOURS:** Part-time employees may request additional available hours within their classification on a store-by-store basis, provided they have the previously mentioned qualifications, are available for the hours, and have notified their Store Manager, in writing, of their desire for more hours, and they shall be afforded such hours by seniority.

**4.10.3   REMOVAL FROM LIST:** Employees refusing an offer of full-time work, requesting part-time work after having been selected for full-time work, indicating their unavailability for continued full-time work, or refusing a job opening with more hours shall not be entitled to exercise rights set forth above for a period of six (6) months.

**4.10.4   REDUCTION IN HOURS AND LAYOFF:** Reduction in employees' hours due to lack of work shall be accomplished by seniority and by classification on a store-by-store basis.

When layoffs occur due to lack of work, the last employee hired in the classification shall be the first to be laid off.

Notwithstanding the above, it is recognized that the Employer's business conditions may from time-to-time require the temporary reduction of full-time employees. No full-time employee in the store affected by the lack of work shall be reduced to fewer than those scheduled and/or worked by any part-time employee in the store. In order to effectuate the above, the Employer may make necessary operational transfers consistent with the provisions of Section 4.9. In this Agreement, nothing contained in this section shall affect the right of the Employer to transfer employees or the right of employees to request transfers pursuant to the provisions of Section 4.9.

DRAFT

A full-time employee subject to reduction in hours as set forth in paragraph 3 shall be given a choice of replacing the least senior full-time employee in the geographical seniority area or accepting the temporary reduction in hours in his store. If the employee elects to accept the reduction in hours, he shall have first preference for all available additional hours in that store up to and including a full-time, forty (40) hour job opening. While such an employee is temporarily working less than forty (40) hours, he shall retain his full-time designation for a period of six (6) months following the initial reduction.

**4.10.5  WAGE CLAIMS:** It is understood that employees will not be able to claim wages under this interpretation, except for hours lost commencing with the weekly schedule immediately following the Union's written notification to the Employer of the claim and thereafter until resolved. If the employee or the Union gives written notice to the Employer within seven (7) days of his layoff, the above provisions do not apply.

**4.10.6  WEEKLY GUARANTEE:** Each part-time employee (excluding Courtesy Clerks) shall be scheduled for at least twenty-four (24) hours work in each week.

Each Courtesy Clerk shall be scheduled for at least sixteen (16) hours work in each week.

The aforementioned weekly guarantee shall not apply if one or more of the following conditions exist:

    **4.10.6.1**  The store is normally open for business six (6) days or less in the work week;

    **4.10.6.2**  A week in which one of the holidays named in this Agreement falls;

    **4.10.6.3**  Employees scheduled to work are absent without proper notice;

    **4.10.6.4**  Work is not available due to acts of God;

    **4.10.6.5**  The part-time employee, the Employer, and the Union agree that the employee may work less than twenty-four (24) hours per week; or less than sixteen (16) hours per week if the employee is a Courtesy Clerk;

    **4.10.6.6**  An unanticipated, significant business fluctuation;

    **4.10.6.7**  During the week an employee is recalled from layoff or returns from leave of absence.

**4.11.**  Notwithstanding anything to the contrary contained in this Agreement, any employee can perform the work of a lower paid classification except that Non-Food and General Merchandise Clerks can only perform Courtesy Clerk duties.

## SECTION 5.  GENERAL PROVISIONS

**5.1   SAFETY RULES:** Safety rules pertaining to the conduct of employees shall be conspicuously posted by the Employer in its place of business, and the Employer shall maintain in its Meat Department and in the store a fully equipped first-aid kit.

DRAFT

All first-aid kits shall be maintained so as to contain the following:

NO COTTON
(1)   2 packages of 2" compress bandages – 4 per package
(2)   1 package 4" compress bandage – 1 per package
(3)   1 ammonia inhalants (10 tubes)
(4)   Tincture of methylate swabs, 10 pkgs
(5)   1 sterilized gauze 25 2 x 2 or equal
(6)   1 tube burn ointment
(7)   1 – 4" bandage scissors
(8)   1 – 3½" tweezers
(9)   1 tourniquet
(10)  1 – 1 oz. dropper bottle boric acid solution for eyes
(11)  1 roll adhesive tape ½" or 1"
(12)  First-aid manual
(13)  Sanitary gloves

Industrial kit basic content, add as necessary.

Where employees are required to work after dark, the Employer shall provide the use of a lighted parking area in the immediate vicinity of the store.

Working conditions which are injurious to the health or safety of the employees shall be directed to the attention of the Employer, at which time the Employer shall immediately investigate the alleged condition, shall meet with representatives of the Union to discuss the alleged condition, and shall immediately take the necessary steps and measures to correct such condition.

5.2   **MILITARY SERVICE:** The Employer agrees to comply with the terms of the Universal Military Training and Service Act with reference to all provisions providing for the reemployment of persons entering Military Service. These provisions shall be deemed a contractual obligation under the terms of this Agreement.

5.3   **BONDING:** Whenever the Employer requires the bonding of any employee or the carrying of any insurance for the indemnification of the Employer, premiums for the same shall be paid for by the Employer. No cash deposits, cash, or real property bond shall be required of any employee.

5.4   **FLOOR COVERING:** Wood or suitable floor covering shall be provided for on all concrete floors behind checkstands. A suitable floor covering shall be placed over any concrete or concrete substitute floor behind the meat counter.

5.5   **UNIFORMS:** Where the Employer desires the wearing of a uniform and/or head covering, the Employer shall furnish the same without cost to the employee. The Employer shall also provide for the maintenance of such wearing apparel, except if the Employer furnishes drip-dry uniforms, the employee shall maintain such uniforms.

Shirts and/or ties will be supplied only if the Employer specifies both the color and the specific style. Specific style shall be defined as collar style, sleeve length, and fabric content. Once implemented, there shall be no change in color unless by mutual agreement.

**SPECIAL WEAR:** It is also understood if an employee is required by the Employer to purchase or rent a special costume or unusual clothing not part of his existing wardrobe, the Employer shall reimburse the employee for any reasonable and necessary cost involved or furnish the required costume or unusual clothing to the employee without cost for the period of time the

DRAFT

requirement is in effect.

In each market which utilizes the "sage" sanitation system, protective wearing apparel will be provided by the Employer with the understanding that employees using said protective apparel shall be responsible for returning it to its proper place.

Employees required to work in refrigerated rooms or in and out of cutting rooms or coolers shall be permitted to wear slacks, sweaters, or other suitable clothing to adequately protect them from cold and dampness while working in such rooms. Employees who are assigned to continuous work in freezers will not be required to remain therein more than fifty (50) minutes out of each hour.

Employees who are required by the Employer to use clothing or boots other than those provided for in the preceding paragraph shall have such clothing or boots supplied by the Employer. The Employer shall provide rain jackets.

**5.6   TOOLS AND EQUIPMENT:** The Employer shall furnish all the required equipment and tools, except for meat cutting tools, necessary for the employment, without cost to the employee. All grinding of tools and sharpening of saws shall be at the Employer's expense.

**5.7   PAYDAY AND DEDUCTIONS:** Employees shall be paid Friday of each week. The Employer shall furnish each employee with a weekly wage statement showing his name, hours of work, overtime if any, total wages paid, and list of deductions made.

Extra Workers who are not paid on the next normal payday will receive their pay by mail or by direct deposit. It shall be the obligation of the Extra Worker to provide his current mailing address and/or direct deposit information to the Employer.

**5.8   BULLETIN BOARD:** The Employer agrees to provide sufficient space on the store bulletin board for the posting of official Union notices. Such notices shall contain only matters of official Union business and shall not be used for propaganda purposes.

There is an understanding between the parties that the Unions may put up bulletin boards in the stores so long as it comports with Albertsons Letter of Understanding with Local 5 and that the materials posted on these bulletin boards are consistent with Section 5.8 of Local 5's contract regarding official Union notices. The Companies have the sole discretion to determine whether any such materials are "detrimental" to the Company's interests.

**5.9   UNION BUSINESS:** Employees shall be allowed time off without pay for the purposes of attending Agreement negotiations, adjustment or arbitration board hearings or for other bona fide Union business. In all such instances, the Employer shall be notified not less than three (3) days in advance of such absence and the number of employees requesting such absences shall be so limited by the Union that it will not interfere unreasonably with the Employer's business.

The Employer agrees to schedule any employee who is an officer, or a representative of the Union in any capacity of the Union, hours of work that will permit him to attend the meetings of the Union, provided that it does not exceed one (1) employee per store or two (2) meetings per year. The Employer further agrees that these representatives will not suffer any loss in their normal scheduled hours in the week that they attend said Union meetings. It being understood that, in doing so, the Employer shall not be placed in a position of violating the contract or of having to pay any penalty for improper scheduling. The Union agrees that it will give the Employer two (2) weeks' advance notice of the date and time of the meeting referred to above. This provision shall also apply to new members who are required to attend meetings for the

DRAFT

purpose of completing their obligations as members of the Union.

The Employer recognizes the right of the Union to appoint Store Representatives. The Employer agrees to schedule up to one (1) Store Representative, designated by the Union, a day off, at the employee's daily straight-time rate based on the average daily hours worked in the pay period preceding, not to exceed eight (8) hours, to attend an annual education meeting. The parties agree that such time shall not be considered time worked for purposes of overtime, benefit contributions, or other incidents of "time worked".

Should an employee be notified by a representative of management that he will be subject to an investigative interview conducted by a Loss Prevention Agent and/or Human Resources Manager, which may lead to the employee being disciplined, the Company will advise the employee that he has the right to Union representation.

**5.10   UNION EMBLEM:** In consideration of the performance of the covenants herein contained, the Union agrees to lend Union store cards and/or decals to Employers entitled hereto under the rules governing Union store cards set forth in the Constitution of the United Food and Commercial Workers International Union. Employers who are entitled to Union store cards and/or decals agree to accept and display them in a public space in their stores. It is understood that such Union store cards and/or decals are issued by and remain the property of the United Food and Commercial Workers International Union, and the Employer agrees to surrender said Union store cards and/or decals at the Union's request upon his failure to observe the terms of this Agreement or the conditions under which said Union store cards and/or decals are issued.

**5.11   JOB INJURY:** When an employee is injured on the job and reports for medical care and it is certified that he is unable to continue work, he shall be paid the basic straight-time rate of pay for the hours not worked on the day of injury.

**5.12   PAYROLL DATA:** In the event the Union has information that the Employer has violated provisions of this Agreement relating to rates of pay or the payment of Health and Welfare, Pension, and Sick Leave contributions, the Employer agrees to supply the Union with the necessary payroll data.

**5.13   JURY DUTY OR COURT APPEARANCES:** Employees required to perform jury duty or to appear in Court or the Police Department on behalf of their Employer shall receive their regular straight-time pay during such jury duty or such appearances, less jury pay or witness fees received.

Employees performing jury duty shall have their schedule changed so that their shift begins at the time of reporting for such jury duty.

Employees regularly scheduled for night work shall be rescheduled to a day shift for the period of jury duty service.

It is understood that time spent in awaiting impaneling for jury service is to be considered covered time under this provision.

Employees shall immediately report for work after being excused from jury duty service, provided there is sufficient time remaining on the daily work schedule to work for at least half of the daily shift. Failure to so report shall render null and void any claim for jury service for that day.

The rescheduled work shift, when combined with time spent for jury service or court

DRAFT

appearances, is not to exceed a total of eight (8) hours when in reasonable control of the Employer.

Otherwise, the overtime rate of time and one-half (1½), shall apply for all time in excess of the combined total of eight (8) hours. The employee shall supply the Employer with verification of the time spent and fees paid for jury duty services.

If an employee appears in court or the police department on behalf of the Employer on his days off, he shall receive his basic straight-time rate of pay for the time spent in making such appearances, but such time shall not be considered as part of the work week under the terms o(this Agreement.

5.14    LEAVES OF ABSENCE: Leaves of absence shall be granted as follows:

    **5.14.1 SICKNESS AND NON-INDUSTRIAL INJURIES:** Up to twelve (12) months after one (1) year's employment.

    **5.14.2 INDUSTRIAL INJURIES:** Up to twelve (12) months for any employee incurring an industrial injury after his first sixty (60) days of employment and, who has less than three (3) years seniority at the time said leave of absence commences.

    Up to eighteen (18) months for any employee who has three (3) or more years seniority at the time said leave of absence commences.

    **5.14.3 PERSONAL LEAVES:** Leaves up to thirty (30) days after one (1) year of employment for compelling personal reasons to be agreed upon by the parties, such leaves shall be requested and granted in writing.

    **5.14.4** At the end of any period of such leave of absence for illness or injury, an employee shall be restored to employment with the Company with full seniority to a position comparable to the one he held immediately prior to such leave of absence.

    **5.14.5** The foregoing notwithstanding, no employee shall suffer loss of seniority because of absence due to illness of fifteen (15) working days or less. The parties agree to comply with the Family Medical Leave Act (FMLA) and Americans with Disabilities Act (ADA) and the equivalent state acts and regulations.

5.15    FUNERAL LEAVE:

    **5.15.1 PART-TIME FUNERAL LEAVE:** Part-time employees shall be entitled to funeral leave pay for the actual day of the funeral if scheduled to work on said day.

    **5.15.2 FULL-TIME FUNERAL LEAVE:** When a regular full-time employee on the active payroll is absent from work for the purpose of arranging for or attending the funeral of a member of his immediate family, as defined below, the Employer shall pay him for eight (8) hours at his regular rate of pay for each day of such absence up to a maximum of three (3) days, provided:

        **5.15.2.1**    The employee notified the Employer of the purpose of his absence on the first day of such absence;

        **5.15.2.2**    The day of absence is one (1) of the three (3) days commencing with the day of such death or the day immediately following the day of such death;

DRAFT

5.15.2.3    The absence occurs on the day during which the employee would have worked but for the absence;

5.15.2.4    The day of absence is not later than the day of such funeral except where substantial travel time is required;

5.15.2.5    The employee, when requested, furnishes proof satisfactory to the Employer of the death, his relationship to the deceased, the date of the funeral, and the employee's actual attendance at such funeral.

For the purpose of Subsections 5.15.1 and 5.15.2, a member of the immediate family means the employee's spouse, child, mother, father, sister, brother, mother-in-law, father-in-law, grandparents, grandchildren, stepmother, stepfather, and stepchildren.

5.16    RETURNED CHECKS; Where the Employer has a posted or published check-cashing policy, the employees shall conduct themselves accordingly, and when an employee follows such policy, he shall not be held financially responsible for returned checks other than his own personal check, nor shall he be expected or required to locate the check-cashing customer.

5.17    DUES CHECKOFF:

5.17.1 The Employer agrees to deduct uniform monthly dues, initiation fees, and political contributions as determined by the Local Union on a regular basis from the wages of employees in the bargaining unit who provide the Employer with a voluntary written authorization for such deductions. Such deductions, when authorized, will be transmitted to the office of the Local Union no later than the 15th day of the month following the month in which deductions are made. No deduction will be made from the wages of any employee until the Employer has received a signed copy of voluntary written authorization for such deductions.

5.17.2 Authorizations for deductions are to be entirely voluntary upon the part of each such individual employee. Authorizations shall be irrevocable for a period of one (1) year or until the termination of this Agreement, whichever occurs sooner. The authorization shall be automatically renewed or be irrevocable for successive periods of one (1) year each or for the period of each succeeding applicable Collective Bargaining Agreement, whichever shall be shorter, unless written notice is given by the employee to the Employer and the Local Union not more than twenty (20) days and not less than ten (10) days prior to the expiration of each period of one (1) year or of each applicable Collective Bargaining Agreement.

5.17.3 The Union shall indemnify and hold the Employer harmless from any and all actions resulting from the implementation of this provision. However, mistakes by the Employer shall be immediately corrected by the Employer upon notification from the Union.

## SECTION 6.  HOURS, OVERTIME AND SUNDAY PREMIUM PAY

PREAMBLE: In the event of the application of federal wage and hour law as applied to retailing conflicts with the intent of this Agreement, the parties shall meet immediately to renegotiate this Agreement in order to preserve the intended work week and the rates pertaining thereto.

The industry recognizes the five (5) day, forty (40) hour week provisions except for layoffs and

DRAFT

individual cutbacks due to lack of work, acts of God, or circumstances beyond the control of the Employer. This section, however, does not impede the right of the Employer to use part-time help as needed.

**6.1      BASIC WORKDAY AND WEEK:** Forty (40) hours, consisting of five (5) days of eight (8) hours each in a calendar week, Sunday through Saturday, shall constitute a week's work as provided in this entire section. Employees other than those scheduled to work six (6) days in a week shall receive two (2) days off, not necessarily consecutive, in each calendar week. A day's work shall consist of eight (8) hours within nine (9) consecutive hours with one (1) full uninterrupted hour off for a meal. A one-half (½) hour lunch period for a crew, a shift of employees, or an individual employee may be implemented by mutual agreement of the Employer and the employee(s). No employee shall be required or permitted to work a split shift.

A workweek consisting of four (4) ten (10) hour days may be implemented by mutual agreement of the parties. Work shall not be performed without pay prior to the beginning of the scheduled working day. Work may be performed at the end of the working day in completing service to a customer, which commenced prior to the end of the working day. It is understood that the checking of produce or shelf prices shall be considered as time worked.

**HOLIDAY WORK WEEK:** Thirty-two (32) hours, consisting of four (4) eight (8) hour days, exclusive of the holiday, shall constitute a week's work in any week in which the holiday falls. Any employee working thirty-two (32) straight-time hours in a holiday week, not Including holiday work, shall receive not less than forty (40) hours' pay. Holiday pay for part-timers shall in all instances be prorated in accordance with Section 10.1.5.

**6.2      OVERTIME AND PREMIUM WAGE RATES:** The overtime and premium wage rates of pay shall be as follows:

**6.2.1    TIME AND ONE-THIRD (1⅓) THE STRAIGHT-TIME HOURLY RATE:**

6.2.1.1 Work performed on Sunday shall be paid at a rate of one and one-third (1⅓) times the straight-time hourly rate. Courtesy Clerks hired after April 15, 2005, are not entitled to Sunday premium.

**6.2.2    TIME AND ONE-HALF (1½) THE STRAIGHT-TIME HOURLY RATE:**

6.2.2.1 Work in excess of eight (8) hours per day.

6.2.2.2 Work in excess of forty (40) hours per week.

6.2.2.3 Work on the sixth (6th) day worked in a calendar week.

6.2.2.4 Work on the fifth (5th) and sixth (6th) day worked in a week containing one of the holidays named in this Agreement not including holiday worked.

6.2.2.5 Work performed after the fifth (5th) consecutive day worked without reference to the calendar week by a normal five (5) day employee until consecutive days are broken by a day off, except when the schedule of an employee who has had or who is to have two (2) consecutive days off is changed in accordance with this Agreement.

6.2.2.6 Work performed after the sixth (6th) consecutive day worked without reference to the calendar week by a normal six (6) day employee until consecutive days are broken by a day off, except when the schedule is being

DRAFT

changed in accordance with this Agreement.

6.2.2.7 Work performed by a full-time employee called in to work on a scheduled day off and given shorter notice than required by the Agreement shall receive a minimum of eight (8) hours' pay on that day but if such employee works six (6) days during that calendar week, work performed on the scheduled day off shall be paid for at the employee's straight-time rate for that day and that on the sixth (6th) day worked shall be paid for at the overtime rate.

6.2.2.8 Work performed within ten (10) hours from the time the last shift ended.

6.2.2.9 Work performed where a meal period is not afforded in conformity with Section 7.5.

6.2.3    TWO (2) TIMES THE STRAIGHT-TIME HOURLY RATE:

6.2.3.1 Work in excess of eight (8) hours on the sixth (6th) day worked in a calendar week.

6.2.3.2 Work performed on Sunday which is a day in excess of five (5) consecutive days by a scheduled five (5) day employee, except when the schedule of said employee who has had or is to have two (2) consecutive days off is changed in accordance with this Agreement.

6.2.3.3 Work performed on the seventh (7th) day in a calendar week.

6.2.3.4 Work performed on a holiday in this Agreement (in addition to holiday pay if entitled) regardless of which day of the week the holiday falls for employees hired prior to April 13, 2005. For employees hired after April 13, 2005, work performed on the holiday (in addition to holiday pay if entitled) will be paid at their straight-time hourly rate and an additional one dollar ($1) per hour premium.

6.2.3.5 Work performed after five (5) hours on a Sunday until a meal period is taken.

6.2.3.6 Work performed on a Sunday until ten (10) hours between shifts has elapsed.

6.2.4   TWO AND ONE-QUARTER (2¼) TIMES THE STRAIGHT-TIME HOURLY RATE OF PAY:

6.2.4.1 Work performed in excess of eight (8) hours on a Sunday.

6.2.5   TWO AND ONE-HALF (2½) TIMES THE STRAIGHT TIME HOURLY RATE OF PAY:

6.2.5.1 Work performed by an employee on Sunday when Sunday was a scheduled day off and the employee was given shorter notice than that required by the Agreement shall receive a minimum of eight (8) hours' pay for that day; but if such employee works six (6) days during that calendar week, work performed on that Sunday shall be paid at the rate of time and one-half (1½) the straight-time hourly rate; and that on the sixth (6th) day worked shall be paid for at the applicable overtime rate.

DRAFT

**6.2.5.2** Work performed on Sunday which is in excess of six (6) consecutive days by a six (6) day employee.

**6.2.5.3** Work performed after five (5) hours until a meal period is taken on a holiday unless the exception stated in Section 7.5 is applicable.

**6.2.5.4** Work performed on a holiday until ten (10) hours between shifts has elapsed.

**6.2.6   THREE (3) TIMES THE STRAIGHT-TIME HOURLY RATE:** Work in excess of eight (8) hours on a holiday named in this Agreement.

**6.3     CONSECUTIVE DAYS:** It is understood that consecutive days worked are interrupted by a holiday or a scheduled day off and shall be considered to be interrupted when an employee is required to work on a holiday or when, by reason of a bona fide emergency, an employee is required to work on his scheduled day off for which he has received the required premium pay for such work.

**6.4     SCHEDULED WORK:** Whenever an employee's schedule is not changed in accordance with the provisions of this Agreement and he is worked outside such schedule, then the hours so worked shall be paid for in accordance with the overtime provisions of this Agreement.

**6.5     NO COMPOUNDING OR PYRAMIDING:** There shall be no pyramiding of overtime and/or premiums and only the highest applicable rate shall apply.

## SECTION 7.   WORK SCHEDULE

**7.1     POSTING OF WORK SCHEDULE:** The Employer agrees to keep posted, in each store, a weekly schedule, in ink, of the working hours for all employees. Such schedule shall show the full name of each employee, the classification, starting time, mealtime, quitting time, and days off. It is further agreed that any change in this schedule must be made and the employee so notified no later than 12 noon on Thursday of the week preceding the week in which the change is to become effective (emergency excepted). Such schedule shall be posted by 12 noon on Thursday of the week preceding the week in which such schedule is to be effective on the bulletin board or at a place where all employees and representatives of the Union may observe same. If assignment of employees to schedules is inconsistent with the terms of Section 4 Seniority, Subsection 4.5 hereof, employees will have until 3 p.m. on Thursday [or three (3) hours after the schedule is posted] to bring such inconsistency to the Store Manager's attention and seek assignment in accordance with Section 4 Seniority, Subsection 4.5 hereof. When a senior employee obtains such a different schedule, then the displaced junior employee shall be assigned the senior employee's previously assigned schedule for the following week.

If the schedule is not posted timely as stated above, such shall be deemed as a contract violation and subject to the grievance procedure. Due to circumstances beyond the control of the person responsible for posting it, the untimely posting shall not be the basis for any monetary claims.

Time worked by employees on the last shift during the period the store is open for business, for the purpose of serving customers in the store at the closing hour or performing other miscellaneous duties necessary in connection with the closing of the store, shall be properly scheduled in their straight-time shift.

**7.2     SHIFT INTERVAL:** Except in bona fide emergencies, the minimum time off between

DRAFT

shifts shall be ten (10) hours and employees called to work sooner than ten (10) hours from the end of their last work period shall be paid time and one half (1½) the employee's straight-time rate for all work performed up to the time said ten (10) hour period between shifts shall have elapsed.

**7.3    SCHEDULED TO WORK A HOLIDAY:** Any employee normally scheduled to work five (5) days who is temporarily rescheduled to work on a holiday shall be permitted to work his normal number of working days that week.

**7.4    HOLIDAY EVE:** No employee shall be required to work after 7 p.m. on Christmas Eve except those necessary to service the customers in the store at 7 p.m. and to properly close and secure the store. This shall not apply to employees in the Liquor Department where the Liquor Department may be isolated from the Grocery Department. The holiday premium of double (2) time shall not apply to any hours worked prior to 12:01 a.m. on the holiday.

On New Year's Eve, the store shall be staffed with volunteers between 7 p.m. and 12 midnight. If insufficient employees volunteer, assignment shall be by inverse seniority. The Employer will post a sign-up sheet for volunteers, in a conspicuous location, at least two (2) weeks in advance of the New Year's Eve or Christmas Eve.

**7.5    MEAL PERIOD:** Each employee shall be released from work for his meal period within five (5) hours, but no sooner than three (3) hours of the time of his reporting for work. Any employee who is given a meal period prior to three (3) hours into his shift or works in excess of five (5) hours without a meal period shall receive one and one-half (1½) times the employee's straight-time hourly rate for hours worked between the meal period and the completion of the third (3rd) hour or one and one-half (1½) times the employee's straight-time hourly rate for hours worked in excess of five (5) hours until a meal period is given.

During one (1) lunch hour in any workday in a market employing one (1) or more Meat Cutters in work covered in accordance with Section 1.3 of this Agreement, Monday through Saturday, there must be a Meat Cutter covered by this Agreement in attendance at all times during which fresh meat is being sold. In such markets where the Meat Cutter is alone, the Employer may also, close the market (fresh meat section), use a relief employee, operate for one (1) unattended lunch hour in a day, or require the Meat Cutter to work through the lunch hour, in which event the Meat Cutter shall be paid at the applicable overtime rate for the lunch hour and shall be permitted to eat his lunch on the job.

In the event a Meat Cutter shall work his lunch hour as hereinabove provided and completes the workday, he shall be paid his regular straight-time hourly rate of pay for the ninth (9th) hour.

On Sundays and holidays in self-service markets where only one (1) employee is performing work covered by this Agreement, he shall be provided with a full, uninterrupted hour off for lunch and the Meat Department may remain open; provided that no individual, except the Owner-Employer, not otherwise employed in work covered by this Agreement, shall be permitted to perform work covered by this Agreement during such unattended lunch hour. On Sundays and holidays in a conventional or self-service market, a Meat Cutter may eat on the job and shall receive pay in accordance with the provisions above.

In accordance with state law, the Employer may schedule up to a six (6) hour shift without a meal period. Any scheduled or extended shift that is more than five (5) hours up to and including a six (6) hour shift shall not be subject to the overtime rate and shall include two (2) unscheduled ten (10) minute breaks.

**7.6    BREAK:** No employee shall be denied the right to necessary or required relief. All

DRAFT

employees shall be allowed an unscheduled ten (10) minute break in the first half of their shift prior to the meal period and an unscheduled ten (10) minute break in the last half of their scheduled shift prior to quitting time.

**7.7     DAILY GUARANTEE:** Any full-time employee [one who is normally scheduled to work forty (40) hours or more per week] who is ordered to report for work shall be guaranteed not less than eight (8) hours' work. Any part-time employees except students and Courtesy Clerks who are ordered to report for work shall be guaranteed not less than four (4) hours' work. All Apprentices and experienced Food Clerks hired or promoted after May 2, 1983, when so reporting shall receive no less than four (4) hours' work for that day. Bona fide students, who, by reason of attending scheduled classes, may not work four (4) hours, may be individually excepted from this provision by written agreement of the Employer, the Union, and the employee involved.

**7.8     NIGHT PREMIUM:** All employees, except Courtesy Clerks, Meat Cutters, and Apprentice Meat Cutters, shall receive extra compensation, in addition to the regular scale herein set forth, of sixty-five cents (65¢) per hour for all work performed between the hours of 10 p.m. and 6 a.m.

Any Meat Cutter or Apprentice Meat Cutter who may be required to work any part of his workday prior to 8 a.m. or after 6 p.m. shall be paid two dollars ($2.00) in addition to his regular rate of pay.

Meat Cutter or Apprentice Meat Cutter employees who are scheduled to work a regular eight (8) hour shift between the hours of 8 a.m. and 6 p.m. on any day and who are required to work in excess of such eight (8) hours after 6 p.m. by reason of an emergency shall receive overtime pay at the appropriate rate but shall not be entitled to the two dollar ($2.00) shift premium required above.

**7.9     PREMIUM DAY:** Employees working any hours on a Sunday or a holiday shall be paid the premium pay as provided for in this Agreement for the hours worked between 12:01 a.m. and 12 midnight on that day.

**7.10   SEPARATE EMPLOYERS:** Any employee who works for another Employer in the retail food or liquor Industry on his day or days off shall be paid therefore at straight time, overtime, or premium rates calculated as though he had worked that week for a single Employer. It is understood that if the employee is properly shown on the schedule, the overtime rates shall not be in effect until after the Union notifies the Employer that the employee in question is an employee of another Employer in the Industry.

**7.11   EMPLOYEES ON LAST SHIFT:** Employees on duty at the recognized hour of closing may be required to wait on all customers and perform other duties necessary to closing. Such employees shall be scheduled so that their shift ends at least fifteen (15) minutes after the recognized hour of closing.

## SECTION 8.   WAGES

**8.1     The** Appendixes set forth the minimum rates of pay, effective dates, and other provisions and are incorporated herein as if set forth in full.

Non-contractual, discretionary bonuses may be modified or discontinued at the Employer's discretion with prior notice to the Union. This exception does not apply to over scale wage rates.

DRAFT

## SECTION 9.  CLASSIFICATION OF EMPLOYEES

**9.1**    For the purpose of this Agreement, the classification of employees is hereby defined as follows:

**9.1.1  MANAGING CLERK:** Every store shall have a Managing Clerk unless the Employer, or a supervisor within the meaning of the National Labor Relations Act, as amended, is actively engaged on the premises performing the work of the Managing Clerk. A Managing Clerk is an employee who has charge of and general supervision over not more than one (1) store.

In the event the Employer or supervisor is absent from the store for one (1) or more eight (8) hour days in a week, a Clerk shall receive the wage scale of a Managing Clerk for said work.

**9.1.2  SENIOR HEAD CLERK, SENIOR PRODUCE CLERK, HEAD MEAT CUTTER, AND HEAD CLERK:** These are non-supervisory employees who, in addition to their duties of Clerk or Meat Cutter in the course and scope of their employment, perform one (1) or more of the following duties:

**9.1.2.1 SENIOR HEAD CLERK:** This classification shall apply only to the Senior Head Clerk who acts as Assistant to the Managing Clerk or Owner and is commonly known as the "second person" in the store.

**9.1.2.2 SENIOR PRODUCE CLERK:** This classification shall apply to an employee who manages the Produce Department including, but not limited to, ordering, scheduling, and operating the Produce Department.

**9.1.2.3 HEAD MEAT CUTTER:** A Head Meat Cutter orders, buys, schedules, and overall supervises all operations of the fresh, frozen meat, fish, and packaged meat-deli sections within the entire Meat Department. A Head Meat Cutter is in charge of all education and training of Apprentice Meat Cutters and Meat Clerks.

Stores shall have one (1) Head Meat Cutter on duty each day whenever fresh meat is available for sale. Only a Journeyman Meat Cutter may perform the duties of a Head Meat Cutter.

**9.1.2.4 HEAD CLERK:**

**9.1.2.4.1**    The following are the responsibilities of a Head Clerk:

**(a)**    In charge of and responsible for the receiving of merchandise and the Receiving Department;

**(b)**    Conducts the operation of the store in the temporary absence of the Supervisory Store Manager, the Managing Clerk, the Senior Head Clerk, or the Owner, or is responsible for the opening or closing of a store;

**(c)**    In charge of and responsible for directing a Night Stocking Crews.

DRAFT

9.1.2.4.2      The Employer agrees to have at least six (6) employees classified as Head Clerks in each store to fill the job requirements as listed in 9.1.2.4.1. In stores where a person is responsible for both the Bakery and Deli departments, such employee shall be reclassified as a Head Clerk and the Employer will not be required to have individual Department Managers for the Bakery or Deli. Employees classified as Head Clerks must be able to do all the Head Clerk duties. No current Head Clerks will be reclassified or demoted as a result of the implementation of this section.

9.1.2.4.3      In every store having three (3) or more full-time employees, where one or more of the employees perform the duties of Head Clerk as a regular part of their employment, the Employer shall designate at least one (1) of said employees to act as Head Clerk; provided, however, that the Employer may combine and rearrange the duties performed by his employees in order to minimize the number of Head Clerks required.

9.1.2.4.4      ADDITIONAL DUTIES: In the event that the Employer desires to assign additional non-supervisory duties and responsibilities to one of his employees over and above the normal duties and responsibilities of Head Clerk, then in such event, the additional compensation to be paid such an employee shall be agreed upon between the Employer and the Union.

9.1.2.4.5      When an employee qualifies for or is held responsible for Senior or Head Clerk's duties, he shall receive the Senior or Head Clerk's pay for the entire shift.

9.1.2.4.6      It is understood that the mere occasional or incidental performance of any of the Head Clerk's duties shall not be considered as the basis for classifying any employee as Head Clerk.

9.1.3   EXPERIENCED FOOD CLERK: An Experienced Food Clerk is an employee that has gained seven thousand eight hundred (7,800) hours' experience in the retail food industry.

PREVIOUS EXPERIENCE: If an experienced Food Clerk has been out of the industry less than five (5) years, he will be allowed to start at the Experienced All Purpose Clerk rate:

If an Experienced Food Clerk has been out of the industry between five (5) and ten (10) years, he will be allowed to start at the 6th Step All Purpose Clerk rate of pay.

If an Experienced Food Clerk has been out of the industry ten (10) or more years, he will be allowed to start at the 3rd Step All Purpose rate of pay.

If a person has been out of the industry for five (5) years or more, who has not reached Experienced Food Clerk status, he will be allowed to start at the 1st Step All Purpose Clerk rate of pay.

It is understood that before the Employer can hire an employee into the All Purpose Clerk classification, all employees in the Non-Food and Meat Clerk classifications in the store must already be All Purpose Clerks.

DRAFT

**9.1.3.1 PRIOR EXPERIENCE:** An employee who fails to accurately list, on an employment application, his approximate number of prior hours of experience in the Retail Food Industry and, as a result, is improperly classified by the Employer shall not be entitled to a retroactive wage adjustment if it is subsequently determined that a classification adjustment is warranted.

Notwithstanding the above, no such retroactive wage claim shall exceed ninety-one (91) days.

**9.1.4 APPRENTICE FOOD CLERK:** An Apprentice Food Clerk is an employee who has less than seven thousand eight hundred (7,800) hours' experience in the Retail Food Industry. The Union agrees to negotiate with the Employer an appropriate rate, during the probationary period, for employees who have gained food store experience outside of the jurisdiction of the Northern California Retail Clerks Unions. The appropriate Apprentice or Experienced Food Clerk rate shall be determined by the parties according to the employee's comparable previous retail grocery store experience. An Apprentice Food Clerk may perform the duties of any classification except Managing Clerk or Head Clerk. No employees hired after ratification may be hired into the Apprentice Food Classification.

**9.1.4.3 TRAINING:** It shall be understood that Apprentices shall be guaranteed full training within the apprenticeship period, including thirteen (13) weeks' work at the checkstand and at least thirteen (13) weeks' work in shelf stocking assignments.

**9.1.5 ALL PURPOSE CLERKS (APC):** An All Purpose Clerk may perform any and all duties that a Food Clerk may do.

The implementation of the All Purpose Clerk classification shall not cause the replacement or reduction of hours of any Food Clerk on the payroll as of the date of June 22, 2008.

Training opportunities will be posted and offered to the most senior employees that bid and who have no suspensions in the preceding six (6) months.

**9.1.6 MEAT CUTTERS:**

**9.1.6.1 REGULAR FULL-TIME EMPLOYEE:** An employee who has completed the sixty (60) day probationary period and is hired to work at least forty (40) straight-time hours per week in five (5), eight (8) hour days.

**9.1.6.2** Journeymen replacing Head Meat Cutters on their days off shall receive Head Meat Cutter's rate of pay. Only Journeyman shall operate a market as a Head Meat Cutter.

**9.1.7 APPRENTICES (MEAT CUTTERS):**

**9.1.7.1** Two (2) Apprentices shall be allowed to everyone (1) Journeyman. A Journeyman Meat Cutter shall continue to be defined as an Apprentice who has completed four thousand one hundred sixty hours (4,160) hours, with the understanding that this definition will have no application to the New Hire/Promoted wage progression.

DRAFT

9.1.7.2 An Apprentice can work without Journeyman supervision for no more than three (3) hours during his first six (6) months' apprenticeship period or for more than four (4) hours during his second six (6) months' apprenticeship period, exclusive of meal periods.

An Employer may establish its own apprenticeship program which can be implemented by mutual agreement of the Company and the Union.

9.1.7.3 On-the-job training of Apprentices shall be in accordance with the California Apprenticeship Law (Shelly-Maloney Act) as set forth in the California Labor Code. Both the Union and the Employer will assist in developing sound and uniform Retail Industry-wide Apprenticeship Training Programs.

9.1.7.4 Tests to judge the competency of an Apprentice shall be set up by the Industry Joint Labor-Management Apprenticeship Committee and, by majority vote. Its decision shall be final. Said tests shall be conducted jointly by one (1) representative of the Industry and one (1) representative of the Union.

9.1.7.5 A Joint Advisory Committee consisting of a representative of the State of California, Division of Apprenticeship Standards, and an equal number of representatives appointed by the Food Employers Council, Inc., representing the Employers and an equal number of representatives appointed by each Local Union as follows: 5, 8-Golden State, and 101 to represent all segments of the Retail Meat Industry in Northern California, shall be charged with the responsibility of preparing a uniform Northern California-wide program prior to February 1, 1974, to develop procedures, guidelines, and standards to train Apprentices in compliance with the California Apprenticeship Law (Shelly-Maloney Act), Title VII of the Civil Rights Act, and any other applicable federal statutes.

The procedures, guidelines, and standards as developed by the Joint Advisory Committee shall be used by Joint Apprenticeship Committees to train Apprentice Meat Cutters working under contracts with 8-Golden State. If the Joint Advisory Committee is unable to reach mutual agreement, matters in dispute shall be referred to the Regional Director, Region 9, Apprenticeship and Training Division, United States Department of Labor, for settlement.

9.1.8   MEAT CUTTER (STEP-UP) - (UFCW 8-GS ONLY):

9.1.8.1 A Step-Up Meat Cutter will normally perform Meat Clerk work and be compensated at the Meat Clerk rate. A Step-Up Meat Cutter will be allowed to step up (for an entire shift) to the Meat Cutter classification because of illness, days off, vacation, or leaves of absence. All time served working as a Meat Cutter will be credited at the time of promotion to be a Meat Cutter. A Step-up Meat Cutter will be compensated at the appropriate Meat Cutter Rate.

No current or future Meat Cutter will be laid off or reduced in hours because of the use of Step-Up Meat Cutters. The use of Step-Up Meat Cutters is not intended to avoid scheduling Meat Cutters on premium days.

Promotion to the Step-Up Meat Cutter will be according to the Promotion section of this Agreement.

9.1.9   MEAT CLERKS:

DRAFT

9.1.9.1 Meat Clerks may wrap, weigh, price, and stock fresh, chilled, or frozen meat; fresh, chilled, or frozen poultry; fresh, chilled, or frozen fish as well as cold and smoked meats and, in addition thereto, may display and dispense frozen meat; fresh, chilled, or frozen poultry; fresh, chilled, or frozen rabbits; fresh, chilled, or frozen fish, as well as cold and smoked meat, provide relief in the Fish Department, and may also act as Demonstrator.

9.1.9.2 Meat Clerks may take bell calls (contact the customer, serve the customer, relay the orders to the Meat Cutter, wrap the merchandise, and give it to the customer), and may also keep the meat cases tidy, clean the glass, empty cases, and empty trays.

LOCAL 5 & 101 ONLY: Meat Clerks may do all types of cleaning, including heavy cleaning and breaking down meat loads.

Only Meat Cutters shall disassemble and assemble equipment.

In addition, the Meat Clerk may keep the counter neat and clean, fill the counter, replace trays of meat including boating, wait on the trade, collect money, give change, cut a steak or roast which has already been processed by a Meat Cutter to size in order to serve a customer, modify any prepared cut to suit a customer, and use slicing machine, cube steak machine, and grinder to serve the customers.

Any employees that are currently performing these described duties at whatever rate of pay they are currently receiving will not be reduced by virtue of this expansion of duties.

9.1.9.3 Meat Clerks desirous of entering the Meat Cutter Apprenticeship Program shall make their desires known to the Company, in writing, and such employees shall receive consideration for such training and, if selected, attend the apprenticeship training program. Said Meat Clerks entering apprenticeship training shall be given a thirty (30) day trial period. To the extent permitted by law, and in compliance with the terms of this Agreement, it is the intent of the parties to see that all minorities are given an opportunity to move into all classifications of work covered by this Agreement. Consistent with this objective, qualified Meat Clerks will be given preference by seniority over other applicants for such work.

A Meat Clerk covered under this Agreement who enters the Apprenticeship Training Program or is promoted to the Meat Cutter classification will move to the closest step progression that represents an increase from their current rate of pay, and the employee will not be required to make up the hours of the previous steps. Said Apprentice will then progress through the Apprentice steps to Journeyman. After completing the thirty (30) day trial period, all acquired Company seniority shall be applied to the employee's new classification.

9.1.9.4 Meat Clerks desirous of entering the Meat Cutter Apprenticeship Program.

9.1.9.5 Meat Clerks may perform Non-Foods and General Merchandise work. Non-Food Clerks may also perform Meat Clerk work. No Meat Clerk on the payroll as of the merging of the agreements shall be laid off or have hours

DRAFT

reduced as a direct result of the merging of the classifications.

9.1.9.6 New employees hired, after the date of ratification, to do Meat Clerk work will be hired into the Non-Food/General Merchandise Clerk classification.

### 9.1.10 COURTESY CLERKS:

**9.1.10.1:** **DUTIES:** A Courtesy Clerk may not stock, prepare, or price merchandise (except carry-backs), operate cash registers, perform normal janitorial work, perform office work, face shelves, or break down loads. Courtesy Clerks are allowed to work one (1) hour before the opening of the store and one (1) hour after the closing of the store.

**9.1.10.2** **DAILY GUARANTEE:** Courtesy Clerks shall be subject to all the provisions of this Agreement except that instead of the minimum work guarantee set forth in this Agreement, when scheduled or called in to work, they shall be provided with at least two (2) hours' work on week days and four (4) hours' work on Saturdays, Sundays, or on Holidays as set forth in this Agreement.

**9.1.10.3** **WEEKLY GUARANTEE:** Each Courtesy Clerk shall be offered at least sixteen (16) hours' work in each week. In the event said Courtesy Clerk cannot be scheduled to work or cannot work sixteen (16) hours in the week, he shall not work at all during that particular week.

**9.1.10.4** **NO REDUCTION:** The employment or continuation of employment of a Courtesy Clerk shall not cause the replacement of an existing regular full-time or part-time Journeyman Food Clerk or Apprentice Food Clerk, nor shall it cause a reduction in the number of hours of work of such Clerks.

**9.1.10.5** **BADGES:** Courtesy Clerks shall wear badges on their person designating them as a Courtesy Clerk at all times during working hours, and their failure to wear such badge while working shall be considered a violation of these provisions. The Union will submit to the Employer and the employee involved a written warning; and in the event of a second violation with the same Employer by the same employee, the Employer agrees to suspend said employee for six (6) calendar months following written notice from the Union to the employee and Employer involved. If the Employer does not furnish the badges, the Union may furnish them.

**9.1.10.6** **PENALTY FOR VIOLATION:** The Employer agrees that Courtesy Clerks shall not perform duties as outlined in Section 9.1.10 of this Agreement. In the event of a violation of this section, the Union shall notify the Employer in writing of such violation and it shall be corrected.

In the event any of the same persons are involved in a second violation within one (1) year from the first infraction, the person performing the work, unless directed to do so by a person in charge, shall be suspended for one (1) week and the person who directed that the work be performed shall also be suspended for one (1) week or the sum of $500.00 shall be paid into the Northern California Retail Clerks and Food Employers Joint Pension Fund.

In the event of a third violation within one (1) year from the first infraction by any of the same persons, the person performing the work, unless directed to do so by a person in charge, and the person directing that the work be performed will be

DRAFT

suspended for one (1) month or the sum of $1,500 will be paid into the Northern California Retail Clerks and Food Employers Joint Pension Fund.

**9.2    TWO CLASSIFICATIONS:** Unless otherwise provided herein, the Employer may require any employee to do work within the duties of any classification in which event such employee shall be classified and paid for the entire shift under that classification which pays the highest wage; except that where any employee of a higher classification is relieved for a meal period or the mere occasional or incidental performance of the duties of a higher classification shall not be construed as entitling the employee to the pay of the higher classification.

**9.3    STEP-UP RULES - MANAGING CLERKS, SENIOR HEAD CLERKS, HEAD CLERKS:** The following rules are applicable at stores where Managing Clerks, Senior Head Clerks, Senior Produce Clerks, and Head Clerks are employed:

**9.3.1   MANAGING CLERKS, SENIOR HEAD CLERKS, HEAD CLERKS:**

**9.3.1.1** When the Managing Clerk is absent for one shift [eight (8) within nine (9) hours] or more and the store is open beyond the hours during which the Senior Head Clerk (acting as Managing Clerk) is present, another regular employee on duty during such hours shall be paid at the Senior Head Clerk's rate for his entire shift, except that where there is a regularly employed Head Clerk [forty (40) hours per week] in the store during such hours, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.2** On the Senior Head Clerk's day or days off, another regular employee on duty during said days shall receive the Senior Head Clerk's rate for each such shift worked, except that where there is a regularly employed Head Clerk [forty (40) hours per week] on duty in the store during said days, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.3** On any day when the store is open beyond the regular shifts [eight (8) within nine (9) hours] of both the Managing Clerk and Senior Head Clerk, another regular employee on duty during such hours shall receive the Senior Head Clerk's rate for his entire shift, except that where there is a regularly employed Head Clerk [forty (40) hours per week] in the store during such hours, he may continue to be paid at his regular Head Clerk's rate.

**9.3.1.4** When the Senior Head Clerk is absent for any period because of illness, vacation or other reasons, another regular employee or a Head Clerk, as the case may be, shall be paid at the Senior Head Clerk's rate for all such time worked during the said absence of the Senior Head Clerk.

**9.3.2   SENIOR PRODUCE CLERKS:**

**9.3.2.1** On the Senior Produce Clerk's day or days off, another regular employee shall be paid at the Senior Produce Clerk's rate for all hours worked in the absence of the Senior Produce Clerk, except that if the Senior Produce Clerk has Sunday as a day off, no other employee on duty on Sunday need be paid at the Senior Produce Clerk's rate unless he performs the Senior Produce Clerk's duties on said day.

**9.3.2.2** When the Senior Produce Clerk is absent for any period because of illness, vacation, or other reasons, another regular employee shall be paid at the Senior Produce Clerk's rate for all such time worked during the said absence of

DRAFT

the Senior Produce Clerk.

9.3.2.3 It is understood by the parties that "small stores" should be exempt from the application of these rules. It should be noted that we have been unsuccessful in an effort to define a "small store." However, through agreement with the various Local Unions or otherwise, certain Employers in this category have not been following the step-up rules and they shall continue to be exempt. Certain other Employers in this category have been following step-up rules and they shall continue to adhere to the rules. In the event the Union protests failure to adhere to these rules by Companies who have not been following them, there should be a joint committee established to determine whether or not the Employer falls in the "small store" category. Likewise, for any Employer who has been following the rules, he may protest the application of those rules to his operation and this same joint committee shall endeavor to determine whether his operation falls in the "small store" category. In the event a Company who has not been following rules is determined to be ineligible for the "small store" exemption, application of the rules shall be prospective only.

9.4    DEMONSTRATORS: All work connected with or incidental to the demonstration of merchandise offered for sale in the Employer's retail store (except merchandise referred to in Section 1.2, hereof as being excluded from this Agreement) shall be covered by this Agreement; and all such work shall be performed only by members of the appropriate unit as defined in Section 1.1, hereof. No Demonstrator may perform such work in the Employer's retail store unless said Demonstrator is on the payroll of the Employer and, unless the Employer, at all times, holds and exercises full control of the terms and conditions of employment of any such Demonstrators while such work is being performed in the Employer's retail store. Demonstrators shall be covered by all the terms of this Agreement, except Health and Welfare and Pension.

The hourly rate of pay for Demonstrators shall be as follows:

Effective December 2, 2007          twelve dollars and seventy-five cents ($12.75)

9.5    TRAVEL ALLOWANCE: An employee who is hired to work on a full-time basis in one store, who is temporarily assigned to relief work in another store, shall be entitled to reimbursement for the following travel expenses:

9.5.1    Mileage for the extra travel resulting from such assignment, or established bus or taxi fare if so designated by the Employer, according to the amount provided for under the Internal Revenue Service regulations. Increase in the amount provided for under Internal Revenue Service regulations shall be effective the date such increase is to be effective under the Internal Revenue Service regulations or the week following notification to the Employer by the Union, whichever is later; and

9.5.2    Reasonable allowance for board and lodging when required to stay away from home overnight; and

9.5.3    Necessary out-of-pocket expenses such as bridge tolls and parking fees.

The above provisions shall not apply to an employee who is hired for or regularly assigned to relief work or to work in different stores on different days of the week, or in the case of Meat Cutters, in order to achieve additional available hours.

9.6    TRANSPORTATION: Any employee who is required by the Employer to perform his or her regular duties in more than one store in any day shall be reimbursed for necessary

DRAFT

out-of-pocket and mileage expenses as provided for above. No such transfer shall be made in a manner to interfere with the lunch hour of the employee so transferred, and all time consumed in travel from one store to another shall constitute a part of the regular day's work of the employee.

9.7     TRANSFER OR REMOVAL OF WORK: No work now being performed by employees in the unit covered by this Collective Bargaining Agreement shall be transferred or removed from the unit without consultation and negotiation with the Union and unless the transfer or removal of such work is required for the purpose of promoting improved operating techniques, technological changes, automation, or other factors connected with more efficient operations, as distinguished from reasons connected with securing the performance of such work at lower rates of pay or under less favorable employment conditions.

9.7.1   Where, as a result of such consultation and negotiation, it is determined that the transfer or removal of any work is justified upon the considerations set forth above, the parties shall seek to determine the extent of the work transferred or removed and the number of jobs or hours of work to be lost by the Union members affected. Based upon such findings, the following remedies shall be applied:

9.7.1.1 Any employee losing hours of employment by reason of such transfer or removal of work shall either be compensated at his regular rate of pay for such hours or he shall be given other comparable employment by the Employer in the area covered by this Agreement at compensation equal to that received by him prior to the work transfer. If the comparable employment is within the bargaining unit, then he shall retain his seniority and other benefits under this Agreement.

9.7.1.2 The Employer shall attempt to provide any employee losing his job as a result of any such transfer or removal of work with other comparable employment in the area covered by this Agreement without loss of pay, status, seniority, or other benefits. Any employee not receiving such other employment shall receive one (1) week's severance pay for each year of service with the Employer; provided that, if an employee receives such comparable employment outside the bargaining unit and does not remain in such employment for at least thirty (30) days, he shall receive the full severance pay provided for herein.

9.7.2   Any employees who lose work or employment as a result of the failure of the Employer to observe the requirement provided for herein for consultation and negotiation concerning transfer or removal of work shall be entitled to full pay at their regular rate of pay for all such loss of work or employment.

9.8     Notwithstanding the above, it is agreed that should the Employer intend to institute electronic checkout systems which would have direct, material impact on employment covered by this Agreement, the Employer shall give to the affected Union or Unions at least sixty (60) days' written advance notice by certified or registered mail setting forth the nature of such intended changes and/or methods of operation.

9.8.1   Upon written request by the Union, negotiations shall commence with respect to the following subjects: rates of pay for new jobs which might be created; transfer to comparable work within or outside the bargaining unit; or the disposition of displaced employees resulting from the institution of such new methods.

9.8.2   In the event the parties do not reach agreement within such period, then all unresolved issues as set forth above shall be submitted to final and binding arbitration. It is not the intent of the parties that such negotiations or arbitrations will in any way

DRAFT

jeopardize the efficiencies and increased productivity to be gained by the installation of such systems. The arbitrator shall be selected in accordance with the provisions of Section 18.

9.8.3    The parties further agree that the arbitrator's decision shall be final and binding, and that there will be no strike, work stoppages, lockout, or economic action of any sort or form employed by either party in connection with or arising out of any dispute concerning or related in any way to the operation of this section.

9.8.4    It is agreed and expected that the parties will exert every effort to accomplish the foregoing within the sixty (60) day allotted period, but failing to do so shall not prohibit or in any way impede the Employer from installing or effectuating any such new methods, systems, or equipment upon the expiration of the allotted sixty (60) day time period, unless such period is extended by mutual written agreement. The decision of the arbitrator or the parties shall be effective on or retroactive to the date such new methods are installed. The cost of the impartial arbitrator shall be borne equally by the parties.

9.8.5    SELF-CHECKOUT: The Employer may have, at its discretion, a multi-unit self-checkout checkstand per store. If the Employer wants to introduce a second multi-unit self-checkout checkstand, the parties agree to negotiate over the effects of the introduction of a second unit.

## SECTION 10.  HOLIDAYS

10.1    The following days shall be recognized as paid holidays:

Employee's Birthday, Anniversary Date of Employment, one (1) floating holiday, New Year's Day, Memorial Day, Fourth of July, Labor Day, Thanksgiving Day, and Christmas Day. It is understood that the day of observance for Memorial Day shall be the dates established by federal statute.

10.1.1 NO WORK: No employee shall be required to work on Christmas Day.

10.1.2 WORK: In the event the employees shall be obligated to work on any of the holidays, they shall be paid at the rate of two (2) times the straight-time rate of pay in addition to the normal holiday pay.

For employees hired after April 16, 2005, who are obligated to work any of the open holidays, shall be paid at their straight-time hourly rate plus an additional one dollar ($1.00) per hour in addition to the normal holiday pay.

If the Employer elects to open on New Year's Day, Labor Day, or Thanksgiving Day, the store shall be staffed with volunteers. If more employees than are needed volunteer, assignment shall be by seniority. If an insufficient number of employees volunteer, assignment shall be by inverse seniority.

10.1.3 EMPLOYEE'S BIRTHDAY: Employees shall receive pay for said holiday as if worked. Each employee shall give his Employer notice of his birthday at least two (2) weeks prior to the week in which the birthday occurs.

Such birthday holiday shall be enjoyed by the employee on the actual day of his birthday or on another day mutually agreeable to the employee and the Employer.

DRAFT

If an employee's birthday falls on a day, which is otherwise considered as a holiday, he shall receive an additional day off for the birthday in addition to the holiday on which it falls.

**10.1.4 EMPLOYEE'S ANNIVERSARY DATE OF EMPLOYMENT AND FLOATING HOLIDAY:** The Anniversary Date of Employment and the Floating Holiday shall be enjoyed by regular employees in accordance with the observance procedures governing the employee's birthday holiday.

Employees hired on or after April 3, 2005, shall be entitled to a floating holiday and anniversary holiday after the completion of three (3) years of employment.

**10.1.5 HOLIDAY PAY OUT:** All earned personal holidays (i.e. birthday, anniversary, and floating holidays) not taken within a calendar year will be paid at termination or at the end of each calendar year, whichever occurs first.

**10.1.6 SENIORITY HOLIDAYS:** Employees with at least twenty-five (25) years of service with the Employer will receive two (2) additional holidays. The one holiday will be earned May 1 and the second will be earned on September 1 of each year.

**10.1.7 PROBATIONARY EMPLOYEES:** Probationary employees are not entitled to any paid holidays. Entitlement to the birthday holiday shall commence with the employee's first birthday following completion of one (1) year of employment with the Company. An employee shall not be entitled to the floating holiday until after the completion of six (6) months of employment, except as modified by Section 10.1.4.

**10.1.8 SUNDAY:** Whenever any of the holidays mentioned in this Agreement fall on Sunday, they shall be observed on the following Monday, except that any Christmas or New Year's Day or July 4th that falls on a Sunday will be observed on the Sunday.

**10.1.9 VIOLATION:** In the event any Employer violates this provision by allowing anyone to work in the store on any of the above holidays, the Union will be allowed to place pickets at the store as soon as possible and allow them to continue their activities for a maximum of three (3) days following each violation.

**10.1.10    PART-TIME EMPLOYEES:** Holiday pay for employees who work less than forty (40) hours shall be based on twenty percent (20%) of the employee's average hours worked per week in the six (6) weeks immediately preceding the holiday or the number of weeks worked if less than six (6); except that in computing pay for the New Year's holiday the same period of time used in computing pay for the Christmas holiday shall be used.

**10.2   HOLIDAY WEEK:** Any employee who has reported for work on his scheduled working day immediately preceding and his scheduled working day immediately following a recognized holiday, except when permission to be absent has been granted by the Employer or when the absence is due to a bona fide illness of the employee, shall receive holiday pay at his regular rate of pay. It is understood that in order to qualify for holiday pay an employee must work at least one (1) work day during the week in which the holiday falls.

**10.3   OTHER HOLIDAY OBSERVANCE:** Where the Employer closes his store to the public on any day of special religious significance, or on any legal holiday other than those listed above, it is understood that he shall reschedule his regular full-time employees to work their normal number of working hours that week.

DRAFT

**10.4    GOOD FRIDAY:** Employees desiring time off on Good Friday to attend bona fide religious services shall request such time off at least two (2) weeks in advance. All such requests for time off shall be granted, provided that a sufficient number of qualified employees are still available to properly staff the store as determined by the Employer. If due to an excessive number of requests for time off it becomes necessary to require employees to work on Good Friday, such assignments shall be made by inverse seniority from among those employees requesting the time off who possess the qualifications necessary to perform the required work. An employee taking such time off will receive straight-time pay for scheduled working time during this period and shall not be required or permitted to make up such time off.

**10.5    EXTRA WORKERS:** Extra Workers are not entitled to holiday pay; except when an Extra Worker works the four (4) days in the week of a holiday, he shall be paid for the holiday, but in such event, the day of the holiday shall be paid eight (8) hours at the regular scale and not the Extra scale.

For the purposes of holiday worked premium pay, Meat Extras who worked for the Company prior to February 11, 2005, shall receive the same holiday premium as all other employees hired prior to February 11, 2005. Likewise, Meat Extra who first worked for the Company after February 11, 2005, will be paid at their straight-time hourly rate and an additional one dollar ($1.00) per hour premium, the same as other employees hired after February 11, 2005.

## SECTION 11:    VACATIONS

**11.1**    All employees who have been in the service of the Employer for one (1) year, twelve (12) consecutive months, shall be granted a minimum of two (2) weeks' vacation annually with pay, except employees hired after April 13, 2005, who will earn one (1) week of vacation after one (1) year, twelve (12) consecutive months and two (2) weeks of vacation annually after three (3) years of employment. Such employees who have been in the service of the Employer for five (5) years or more shall receive three (3) weeks' vacation annually with pay. Such employees who have been in the service of the Employer for fifteen (15) years or more shall receive four (4) weeks' vacation annually with pay. Such employees who have been in the service of the Employer for twenty (20) years or more shall receive five (5) weeks' vacation annually with pay.

**11.2    ACCUMULATION:** Vacations may not be waived, nor may extra pay be received by any employee for work performed for the Employer during the employee's vacation period. Vacations may not be cumulative from year to year.

**11.3    CONTINUITY:** All loss from employment because of reasonable absence from work through sickness or other emergencies, or temporary layoff, not exceeding thirty (30) calendar days, shall be considered as time worked for the purpose of determining the length of employment.

**11.4    PAY AND SPECIAL PROVISIONS:** For the purpose of computing or prorating vacation earnings, two percent (2%) of the employee's earnings for the previous year equals one (1) week's vacation pay; four percent (4%) of the employee's earnings for the previous year equals two (2) weeks' vacation pay; six percent (6%) of the employee's earnings for the previous year equals three (3) weeks' vacation pay; eight percent (8%) of the employee's earnings for the previous year equals four (4) weeks' vacation pay and ten percent (10%) of the employee's earnings for the previous year equals five (5) weeks' vacation pay.

**NOTE:** Vacation pay shall be computed on the employee's W-2 form earnings for the prior calendar year from which it was earned; except for the first year of employment, it shall be computed on total earnings during the first anniversary year of employment; and when an

DRAFT

employee terminates, it shall be computed on his earnings from the employee's anniversary date of employment to his termination date.

**11.5    MISCELLANEOUS PROVISIONS:**

VACATION PAY: The parties agree that they will take the appropriate steps to wind down and terminate the Vacation Fund and that the Employers will continue to recognize and pay all industry-earned vacation benefits directly to employees as previously provided for in the Vacation Trust Fund after benefits from the Vacation Fund have been exhausted. All employees taking scheduled vacation shall receive their vacation pay allowance on the pay check immediately preceding the employee's scheduled vacation. This change will take place when administratively feasible by the Company. Furthermore, all earned and unused vacation shall be paid out on the anniversary date of employment following the year it is earned.

Employees hired after June 19, 2001, with over ten (10) years 'of industry time will receive three (3) weeks of vacation after twelve (12) months of employment with the Employer; four (4) weeks of vacation after five (5) years of employment with the Employer; and five (5) weeks of vacation after ten (10) years of employment with the Employer.

**11.6    NEW EMPLOYER:** Vacation seniority, defined as the length of an employee's service which determines the length of vacation to which he is entitled, shall not be affected by the sale or transfer of the store in which he works. Employees who continue in employment with a new Employer acquiring a store shall have their service prior to the time of acquisition credited by the new Employer.

The new Employer shall be obligated to make vacation payments after the acquisition in accordance with the employee's service with the new Employer.

The former Employer shall pay each of his employees earned vacation prorated to the time of the sale or transfer of the business.

However, if the selling or transferring Employer fails to comply, then the Employer who takes over or purchases the store shall assume the pro rata obligations.

**11.7    SCHEDULE:** The Employer agrees to post the available vacation dates for each classification by January 1 of each year. If an employee fails to exercise his vacation selection right by February 1, or has lost his prior selection by reason of less seniority, the employee may select from the remaining available periods. The selection of vacation periods must be completed by March 1st of each year. If an employee fails to select his or her vacation by March 1st, that employee's vacation period will be assigned by the Employer. The Employer will post a copy of the final approved vacation dates.

Whenever a holiday falls during a vacation period of an employee, such employee shall receive an additional day's vacation with full pay; however, by mutual agreement between the Employer and the employee, the employee may be paid out the additional day without an extra day being taken off.

**11.8    SELECTION:** The selection of vacations shall be on a store basis by seniority except:

11.8.1  The vacation of an employee shall not be changed if it was scheduled prior to his transfer from one store to another.

DRAFT

**11.8.2** If an employee does not have a scheduled vacation at the time of such transfer, the scheduling of his vacation shall be based solely upon his seniority status in the store to which he is transferred.

**11.8.3** For the selection of vacations, the Head Meat Cutter and Meat Cutter classifications shall be considered as one classification and will be based on geographical area.

**11.9  PERIOD:** Vacation periods shall be granted between January 1 and December 31 of each year or at other times if mutually agreeable to the Employer and employees affected, but, in all cases, at least ten (10) days' notice of the date of vacation shall be given each employee.

Notwithstanding the above, the Employer may block out five (5) weeks between the months of November 1 and March 1. However, in the case of Meat Cutters, the Employer may block out five (5) weeks throughout the entire year with no more than one (1) week blocked out in any month.

After the completion of one (1) year of employment, if the employee is scheduled to take his time off prior to his anniversary date then, in that event, a pro rata payment based upon Company service shall be made at that time; and the additional amount will be paid at the time of his anniversary date.

As long as no weeks during the vacation period are blocked out, except as specifically allowed above, the Employer has the right to limit the number of employees on vacation at any given time.

**11.10  PRO RATA:** Any employee who is discharged, laid off, or who resigns after one (1) year or more of employment shall receive vacation wages prorated on the basis of the period worked at the time of said interruption or termination of employment.

**11.11  CONTINUOUS:** All vacations shall be taken in one continuous period. All employees entitled to a vacation shall receive their vacation pay allowance in advance immediately preceding the employee's vacation. Employees, at their option, shall be entitled to an additional week's vacation without pay; in all such cases, however, the employee shall give the Employer at least ten (10) days' notice prior to leaving for paid vacation.

**11.12  VARIATION:** Notwithstanding the above provisions, employees entitled to three (3), four (4), or five (5) week vacations shall be allowed to take them in one or two periods such as: two (2) two-week periods; two (2) week and one (1) week periods; three (3) week and one (1) week periods; three (3) week and two (2) week periods; four (4) week and one (1) week periods; provided such vacation schedule shall be approved by the Employer, the employee involved, and the Union.

Employees who earn four (4) or five (5) weeks of vacation per year may convert one (1) week of vacation into five (5) individual days.

**11.13  EXTRA WORKERS:** Extra Workers are not entitled to vacation accumulation or credit for any purpose.

## SECTION 12.  HEALTH AND WELFARE AND SICK LEAVE

**12.1  EMPLOYER ACCEPTANCE:** The Employer agrees to accept and be bound fully by the terms of that certain Declaration of Trust dated August 26, 1963, providing for the UFCW

DRAFT

Northern California Health and Welfare Trust Fund as the same may be applicable to the Welfare Plan therein provided for, and any amendments thereto. The Employer hereby acknowledges receipt of a copy of said Declaration of Trust.

The trustees are directed to merge the UFCW Northern California Health and Welfare Trust Fund and the UFCW Bay Area Health and Welfare Trust Fund. The merged fund shall be called the UFCW Benefits Trust Fund ("Fund"). The Employer and the Union agree that the merger shall occur by January 1, 2008, or as soon thereafter as is practicable in the exercise of due speed and diligence. As part of the merged Plan, the Employer and the Union agree to equalize benefits as described in Schedule 2, hereto attached.

12.2   EMPLOYER CONTRIBUTIONS: The contribution rate is five dollars and fifty-two cents ($5.52 Nor Cal/$5.42 Bay) for all classifications effective through hours worked in April 2008 and payable in May 2008. Effective with hours worked in May 2008 and payable in June 2008, the Employer agrees to contribute five dollars and twenty-five cents ($5.25) for all classifications through hours worked in November 2008 and payable in December 2008. Effective with hours worked in December 2008 and payable in January 2009, the Employer agrees to contribute five dollars and ninety cents ($5.90) for all classifications through hours worked in November 2009 and payable in December 2009. Effective with hours worked in December 2009 and payable in January 2010, the Employer agrees to contribute six dollars and fifteen cents ($6.15) for all classifications through hours worked in November 2010. Effective with hours worked in December 2010 and payable in January 2011, the Employer agrees to contribute six dollars and twenty cents ($6.20) until the expiration of this Agreement.

Apply the Side Letter on the "funding of the Merged UFCW Northern California and UFCW Bay Area Health and Welfare Trust Fund."

Such contributions shall be made on all straight-time hours worked, including Sundays, and/or compensated, such as vacations and holidays. Contributions shall be made on or before the twentieth (20th) of the month for covered hours worked during the previous month. It is understood that the contributions required on behalf of any employee shall not exceed forty (40) straight-time hours per week or two thousand eighty (2,080) straight-time hours in any calendar year.

Notwithstanding the foregoing, the Employer will not be required to make any contributions for Fuel Station employees during the first twelve (12) months from their date of hire.

12.3:  PROMPT PAYMENT: The parties recognize and acknowledge that the regular and prompt payment of Employer contributions to the Fund is essential to the maintenance of the Health and Welfare Plan, and inasmuch as beneficiaries under the Plan are entitled to benefits for the period of time they may have worked while covered by the Plan even though contributions have not been paid on their behalf by their Employer, that it would be extremely difficult, if not impractical, to fix the actual expense and damage to the Fund and to the Plan which would result from the failure of an individual Employer to pay such monthly contributions in full within the time provided. Therefore, the amount of damage to the Fund and Health and Welfare Plan resulting from any such failure shall be presumed to be the sum of twenty dollars ($20.00) per delinquency, or ten percent (10%) of the amount of the contribution or contributions due, whichever is the greater, not to exceed the sum of one hundred dollars ($100.00) per delinquency, which amount shall become due and payable to the Fund as liquidated damages, and not as a penalty, upon the day immediately following the date upon which the contributions became delinquent, and shall be in addition to said delinquent contribution or contributions.

Notwithstanding the above, interest on unpaid contributions will accrue at the rate of ten percent (10%) per annum, commencing with the first (1st) day of the month following the month in which

DRAFT

the contribution is due. In addition, if legal action is pursued to collect delinquent contributions, the statutory provisions in ERISA will apply and liquidated damages shall be assessed in an amount equal to the greater of twenty percent (20%) of the unpaid contributions at the time the legal action is commenced or interest at the above rate on the unpaid contributions from the due date through the date the contributions are paid. The Trustees shall have the authority to adopt and to amend from time to time written Delinquency Collection Procedures which shall specify the interest, liquidated damages, and other amounts to be assessed on any delinquency, and the procedures for collecting same, and such procedures shall be binding on the Employer.

12.4    BENEFITS: The Trustees are authorized and directed to modify benefits, for active employees, in the manner as enumerated below. The Trustees shall implement and maintain over time a schedule of benefits and Plan design, including a prudent operating reserve that can be supported by the applicable hourly contribution rate. These changes shall be made by the Trustees to be effective January 1, 2008, or as soon thereafter as may be adopted and implemented by the UFCW Benefits Trust Fund.

1.    Eliminate annual prescription deductible.

2.    Eliminate the annual dental deductible in Plan A and Plan B.

3.    Increase annual dental maximum in Plan A to $2,500 and in Plan B to $2,000.

4.    Increase the orthodontic combined lifetime maximum to an aggregate of $2,000 in Plan A and Plan B.

5.    100% coverage for participants for preventative care in Plan A and Plan B based on Schedule 1 as modified by guidance from nationally recognized experts.

6.    First dollar coverage for preventative and diagnostic dental care in Plan C and coverage for well-baby care in Plan C (as described in Schedule 1).

7.    Reduce co-pays for maintenance drugs for conditions such as diabetes, high blood pressure, etc. as such maintenance drugs may be identified by the PBM from time to time:

Retail:                                                    $7/$15/$25

Mail Order or Retail for a 90-day supply
for maintenance medications only:          $14/$30/$50

When no generic or formulary is available, based on the PBM's list as of the date of the new CSA as reviewed and modified from time to time, the formulary co-pay will apply for these prescriptions.

Furthermore, effective January 1, 2008, the initial eligibility rule will be modified to require four (4) months of qualifying hours, of which the first two (2) months must be met consecutively. Coverage will begin the first (1st) day of the second (2nd) month following the fourth (4th) month of qualifying hours.

Plan C shall cover the employee and dependent children only.

Courtesy Clerks hired after ratification of this agreement will be eligible for employee only coverage. If a Courtesy Clerk is promoted, they will be given credit, for the purpose of eligibility, back to their date of hire.

DRAFT

- Effective the month following the twenty-fifth (25th) month from date of hire, employees, their spouse, and dependents will be eligible for Plan B coverage.

- Effective the month following the seventy-second (72nd) month from date of hire, employees, their spouse, and dependents will be eligible for Plan A coverage.

The Plan's current monthly straight-time work hours' requirements for each classification of employment, as they relate to eligibility, shall continue to apply.

Any Employer that desires to cover all of its employees under Plan A shall pay an Employer contribution rate for those additional employees sufficient to cover the projected cost of the Plan as determined by the co-consultants during the term of this Agreement.

**12.5   LEGISLATION:** In the event of legislation providing Health and Welfare or Sick Leave benefits, which are also provided for under this Agreement, the Trustees are directed to amend the Plan Document immediately deleting duplicated benefits. If, by reason of the elimination of duplicated benefits, there is a savings to the Employer and the Fund, after the cost thereof is set off against the cost required of the Employer to finance said benefits, the Trustees shall meet no later than thirty (30) days from the effective date of the legislation to determine how said savings shall be used by the Fund. If the Trustees fail to reach an agreement, they shall proceed, under the Trust Agreement, to decide such deadlock within seventy-five (75) days of the effective date of the legislation. Any cost reductions to the Employer and the Fund attributable to a cost required of the employee under the legislation will be passed on to the employee through other Health and Welfare changes. In the event Medicare becomes secondary in the application of the Retiree Benefit Plan, the Trustees will take immediate and remedial action to protect the financial integrity of the Plan.

**12.6   COST CONTAINMENT:** The Trustees are authorized and directed to study and expand cost containment programs where appropriate, for both the active and retiree plans.

**12.7   RETIREE BENEFITS:** The collective bargaining parties recognize that retiree Health and Welfare benefits are not vested benefits. Pursuant to this Agreement, a contributing Employer's sole and only obligation is to contribute, during the term of this Agreement, the specific contributions required under this Agreement. Despite the adoption of a plan of benefits that currently may be available to Plan participants, the Employer's liability for any and all Health and Welfare benefits including retiree Health and Welfare benefits shall be limited to the contribution specified in this section and for the period of this Agreement. The parties authorize and direct the Trustees of the Health and Welfare Plan to take the necessary action to assure compliance with the terms of this paragraph.

The Trustees are authorized and directed to require that retirees contribute seventy dollars ($70.00) per month per retiree toward the cost of retiree health care benefits. This provision shall not impact the retirees' cost for the self-pay retiree plan. Any retiree who does not make the required monthly premium shall lose coverage under the Plan in accordance with such rules and regulations adopted by the Trustees.

Current retirees in Plan IV will be placed in Plan B and treated the same as current Plan B retiree participants.

The Trustees will establish a Retirement Health and Welfare Committee to be effective January 2008 in accordance with the Retirement Health and Welfare Committee Side Letter to this Agreement.

DRAFT

**12.8   BUSINESS EXPENSE:** It is understood that the provision for a Health and Welfare, Dental, Vision Care, Drug, and Sick Leave Plan(s) is being entered into and continued upon the condition that all payments shall be deductible in the year in which the contribution is made as a business expense under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar state revenue or tax laws.

**12.8.1:** The obligation to make any contribution specified in Section 12 and 13 Health and Welfare, Sick Leave, and Pensions of this Agreement is expressly conditioned on the deductibility of that contribution by the Employer as an ordinary and necessary business expense, or otherwise, in the year which the contribution is made. In the event that any Employer's contribution is not deductible as an ordinary necessary business expense, or otherwise, in the year which the contribution is to be made, the Employer's obligation to make such contribution shall be permanently suspended for any month in which the contribution is not deductible. Such obligation shall not resume until such contribution becomes deductible as herein described. An Employer shall also be entitled to a refund of any contribution actually made, if that contribution is not deductible by the Employer as an ordinary necessary business expense, or otherwise, in the year in which it is made.

**12.9   SICK LEAVE BENEFITS:**

**(a)   ACCRUAL:** Employees in Plan A and Plan B accrue sick leave monthly as follows:

| | |
|---|---|
| Less than 64 hours | 0 hours |
| At least 64 hours but less than 120 hours | 3 hours |
| 120 hours or more | 6 hours |

Employees that are in neither Plan A or Plan B accrue sick leave monthly as follows:

| | |
|---|---|
| Less than 64 hours | 0 hours |
| At least 64 hours but less than 120 hours | 2 hours |
| 120 hours or more | 4 hours |

**(b)   SICK LEAVE USE:** New employees will be eligible to use sick leave once they are eligible for Health and Welfare benefits.

**(c)   SICK LEAVE PAYOUT:**

**1.   ELIGIBILITY:** In order to be eligible for a sick leave payout, an employee must have the maximum of three hundred and sixty (360) hours accumulated sick leave as of December 31.

**2.   AMOUNT OF PAYOUT:** Each employee who is eligible for a sick leave payout in accordance with paragraph (1) shall receive four hundred dollars ($400) less ten dollars ($10) for each hour of sick leave used during that calendar year.

Payments shall be made as soon after the end of the calendar year as administratively feasible.

**(d)   MEAT EMPLOYEES:** Effective January 1, 2008, Employer-paid sick leave banks will be frozen at their current levels. Meat Department employees will begin

DRAFT

accumulating sick leave benefits through the UFCW Benefits Trust Fund as described in 12.9 above.

During the transition, the employee will continue to draw from his or her sick leave bank through the Employer, as necessary, until the bank with the Employer is exhausted, at which time, the Fund will be notified that the employee no longer has any sick leave time remaining.

The Employer agrees to pay out, beginning January 1, 2008, and each January thereafter, to each Meat Department Employee up to eight (8) days per year, minus any sick leave day(s) taken, from the sick leave bank at the rate of one-half (½) of the sick leave in cash, until the entire sick leave bank has been exhausted.

A Meat Department employee who retires during the sick leave transition shall be eligible for the remaining banked sick leave at a half (½) cash payout through the Employer.

## SECTION 13.   PENSION

**13.1   EMPLOYER ACCEPTANCE:** The Employer agrees to accept and be bound fully by the terms of the certain Declaration of Trust dated April 1, 1957, providing for the UFCW–Northern California Employers Joint Pension Trust Fund as the same may be applicable to the Pension Plan therein provided for, and any amendments thereto. The Employer hereby acknowledges receipt of a copy of said Declaration of Trust.

**13.2   EMPLOYER CONTRIBUTIONS:** Effective with hours worked May 2008, the Employer agrees to contribute to the Trust Fund for the term of the Agreement the following composite rate of one dollar and seventy-two cents ($1.72) per straight-time hour on all employees.

The seven (7) month deferral of contributions for accounting and actuarial purposes, first implemented for the Trust Fund's 1999 fiscal year, continues to be in effect.

Such contributions shall be made on all straight-time hours worked by all employees covered by the Collective Bargaining Agreement, including Sundays, and/or all hours compensated, such as vacations and holidays. Contributions shall be made on or before the twentieth (20th) of the month for covered hours worked during the preceding calendar month. It is understood that the contributions required on behalf of any employee shall not exceed forty (40) straight-time hours per week or two thousand and eighty (2,080) straight-time hours in any calendar year.

An employee shall receive both vesting and benefit accrual credit for all hours compensated (including those for which no contribution is due to the Trust) to a maximum of forty (40) hours per week and two thousand and eighty (2,080) hours per year. For employees who are hired on or after January 1, 2005, their benefit accrual credits will not begin until they have met the eligibility requirements described below:

In the event that the contributing Employers are required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the contributing Employers will receive a dollar-for-dollar credit for additional contributions in any subsequent Plan year where there is sufficient excess funding exceeding the minimum funding level required to offset the additional contribution provided this offset does not create a minimum funding deficiency the following Plan year. In other words the Employer payments in excess of the negotiated contributions will create future contribution suspensions that will be taken as soon as possible as long as the minimum funding concerns outlined above are met.

DRAFT

**13.3   TERMINAL VACATION PAY:** Upon retirement, no Trust Fund contributions will be required of the Employer on terminal vacation pay made to an employee at retirement. The employee's retirement benefits will not be delayed, and he will receive credit for hours even though contributions are not required.

**13.4   PROMPT PAYMENT:** The parties recognize and acknowledge that the regular and prompt payment of Employer contributions to the Fund is essential to the maintenance of the Pension Plan; and inasmuch as beneficiaries under the Plan are entitled to Pension benefits for the period of time that they may have worked while covered by the Plan, even though contributions have not been paid on their behalf by their Employer, that it would be extremely difficult, if not impractical, to fix the actual expense and damage to the Fund and Pension Plan which would result from the failure of an individual Employer to pay such monthly contributions in full within the time above provided; therefore, the amount of damage to the Fund and Pension Plan resulting from any such failure shall be presumed to be the sum of twenty dollars ($20) per delinquency, or ten percent (10%) of the amount of the contribution or contributions due, whichever is the greater, not to exceed the sum of one hundred dollars ($100) per delinquency, which amount shall become due and payable to the Fund as liquidated damages and not as a penalty, upon the day immediately following the date upon which the contributions became delinquent, and shall be in addition to said delinquent contribution or contributions.

**13.5.   BENEFITS:** The Trustees are authorized and directed to modify benefits in accordance with the following provisions, and otherwise in accordance with the provisions of this Agreement.

In the event that there has been a green-zone certification in each year of the Agreement and in conjunction with the 2011 certification, the Plan co-actuaries are to conduct the PPA certification process and simultaneously determine when a green-zone certification can be achieved while also providing a Pension accrual increase retroactive to January 1, 2007.

The maximum Pension accrual increase that will be provided is fifteen point thirty-eight percent (15.38%) and will apply for accruals earned during the Plan years beginning during the term of this Agreement (i.e. 2007, 2008, 2009, and 2010). In order to determine the level of a possible Pension accrual increase a two-stage process will be implemented.

First, a maximum of a seven point sixty-nine percent (7.69%) accrual increase will be provided when the co-actuaries certify that the Plan is able to obtain a PPA green-zone certification in 2011. Secondly, a maximum additional seven point sixty-nine percent (7.69%) Pension accrual increase will be provided when the co-actuaries project that the Funding Standard Account Credit Balance will remain positive through December 31, 2019, the Trustees are directed to adopt these possible accrual changes in 2011.

**13.6   APPLICATION FOR EXTENDED AMORTIZATION EXTENSIONS UNDER INTERNAL REVENUE CODE SECTION 431:** The Trustees shall cause the Trust Fund to apply for an amortization extension under Internal Revenue Code §431(d); if necessary to avoid a certification of the Trust Fund as either "critical" or "endangered" under the provisions of the Pension Protection Act. In making such application, the required "plan" to improve the Trust Fund's funding status under ERISA Section 431(d)(1)(B) shall be the long-term funding policy set forth below. In the event that the application under Internal Revenue Code §431 is approved by the reviewing government agency, the Trustees will adopt the following long-term funding policy.

**UFCW-NORTHERN CALIFORNIA EMPLOYERS JOINT PENSION TRUST FUND LONG-TERM FUNDING POLICY:**

DRAFT

---

The co-consultants will produce with the annual actuarial valuations a seven (7) year actuarial projection with the goal of identifying future funding deficiencies (defined as where the negotiated contributions are not enough to satisfy the minimum required contributions under Internal Revenue Code Section 412). These annual projections will be based on the following:

    A.      Projections will take into account only negotiated contributions.

    B.      Using the assumptions and actuarial methods in the then current annual actuarial valuation as jointly agreed to by the Fund's co-consultants.

    C.      No unanticipated actuarial gains or losses during the projection time period.

If the annual projection indicates any future funding deficiencies during the seven (7) year projection, the Board of Trustees is authorized and directed to amend future benefit accruals (or any other non-protected benefits), effective immediately, in order to eliminate the projected future funding deficiencies.

In the event that the contributing Employers are required to make any additional contributions above the negotiated contribution rates in order to avoid funding deficiencies, the contributing Employers will receive a dollar for dollar credit for additional contributions. When the Board of Trustees reduces benefits to eliminate the future funding deficiencies, it shall take into account that these contribution credits will be taken as reductions in the negotiated contributions in the next Plan year. In other words the Employer payments in excess of the negotiated contributions will create future contribution suspensions that will be taken as soon as possible and the Co-consultants will reflect this with the annual seven (7) year projections.

In the event that the application under Internal Revenue Code §431 is denied by the reviewing government agency, the Trustees shall not be required to adopt the above long-term funding policy.

Any deadlocked Trustee motion relating to a reduction in benefits required under the long-term funding policy shall be arbitrated on an expedited basis with the arbitration to take place no later than sixty (60) days following the Trust meeting in which the deadlock occurs.

**13.7    OTHER PLANS:** The Employer retains the exclusive right to alter, amend, cancel, or terminate any presently existing Company-sponsored pension plan or employee retirement plan which existed prior to the establishment of the Pension Fund, provided that the effective date of such alteration, amendment, cancellation, or termination shall not occur prior to the acceptance of this Plan.

**13.8:   REGULATIONS:** The Trust and the benefits to be provided from the Pension Trust Fund and all acts pursuant to this Agreement and pursuant to such Trust Agreement and Pension Plan shall conform in all respects to the requirements of the Treasury Department; Internal Revenue Service, and to any other applicable state or federal laws and regulations.

**13.9   BUSINESS EXPENSE:** It is understood that this provision for a Pension Plan is being entered into upon the condition that all payments made by the Employer hereunder shall be deductible in the year in which the contribution is made as business expenses under the Internal Revenue Code as it presently exists or as it may be amended subsequent to the date of this Agreement and under any similar applicable state revenue or tax laws.

**13.10  LIMITATION:** The Employer's sole and only obligation shall be limited to the contribution requirements outlined in 13.2 of this section.

DRAFT

**13.11   LEGISLATION:** In the event of legislation requiring the restructuring of any of the essential elements of the Pension Plan, including, but not limited to, the benefit formula, amortization period, actuarial assumptions, vesting, or administration of the benefits, the Trustees are instructed to comply immediately with such legislation in adjusting the elements on a sound actuarial basis with no change in the existing Employer contribution rate.

**13.12   DEFINED CONTRIBUTION PENSION PLAN:** The Trustees have established a Defined Contribution Pension Plan and Trust effective March 1, 1987, in addition to and supplemental to the Pension Plan described in this section.

The Employers agree that they will not oppose a motion by the Unions to create self-directed accounts in the IAP so long as such accounts may legally be created and the Trust Fund will incur no additional costs as the result of the creation of such. Furthermore, the Unions and the Employers agree to authorize and direct the Trust Fund to establish a subcommittee with the power to act to carry out the foregoing purpose. Moreover and subject to the foregoing, no such accounts will be established sooner than January 1, 2009.

**13.13   USE OF CONTRIBUTIONS:** The Employer contributions shall be for the sole purpose of providing the Pension benefits and for the administration of said program. The Trustees are not authorized to use any of the contributions or Plan assets for benefit improvements or any other purpose except as specifically provided here in Section 13.

**13.14   OPERATIONAL PLAN RULES:** The Trustees are instructed to follow these operational Plan rules, and the Plan shall be amended as necessary to implement such rules:

> **(1)** Where an Employer is contributing at a rate that is less than the maximum allowed contribution level and later increases their contribution rate (but only up to the maximum contribution rate accepted by the Pension Fund), such increase will only increase future benefit accrual rates. Benefits accrued prior to the date that Employer increases their Pension contribution rate will not be affected and will remain at the level based on the earlier Employer contribution level.

> **(2)** The Board of Trustees will instruct the co-consultants to look at situations such as, but not limited to, if an Employer attempts to decrease their contribution rate after a period of contribution suspension. Such review and approval shall include a consideration of whether the contribution rate is sufficient to support the benefits promised, as well as any subsidy or equity issues, all as may be identified by the co-consultants to the Fund.

## SECTION 14:  FIELD ADMINISTRATION TRUST FUNDS

**14.1**   The Unions have determined that they are no longer willing to provide administrative functions, as distinguished from the usual and normal Union services, at Union expense to persons covered by the terms of the various benefit plans provided for by the Collective Bargaining Agreements. It is agreed that the portion of these functions determined to be Trust Fund functions, are properly chargeable to the Trust Funds under which said Plans are established and maintained.

All expenses of the sub-administrative offices shall be paid for by the respective Funds according to the formula established by the parties pursuant to the 1974 Joint Study.

DRAFT

## SECTION 15. STORE MEETINGS AND CHARITABLE DRIVES

**15.1** Time spent in store meetings or in meetings called by the Employer before the commencement of the day's work or after the day's work shall be considered as time worked and shall be paid for in accordance with the provisions of this Agreement.

**15.2** All employee contributions to charity shall be voluntary.

## SECTION 16. CONTRACT ENFORCEMENT AND STORE VISITS

**16.1** **VISITS:** It is agreed by both parties hereto that the Union Representative of the Union shall have the right and shall be allowed by the Employer to visit any and, all stores and shall have free access to the employees during such visits for the purpose of making inquiries from the employees relative to information concerning working conditions, complaints of members of the Union, and other matters pertaining to the enforcement of this Agreement, provided said investigation may be accomplished without interfering with the duties of the employees.

**16.2** **RECORDING TIME:** The parties agree to observe the following procedures in enforcing the terms of this Agreement with respect to authorized work and reporting of working time:

**16.2.1** The Employer shall post the following notice in all stores:

> "The law and the Union Agreement require that all time worked shall be recorded daily, including starting and stopping time. All employees shall comply strictly with these requirements, and any employee failing to so comply shall be subject to discipline on the same basis as is followed with respect to any other violation of store rules or procedure."

**16.2.2** The Union shall promptly report in writing to the Employer any observed violation by an employee of this reporting time provision or the working of unauthorized time, and the Employer will take the necessary steps with the employee to correct such violation.

**16.2.3** Upon notification by the Union of a second such violation by the same employee, the Employer shall pay to the Welfare Fund provided for herein an amount equal to the overtime pay due and payable to the employee. In such case, the employee involved shall be subject to discharge; however, retaining his right to appeal any such discharge under the terms of this agreement.

**16.3** **FREE TIME:** When an employee willfully violates the provisions of this Agreement by working free time without the knowledge of the Employer, after a second written notice by the Union of this employee's repeated contract violation, the Employer agrees to discharge said employee within seven (7) days after receiving written notice of such violation.

## SECTION 17. NEW METHODS (MEAT DEPARTMENT)

**17.1** It is agreed that should the Employer intend to initiate a major change in method of operation which is not presently in the Industry within the area of operation covered by the Union that would result in a substantial change in the content of any job presently covered by this Agreement, the Employer shall give notice of the nature of such suggested new method of operation to the Union, following which, the matter of job classifications, wages, working conditions, and/or the disposition of employees potentially to be displaced shall then become a matter of negotiation with the Union for a period of forty-five (45) days.

DRAFT

Pending negotiations by the parties during the above-mentioned forty-five (45) day period, no change of operations as above set forth shall be placed into effect.

In the event the parties have not arrived at agreement within the above forty-five (45) day period, the Employer may elect to place such changed method of operation, as above defined, into effect, and all unresolved issues in regard to job classifications, wages, working conditions, and/or the disposition of displaced employees shall be submitted to final and binding Arbitration in accordance with Section 18 Adjustment Board and Arbitration of Disputes of this Agreement.

The remedy, if any, shall be effective with the date of the arbitrator's award.

Any Company that seeks to introduce "case ready" cuts of meat must notify the Union(s) in advance of a change in the method of operations and proceed in accordance with this section of this Collective Bargaining Agreement.

A committee shall be formed to negotiate a merger of the Valley and the Bay Meat Addendum language.

## SECTION 18.   ADJUSTMENTS AND ARBITRATION OF DISPUTES

**18.1**   Upon the request of either party hereto, a Board of Adjustment shall be created, to be composed of two (2) representatives of each party to this Agreement, for the purpose of passing on all claims, disputes, and grievances arising between the parties during the term of this Agreement over the construction and application of this Agreement or relating to working conditions arising out of this Agreement, when such cannot be settled directly between the Union and the Employer. Said Board shall meet for consideration of any such matter referred to it within seven (7) calendar days subsequent to a request therefore by either party. For cases other than those which are disciplinary in nature, the convening of the Adjustment Board may be waived. The request of either party to extend the time limit for the convening of the Board of Adjustment due to extenuating circumstances will not be unreasonably denied. If the matter is not adjusted and is at an impasse, the moving party shall communicate, in writing, to the other party within twenty (20) business days following the meeting of the Board of Adjustment their desire to proceed to Arbitration. Failure of the moving party to comply with the twenty (20) business day time limit herein specified shall be deemed to be a conclusive waiver of the grievance.

**18.2**   Disciplinary arbitrations (meaning a matter concerning a suspension, demotion, or termination) will be heard without the use of a court reporter or briefs. The parties will present their evidence and witnesses and argue orally. At the conclusion of the arbitration hearing but before issuance of the bench decision, the Union and the Employer will meet and in good faith attempt to resolve the grievance. If the parties are unable to settle the grievance, the arbitrator will announce his/her decision within fourteen (14) business days and subsequently will reduce his/her decision to writing. The parties may mutually agree to waive or modify any or all of the provisions of this expedited procedure.

**18.3**   INTERPRETATION OR APPLICATION DISPUTES: For contract interpretation disputes which proceed to Arbitration, the parties will mutually select an impartial arbitrator. If the parties are unable to agree upon the selection of an arbitrator, they shall request a panel of arbitrators from the United States Federal Mediation and Conciliation Service; and they shall select an arbitrator there from by the strike-off method.

The award of the Adjustment Board or arbitrator shall be final and binding upon the Employer,

DRAFT

the Union, and the employee.

18.4    Each party shall in good faith divulge to the other party all available material facts at the time said party acquires knowledge thereof concerning the matter in dispute. Nothing contained herein shall require either party to supply documents which are irrelevant.

18.5    All jointly incurred arbitration expenses shall be borne by the losing party. In the event of a dispute concerning the application of this section, the arbitrator shall be empowered to determine the allocation of expenses.

In termination cases, it is agreed that if a grievant is reinstated to employment with full back pay, the Company shall pay the jointly incurred costs of the arbitration. If a grievant is not reinstated, the Union shall pay the jointly incurred costs of the arbitration. If a grievant is reinstated with partial or no back pay, the parties shall split the jointly incurred costs of the Arbitration.

If either party fails or refuses (1) to constitute a Board of Adjustment, as required by Subsection 18.1 above; (2) to observe the time limits provided in Subsection 18.1 above for the consideration of complaints by the Adjustment Board or the submission thereof to arbitration; or (3) to select an arbitrator within a reasonable time after the Adjustment Board has failed to agree on any question referred to it, then in any such event the other party shall be free to proceed to arbitration, whether or not the other party chooses to participate; provided, however, that prior written notice of such intent is given to the other party. In any case, where one party proceeds to arbitration without the participation of the other party, as herein provided, the arbitrator shall be selected by the participating party from a panel furnished by the United States Federal Mediation and Conciliation Service, and any award rendered by an arbitrator so selected shall be final and binding upon both parties.

18.6    The arbitrator shall not have the right to alter, amend, delete, or add to any of the terms of this Agreement.

18.7    Interest at seven percent (7%) shall be payable on all money claims awarded by the Adjustment Board or by an arbitrator, and such interest shall commence as of the date the complaint is first submitted to the Adjustment Board.

18.8    CLAIMS: In the case of a direct wage claim or a claim for contributions to employee benefit plans which does not involve an interpretation of any of the provisions of this Agreement, either party may submit such claim for settlement to either the grievance procedure provided for herein or to any other tribunal or agency which is authorized and empowered to effect such a settlement.

The Employer is not required to pay any wage claim or portion thereof retroactively for a period of more than ninety-one (91) days immediately prior to the date of the Employer's receipt of written notice from the Union of such claim.

## SECTION 19.   STRIKE OR LOCKOUT

19.1   During the life of this Agreement, the Union agrees not to engage in any strike or stoppage of work.

19.2   During the life of this Agreement, the Employer agrees not to engage in any lockout.

19.3   Refusal of any employee covered by the terms of this Agreement to pass through any lawful primary picket line which has been sanctioned by the Central Labor Council of proper

DRAFT

jurisdiction and/or the United Food and Commercial Workers International Union shall not constitute a violation of this Agreement.

## SECTION 20. TERM OF AGREEMENT

20.1    Except as otherwise indicated herein, this Agreement shall be effective on the date of ratification, and shall remain in full force and effect in all areas to and including October 8, 2011, and shall be considered as renewed from year to year thereafter unless either party hereto gives written notice to the other of its desire to have the same modified or terminated. Such notice shall be given at least sixty (60) days prior to such expiration date during which period negotiations for a new Agreement shall be conducted with all conditions agreed to by the parties to become effective on the first day of the week nearest the expiration date of this Agreement. If after opening, as provided herein, the parties fail to reach an agreement within the period so provided then the provisions of Section 19 Strike or Lockout of this Agreement shall not be binding on either party.

20.2    The provisions of this Agreement are deemed to be separable to the extent that if and when a court of last resort adjudges any provision of this Agreement in its application between the Union and the undersigned Employer to be in conflict with any law, such decision shall not affect the validity of the remaining provisions of this Agreement, but such remaining provisions shall continue in full force and effect, provided further, that in the event any provision or provisions are so declared to be in conflict with a law, both parties shall meet within thirty (30) days for the purpose of renegotiation and agreement on the provision or provisions so invalidated.

It is understood and agreed between the parties that all prior Agreements between them are hereby terminated and canceled and that this Agreement supersedes and replaces all such prior Agreements.

This Agreement shall be binding upon the heirs, executors, and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties hereto by their duly constituted representative officers affixed their signatures this _____ day of _____ 2008.

FOR THE UNION:                              FOR THE EMPLOYER:

UNITED FOOD & COMMERCIAL                    NOB HILL FOODS
WORKERS UNION, LOCAL 8

UNITED FOOD & COMMERCIAL
WORKERS UNION, LOCAL 8

UNITED FOOD & COMMERCIAL

DRAFT

## APPENDIX "A"
## WAGES

**A.1**     Notwithstanding any schedule of minimum wages, employees now receiving a higher wage than indicated in said schedule for the particular classification of work performed shall not have their wages reduced due to signing and effect of this Agreement.

The schedule of minimum wages shall be maintained by the parties hereto during the period of this Agreement, and the Employer shall and hereby agrees to pay wages in compliance therewith.

**PREMIUM EMPLOYEES:** Premium wage employees shall maintain the same hourly differential which they received over and above the previous contract rate.

The Company retains the right to terminate any non-contractual benefit including but not limited to gain sharing, discounts, awards, bonuses. This provision does not apply to over scale wage rates.

**VOLUNTARY BUYOUT:** The parties agree that the Employer may offer voluntary buyout opportunities to employees at any time(s) during the term of this Agreement. In the event such voluntary buyouts are offered, the Employer agrees to provide thirty (30) days' advance notice to the Union concerning the buyout components, the terms of the offer(s), and the timing of any offering(s), and to allow the Union to attend employee meetings regarding this issue.

**A.2**   **LENGTH OF SERVICE WAGE ADJUSTMENTS:** The experience and length of service wage adjustments provided for under Appendix A shall be placed into effect the first (1st) workday of the first (1st) workweek immediately following the workweek in which the employee qualifies for a higher rate of pay.

**A.3**     **BONUSES:** Bargaining unit employees in the designated experienced classifications (that are over scale) and on the payroll for each October's increase in this contract and actively employed on the date of payment of this bonus, shall receive a lump sum bonus, as provided below:

Designated classifications known as rates of pay that exceeds the highest pay rate per classification shall receive the requisite wage increase per hour for each calendar year's increase for which the employee was compensated (excluding overtime) for the fifty-two (52) calendar weeks preceding September 1st of the year.

This contract bonus will be paid on the week following the effective date of the contractual wage increase and will only be paid to employees who are actively employed on that date or thirty (30) days from when an employee returns to work from an approved leave of absence or layoff. Consistent with past practice, this bonus will not be calculated to include derived overtime.

This provision will apply to employees on approved leave of absence or layoff at the time of reinstatement who are actively employed at the time payment is due. This payment also will be made no later than thirty (30) days following the expiration of the employee's recall rights under the term of this Agreement.

DRAFT

**WAGE RATES**

| CLASSIFICATION | EFFECTIVE | | | | |
|---|---|---|---|---|---|
| | Current | 12/02/07 | 10/05/08 | 10/04/09 | 10/03/10 |
| Managing Clerks | 20.418 | 21.12 | 21.52 | 21.87 | 22.22 |
| Senior Head Clerks and Senior Produce Clerks | 19.877 | 20.58 | 20.98 | 21.33 | 21.68 |
| Head Clerks | 19.763 | 20.47 | 20.87 | 21.22 | 21.57 |
| | | | | | |
| **Food Clerks** | | | | | |
| Experienced | 19.33 | 20.03 | 20.43 | 20.78 | 21.13 |
| 8th 1040 hours | 17.00 | 17.50 | 17.50 | 18.00 | 18.00 |
| 7th 1040 hours | 15.00 | 15.50 | 15.50 | 16.00 | 16.00 |
| 6th 1040 hours | 14.25 | 14.50 | 14.50 | 14.50 | 14.50 |
| 5th 1040 hours | 13.50 | 14.00 | 14.00 | 14.00 | 14.00 |
| 4th 1040 hours | 11.95 | 12.40 | 12.40 | 12.40 | 12.40 |
| 3rd 1040 hours | 10.00 | 10.40 | 10.40 | 10.90 | 11.05 |
| 2nd 1040 hours | 9.50 | 9.75 | 9.75 | 10.25 | 10.50 |
| 1st 520 hours | 9.00 | 9.25 | 9.25 | 9.75 | 9.85 |
| | | | | | |
| **Experienced (Senior All Purpose Clerks) 1st month after 12 years at the Experienced All Purpose Clerk Rate** | 19.33 | 20.03 | 20.43 | 20.78 | 21.13 |
| **All Purpose Clerks** | | | | | |
| Experienced | | 16.75 | 17.25 | 17.75 | 18.25 |
| 11th 1040 hours | | 15.50 | 16.00 | 16.50 | 17.00 |
| Interim Step | | 15.00 | 15.50 | 16.00 | 16.50 |
| 10th 1040 hours | | 14.50 | 15.00 | 15.50 | 16.00 |
| 9th 520 hours | | 14.01 | 14.51 | 15.01 | 15.51 |
| 8th 1560 hours | | 13.00 | 13.00 | 13.00 | 13.00 |
| 7th 1040 hours | | 12.25 | 12.25 | 12.50 | 12.50 |
| 6th 1040 hours | | 11.70 | 11.70 | 11.70 | 11.75 |
| 5th 1040 hours | | 11.20 | 11.20 | 11.20 | 11.25 |
| 4th 1040 hours | | 10.70 | 10.70 | 10.80 | 10.85 |
| 3rd 1040 hours | | 10.40 | 10.40 | 10.50 | 10.55 |
| 2nd 1040 hours | | 10.00 | 10.20 | 10.20 | 10.35 |
| 1st 1040 hours | | 9.50 | 9.80 | 9.80 | 10.00 |

Example: An experienced GMC promoted to the APC classification will be moved to the 10th Step and work 1040 hours and then work 1040 in the interim step before moving back to the 11th Step. Employees hired into the APC classification will not have to work the interim step.

DRAFT

| CLASSIFICATION | EFFECTIVE | | | | |
|---|---|---|---|---|---|
| | Current | 12/02/07 | 10/05/08 | 10/04/09 | 10/03/10 |
| **Pharmacy Technicians** | | | | | |
| Experienced | 16.25 | 16.95 | 17.35 | 17.70 | 18.05 |
| 3rd 1040 hours | | 16.25 | 16.65 | 17.00 | 17.35 |
| 2nd 1040 hours | 14.90 | 15.30 | 15.70 | 16.05 | 16.40 |
| 1st 1040 hours | 13.60 | 14.00 | 14.40 | 14.75 | 15.10 |
| | | | | | |
| **Bakery/Deli Manager** | 19.33 | 20.03 | 20.43 | 20.78 | 21.13 |
| **Department Head Clerk** (optional) | 13.855 | 14.405 | 14.905 | 15.405 | 15.905 |
| | | | | | |
| **Non-Food Clerks/General Merchandise Clerks/Meat Clerks Hired After Ratification** | | | | | |
| Experienced | 13.455 | 14.01 | 14.51 | 15.01 | 15.51 |
| 8th 1560 hours | | 12.75 | 12.75 | 12.75 | 12.75 |
| 7th 1040 hours (current 8th step) | 11.75 | 12.00 | 12.00 | 12.25 | 12.25 |
| 6th 1040 hours | | 11.40 | 11.50 | 11.50 | 11.55 |
| 5th 1040 hours (current 7th step) | 10.60 | 10.90 | 11.00 | 11.00 | 11.05 |
| 4th 1040 hours (current 6th step) | 10.10 | 10.50 | 10.50 | 10.60 | 10.65 |
| 3rd 1040 hours (current 5th step) | 9.70 | 10.25 | 10.25 | 10.35 | 10.40 |
| 2nd 1040 hours (current 4th step) | 9.40 | 9.80 | 10.00 | 10.00 | 10.15 |
| 1st 1040 hours (current 1st, 2nd, 3rd steps) | 8.90 8.60 8.40 | 9.60 | 9.80 | 9.80 | 10.00 |
| Employees at the current 8th step ($11.75) will progress to the $12.25 rate and zero (0) hours in the step. Employees at the current 7th step ($11.60) will progress to the $11.40 rate and zero (0) hours in the step. Employees at the current 6th step ($10.10) will move to the $10.50 rate with credit for hours worked in the step. Employees at the current 5th step ($9.70) will move to the $10.25 rate with credit for hours worked in the step. Employees at the current 4th step ($9.40) will move to the $9.80 rate with credit for hours worked in the step. Employees at the current 3rd step ($8.90) will progress to the $9.60 rate and zero (0) hours in the step. Employees at the current 2nd step ($8.60) will move to the $9.60 rate with credit for hours worked in the step. Employees at the current 1st step ($8.40) will move to the $9.60 rate and zero (0) hours in the step. | | | | | |
| **Utility Clerks** | | | | | |
| Experienced | 13.455 | 14.01 | 14.51 | 15.01 | 15.51 |
| 8th 1560 hours | | 12.75 | 12.75 | 12.75 | 12.75 |
| 7th 1040 hours (current 8th step) | 11.75 | 12.00 | 12.00 | 12.25 | 12.25 |
| 6th 1040 hours | | 11.40 | 11.50 | 11.50 | 11.55 |
| 5th 1040 hours (current 7th step) | 10.60 | 10.90 | 11.00 | 11.00 | 11.05 |
| 4th 1040 hours (current 6th step) | 10.10 | 10.50 | 10.50 | 10.60 | 10.65 |
| 3rd 1040 hours (current 5th step) | 9.70 | 10.25 | 10.25 | 10.35 | 10.40 |
| 2nd 1040 hours (current 4th step) | 9.40 | 9.80 | 10.00 | 10.00 | 10.15 |
| 1st 1040 hours (current 1st, 2nd, 3rd step) | 8.90 8.60 8.40 | 9.60 | 9.80 | 9.80 | 10.00 |
| Same as Non-Food Classification above. | | | | | |

DRAFT

| CLASSIFICATION | EFFECTIVE | | | | |
|---|---|---|---|---|---|
| | Current | 12/02/07 | 10/05/08 | 10/04/09 | 10/03/10 |
| **Fuel Station** | | | | | |
| Experienced | 11.85 | 12.20 | 12.45 | 12.70 | 12.95 |
| 8th 1040 hours | 10.80 | 11.20 | 11.35 | 11.50 | 11.65 |
| 7th 1040 hours | 10.20 | 10.70 | 10.85 | 11.00 | 11.15 |
| 6th 1040 hours | 9.60 | 10.00 | 10.40 | 10.55 | 10.70 |
| 5th 1040 hours | 9.00 | 9.50 | 9.75 | 10.20 | 10.40 |
| 4th 1040 hours | 8.80 | 9.50 | 9.75 | 10.00 | 10.20 |
| 3th 1040 hours | 8.40 | 9.25 | 9.50 | 9.75 | 9.90 |
| 2nd 1040 hours | 8.25 | 9.00 | 9.25 | 9.50 | 9.65 |
| 1st 1040 hours | 8.00 | 8.75 | 9.00 | 9.20 | 9.35 |
| **Courtesy Clerks** | | | | | |
| Experienced | 8.70 | 9.00 | 9.20 | 9.40 | 9.60 |
| 1st 1040 hours | 8.20 | 8.50 | 8.70 | 8.90 | 9.10 |

| CLASSIFICATION | EFFECTIVE | | | | |
|---|---|---|---|---|---|
| | Current | 12/02/07 | 10/05/08 | 10/04/09 | 10/03/10 |
| Head Meat Cutter | 21.274 | 21.974 | 22.374 | 22.724 | 23.074 |
| **Meat Cutter** | | | | | |
| Journeyman | 19.774 | 20.474 | 20.874 | 21.224 | 21.574 |
| 8th 1040 hours | 18.50 | 18.65 | 18.80 | 18.95 | 18.95 |
| 7th 1040 hours | 17.50 | 17.65 | 17.80 | 17.95 | 17.95 |
| 6th 1040 hours | 16.50 | 16.65 | 16.80 | 16.95 | 16.95 |
| 5th 1040 hours | 15.80 | 15.95 | 16.10 | 16.25 | 16.25 |
| 4th 1040 hours | 15.19 | 15.34 | 15.49 | 15.64 | 15.64 |
| 3rd 1040 hours | 13.43 | 13.58 | 13.58 | 13.80 | 13.80 |
| 2nd 1040 hours | 11.66 | 11.81 | 11.96 | 12.11 | 12.11 |
| 1st 520 hours | 10.00 | 10.15 | 10.25 | 10.40 | 10.50 |
| **Meat Clerk (Grandfathered)** | | | | | |
| Journeyman | 14.974 | 15.528 | 10¢w/40¢b 15.63 | 50¢ bonus 15.63 | 16.13 |
| 8th 1040 hours | 13.00 | 13.50 | 13.50 | 13.50 | 13.50 |
| 7th 1040 hours | 12.18 | 12.50 | 12.50 | 12.50 | 12.50 |
| 6th 1040 hours | 11.50 | 11.75 | 11.75 | 11.75 | 11.75 |
| 5th 1040 hours | 10.50 | 10.75 | 10.75 | 10.75 | 10.75 |
| 4th 1040 hours | 9.50 | 9.75 | 9.75 | 9.75 | 9.75 |
| 3rd 1040 hours | 8.90 | 9.25 | 9.25 | 9.25 | 9.50 |
| 2nd 1040 hours | 8.60 | 9.00 | 9.00 | 9.00 | 9.25 |
| 1st 520 hours | 8.40 | 8.75 | 8.75 | 8.75 | 9.00 |

DRAFT

**APPENDIX "B"**
**OFFICE ADDENDUM TO THE FOOD AGREEMENT**

The following rates of pay, classifications, and exceptions shall prevail:

1.      A separate classification of Store Office Clerk exists and applies to employees whose work is not directly connected to checkstand operation or procedures.

2.      The provisions of Section 2 pertaining to "job referral" and "other hiring" are inapplicable to this classification.

3.      Section 4 modified to establish separate seniority for this classification.

4.      Section 7.7 Daily Guarantee is modified to provide that the minimum four (4) hour daily guarantee shall apply except in those cases where it is operationally impractical. If the Employer establishes a Non-Food Department then each employee shall be offered at least twenty-four (24) hours' work in each week. The employee may work in the Non-Food Department in order to meet the scheduling requirements.

5.      It is understood that the above employees will only perform work and services in the office, which may include cashing customer checks, setting up tills, delivering change to the registers, doing check runs and store reports, and handling lottery tickets. In the event the Employer hires employees to perform additional duties, they will be paid in accordance with the Food Store Contract. In addition to the work in the office, the above employee may also make "pulls" from the registers, deliver change to the registers, and take register readings in connection with their bookkeeping duties.

6.      Employees hired by the Employer who have had previous experience will be given credit for such experience up to a maximum of twelve (12) months in determining their starting rate. To receive credit, experience must be approximately equal in skill, function and responsibility required. All part-time employees shall receive credit on their scale according to hours worked.

7.      The hourly rate shall be the same pay scale as General Merchandise Clerks hired on or after March 3, 1983.

DRAFT

## APPENDIX "C"
## FUEL STATIONS

The Master Food Agreement shall apply to Fuel Station employees except for the following modifications:

**EXCLUSION:** There shall be one (1) exclusion from the bargaining unit for each Fuel Station operation.

**HEALTH AND WELFARE:** Fuel Station employees' Health and Welfare eligibility shall be at seventy-six (76) hours per month. The Employer will not make any contributions on Fuel Station employees for the first twelve (12) months of employment.

**PENSION:** A Pension contribution of fifty cents (50¢) per straight-time hour worked will be made on behalf of eligible Fuel Station employees. Fuel Station employees will be entitled to an Individual Account Plan contribution in accordance with the new hire provision of Section 13.11 of the Agreement.

**HOURS:** Part time Fuel Station employees shall be scheduled for at least twenty (20) hours per week.

DRAFT

## APPENDIX "D"
## PHARMACY TECHNICIAN

The following confirms the full and complete understanding and agreement arrived at between Nob Hill General Store, Inc. ("Employer") and the United Food and Commercial Workers Union Local 5 ("Union"), with respect to the wages and the establishment of the Pharmacy Technician position.

The Employer agrees that if a General Merchandise Clerk is promoted to a Pharmacy Technician, they will maintain their current rate of pay and remain there until such time that the hours worked in the Technician class to warrant a step increase shall be maintained in the new classification.

It is further agreed that:

1)     Employees considered for the Pharmacy Technician classification must have met any of the following requirements:

    (a)     Have obtained at least an Associate of the Arts degree in a field of study directly related to the duties performed by a Pharmacy Technician.

    (b)     Have successfully completed a training course specified by the Board.

    (c)     Are eligible to take the Board's Pharmacist Licensure Examination.

    (d)     Have at least one (1) year's experience, to include a minimum of fifteen hundred (1,500) hours, performing the tasks specified in the regulation while employed or utilized as a Pharmacy Technician to assist in the preparation of prescriptions for an inpatient of a hospital, for an inmate of a correctional facility, or experience deemed equivalent by the Board, including, but not limited to, experience received while employed as a Technician in another state or as a Technician employed by the federal government.

    (e)     A person shall be deemed to have "equivalent experience", within the meaning of Paragraph (d), if he has at least fifteen hundred (1,500) hours of experience performing the duties specified in the regulation in a pharmacy in the last three (3) years.

2)     The Employer will have sole discretion in selection of Pharmacy Technician.

3)     The Employer believes that the safety of its customers and the public is the fundamental guiding concern behind the establishment of this classification. To this end, the Employer shall provide mandatory training, on Employer time as required by the regulation, for those individuals who are selected for the classification of Pharmacy Technician.

4)     Because of safety and quality control factors, the Pharmacy Technicians will be subject to the immediate and personal supervision of a Registered Pharmacist. Immediate and personal supervision in the case of a Pharmacy Technician requires that a Pharmacist verify and document any function performed by a Pharmacy Technician in connection with all activities surrounding the dispensing of a prescription. It is understood and agreed that Pharmacists, as trained professionals, have the ultimate responsibility for dispensing prescriptions.

5)     The Pharmacy Technician may perform any and all duties of a General Merchandise Clerk.

DRAFT

EXHIBIT A

BEEF

**FOREQUARTER**
Blade Chuck
Full Standing Rib, Chine bone off (7 inches) removed)
Full Standing Rib, boneless
Whole Fore Shank
English Shortribs
Shoulder Clod
Shortrib
Brisket, boneless
Plate*
Blade Chuck, neck on, boneless
Blade Chuck, neck off
Chuck Roll
Skirt Steak
Neck, bone in or boneless
Fore Shank, squared
Regular Chuck
Arm Chuck
Shin and Shoulder
Ground Meat
Boneless Meat, normal trim which
would include Flap Meat, Bull,
Cow Meat
Rib Eye
Boneless Rib Eye
Beef Back Ribs
Boneless Chuck – unnetted or netted
Cross Rib Roast – unnetted or netted
Stew Beef
Beef Chuck, Stack Pac
Beef Ribs, Stack Pac

**HINDQUARTER**
Semi-boneless Round
(Aitch and Shank bone
Sirloin Tip, boneless
Boneless Head Loin
Short Loin
Full Round, Shank off
Top Round
Bottom Round
Head Loin, bone in
Flank Meat
Flank Steaks
Shank, bone in, boneless
Top Sirloin
Filet
New York
New York Strip
Boneless Meat, normal trim
which would include Flank
Meat, Heel and trimmings
Boneless Round
Whole Sirloin Tips-unnetted
or netted
Tenderloin
Short Loin, Stack Pac

*Not vacuum packed

**OFFAL:**      All beef, pork, lamb, and veal, eatable internal organs, such as liver, heart, tongue, kidney, tripe.

**SAUSAGES:**  Include fresh, smoked, or frozen beef, pork, veal, and poultry sausages.

VEAL, LAMB, AND PORK

Carcasses, primal cuts, and all standard wholesale cuts.

DRAFT

## CASE-READY MEAT JOB-PROTECTION ADDENDUM

The parties recognize that the competition has been introducing prepackaged case-ready meat products for some time. The parties further recognize the importance of being able to effectively compete with these measures while at the same time addressing the job security concerns of potentially impacted meat employees.

Although the contract recognizes the conditional right of the Employer to introduce case-ready meats as provided in Section 19 of the Agreement, the parties recognize that an Employer may not wish to comply with all the provisions of that section before introducing case-ready meats. Accordingly, without waiving any Employer rights to introduce case-ready meats and any Union rights to challenge such introduction as provided in Section 19 of the Agreement, the parties agree as follows:

Notwithstanding anything contained in the Meat Agreement to the contrary, pursuant to this Addendum, the Employer shall not be restricted in, or prohibited from, obtaining and offering for sale fresh, smoked, cured, cooked, and frozen meats, poultry, fish, or seafood which have been cut, prepared, processed, packaged, weighed, and/or priced off the Employer's premises, and it is expressly understood and agreed that such shall not constitute a violation of this Agreement.

Should the Employer wish to utilize this Addendum, the Employer shall notify the affected Unions in writing by certified mail of its intention and the effective date of when case-ready meats will be introduced in the stores. In utilizing this Addendum, the Employer agrees that no Head Meat Cutter, Journeyman Meat Cutter, or Apprentice Meat Cutter employed as of July 1, 2001, and assigned to one of the aforementioned classifications by the Employer shall be laid off, reclassified, or reduced in hours or full-time status. The Employer still maintains the right to discipline or discharge employees consistent with Section 2 of the Agreement. The Employer shall have the right to transfer and/or schedule Meat Cutters by seniority to the extent provided for in the contract in more than one (1) store within the geographical seniority area and/or adjacent geographical seniority area(s) as may be necessary to fulfill this obligation, except that the Employer shall not schedule such employee for split shifts. The Employer shall be obligated to provide a minimum of eight (8) hours per calendar day when such Journeyman Meat Cutter is scheduled to work in each store. Other meat shop manning requirements will be suspended given these job securities in the event the Employer utilizes this Addendum.

The Employer shall continue to have the right to layoff meat employees other than Head Meat Cutters, Journeyman Meat Cutters, or Apprentice Meat Cutters in accordance with the seniority provisions of this Agreement, provided that the layoff of any Meat Wrapper, Butcher Block, Meat Clerk or Meat Clean-up Clerk assigned to such classification on or before July 1, 2001, is for reasons other than the Employer's utilization of the products set forth above. The Employer agrees it will demonstrate that said layoff was for such unrelated reasons. It is understood and agreed that in meeting the job guarantees contained herein, the Employer shall have the right to assign any higher classified employee to perform work in a lower classification.

DRAFT

Addendum re: Case-ready Meats
Page 2

In the event of a store closure, resulting in the layoff of any Head Meat Cutter, Journeyman Meat Cutter, Apprentice Meat Cutter, or Meat Clerk, such affected employee shall be permitted to exercise his seniority to displace the least senior Meat Cutter or Meat Clerk in the involved bargaining unit's seniority area as provided for herein, or, at the affected employee's discretion, the least senior Meat Cutter or Meat Clerk in the Local Union's jurisdiction. Such least senior Meat Cutter or Meat Clerk affected by the exercise of the most senior Meat Cutter's or Meat Clerk's seniority shall be laid off. This store closure exception shall not apply in the event the Employer closes a store and opens a replacement store within thirty (30) days within three (3) square miles of the closed store. It is understood that in applying this Addendum, Meat Cutters may only displace Meat Cutters and Meat Clerks may only displace Meat Clerks.

DRAFT

FOOD EMPLOYERS COUNCIL, INC.
Drawer 1298, 3685 Mt. Diablo Blvd.
Lafayette, California 94549 (415) 284-9350


April 28, 1989
Thornton C. Bunch, Jr., Esquire
22 Battery Street, Suite 810
San Francisco, CA 94111

Mr. Dino Polizziani, President
UFCW Local 115
208 Miller Avenue
San Francisco, CA 94080

Mr. John Briley, President
UFCW Local 839
1145 North Main Street
Salinas, CA 93906

Ms. Beverly Crownover, President
UFCW Local 1532
382 Tesconi Court
Santa Rosa, CA 95406

Re:    April 28, 1989 Final Offer – Involving the Food Employers Council, Inc., On Behalf of Its
       Member Companies and United Food & Commercial Workers Union, Locals 115, 839,
       and 1532

Gentlepersons:

This will confirm that the proposed modification in Section 1.3.1 of the Master Food Agreement
involving "delicatessen merchandise" is not intended to and does not affect the status of
traditional "peg board" sections of the store.

If you have any questions or require additional information, please contact this office.

                                        Very truly yours,
                                        FOOD EMPLOYERS COUNCIL,
                          INC.

                                        Northern California Division
                                        /s/ DAVID R. COX
                                        David R. Cox
                                        Executive Director

WRV:bjr

DRAFT

## LETTER OF UNDERSTANDING

With regard to the addition of health food merchandise to the definition of non-food department in Section I.C.1(b), it is agreed that:

1.      Health food merchandise is health food contained in a health food department.

2.      The words "health food merchandise contained in a health food department" shall be added to Section I.C.1(b) in the first sentence thereof.

3.      The employment or continuation of employment of a health food department clerk shall not cause the replacement of an existing regular full-time or part-time clerk or apprentice clerk, nor shall it cause a reduction in the number of hours of work of such clerks.

/s/ DAVID R. COX
FOOD EMPLOYERS COUNCIL, INC.

/s/ FRANK O. NETH
    UFCW LOCAL 17

/s/ THERESA PIAZZA BY TCB
UFCW LOCAL 115

/s/ WYNN C. PLANK
UFCW LOCAL 588

/s/ WILLIAM AMOS BY TCB
UFCW LOCAL 839

/s/ GREGORY DON HUNSUCKER
UFCW LOCAL 1288

/s/ ROBERT E. KOENIG
UFCW LOCAL 1364

/s/ CHARLES DIXON
UFCW LOCAL 1532

DRAFT

**FOOD EMPLOYERS COUNCIL, INC.**
2000 Crow Canyon Place, Suite 200
San Ramon, California 94583 (510) 275-1750

March 6, 1992

Mr. Joseph T. Hansen
UFCW Regional Director
3300 Douglas Boulevard, Suite 345
Roseville, California 95661

Dear Mr. Hansen:

In the event that an Employer party to the Master Food Contract leases space in one of the Employer's stores to a separate party lessee; the product sold by the lessee is handled, displayed and sold within a distinct leased area separate from the Employer's merchandise; and said lessee does not sell items such as name-brand products in the same form as traditionally handled by bargaining unit employees (deminimus excepted); then the Union agrees that Sections 1.4 and 1.5 of the Master Food Agreement shall not in any way be applicable to said department.

Very truly yours,

FOOD EMPLOYERS COUNCIL, INC.

/s/ David R. Cox
Executive Director
Northern California Division

DRC:jk

/s/ Joseph T. Hansen, Regional Director
On Behalf of UFCW Local Unions 115, 373,
428,588,775,839,870,1119,1179,1288
and 1532

DRAFT

## LETTER OF UNDERSTANDING

Food Employers Council, Inc. on behalf of its member Employers, and UFCW Locals 115, 588, 839, 916, 1288 and 1532 agree that the correct interpretation and application of Shift Selection, Section VI, is that set forth at the first full paragraph on Page 9 and the paragraph which begins on Page 11 and continues on Page 12 of the award of arbitration by David E. Feller in Retail Clerks Union, Local 17 and Safeway Stores, issued on November 8, 1979.

A copy of said language is attached hereto.

/s/ DAVID R. COX
FOOD EMPLOYERS COUNCIL, INC.

/s/ THORNTON C. BUNCH
UFCW-UNION LOCAL 115

/s/ JACK L. LOVEALL
UFCW-UNION LOCAL 588

/s/ BILL AMOS
UFCW-UNION LOCAL 839

/s/ FRANK O. NETH
UFCW-UNION LOCAL 916

/s/ GREGORY DON HUNSUCKER
UFCW-UNION LOCAL 1288

/s/ CHARLES DIXON
UFCW-UNION LOCAL 1532

DATED: 3/21/86

DRAFT

EXCERPT FROM ARBITRATION AWARD
BY
DAVID E. FELLER

ISSUED NOVEMBER 8, 1979
(Retail Clerks Union Local 17 and Safeway Stores)
(START OF PAGE 9 as typed)
A journeyman clerk is, by definition, trained and qualified to perform in at least satisfactory fashion (although perhaps not in the best possible fashion) all of the duties of a journeyman clerk and there is, therefore, no reason to inquire at all into the qualifications of any other employee.

Acceptance of this position would essentially eliminate all of the factual issues in this case. I decline, however, to accept it. Although there is clearly a distinction between job assignments and shift assignments, it is nevertheless not true that there is no relationship between them. Nor can it be said, in the light of the agreement's language, that any journeyman is qualified by virtue of the fact that he is a journeyman to perform all of the work assigned to a journeyman, since the agreement clearly evinces a recognition that there are shift assignments which require particular qualifications. It does so in Section V-I-2, where the right to select a shift schedule is conditioned on the possession of "the necessary qualifications for the schedules selected". Indeed the notion that there may be a qualification for a particular shift is emphasized by the fact that the agreement goes on to specify that qualifications "shall include such factors as experience, job performance, aptitude, attendance, etc".

The problem which this case presents is that no such qualification requirement is specified with respect to the junior employee whom the agreement requires be placed on the shift of a senior employee who has exercised his seniority right to the junior employee's schedule. It is clear that the apparently mandatory requirement that the junior employee bumped off a schedule be given the schedule of the senior employee who bumped him was inserted in the agreement in order to prevent a chain reaction. If a bumped employee could exercise his seniority preference
(END PAGE 9 as typed)
(START OF PAGE 11 as typed)
employees, that qualification on the senior employee's right would possibly be more onerous than the one which the parties have inserted in the agreement. The Union's argument that shift schedules and job assignments are unrelated is not correct, but there clearly is a substantial difference between them. No employee has the right to insist on doing the same work which he previously did on his shift. So long as the work is properly within the journeyman clerk classification, management's right to direct the working forces clearly encompasses the right to assign and to reassign and to change assignments so long as the employee's right to the shift which he has selected is not violated. It follows that there is no requirement in the agreement that the junior employee, bumped as a result of a senior employee's exercise of his right to shift preference, be qualified to perform the work previously assigned to the senior employee. The only requirement

is that there be a reasonably practicable method of reassigning the work to some journeyman clerks so that the business of the Company can be performed. The Company is clearly correct when it says that once the weekly schedule has been posted it would violate the agreement if it changed the schedules of other employees in order to accommodate the shift schedule change requested by a senior employee. It is not correct, however, in assuming that this is necessarily the only way in which it can secure the satisfactory performance of the work previously performed by the senior employee, since it has the right to change the functions to which other employees are assigned within their scheduled shifts.

I conclude, then, that the right of a qualified senior employee to exercise his shift preference rights can be denied if, and only if, the Employer can show that it is impossible to reassign the duties of other clerks within their posted schedules so that the work which the senior
(END OF PAGE 11 as typed)
(START OF PAGE 12 as typed)
employee has performed on his previous shift will in fact be performed satisfactorily. Given the absolute nature of the language of the agreement, the burden of so showing must be placed upon the Company, and it is not met by simply showing that the junior employee who must be transferred to the senior employee's shift is himself or herself not capable of performing the work efficiently. It must be shown that no reassignment of job duties could result in the satisfactory performance of the work involved.

I also conclude that no such showing has been made in this case. It is conceded that there were other employees capable of taking care of the end displays. It is clear that there were other employees who were capable of doing the checking which the grievant was assigned to in the hours after 1 p.m. The Company has not met the burden of showing that it would have been impossible to rearrange the job duties of the clerks employed by the store in such a way that all of the functions performed by the grievant on his previous shifts could have been performed satisfactorily. Accordingly, I conclude that the substantive issue involved must be decided in favor of the Union.

With respect to remedy, I also conclude that the grievance must be granted. The language of Section VI-K is too clear to warrant what is in effect an amendment based upon proposals made by the Union. The agreement says, as plainly as· language can, that when ever an employee's schedule is not changed in accordance with the provisions of this agreement and he has worked outside "such schedule" then the hours so worked shall be paid for at overtime rates. The words "such schedule" plainly mean the schedule which the employee has requested in his request for a change. The provision cannot be read as referring only to cases in which schedules are .
(END OF PAGE 12 as typed)
END OF EXCERPT

FOOD EMPLOYERS COUNCIL, INC.
2000 Crow Canyon Place, Suite 200
San Ramon, California 94583 (510) 275-1750

March 7, 1992

Mr. Joseph T. Hansen
UFCW Regional Director
3300 Douglas Boulevard, Suite 345
Roseville, California 95661

Dear Mr. Hansen:

This will confirm our agreement that shifts which begin during the last day of the work week defined in Subsection 6.1 of the Collective Bargaining Agreement and end during the first day of the next work week shall not result in the payment of any penalty or premium on the basis that the shift overlaps two separate work weeks.

                                        Very truly yours,

                                        FOOD EMPLOYERS COUNCIL, INC.
                                        /s/ David R. Cox
                                        Executive Director
                                        Northern California Division

DRC:jk

/s/ Joseph T. Hansen, Regional Director
On Behalf of UFCW Local Unions 115, 373,
428,588,775,839,870,1119,1179,1288
and 1532

DRAFT

**FOOD EMPLOYERS COUNCIL, INC.**
Drawer 1298, 3685 Mt. Diablo Blvd.
Lafayette, California 94549.(415)284-9350

April 28, 1989

Thornton C. Bunch, Jr., Esq.
Spokesman On Behalf of UFCW Union
Locals 115, 5 and 1532
22 Battery Street
San Francisco, CA 94111

Re: Subsection 9:2 of the .Master Food and Liquor Agreement

Dear Mr. Bunch:

By mutual agreement of the parties, a Courtesy Clerk may be scheduled to work as an Apprentice Clerk or a Non-Food and General Merchandise Clerk providing said employee is paid for the entire shift at the higher rate of pay. Upon promotion, a Courtesy Clerk will be credited with the total number of hours worked in the higher classification.

If the above accurately reflects your understanding of our agreement in this matter, please sign in the space provided below.

Very truly yours,

FOOD EMPLOYERS COUNCIL, INC.
Northern California Division

/s/ DAVID R. COX
David R. Cox
Executive Director

WRV:DRC:bjr

Agreed to this 28th day of April, 1989.

/s/ THORNTON C. BUNCH
Thornton C. Bunch, Jr., Esq.
On Behalf of UFCW Union Locals 115,839 and 1532

DRAFT

LETTER OF UNDERSTANDING
BETWEEN
UFCW LOCAL 5
and
NOB HILL GENERAL STORE, INC.

Alameda Store #632

Current employees classified as Senior Clerks will be moved to the next highest rate in the Food Clerk classification and will not have to backfill hours in the progression.

Current employees classified as Clerks will be transferred to the All Purpose Clerk classification as follows and will not have to work through the interim step.

Clerks at $9.30 will transition to the APC Step 1 $9.60 with credit for hour worked in current step.
Clerks at $9.54 will transition to the APC Step 2 $10.00 with zero credited hours.
Clerks at $9.67 will transition to the APC Step 2 $10.00 with credit for hours worked in step.
Clerks at $10.01 will transition to the APC Step 3 $10.40 with credit for hours worked in step.
Clerks at $10.46 will transition to the APC Step 4 $10.70 with credit for hours worked in step.
Clerks at $10.90 will transition to the APC Step 5 $11.20 with credit for hours worked in step.
Clerks at $11.34 will transition to the APC Step 6 $11.70 with credit for hours worked in step.
Clerks at $13.96 will transition to the APC Step 10 $14.50 with zero credited hours.

DRAFT

LETTER OF UNDERSTANDING
BETWEEN
UFCW LOCAL 5
AND
NOB HILL FOODS

The following is an understanding between the parties that the Unions may put up bulletin boards in the stores so long as the materials posted on these bulletin boards are consistent with Section 5.8 of Local 5's contract regarding official Union notices and that the bulletin boards comport with the following:

1.      The bulletin boards may be no larger than 36"H x 30"W and are limited to one per store.

2.      The placement of the bulletin board will be at the determination of the store director at each store location.

3.      The Union will bear all costs associated with the installation and the upkeep of the bulletin boards described herein.

4.      The Union will inform the Labor Relations Director or HR Manager with at least seventy-two (72) hours advance notice of the posting of materials (excluding meeting notices) to the bulletin board. Information placed in the bulletin boards described herein shall not contain any information/propaganda that is detrimental to the Company. The Company has sole discretion to determine whether any such material is "detrimental" to the Company's interest.

5.      The Company shall not be held responsible for any damage to the bulletin boards described herein; however the Company reserves the right to discipline any employee that has willfully caused damage to a bulletin board located on the Company's premises.

6.      The Company reserves the right to relocate or remove the bulletin boards described herein for genuine business reasons as it deems necessary. Such reasons shall include, but are not limited to: property damage due to "acts of God", remodels, repairs and maintenance to building structures or equipment, or store closures. In the event a bulletin board is to be relocated or removed, it is agreed that the Union shall be contacted to arrange for reinstallation or removal of the bulletin board.

**DRAFT**

**LETTER OF UNDERSTANDING**
**BETWEEN**
**UFCW LOCAL 5**
**AND**
**NOB HILL FOODS**

The taking of individual vacation days will be by mutual agreement of the Employer and employee. The Employer will cooperate with employees that wish to combine vacation days with regular days off in order to receive three consecutive days off.

LETTER OF UNDERSTANDING
BETWEEN
UFCW LOCAL 5 & 101
AND
NOB HILL FOODS

**Section 1.2.4:** If a dispute develops between Safeway, Albertsons, or Ralphs regarding the interpretation of the modifications negotiated in the 2005 Agreement, Nob Hill will abide by any agreement between the Locals named above and the aforementioned companies or any arbitration decisions concerning the matter. Until there is an understanding or an arbitration decision, Nob Hill may follow Safeway, Albertsons, or Ralphs practices without penalty.

**Section 10.1.2:** Allow for scheduling by inverse seniority if insufficient employees volunteer (New Year's Day and Labor Day), applies only to employees hired after the date of ratification.

**Local 5:** Modify current Section 10.5 to allow for scheduling by inverse seniority, if insufficient employees volunteer, applies only to employees hired after the date of ratification.

**Extra Meat Cutter:** Meat Extras will receive $1.50 above the Meat Cutter rate of pay.

**Bargaining Notes:**

**Section 2.1:** Nob Hill will work with the Unions involving extenuating circumstances.

**Section 4:** As a result of the merging of the previous Nob Hill Agreements with Locals 373, 428, 839, 870, and 1179 into one agreement, the parties agree to discuss the issue of realigning the geographical seniority areas

**Section 4.7:** Nob Hill agrees that the Unions may post in the break room the seniority list provided to them on a semi-annual basis.

**Section 6.1:** Current full-time employees who receive two (2) consecutive days off in a holiday week will continue to receive two (2) consecutive days off in a holiday week.

**Section 10.1.1:** If UFCW Local 5 reaches an agreement that allows another major retail food Employer the option of opening on a day that Nob Hill is currently prohibited from opening, Nob Hill will be allowed to incorporate the language into the current settlement agreement.

DRAFT

EXHIBIT D



UNITED STATES GOVERNMENT
## NATIONAL LABOR RELATIONS BOARD

REGION 20
901 MARKET ST
STE 400
SAN FRANCISCO, CA 94103-1738

Agency Website: www.nlrb.gov
Telephone: (415)356-5130
Fax: (415)356-5156

July 30, 2012

PATRICK W. JORDAN
JORDAN LAW GROUP
1010 B ST  STE 320
SAN RAFAEL, CA 94901-2920

RECEIVED

AUG 0 1 2012

Re:   United Food & Commercial Workers Union, Local
8 - Golden State (Raley's)
Case 20-CB-082003

United Food & Commercial Workers Union, Local
5 - Golden State (Raley's)
Case 20-CB-082004

United Food & Commercial Workers Union, Local
5 (Raley's)
Case 20-CB-082009

United Food & Commercial Workers Union, Local
5 (Raley's)
Case 20-CB-082027

United Food & Commercial Workers Union, Local
8 - Golden State (Raley's)
Case 20-CB-082034

United Food & Commercial Workers union, Local
8 - Golden State (Raley's)
Case 20-CB-082065

Dear Mr. JORDAN:

We have carefully investigated and considered your charges that UNITED FOOD
COMMERCIAL WORKERS UNION, LOCAL 8 - GOLDEN STATE, and UNITED FOOD &
COMMERCIAL WORKERS INTERNATIONAL UNION, CLC, LOCAL 5 have violated the
National Labor Relations Act.

**Decision to Dismiss:** Your charges allege that the United Food and Commercial
Workers, Locals 5 and 8 (collectively known as the Unions) violated the Act by engaging in
surface bargaining, and by insisting to impasse that Raley's (Employer) bargain over permissive
subjects of bargaining, to wit neutrality language, changes in working conditions at the
Employer's nonunion stores, and retiree health and welfare benefits.

United Food & Commercial Workers Union,   - 2 -                          July 30, 2012
Local - Golden State (Raley's)
Case 20-CB-082003 et al.

There is insufficient evidence to establish that the Unions engaged in surface bargaining.
The evidence showed that the parties participated in approximately 52 bargaining sessions and
reached many tentative agreements.  The lack of economic concessions in the Unions' most
recent proposals, in these circumstances, does not equate to surface bargaining.

Regarding the allegation that the Unions are insisting that the Employer bargain over
permissive subjects of bargaining, the evidence was insufficient to establish a violation of the
Act.  The investigation revealed that the Unions withdrew their proposal regarding neutrality
language on or about April 30, 2012.  Moreover, the evidence showed that the Unions did not
make proposals about terms and conditions of employment in the Employer's nonunion stores.
Rather, the Unions challenged the Employer's claimed need for financial concessions by
pointing to certain actions by the Employer at its nonunion stores, such as the granting of
bonuses.  As to retiree health and welfare benefits, there was insufficient evidence that the
Employer unequivocally refused to bargain over this subject.  To the contrary, even late in the
negotiating process, the Employer made proposals to continue pre-65 retiree health and welfare
benefits and phase out post-65 retiree health and welfare benefits.  Finally, the Unions' latest
comprehensive proposals did not include any proposals with regard to the three aforementioned
subjects of bargaining.

**Your Right to Appeal:** You may appeal my decision to the General Counsel of the
National Labor Relations Board, through the Office of Appeals.  If you appeal, you may use the
enclosed Appeal Form, which is also available at www.nlrb.gov.  However, you are encouraged
to also submit a complete statement of the facts and reasons why you believe my decision to
dismiss your charges was incorrect.

**Means of Filing:** An appeal may be filed electronically, by mail, or by delivery service.
Filing an appeal electronically is preferred but not required.  The appeal MAY NOT be filed by
fax.  To file an appeal electronically, go to the Agency's website at www.nlrb.gov, click on **File
Case Documents**, enter the NLRB Case Number, and follow the detailed instructions.  To file an
appeal by mail or delivery service, address the appeal to the General Counsel at the National
Labor Relations Board, Attn: Office of Appeals, 1099 14th Street, N.W., Washington D.C.
20570-0001.  Unless filed electronically, a copy of the appeal should also be sent to me.

**Appeal Due Date:** The appeal is due on August 13, 2012. If you file the appeal
electronically, we will consider it timely filed if you send the appeal together with any other
documents you want us to consider through the Agency's website so the transmission is
completed by **no later than 11:59 p.m. Eastern Time** on the due date.  If you mail the appeal or
send it by a delivery service, it must be received by the Office of Appeals in Washington, D.C.
by the close of business at **5:00 p.m. Eastern Time** or be postmarked or given to the delivery
service no later than August 12, 2012.

**Extension of Time to File Appeal:** Upon good cause shown, the General Counsel may
grant you an extension of time to file the appeal.  A request for an extension of time may be filed
electronically, by fax, by mail, or by delivery service.  To file electronically, go to
www.nlrb.gov, click on **File Case Documents**, enter the NLRB Case Number and follow the
detailed instructions.  The fax number is (202)273-4283.  A request for an extension of time to

United Food & Commercial Workers Union,    - 3 -                                July 30, 2012
Local - Golden State (Raley's)
Case 20-CB-082003 et al.

file an appeal **must be received on or before** August 13, 2012.  A request for an extension of
time that is mailed or given to the delivery service and is postmarked or delivered to the service
before the appeal due date but received after the appeal due date will be rejected as untimely.
Unless filed electronically, a copy of any request for extension of time should be sent to me.

   **Confidentiality:** We will not honor any claim of confidentiality or privilege or any
limitations on our use of appeal statements or supporting evidence beyond those prescribed by
the Federal Records Act and the Freedom of Information Act (FOIA).  Thus, we may disclose an
appeal statement to a party upon request during the processing of the appeal.  If the appeal is
successful, any statement or material submitted with the appeal may be introduced as evidence at
a hearing before an administrative law judge.  Because the Federal Records Act requires us to
keep copies of case handling documents for some years after a case closes, we may be required
by the FOIA to disclose those documents absent an applicable exemption such as those that
protect confidential sources, commercial/financial information, or personal privacy interests.

                                        Very truly yours,


                                        JOSEPH F. FRANKL
                                        Regional Director

Enclosure

cc:    GENERAL COUNSEL                          KRISTIN L. MARTIN
       OFFICE OF APPEALS                        DAVIS, COWELL & BOWE, LLP
       FRANKLIN COURT BUILDING                  595 MARKET ST  STE 1400
       NATIONAL LABOR RELATIONS BOARD           SAN FRANCISCO, CA 94105-2821
       1099 14TH STREET, NW
       WASHINGTON, DC 20570                     RALEYS
                                                LEGAL DEPT.
       JACQUES LOVEALL                          500 W CAPITOL AVE
       UNITED FOOD COMMERCIAL WORKERS           WEST SACRAMENTO, CA 95605-2696
       UNION, LOCAL 8 - GOLDEN STATE
       2200 PROFESSIONAL DR                     RON LIND
       ROSEVILLE, CA 95661-7763                 UNITED FOOD & COMMERCIAL
                                                WORKERS LOCAL 5
       DAVID A. ROSENFELD                       240 S MARKET ST
       WEINBERG, ROGER & ROSENFELD              SAN JOSE, CA 95113-2310
       1001 MARINA VLG PKWY  STE 200
       ALAMEDA, CA 94501-6430

Form NLRB–4767

## UNITED STATES OF AMERICA
## NATIONAL LABOR RELATIONS BOARD

### APPEAL FORM

To:  General Counsel                                                              Date:
     Attn: Office of Appeals
     National Labor Relations Board
     Room 8820, 1099 - 14th Street, N.W.
     Washington, DC  20570-0001

      Please be advised that an appeal is hereby taken to the General Counsel of the National Labor Relations Board from the action of the Regional Director in refusing to issue a complaint on the charge in

_____

Case Name(s).

_____

Case No(s). *(If more than one case number, include all case numbers in which appeal is taken.)*

                                        _____
                                                    *(Signature)*

**EXHIBIT E**

RETAIL FOOD AGREEMENT

**NOVEMBER 13, 2012**

**RALEY'S/BEL AIR SUPERMARKETS**
**and UFCW LOCALS 5 and 8 — GOLDEN STATE**
**SETTLEMENT AGREEMENT**

The Memorandum of Agreement (the "MoA") sets forth the parties' agreement on the terms and conditions for a successor Collective Bargaining Agreement to the Agreement dated October 7, 2007, through October 8, 2011, and as extended to this effective date, October 9, 2011, through October 11, 2014, (the "CBA"), between **RALEY'S/BEL AIR SUPERMARKETS** (the "Employer") and **UNITED FOOD & COMMERCIAL WORKERS LOCALS 5 and 8 Golden State** (the "Unions"). Except for the modifications stated in this Memorandum of Agreement, the provisions of the Collective Bargaining Agreements shall remain the same and in full force and effect.

### Section 1.1 — Card Check Neutrality language

The parties mutually recognize national labor law guarantees employees the right to form or select any labor organization to act as the employees' exclusive bargaining representative for the purpose of collective bargaining with the Employer.

The parties hereby establish the following procedure for the purpose of ensuring an orderly environment for the exercise by the Employer's employees of their rights under Section 7 of the National Labor Relations Act and to avoid picketing and/or other economic action directed at the Employer in the event the Union decides to conduct an organizing campaign at any operation at which the Union does not have representation rights.

The Employer will take a neutral approach to unionization of employees. The Employer will not take action nor make any statement that will directly or indirectly state or imply any opposition by the employer to the selection by such employees of a collective bargaining agent.

Within ten (10) days following receipt of written notice of intent to organize certain employees, the Employer will furnish the Union with a complete list of such employees, including job classifications and departments. Within two (2) weeks thereafter, the Employer will furnish a second list of such employees to the Union, including the addresses of all employees. Thereafter, the Employer will provide updated lists as requested, but no more frequently than monthly. At no time will the Union or its agents and employees harass non union employees by repeated home visits or other similar tactics. The overarching principal is that Section 7 protects an employee's right to choose one way or the other without fear of reprisals, threats or other coercive conduct on the part of the Union or the Employer.

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

## RETAIL FOOD AGREEMENT

The Union may request recognition as the exclusive collective bargaining agent for the employees in a traditional bargaining unit represented by the Union in the food industry, including, including single store clerk or meat units. A disinterested, neutral party mutually satisfactory to the Employer and the Union will be selected to conduct a confidential review of employees' authorization cards and membership information submitted by the Union in support of its claim to represent a majority of the employees in the unit, if either the Union, or Employer, so requests.

If a majority of employees within the unit has joined the Union or designated it as their exclusive collective bargaining representative, the Employer will recognize the Union as such representative of the employees and will extend to such employees the Collective Bargaining Agreement between the Union and the Employer together with any amendments agreed to by the parties. The Employer will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this Agreement.

During the life of this Agreement, the Union will not engage in picketing or other economic activity at any operation covered by this Section, provided that if the Employer recognizes any other Union as the exclusive collective bargaining representative of employees in the unit, or any part thereof, traditionally represented by the Union, this paragraph shall terminate immediately and without notice.

During the life of this Agreement, the Union agrees not to engage in any stoppage of work, and furthermore, the Union and its representatives, including store representatives, agree not to boycott, handbill, publicly disparage, or engage in any adverse economic action against the Employer's stores covered by this Agreement. This provision does not apply in any of the Employer's stores where the Union has not been recognized by the Employer as the employee's bargaining representative.

The parties agree that any disputes over compliance with or the application of this Section, including claims of Union violation, shall be submitted to expedited arbitration using the expedited arbitration process set forth in the parties' collective bargaining agreements. The arbitrator shall have the authority to order the non-compliant party to comply with this Section and to order such other remedies deemed necessary to effectuate the intent of this Section. The parties hereto consent to the entry of any order of the arbitrator as the order of judgment of the United States District Court, without notice.

The parties agree in order to avoid issues concerning negative consequences to employees' pensions, that for any newly organized stores, they will negotiate a transition plan with regard to pension coverage. Until the parties reach agreement on said pension transition, the pension plan then in effect at the newly organized location shall remain in effect notwithstanding the fact that the parties' collective bargaining agreement will become effective for all other purposes.

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

RETAIL FOOD AGREEMENT

Modify Section 1.4, 1.4.1 and 1.4.2 to read as follows:

1.4 SUBCONTRACTING AND SUBLEASING: It is recognized that the Employer and the Union have a common interest in protecting work opportunities for all employees covered by this Agreement. Therefore, except for work which is exclusively inventory or janitorial work (such as washing windows, washing or waxing floors, and cleaning restrooms), or involves certain specialty departments such as Hot Wok, or operations such as a tacqueria restaurant or a bar/tavern which sell products and services of a nature that are not currently offered by the Employer or work hereinabove excluded, no work covered by this Agreement, as defined in Subsection 1.2 and 1.3 above, shall be performed under any sublease, subcontract, or other agreement unless the terms of said lease, contract, or other agreement specifically provide:

1.4.1 That all such work shall be performed only by members of the appropriate unit as defined in Subsection 1.1 above;

1.4.2 That the Employer shall at all times hold and exercise full control of the terms and conditions of employment of all such employees pursuant to the terms of this Agreement.

Add to Section 2.4.4 a new paragraph to read as follows: "Employees shall not be discharged, disciplined or suffer loss of seniority or any other benefit or be otherwise adversely affected by a lawful change of name or social security number.

(Local 5 only) Section 4.7: Add the following after last sentence in 1st paragraph: The lists shall be provided in each geographical seniority area of Local 5 which currently exists as Alameda County (except Livermore and Pleasanton); San Benito/Monterey/Santa Cruz Counties; Contra Costa County (clerks only); Santa Clara County; San Mateo/San Francisco (meat only); Marin, Sonoma (meat only); Humboldt County; Napa/Solano (clerks only), Del Norte, Lake and Mendocino (meat only) if applicable..

Modify Section 4.7 Lists to reflect "The Employer agrees to provide two (2) lists of employees on January 1st and July 1st of each calendar year provided to the union through an electronic format."

Add new paragraph to Section 5.1 Safety Rules to read as follows: "Employees assigned to cleaning areas of the store will be provided clean-up training (as determined by the Employer) or mandated by applicable state or federal law, and the Employer will provide the necessary protective gear when cleaning."

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

RETAIL FOOD AGREEMENT

**Modify** Section 5.3 to observe both the "Universal Military Training and Service Act" and "The Uniformed Services Employment and Reemployment Rights Act."

**Add** to Section 5.6 Uniforms a new 2nd paragraph to read as follows: "In the event the Employer requires the wearing of a uniform, the Employer will provide at least two (2) shirts for part-time employees. At the time an employee is classified as full-time they will be provided an additional two (2) shirts for a total of no less than four (4) shirts. The Employer will provide replacement shirts upon reasonable wear and tear of the shirts."

**Add** to Section 5.6 Special Wear to provide employees will be allowed to wear appropriate clothing to protect them from the inclement weather in accordance with the employer's dress code policy.

**Modify** Section 5.8 Payday and Deductions 1st paragraph to read as follows: "Employees shall be paid Friday of each week. The Employer shall furnish each employee with a weekly wage statement showing his name, hours of work, overtime, if any, total wages paid, and list of deductions made. Checks will be available for pickup after reconciliation on Friday."

**Modify** Section 5.8 Payday and Deductions by adding "full time" or "part time" to paychecks.

**Modify** Section 5.10 by replacing the words "Store Representatives" with the words "Store Stewards" to reflect currently used terminology by the Union Locals. (Side Letter)

**Add** a new 6th paragraph to Section 5.10 to read as follows: "Should an employee be notified by a representative of management that he will be subject to an investigative interview conducted by a Loss Prevention Agent and/or Human Resources Manager, which may lead to the employee being disciplined, the Company will advise the employee that he has the right to Union representation."

**Modify** Section 5.15.1 Leaves of Absence: Increase the nonindustrial injuries leave from twelve (12) months to eighteen (18) months.

**Modify** Section 5.16.1 Part-Time Funeral Leave by providing part-time employees shall be entitled to funeral pay for the actual day of the funeral if scheduled to work on said day and shall be entitled to two (2) unpaid days for bereavement upon request.

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

RETAIL FOOD AGREEMENT

For the purposes of Subsection 5.16:1 and 5.16.2, a member of the immediate family means the employee's spouse, child, mother, father, sister, brother, mother-in-law, father-in-law, grandparents, grandchildren, stepmother, stepfather, and stepchildren. In addition to the list above, registered domestic partner shall be included in the definition of immediate family.

**Modify** Section 6.1 Basic Workweek and Week to provide for consecutive days off for all locations throughout the Local Union jurisdiction, effective January 1, 2013.

**Add** new sentence to Section 6.1 Holiday Workweek to read: "Part-time employees shall be scheduled to work at least their minimum hours regardless of the hours they are paid for the holiday, with the exception of the weeks when the store is closed for the holiday."

**Modify** Section 7.1 Posting of Work Schedule to provide schedules shall be posted by 12 noon Wednesday of the week preceding the week such schedules are to be effective.

**Add** Section 7.1 Posting of Work Schedule after 1st sentence new sentence to provide: "Union officials will be provided an electronic copy of the work schedule when requested. Such request by the Union shall not be unreasonably made or denied."

**Add** to Section 7.6 last paragraph to read: "For all shifts that include a meal period, employees shall be entitled to a ten (10) minute break before the meal period and a ten (10) minute break after the meal period."

**Modify** Section 9.1.6.1 to allow Courtesy Clerks to inflate balloons upon customer requests and perform product demonstration.

**Modify** Section 11.6 Schedule to allow a vacation period from January 1st through December 31st.

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

RETAIL FOOD AGREEMENT

**Modify** Section 11.11 2nd paragraph to provide for those employees with two (2) or more weeks of vacations may convert one (1) week of vacation into five (5) individual vacation days.


<u>PENSION:</u>

As set forth in the Rehabilitation Plan covering the period October 8, 2011 through October 11, 2014;

Maintain Golden 85


<u>HEALTH & WELFARE:</u>

**Replace Section 12.2 EMPLOYER CONTRIBUTIONS** with the following, "The contribution rate is six dollars and twenty cents ($6.20); increasing to $6.45 an hour effective for December 2012 hours, payable January 2013; increasing to $6.50 an hour effective for June 2013 hours, payable July 2013.

Effective January 1, 2014 the parties agree to implement separate Taft-Hartley Health & Welfare plans (Plan) administered by the UEBT LLC. These new Plans will consist of all of the Employer's Active UEBT employees, its existing retirees and its proportionate share of the Funds "orphan" retirees as of 12/31/13.  These new Plans will be entitled to the proportionate share of the UEBT reserves which will be timely transitioned to the new Plan. With respect to the current "orphan" retiree obligations, the existing Retiree Trust will bill/charge the new plan for the Employer's proportionate share which will be handled as an accounting transaction.  If the Employer self funds a sick leave benefit, the above rates will be reduced by the portion of the contribution attributable to sick leave funding.

The Unions will oppose any effort on the part of other employer contributors to the existing UEBT Fund to impose an "exit" tax, unfunded liability charge or penalty as a result of this agreement or the implementation of same and creation of the new Plan.

The core benefit and eligibility structure of the new Plan will be agreed to no later than July 1, 2013. The benefit structure shall be modeled after the 2013 UEBT benefit design. The Union shall have initial responsibility for a Plan design or modifications prior to 1/1/14.  Further, because of the implementation of the Affordable Care Act's 2014 Health Care Exchanges, it is agreed that the Retiree plan benefit design and eligibility structure will be developed in recognition of the individual tax subsidies and overall federal benefits available to Retirees. If the trustees do not agree to the elimination of subsidized Medicare coverage effective 1/1/14 hours this issue shall be submitted to binding arbitration. It is expressly understood the parties shall agree on a design that may be properly funded by the agreed upon contribution rate and will allow for the prudent accumulation of adequate reserves for said Plan. Similarly, the parties will take into consideration the experience of the existing plan in cost containment and efforts to make sure the actual cost of that Plan does not exceed the agreed upon contribution rates. In the event the Plan's reserves exceed six (6) months on a cash basis, the Trustees shall declare a one month contribution holiday.

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

RETAIL FOOD AGREEMENT

In conjunction with the Plan structure, the parties will enter into an appropriate Trust Documents that meets all legal requirements for Taft-Hartley plans. There shall be six (6) Trustees appointed by the Unions and two (2) by the Employer with unit voting for the purpose of acting upon all business that comes before the trust with deadlock provision language so there is equal representation for each side. To the extent there is any dispute as to this provision the matter shall be submitted to the grievance procedure contained in the Collective bargaining Agreements. Each side may select its own co-counsel to the Plan and/or consultant. Such an arrangement shall be followed with respect to both the Active and Retiree Plans. With respect to the existing Retiree Trust the Employer will continue to be represented on said Trust through a Trustee for as long as there is an allocated liability to the Employer.

Notwithstanding the former Plan agreed upon rate of $6.50 per hour the union may request an increase to be effective 1/1/14 based on December hours. The Employer may propose a rate reduction based on the then current plan design. In the event no agreement is reached, the issue(s) shall be submitted to binding arbitration. The arbitrator shall have authority to set the rate at a level not to exceed $6.80. Said rate shall be applied and remain in effect for the duration of the Agreement.

**Add ADR Letter of Understanding:** "Consistent with California state law, the bargaining parties agree they will meet to discuss changes to the manner in which Workers' Compensation Benefits are provided to the bargaining unit employees. These changes may include the adoption by separate agreement of an Alternative Dispute Resolution system to resolve claims in a fair and expeditious manner. Also, the parties will investigate the benefit of providing workers compensation benefits through established, or newly created, Taft-Hartley funds.

On September 2, 2013, Zone B wage rates, excluding Fuel Station, will be equalized with Zone A; apply the same Zone B to Zone A monetary increases to Raley's, Yreka.

Add Meat Department Letter of Understanding (dated March 15, 2012) concerning Meat Clerk duties and volume restrictions.

**Term of Agreement:**    Raley's – October 9, 2011 to October 11, 2014
                          Bel Air – December 9, 2011 to December 11, 2014

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

RETAIL FOOD AGREEMENT

Section citations above are based on UFCW 8 -- Golden State's collective bargaining agreement, but apply to UFCW Local 5's collective bargaining agreement where appropriate. If any contractual differences exist between the Bel Air agreement and the Raley's agreement, the Raley's collective bargaining agreement language will prevail.

The parties agree to modify the collective bargaining agreement to incorporate and reflect all appropriate changes necessary as a result of the ratification of this Memorandum of Agreement. All previously submitted proposals by Local 5 and Nob Hill are considered withdrawn. If there is an oversight in the citing of the sections of the Union or Employer proposals, either party reserves the right to correct or modify the sections during the course of negotiations.

**This Agreement is subject to ratification by the affected memberships of UFCW Locals 5 and 8-Golden State. The Unions, and its representatives, agree to recommend, without qualification, this Agreement to its affected membership for ratification.**

FOR THE EMPLOYER:                    FOR THE UNIONS:

RALEY'S/BEL AIR SUPERMARKETS         UFCW LOCAL 5

By _____           By _____

Date ____11/13/2013____              Date ____11-13-12____

                                     UFCW 8-GOLDEN STATE

                                     By _____

                                     Date ____11-13-12____

PRIVELEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

**EXHIBIT F**

COMPREHENSIVE PROPOSAL FOR A

SUCCESSOR AGREEMENT BETWEEN

UNITED FOOD & COMMERCIAL WORKERS LOCALS 5 and 8

AND

NOB HILL GENERAL STORES

The Memorandum of Agreement (the "MoA") sets forth the parties' agreement on the terms and conditions for a successor Collective Bargaining Agreement to the Agreement dated December 2, 2007, through October 8, 2011, and as extended to this effective date, October 9, 2011, through October 11, 2014, (the "CBA"), between NOB HILL FOODS (the "Employer") and UNITED FOOD & COMMERCIAL WORKERS LOCALS 5 and 8—Golden State (the "Unions"). Except for the modifications stated in this Memorandum of Agreement, the provisions of the Collective Bargaining Agreements shall remain the same and in full force and effect

1. **Section 1.1 Card Check Neutrality Language:** The parties mutually recognize national labor law guarantees employees the right to form or select any labor organization to act as the employees' exclusive bargaining representative for the purpose of collective bargaining with the Employer.

The parties hereby establish the following procedure for the purpose of ensuring an orderly environment for the exercise by the Employer's employees of their rights under Section 7 of the National Labor Relations Act and to avoid picketing and/or other economic action directed at the Employer in the event the Union decides to conduct an organizing campaign at any operation at which the Union does not have representation rights.

The Employer will take a neutral approach to unionization of employees. The Employer will not take action nor make any statement that will directly or indirectly state or imply any opposition by the employer to the selection by such employees of a collective bargaining agent.

Within ten (10) days following receipt of written notice of intent to organize certain employees, the Employer will furnish the Union with a complete list of such employees, including job classifications and departments. Within two (2) weeks thereafter, the Employer will furnish a second list of such employees to the Union, including the addresses of all employees. Thereafter, the Employer will provide updated lists as requested, but no more frequently than monthly. At no time will the Union or its agents and employees harass non

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

union employees by repeated home visits or other similar tactics. The overarching principal is that Section 7 protects an employee's right to choose one way or the other without fear of reprisals, threats or other coercive conduct on the part of the Union or the Employer.

The Union may request recognition as the exclusive collective bargaining agent for the employees in a traditional bargaining unit represented by the Union in the food industry, including, including single store clerk or meat units. A disinterested, neutral party mutually satisfactory to the Employer and the Union will be selected to conduct a confidential review of employees' authorization cards and membership information submitted by he Union in support of its claim to represent a majority of the employees in the unit if either the Union or Employer so request.

If a majority of employees within the unit has joined the Union or designated it as their exclusive collective bargaining representative, the Employer will recognize the Union as such representative of the employees and will extend to such employees the Collective Bargaining Agreement between the Union and the Employer together with any amendments agreed to by the parties. The Employer will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this Agreement.

During the life of this Agreement, the Union will not engage in picketing or other economic activity at any operation covered by this Section, provided that if the Employer recognizes any other Union as the exclusive collective bargaining representative of employees in the unit, or any part thereof, traditionally represented by the Union, this paragraph shall terminate immediately and without notice.

During the life of this Agreement, the Union agrees not to engage in any stoppage of work, and furthermore, the Union and its representatives, including store representatives, agree not to boycott, handbill, publicly disparage, or engage in any adverse economic action against the Employer's stores covered by this Agreement. This provision does not apply in any of the Employer's stores where the Union has not been recognized by the Employer as the employee's bargaining representative.

The parties agree that any disputes over compliance with or the application of this Section, including claims of Union violation, shall be submitted to expedited arbitration using the expedited arbitration process set forth in the parties' collective bargaining agreements. The arbitrator shall have the authority to order the non-compliant party to comply with this Section and to order such other remedies deemed necessary to effectuate the intent of this Section. The parties

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL.

hereto consent to the entry of any order of the arbitrator as the order of judgment of the United States District Court, without notice.

The parties agree in order to avoid issues concerning negative consequences to employees' pensions, that for any newly organized stores, they will negotiate a transition plan with regard to pension coverage. Until the parties reach agreement on said pension transition, the pension plan then in effect at the newly organized location shall remain in effect notwithstanding the fact that the parties' collective bargaining agreement will become effective for all other purposes.

2. Section 1.4.4. Add the following as last sentence: In addition to the above listed items Meat Cutters, Meat Clerks, GM Clerks and AP Clerks can work all "Wall" Deli items including Dips, Biscuits, Cheese, Pickles, etc.

3. Add new Section as 1.4.5: Meat Departments doing weekly sales of $33,500 or less per week, including seafood sales, shall only be required to have on (1) Meat Cutter on duty. Meat Departments that exceed $33,500 per week shall continue to abide by the original Meat Cutter on duty language as contained herein. The measuring period in determining Meat Department sales volume shall be performed in consecutive four (4) week periods throughout the calendar year, with electronic or written notification provided to the Local Unions categorically identifying such stores. It is also agreed in Meat Departments doing weekly sales of $33,500 or less per week that Meat Clerks may grind meat for production purposes, and only after a Meat Cutter has left work for the day and is no longer on duty.

4. Section 1.7. Eliminate second paragraph.

5. Section 1.10 Salesman: Eliminate verbiage after first sentence in section.

6. Section 1.11 Traveling Clerks: Eliminate section and re-number.

7. Section 2.2 Unemployed List: Eliminate section and re-number.

8. Section 2.4. Add as 2.4.3 and re-number: Employees shall not be discharged, disciplined or suffer losses of seniority or any other benefit or be otherwise adversely affected by a lawful change of name or Social Security number.

9. Section 2.5 Other Hiring: Eliminate the words in first sentence "from sources other than the list maintained by the Union"

10. Section 3.1 Probation: Clarify that "sixty days" starts from the first day hired.

11. Section 4.3.2 All Purpose Clerk Transition: Upon ratification of a successor agreement all Experienced GM and Meat Clerks will be transitioned to the AP Clerk classification and moved to the ninth (9th) step, which will be increased from a wage rate of $15.51 per hour to $15.75, and be held at that wage rate for

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

the duration of the successor agreement. The "Interim Step" in the All Purpose Clerk classification will be moved immediately above the ninth (9th) progression step and the tenth (10th) progression step will be moved above the "Interim Step."

Apprentice GM and Meat Clerks will also be transitioned at the time of ratification and will be raised to the next highest wage rate progression step in the APC classification and will continue to accrue hours in the APC classification to the eighth (8th) step and remain at that step without accumulating progression hours for the duration of the agreement. Once the aforementioned transition occurs, the GM Clerk and Meat Clerk classification will be eliminated. The GMC Department Head will be transitioned to the "Interim Step" in the APC classification which will be sixteen dollars ($16) per hour. A new classification will be established in the APC classification as APC Department Head with a wage rate of eighteen dollars and fifty cents ($18.50). Increase ninth step to 1040 hours.

12. **Section 4.7 Lists:** 1st paragraph 1st sentence: Eliminate sentence and replace with the following: "The Employer agrees to provide two (2) lists of employees on January 1st and July 1st of each calendar year provided to the Union through an electronic format."

13. **Section 4.7 Lists:** Eliminate last paragraph.

14. **Section 4.10.1 Request for Full-Time Work:** Eliminate bidding procedure for full-time employees and replace with a full-time to part-time ratio within each of the jurisdictional seniority areas of Local 5 referenced in Section 4.7. The ratio shall include the combined total of Food Clerks and All Purpose Clerks and will be set at thirty percent (30%). When such ratio falls below thirty percent (30%) the most senior part-time Food Clerk or All Purpose Clerk within the jurisdictional seniority area will be offered a full-time position until an offer is accepted. The Employer has discretion on where the location of the full-time position will be filled within the jurisdictional seniority area in which the full-time position was created.

15. **Section 4.10.3 Removal from List (Full-Time Bid List):** Eliminate Section and re-number.

16. **Section 4.10.4 Reduction in Hours and Layoff:** Eliminate last two (2) paragraphs in Section.

17. **Section 5.1 Safety Rules:** Section 5.2 Military Service: Modify section to observe both the "Universal Military Training and Service Act," and "The Uniform Services Employment and Reemployment Rights Act"

18. **Section 5.5 Uniforms:** 2nd paragraph, add as last sentence: "In the event the Employer requires the wearing of a uniform, the Employer will provide at least

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

two (2) shirts for part-time employees.  At the time an employee is classified as full-time they will be provided an additional two (2) shirts for a total of no less than four (4) shirts. The Employer will provide replacement shirts upon reasonable wear and tear of the shirts."

19. **Section 5.5 Special Wear:** Modify "Special Wear" to add: "Additionally, employees will be allowed to wear appropriate clothing to protect from inclement weather in accordance with the Employer's dress code policy."

20. **Section 5.7 Pay Day and Deductions:** Add as last sentence to the first paragraph: "Checks will be available for pick-up after reconciliation on Friday." Also, add "full-time" or "part-time" to paychecks.

21. **Section 5.9 Union Business:** Replace the words "Store Representatives" with the words "Store Stewards."

22. **Modify Section 5.14.1 Leaves of Absence:** Increase the non-industrial injuries leave from twelve (12) months to eighteen (18) months.

23. **Section 5.15 Funeral Leave:** Add domestic partner to last paragraph in section.

24. **Section 5.15.1 Funeral Leave:** Modify to provide two (2) days unpaid leave and one (1) day paid leave for part-time employees.

25. **Section 6.1:** Modify to reflect all employees shall receive two (2) consecutive days off for full-time employees in each calendar week commencing January 1, 2013.

26. **Section 6.1 Holiday Workweek:** Add new sentence to read: "Part-time employees shall be scheduled to work at least their minimum hours regardless of hours they are paid for the holiday except when the store is closed for a holiday(s)."

27. **Section 7.1 Posting of Work Schedule:** Modify schedule posting time to 12:00 p.m. on Wednesday of the week preceding the week such schedules are to be effective.

28. **Section 7.1 Posting of Work Schedule:** Add the following at the end of second sentence: "and list employees by seniority including the total number of weekly hours scheduled by the employee."

29. **Section 7.1 Posting of Work Schedule:** Modify as follows: "Union officials will be provided an electronic copy of the work schedule as agreed upon. Such request by the Union will not be unreasonably made or denied."

30. **Section 7.5 Meal Period:** Add the following at end of first sentence after the word "sold:" "except as outlined in Section 1.4 and 9.1.9.2."

31. **Section 7.7 Daily Guarantee:** Eliminate the words, "except students and Courtesy Clerks."

32. **Section 9.1.2.4.1 Head Clerk:** Add new sub-section as follows; "All Head Clerks are to be designated as full-time regardless of classification.

33. **Section 9.1.3 All Purpose Clerk (APC):** Replace "Experienced Food Clerk" with the following:

An Experienced APC is an employee that has gained 11,960 hours, or the equivalent thereof in the retail food industry.

PREVIOUS EXPERIENCE: If an Experienced APC has been out of the industry less than five (5) years they will be allowed to start at the Experience APC rate.

If an Experienced APC has been out of the industry between five (5) and ten (10) years, he will be allowed to start at the 8th Step APC rate of pay.

If an Experienced APC has been out of the industry ten (10) or more years, he will be allowed to start at the 5th Step All-Purpose rate of pay.

If a person has been out of the industry for five (5) years or more, who has not reached Experienced APC status, he will be allowed to start at the 1st Step APC rate of pay.

34. **Section 9.1.10.1 Duties:** Amend to allow Courtesy Clerks to inflate balloons upon customer request and perform product demonstration.

35. **Section 9.1.10.2 Daily Guarantee:** Modify to clarify Courtesy Clerks receive a minimum of a four (4) hour guarantee, but may work a minimum of two (2) hour work shifts if mutually agreeable between the Employer and the employee.

36. **Section 9.1.7.4** Add the following as new paragraph: "A Joint Advisory Committee consisting of a representative of the State of California, Division of Apprentice Standards, and an equal number of representatives representing the Employers and an equal number of representatives appointed by each Local Union as follows: Locals 5 and 8 to represent all segments of the Retail Meat Industry in Northern California, shall be charged with the responsibility of preparing a uniform Northern California-wide program prior to develop procedures, guidelines, and standards to train apprentices in compliance with the California Apprenticeship Law (Shelly-Maloney Act), Title VII of the Civil Rights Act, and any other applicable federal statutes."

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

37. **Section 9.1.9.2:** Add as second sentence: "Meat Clerks may also grind fresh meat for production purposes in Meat Departments generating $33,500 or less in sales volume as measured in consecutive four week periods throughout the calendar year, and only if the Meat Cutter has left for the day and is no longer on duty."

38. **Section 11.7:** Modify vacation period to January 1st through December 31st.

39. **Section 11.12:** Add last sentence to read as follows: "Employees who earn two (2) or more weeks of vacation may convert one (1) week into five (5) individual days.

40. **Section 12: HEALTH & WELFARE:**

Replace Section 12.2 **EMPLOYER CONTRIBUTIONS** with the following, "The contribution rate is six dollars and twenty cents ($6.20); increasing to $6.45 an hour effective for December 2012 hours, payable January 2013; increasing to $6.50 an hour effective for June 2013 hours, payable July 2013.

Effective January 1, 2014 the parties agree to implement separate Taft-Hartley Health & Welfare plans (Plan) administered by the UEBT LLC. These new Plans will consist of all of the Employer's Active UEBT employees, its existing retirees and its proportionate share of the Funds' "orphan" retirees as of 12/31/13. These new Plans will be entitled to the proportionate share of the UEBT reserves which will be timely transitioned to the new Plan. With respect to the current "orphan" retiree obligations, the existing Retiree Trust will bill/charge the new plan for the Employer self funds a sick leave benefit, the above rates will be reduced by the portion of the contribution attributable to sick leave funding.

The Unions will oppose any effort on the part of other employer contributors to the existing UEBT Fund to impose an "exit" tax, unfunded liability charge or penalty as a result of this agreement or the implementation of same and creation of the new Plan.

The core benefit and eligibility structure of the new Plan will be agreed to no later than July 1, 2013. The benefit structure shall be modeled after the 2013 UEBT benefit design. The Union shall have initial responsibility for a Plan design or modifications prior to 1/1/14. Further, because of the implementation of the Affordable Care Act's 2014 Health Care Exchanges, it is agreed that the Retiree plan benefit design and eligibility structure will be developed in recognition of the individual tax subsidies and overall federal benefits available to Retirees. If the trustees do not agree to the elimination of subsidized Medicare coverage effective 1/1/14 hours this issue shall be submitted to binding arbitration. It is expressly understood the parties shall

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

agree on a design that may be properly funded by the agreed upon contribution rate and will allow for the prudent accumulation of adequate reserves for said Plan. Similarly, the parties will take into consideration the experience of the existing plan in cost containment and efforts to make sure the actual cost of that Plan does not exceed the agreed upon contribution rates. In the event the Plan's reserves exceed six (6) months on a cash basis, the Trustees shall declare a one month contribution holiday.

In conjunction with the Plan structure, the parties will enter into an appropriate Trust Documents that meets all legal requirements for Taft-Hartley plans. There shall be six (6) Trustees appointed by the Unions and two (2) by the Employer with unit voting for the purpose of acting upon all business that comes before the trust with deadlock provision language so there is equal representation for each side. To the extent there is any dispute as to this provision the matter shall be submitted to the grievance procedure contained in the Collective bargaining Agreements. Each side may select its own co-counsel to the Plan and/or consultant. Such an arrangement shall be followed with respect to both the Active and Retiree Plans. With respect to the existing Retiree Trust the Employer will continue to be represented on said Trust through a Trustee for as long as there is an allocated liability to the Employer.

Notwithstanding former Plan agreed upon rate of $6.50 per hour the union may request an increase to be effective 1/1/14 based on December hours. The Employer may propose a rate reduction based on the then current plan design. In the event no agreement is reached, the issue(s) shall be submitted to binding arbitration. The arbitrator shall have authority to set the rate at a level not to exceed $6.80. Said rate shall be applied and remain in effect for the duration of the Agreement.

41. **Section 13 Pension:** Modify Pension section to reflect changes pursuant to the Pension Rehabilitation Plan established by UEBT Trustees and effective in January 2012. Maintain the Rule of 85.

42. **Section 20 Term of Agreement:** December 3, 2011 through October 11, 2014.

43. **Wages:** Wage rates will remain frozen for the duration of the Stabilization Agreement except for those as outlined in Item Number 11 above; Meat Cutters at the seventh (7th) progression step and above; Fuel Station employees and Utility Clerks. Those employees in wage progression steps not receiving progression step increases will retain their accrued hours in their respective progression step but will not continue to accrue additional progression hours until the expiration of the Stabilization Agreement.

44. Side letter reinstating forty (40) hour full-time status to eight (8) employees in the Monterey, Santa Cruz and San Benito geographical seniority areas.

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

Section citations above are based on UFCW 5's collective bargaining agreement, but apply to UFCW Local 8 Golden State's collective bargaining agreement where appropriate.

All previously submitted proposals by Local 5 and Nob Hill are considered withdrawn. If there is an oversight in the citing of the sections of the Union or Employer proposals, either party reserves the right to correct or modify the sections during the course of negotiations.

FOR THE EMPLOYER:                    FOR THE UNION:

By _____              By _____

Date __11/13/2012__                  Date __11-13-12__


_11-13-12_

PRIVILEGED AND CONFIDENTIAL SETTLEMENT PROPOSAL

**EXHIBIT G**



**Ronald J. Lind**
President

**Tim Hamann**
Secretary - Treasurer

**Main Office:**
United Food & Commercial
Workers Union, Local 5
240 South Market Street
San Jose, CA 95113-2382
(408) 998-0428
Fax: (408) 971-8355
Toll Free: (877) 655-FIVE
www.ufcw5.org

28870 Mission Blvd.
Hayward, CA 94544
(510) 889-0870
Fax: (510) 889-6415

208 Miller Avenue
So. San Francisco, CA 94080
(650) 871-5730
Fax: (650) 871-5590

4121 Alhambra Ave.
Martinez, CA 94553
(925) 228-8800
Fax: (925) 228-8355

1145 North Main St.
Salinas, CA 93906
(831) 757-3094
Fax: (831) 757-9115

323 Geary Street, Room 709
San Francisco, CA 94102
(415) 693-0143
Fax: (415) 693-9352

85 Galli Drive, Suite H
Novato, CA 94949
(415) 883-6833
Fax: (415) 883-1043

840 E Street, Suite B
Eureka, CA 95501
(707) 442-1751
Fax: (707) 442-0572

September 8, 2014

Mark Foley
Raley's Family of Fine Stores
500 West Capitol Avenue
West Sacramento, CA 95605-2696

RE: Non-Union Stores

Dear Mr. Foley:

Pursuant to Section 1.1 of our Collective Bargaining Agreement, please consider this official notice of Local 5's intent to organize employees at the following stores: 343, 336, 331, 315, 319, 314, 304, 316, 321, 330, 344 and 307.

The language requires that the company provide us with a complete list of employees, including job classifications and departments within ten days of this request. A follow-up list of employee addresses is required within two weeks of the initial request.

I would also remind you that the contract also requires that the Employer remain neutral during any organizing attempt by the Union.

We look forward to receiving the requested information in a timely manner. Please feel free to contact me if you have any questions.

Sincerely,

Ronald J. Lind
President/International Vice-President

**EXHIBIT H**



United Food & Commercial Workers International Union, AFL-CIO, CLC
Jacques Loveall
President
International Vice President

**Roseville**
(Headquarters)
2200 Professional Dr.
Roseville, CA 95661
(916) 786-0588
(916) 786-0958 (fax)

**Bakersfield**
900 Airport Dr.
Bakersfield, CA 93308
(661) 391-5770

**Chico**
20 Constitution Dr.
Suite C1
Chico, CA 95973
(530) 895-0017

**Fresno**
3485 W. Shaw Ave.
Suite 101
Fresno, CA 93711
(559) 271-1288

**Fresno**
Distillery, Wine & Allied
and Wholesale Division
2918 N. West Ave.
Fresno, CA 93705
(559) 226-5045

**Modesto**
2007 Yosemite Blvd.
Modesto, CA 95354
(209) 529-0596

**Redding**
3400 Beckelli Ln.
Suite C1
Redding, CA 96002
(530) 222-3905

**Santa Rosa**
940 Hopper Ave.
Santa Rosa, CA 95403
(707) 546-1384

September 12, 2014

Sent Via Certified Mail
7007 2560 0002 6989 0803

Mark Foley
Senior Vice President Human Resources and Labor Relations
Raley's Supermarkets
500 W. Capitol Avenue
West Sacramento, CA 95605

RE: Non-Union Stores

Dear Mr. Foley:

Pursuant to Section 1.1 of our Collective Bargaining Agreement, please consider this official notice of UFCW 8's intent to organize employees at the following Raley's and Nob Hill stores: 213, 242, 245, 248, 249, 309, 313, 328, 329, 340, 341 and Nob Hill 601.

The language requires that the Employer furnish the Union with a complete list of such employees, including job classifications and departments, within ten days of this request. Within two (2) weeks thereafter, the Employer will furnish a second list of such employees to the Union, including the addresses of all employees.

I would also remind you that the contract also requires that the Employer remain neutral during any organizing attempt by the Union.

We look forward to receiving the requested information in a timely manner. Please feel free to contact me if you have any questions.

Sincerely,

JACQUES LOVEALL

JSL:lab

**EXHIBIT I**

# THE ZAPPIA LAW FIRM, A Professional Corporation

*— Labor & Employment Law —*
*Defending Management Rights*

**Los Angeles**
333 South Hope Street
Suite 3600
Los Angeles, California 90071
Telephone: (213) 814-5550
Facsimile: (213) 814-5560
www.zappialegal.com

**Orange County**
5942 Edinger Avenue
Suite 113-284
Huntington Beach, CA 92649
Telephone: (657) 888-9353
Facsimile: (657) 888-9354
www.zappialegal.com

*Author's Direct Dial:*
*Edward F. Zappia*
Direct Dial: (213) 814-5555
ezappia@zappialegal.com

September 19, 2014

<u>VIA FACSIMILE (916-786-0958) AND US MAIL</u>

Jacques Loveall
President, UFCW 8 Golden State
220 Professional Drive
Roseville, CA 95661

     **RE:**    Raley's Supermarkets/UFCW Local 8's Notice of Intent to Organize and
             Request For Employee Information Under the Neutrality Agreement

Dear Mr. Loveall:

     Please note that this firm represents Raley's Supermarkets in the above-referenced matter.
We have been provided your letter dated September 12, 2014. Pursuant to Section 1.1 of the
Neutrality Agreement, you informed Raley's of UFCW, Local 8's intent to organize numerous
Raley's and Nob Hill stores, and requested employees' information, including their addresses.

     1.    <u>The Neutrality Agreement</u>

     As you are aware, the Neutrality Agreement was negotiated between Raley's and UFCW
between September and November of 2012, part and parcel of negotiations to end an ongoing strike
at the time. It was executed in final form in late December 2012, after the strike had ended. The
material terms of the Neutrality Agreement were that, in exchange for: (1) UFCW ceasing the 2012
strike; and (2) agreeing to no further/future "picketing or other economic activity...stoppage of
work...boycott, handbill, public disparage[ment], or engag[ing] in any adverse economic action"
against Raley's stores cover by the Neutrality Agreement; (3) Raley's would remain neutral and
make no statement demonstrating opposition to UFCW organization activity in non-union stores;
and (4) provide UFCW with employees' information in non-union stores, including their addresses.

     After reviewing the Neutrality Agreement, the circumstances under which it was entered, and
relevant case law pertaining to employee privacy and the validity of Neutrality Agreements, Raley's

THE ZAPPIA LAW FIRM
— Labor & Employment Law —

Mr. Jacques Loveall
September 19, 2014
Page 2

will not disclose confidential information of its unrepresented employees pursuant to a Neutrality Agreement, without an individualized employee waiver or court order.

2.   Raley's Has a Legal Duty to Maintain the Privacy Rights of Unrepresented Employees

As an employer in necessary possession of employees' confidential information, Raley's has an affirmative duty to maintain, not divulge, its employees' private information. An employees' right to privacy will not be waived absent a court order or specific, knowing, voluntary waiver by the employee. (See, *California Constitution, Art 1, §1; Board of Trustees v. Superior Court* (1981) 119 Cal.App.3d 516, 530 ("California Courts have generally concluded that the public interest in preserving confidential information outweighs the interest of a private litigant in obtaining confidential information."); *Harding Lawson Associates v. Superior Court* (1992) 10 Cal.App.4th 7, 10 ("a balance of the competing interests will favor privacy for confidential information in third party personnel files unless the litigant can show a compelling need for the particular documents and that the information cannot reasonably be obtained through depositions or from non-confidential sources." [italic added]).)

In the specific context of collective bargaining, the California Supreme Court recently affirmed that unrepresented employees' privacy interests outweigh a prospective union's request for their confidential information. In *County of Los Angeles v. Los Angeles County Employee Relations Com.* (2013) 56 Cal. 4th 905, 927, SEIU sought confidential information of represented and unrepresented employees. The Court stated, "Legally recognized privacy interests include interests in precluding the dissemination or misuse of sensitive and confidential information . . . The parties agree that County employees *have a legally protected privacy interest in their home addresses and telephone numbers*. The court thus concluded that the County was *only required to disclose represented employees' information,* since SEIU was their *exclusive bargaining agent.* (Id. at 931.)

The United States Supreme Court has noted in a similar case involving a bargaining representative's request for non-member information:

"Here, for the most part, the unions seek to obtain the addresses of nonunion employees who have decided not to reveal their addresses to their exclusive representative . . . employees . . . have some nontrivial privacy interest in nondisclosure, and in avoiding the influx of union-related mail, and, perhaps, union-related telephone calls or visits, that would follow disclosure. Many people simply do not want to be disturbed at home by work-related matters. Employees can lessen the chance of such unwanted contacts by not revealing their addresses to their exclusive representative. Even if the direct union/employee communication facilitated by the disclosure of home addresses were limited to mailings, this does not lessen the interest that individuals have in preventing at least some unsolicited, unwanted mail from reaching them at their homes. We are reluctant to disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions." (*United States Dep't of Defense v. Federal Labor Relations Auth.* (1993) 510 U.S. 487, 501.)

THE ZAPPIA LAW FIRM
— *Labor & Employment Law* —

Mr. Jacques Loveall
September 19, 2014
Page 3

As the Court of Appeal stated, "In other words, the right to privacy is sufficiently strong to protect a decision not to disclose personal information to a specific audience, such as the organizers of a union with whom the individual chooses not to associate." (*Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal. App. 4th 347, 366.)

Consistent with governing law, Raley's cannot breach its employees' privacy rights by providing their home addresses or other personal information as requested. This is particularly true in light of past conduct directed towards nonunion members during the strike which reasonably causes Raley's concern over the safety of its employees. (*See e.g., Shell Oil Co. v. N.L.R.B.* (9th Cir., 1972) 457 F.2d 615.)

3.    The Neutrality Agreement is Unenforceable as the Product of Coercion and Duress

An agreement secured through coercion or duress, including economic duress is unenforceable. California Civil Code section 1567 provides that an apparent consent is not "real or free" when obtained through duress, menace, fraud, undue influence, or mistake. Moreover, the doctrine of "economic duress" can apply when one party has engaged in conduct sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract. The party subjected to the coercive act, and having no reasonable alternative, can establish "economic duress" to avoid the contract." (*CrossTalk Productions, Inc. v. Jacobson* (1998) 65 Cal.App.4th 631, 644.)  "A party whose consent to a contract has been obtained by economic duress may rescind the contract under certain circumstances. A party to a contract may rescind the contract if the consent of the party rescinding, ... was ... obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party. Thus, a party who enters into a contract under duress may obtain rescission against another contracting party, who, although not responsible for the duress, knows that it has taken place and takes advantage of it by enforcing the contract, particularly a contract made with inadequate consideration." (*Chan v. Lund* (2010) 188 Cal.App.4th 1159, 1174.)

Here, UFCW secured Raley's agreement to the Neutrality Agreement, not through customary arms' length collective bargaining, but by offering to end an ongoing strike which was subjecting both Raley's and its employees to severe economic stress, along with promises of UFCW to refrain from doing so in the future. Moreover, since UFCW now asserts this Neutrality Agreement as a basis to seek disclosure of confidential employee information, Raley's hereby rescinds the Neutrality Agreement as the product of past and ongoing economic coercion and duress as Raley's inducement to agree.

4.    The Neutrality Agreement Likely Constitutes a Criminal Violation of Section 302 of the Labor Relations Management Act

As has recently been addressed up to the United States Supreme Court, Section 302 of the Labor Management Relations Act makes it unlawful for "any employer ...to pay, lend or deliver, any money or other thing of value...to any labor organization, or any officer or employee thereof,

Los Angeles | Orange County | Silicon Valley | 213-814-5550 | www.zappialegal.com

THE ZAPPIA LAW FIRM
— Labor & Employment Law —

Mr. Jacques Loveall
September 19, 2014
Page 4

which represents, seeks to represent, or would admit to membership, any of the employees of such employer..." (29 U.S.C. §186(a)(2).) This is exactly what would occur in our case if Raley's was to comply with your request.

In *Mulhall v. Unite Here Local 355,* (2012, 11ᵗʰ Cir.) 667 F.3d 1211, the United States Court of Appeals for the Eleventh Circuit held that organizing assistance can be a "thing of value" if demanded or given as payment, and could constitute a violation of Section 302. Like here, in *Mulhall,* the labor union and employer entered into a neutrality agreement wherein the employer promised to: (1) provide access to its non-public work premises to union representatives; (2) provide a list of employees, job classifications and addresses to the union upon request; and (3) remain neutral to the unionization of employees. After an extensive analysis by the Court of the term "thing of value," the Court concluded that "[i]t seems apparent that organizing assistance can be a thing of value...." The court also concluded as follows:

> "Yet, a violation of 302 cannot be ruled out merely because intangible assistance
> cannot be loaned or delivered. Section 302 also prohibits payment of a thing of
> value, and intangible services, privileges, or concessions can be paid or operate as
> payment. Whether something qualifies as a payment depends not on whether it is
> tangible or has monetary value, but on whether its performance fulfills an
> obligation." (*Id.* at 1215.)

The case was then taken up by the Supreme Court on a writ of certiorari. However, after hearing oral argument in November 2013, the Court dismissed the writ as being improvidently granted. Applying the reasoning in *Mulhall* here, (and that of other federal appellate circuit courts of appeal), if the UFCW were to request, and Raley's were to provide UFCW Local 8 with information and access to facilitate organizing efforts, that would irrefutably constitute unlawfully requesting and providing a "thing of value" to procure union membership. Given that this is illegal, and all employers were recently reminded of this in the *Mulhall* case, Raley's will not participate, and denies your request for this reason as well.

For all of above-stated reasons, Raley's denies UFCW 8's employee information requests set forth in your September 12, 2014 letter. Please do not hesitate to contact me should you have any questions.

Sincerely,

THE ZAPPIA LAW FIRM
A Professional Corporation

Edward P. Zappia

**EXHIBIT J**

1                    IN THE MATTER OF AN ARBITRATION

2

3        Between

4        UNITED FOOD AND COMMERCIAL

5        WORKERS UNION LOCALS 5 AND 8,

6                              Unions,

7        and

8        RALEY'S, BEL AIR MARKETS AND

9        NOB HILL GENERAL STORES,

10                             Employer.

11       Re:  Neutrality provision.

12       _____/

13

14

15                    TRANSCRIPT OF PROCEEDINGS

16                    VOLUME I, (pages 1-121)

17

18                    December 15, 2014

19                    11:10 a.m.

20

21

22

23

24       Reported by:  MARY P. RADOCY, RPR, CSR #3355

25

                                                        1

1    a short break, we'll have two short witnesses and we may

2    be done by 2:30.

3                    ARBITRATOR KAGEL:  We'll recess.

4                    (Off the record.)

5                    ARBITRATOR KAGEL:  Back on the record.

6                    MR. ZAPPIA:  We'll call our next witness.  Are

7    you ready?

8                    ARBITRATOR KAGEL:  Sure.

9    Whereupon,

10                        LORI LYNN BELGER

11       called as a witness, having been first duly sworn,

12   testified as follows:

13                    ARBITRATOR KAGEL:  Give us your name, please.

14                    THE WITNESS:  Lori Lynn Belger.

15                    ARBITRATOR KAGEL:  Speak up good and loud and

16   spell your names.

17                    THE WITNESS:  Lori is L-o-r-i, L-y-n-n, Belger

18   is B-e-l-g-e-r.

19                    ARBITRATOR KAGEL:  Ms. Belger, my name is John

20   Kagel.  I'm the arbitrator.  Mr. Rosenfeld and Mr. Kahn

21   represent Local 8 and 5 respectively.  They may have some

22   questions for you when Ed finishes.

23

24                        DIRECT EXAMINATION

25                    MR. ZAPPIA:

                                                        105

1    Q.        Where are you employed?

2    A.        For Raley's in Pleasanton.

3    Q.        How long have you been employed by Raley's?

4    A.        Sixteen years and 8 months.

5    Q.        Could you just tell us a little bit about the

6    different positions you've held over the last 16 years?

7    A.        I'm just in the Grocery Department and I'm

8    Cashier or Clerk.

9    Q.        Have you ever given Raley's consent to disclose

10   your address or other confidential information?

11             MR. ROSENFELD:  Objection.  Irrelevant.

12             ARBITRATOR KAGEL:  Overruled.

13             THE WITNESS:  No, I've never given them consent

14   to do that.

15             MR. ZAPPIA:

16   Q.        Would you consent to Raley's disclosing any

17   private information in your personnel file including your

18   address?

19             MR. ROSENFELD:  Objection.  Relevance.

20             ARBITRATOR KAGEL:  Overruled.

21             THE WITNESS:  No, I would not consent to that.

22             MR. ZAPPIA:

23   Q.        Why not?

24             MR. ROSENFELD:  Objection.  Her opinion about

25   this is irrelevant.

                                                    106

1          ARBITRATOR KAGEL:  Overruled.

2          MR. ZAPPIA:

3    Q.        You can answer.

4    A.        Okay.  Because I don't want them calling me or

5    coming to my home.

6          ARBITRATOR KAGEL:  Sorry, you're going to have

7    to speak up.

8          Because?

9          THE WITNESS:  I wouldn't want the Union calling

10   me or coming to my home, neither of them.

11         MR. ZAPPIA:

12   Q.        Do you wear a name tag as part of your duties

13   at work?

14   A.        I do.

15   Q.        What does your name tag state in its entirety?

16   A.        It just says "Raley's" and says "Lori" and we

17   picked  -- they did a cute little thing where you could

18   pick what you wanted and so I picked "I'm a Foodie"

19   because we're in the grocery business -- just trying to

20   do something fun on our name tags.  But it's just

21   "Lori."

22   Q.        Just to be clear for the record, your last name

23   doesn't appear on your name tag, does it?

24   A.        No, it does not.

25         MR. ZAPPIA:  I don't have any further

                                                        107

1                    CERTIFICATE OF REPORTER

2          I, the undersigned, a Certified Shorthand

3    Reporter duly licensed by the State of California, hereby

4    certify that the foregoing proceedings were held at the

5    time and place herein stated; that the testimony of the

6    witnesses was reported by me, a Certified Shorthand

7    Reporter and disinterested person, and was thereafter

8    transcribed under my direction into typewriting; that the

9    foregoing is a full, complete and true record of said

10   proceedings.

11         I further certify that I am not of counsel or

12   attorney for either or any of the parties, nor am I in

13   any way interested in the outcome of the cause named.

14         IN WITNESS WHEREOF, I have hereunto set

15   my hand this 2nd day of January 2015.

16

17

18   _____

19   MARY P. RADOCY, RPR, CSR #3355

20

21

22

23

24

25

                                                            121

                M. P. RADOCY, INC.    (650) 325-4393

**EXHIBIT K**

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENT BETWEEN THE PARTIES

UNITED FOOD AND COMMERCIAL  ]
WORKERS, LOCALS 5 AND 8,    ]
             ]   Opinion and
             ]   Decision
             ]
        Union,  ]   of
   and         ]
             ]   John Kagel
             ]
RALEYS, BEL AIR, NOB HILL,   ]   Arbitrator
             ]
             ]
       Employer. ]   June 18, 2015
             ]
             ]   Palo Alto, California
Re: Neutrality Agreement     ]

APPEARANCES:

For the Unions: Local 8, Andrew J. Kahn, Esq., Davis, Cowell & Bowe, San Francisco, CA, Local 5, David A. Rosenfeld, Esq., Weinberg, Roger & Rosenfeld, Alameda, CA

For the Employer: Edward P. Zappia, Esq., The Zappia Law Firm, Los Angeles, CA

ISSUE:

Whether the card check/neutrality provisions of the Settlement Agreement dated November 13, 2012, and the comprehensive proposal for a successor agreement between the Parties are enforceable; and if not, what shall be the remedy? If enforceable, is the

provision with respect to disclosing nonunion-represented employees' names and addresses enforceable? (Tr. 11)

(Local 5 withdrew an unrelated issue. (5/22/15))

AGREEMENT PROVISIONS:

"1.    Section 1.1 Card Check Neutrality Language: The parties mutually recognize national labor law guarantees employees the right to form or select any labor organization to act as the employees' excusive bargaining representative for the propose of collective bargaining with the Employer.

The parties hereby establish the following procedure for the purpose of ensuring an orderly environment for the exercise by the Employer's employees of their rights under Section 7 of the National Labor Relations Act and to avoid picketing and/or other economic action directed at the Employer in the event the Union decides to conduct an organizing campaign at any operation at which the Union does not have representation rights.

The Employer will take a neutral approach to unionization of employees. The Employer will not take action nor make any statement that will directly or indirectly state or imply any opposition by the employer to the selection by such employees of a collective bargaining agent.

Within ten (10) days following receipt of written notice of intent to organize certain employees, the Employer will furnish the Union with a complete list of such employees, including job classifications and departments. Within two (2) weeks thereafter, the Employer will furnish a second list of such employees to the Union, including the addresses of all employees. Thereafter, the Employer will provide updated lists as requested, but no more frequently than monthly. At no time will the Union or its agents and employees harass nonunion employees by repeated home visits or other similar tactics. The overarching principal is that Section 7 protects an employees right to choose one way or the other without fear of reprisals, threats or other coercive conduct on the part of the Union or the Employer.

The Union may request recognition in a traditional bargaining unit represented by the Union in the food industry, ... A disinterested, neutral party mutually satisfactory to the Employer and the Union

2

will he selected to conduct a confidential review of employees' authorization cards and membership information submitted by the Union in support of its claim to represent majority of the employees in the unit if either the Union or the Employer so request.

If a majority of employees within the unit has joined the Union or designated it as their exclusive collective bargaining representative, the Employer will recognize the Union as, such representative of the employees and will extend to such employees the Collective Bargaining Agreement between the Union and the Employer together with any amendments agreed to by the parties. The Employer will not file a petition with the National Labor Relations Board for any election in connection with any demands for recognition provided for in this Agreement

During the life of this Agreement, the Union will not engage in picketing or other economic activity at any operation covered by this Section, …

During the life of this Agreement, the Union agrees not to engage in any stoppage of work, and furthermore, the Union and its representatives, including store representatives, agree not to boycott, handbill, publicly disparage, or engage in any adverse economic action against the Employer's stores covered by this Agreement This provision does not apply in any of the Employer's stores where the Union has not been recognized by the Employer as the employee's bargaining representative.

The parties agree that any disputes over compliance with or the application of this Section, including claims of Union violation, shall be submitted to expedited arbitration using the expedited arbitration process set forth in the parties' collective bargaining agreements. The arbitrator shall have the authority to order the non-compliant party to comply with this Section and to order such other remedies deemed necessary to effectuate the intent of this Section. The parties hereto consent to the entry of any order of the arbitrator as the order of judgment of the United States District Court, without notice." (Er. Ex. 6)

### "STRIKE SETTLEMENT AGREEMENT …

7.      The Employer and the Unions agree to waive, release, withdraw or dismiss all claims and causes of action of any kind or nature that they have, or may have, against each other, their members, agents or employees arising out of the labor dispute and

3

strike, including but not limited to state and federal court and administrative action. Both the Employer and Unions agree they will not file, or cause to be filed, any civil litigation or administrative charges with federal, state or local courts or agencies against the other relating to any matter or issue arising out of, or during the period of the strike and labor dispute. The Unions and employer agree that they will withdraw with prejudice and file a request for dismissal with prejudice, as appropriate and as required by law, all grievances, administrative charges and civil litigation, relating to any matter or issue arising out of the labor dispute or strike.

8.      Any disagreements as to the interpretation or application of this Agreement shall be handled and resolved pursuant to the grievance and arbitration procedures set forth in the parties' collective bargaining agreements. ..." (Er. Ex. 59)

BACKGROUND:

Two years after the Parties settled a strike resulting in the above neutrality agreement, as well as a "Stabilization Agreement" providing economic relief to the Employer, Local 8 sought addresses of employees of unorganized Employer stores. The Employer refused to provide that list, maintaining to do so would violate the privacy rights of those employees. It also sought to nullify the above-quoted neutrality agreement on the basis that it was agreed to by what the Employer describes as economic duress, not because the Unions struck, but because they used the strike to unlawfully impose the neutrality agreement on the Employer, a permissive subject of bargaining, as a condition to end the strike.

The Employer has stores under three banners, Raley's, Bel Air and Nob Hill. Each has a separate Collective Bargaining Agreement, but, for the purposes of this case, all contain the same relevant wording. The Unions moved the issue of the Employer's

4

noncompliance with the neutrality address list provision to arbitration under the terms of the neutrality agreement, they stipulating that its reference to an expedited arbitration procedure in that agreement did not exist in the underlying Collective Bargaining Agreements.

POSITION OF THE PARTIES:

Position of the Employer:

That since the neutrality agreement is unenforceable as a matter of law, the Employer is entitled to rescind it; that California Civil Code Section 1689.b.1 provides that a contract can be rescinded if consent was given through duress exercised by the opposing party; that Section 1689.b.5 allows recession if the contract is unlawful; that Section 1689.b.6 allows recession if the public interest will be prejudiced by permitting the contract to stand; that nonunion employees' privacy rights would be violated if information concerning their names, addresses and job classifications were provided to the Unions without their consent as provided by the United States Constitution's 14th Amendment and Article 1, Section 1 of the California Constitution; that an invasion of privacy is a tort; that there is a reasonable expectation of privacy with respect to employee's personnel files as recognized by California and federal case law and by statute; that an employer has a duty to not waive the privacy rights of its employees by disclosure to third parties without a compelling need for information in their personnel files; that an employee's privacy interests are sufficient to avoid an influx of non-public union-related mail and phone calls; that there is no expectation of privacy by newly hired

employees by the Employer providing employee addresses at its organized locations to the Unions since they know they will become Union members; that an *Excelsior* list is provided only to the NLRB, and then only after an election has been certified, to provide employees with an opportunity to be informed with respect to the impending election; that given the Unions' rights to organize non-Union employees other than with their names and addresses provided by the Employer, any balancing of rights favors the employees' privacy; that the neutrality agreement is a "thing of value" in violation of Section 302 of the LMRA as organizing assistance substantially aiding the Union in avoiding time and expense of a normal organizing campaign which, in the end, would provide the Union more dues-paying members and bargaining power; that the Unions considered the neutrality agreement valuable was shown by their instance to include it as a condition of ending the strike and reaching agreement; that the Employer had no reasonable alternative but to accept that condition thereby providing a grounds for rescission; that a labor agreement is a contract to which the rescission statute applies; that it was not an economic strike which caused the unlawful duress but the coupling of it with the unconditional demand for the neutrality agreement when the Employer's choice was to acquiesce or to close stores and lay employees off; that the Unions' argument that the Employer benefits from the disclosure of employees' addresses, and that employees are better informed, ignores that the Unions have alternative ways of providing that information, for most employers do not provide addresses of employees and unions successfully organize; that the *Carian* case relied upon by the Unions is distinguishable and *County of Los Angeles* is the applicable California authority; that *Garmon* and

6

*Machinists* preemption doctrines are not factually applicable; that the Unions concede that the Employer agreed to the extension of the Collective Bargaining Agreements and the Neutrality Agreement as a result of extreme financial distress; that the Employer never received any benefits and therefore never ratified the Neutrality Agreement until the Unions sought to enforce it; that the Unions themselves acknowledged that neutrality was a nonpermissive subject of bargaining; that the Strike Settlement Agreement does not foreclose the Employer's position in this case.

Position of the Unions:

That private sector employees have no legitimate expectation of privacy against a union as to their addresses; that federal and state authority has resolved the balancing test used to judge privacy questions, recognizing the strong interests of unions to inform an electorate from a list of eligible voters versus the minimal burden on an individual to disregard or discard communications; that the Employer's duress claim is nonsensical in that economic power is what is involved in resolving collective bargaining agreements; that any such claim is two years' too late to be raised; that the Emplouer's contentions regarding legitimacy of bargaining such issues is solely within the exclusive jurisdiction of the NLRB; that the Employer has waived claims of the legality of Union violations; that the provisions in question are mandatory given the Unions' right to organize additional stores by card check; that work force information is not a "thing of value" within the meaning of Section 302 of the NLRA; that there was no claim the Unions spent money on the Employer's behalf which distinguishes this situation from that of the *Mulhall* decision; that an opt-out process, as an alternative to providing the required

7

information, creates its own problems; that the Employer would not be liable for money damages if an individual employee made a privacy claim against it; that the Employer's opposition is pretextual given its use of mailings to its non-union employees; that the Employer has freely provided addresses of employees to the Unions to comply with the Collective Bargaining Agreements; that the Employer has no standing to represent employees; that to the extent the Employer's duress claim relies on NLRA doctrines, that claim is also untimely; that the Employer enjoyed the full benefits of the Stabilization Agreements for almost two years without even mentioning duress; that the Employer's contention concerning whether it could claim duress by the Unions' insistence on a nonmandatory subject of bargaining is for the NLRB to determine, while the Employer agreed not to pursue unfair labor practice claims, and, in any event, given the *Kroger* decision, furnishing of addresses are a mandatory bargaining subject; that paragraph 7 of the Strike Settlement Agreement bars the Employer's claim in this respect; that employee lists have been upheld as not violating Section 302; that card check neutrality agreements have withstood Section 302 challenges in all courts and arbitration decisions except the 11th Circuit's *Mulhall* decision which itself recognized that unless agreements become illegal payments in a scheme to corrupt a union or extort a benefit from an employer no violation occurs; that there is no such claim here; that the Section 302 claim of the Employer is untimely given the NLRB's 6-month statute of limitations.

DISCUSSION:

Arbitrator's Authority:

Early in the initial hearing in this matter, the Unions noted that the underlying Collective Bargaining Agreements forbade the Arbitrator from negating the neutrality agreement under a clause that any Agreement provision deemed to be severable because it is in conflict with any law could be severed only by the judgment of a "court of last resort." Further, the Arbitrator has no power to delete any terms of the Agreement. (Tr. 40)

Literally applied, those provisions would require the undersigned to enforce the neutrality provisions as written, leaving to courts or other authorities to determine their validity. However, in their post-hearing briefing the Unions do not raise those issues, but proceed directly to the merits involved.

Privacy:

The Employer, relying primarily, but not totally, on cases such as *County of Los Angeles v. Los Angeles County Employee Relations Commission*, 56 Cal.4th 905 (2013), maintains it has standing to reject the Unions' request for addresses as a prohibited invasion of employees' privacy. It points to the balancing test required, noting that the employees have a legally protected privacy interest in the whereabouts of their home addresses. In that case the California Supreme Court, after a full analysis of federal and state labor relations authorities which permitted or required an employer to provide its employees addresses, nonetheless determined, that in the context of that case, the balancing of the interests of the union to secure address against that of the privacy

interests of the employees, found to be serious, were nonetheless "comparatively mild." In that public sector case, the nonmember employees represented by the union there "may experience increased contact with the union or by other means, but there is no evidence [the union] has ever engaged in any harassment of a nonmember." (56 Cal.4th at 932)

The Employer here couples the balancing test required in that case with its analysis of federal authority where addresses are provided to a union only where there is an NLRA election about to occur. (*Excelsior Underwear*, 156 NLRB 1236 (1966)). It maintains that since no such election is involved here, that authority would not be applicable.

What those cases, and those which upheld *Excelsior*, show is that what is required is an analysis of the reasons why the addresses are to be provided to determine if providing them overbalance the privacy interests of the employees. As written in *County of Los Angeles*:

> "...The NLRB reasoned [in *Excelsior*] that an employer can easily communicate with employees to oppose union representation, but labor organizers generally have limited access to worksites. Thus, without a list of employee names and addresses, labor unions cannot be certain of reaching all employees with arguments supporting representation. (*Id.* at pp. 1240-1241.) Although the union might have other means of communicating with some employees, these alternatives are not always adequate. The NLRB stressed that 'the access of all employees to such communications can be insured only if all parties have the names and addresses of all the voters.... [B]y providing all parties with employees' names and addresses, we maximize the likelihood that all the voters will be exposed to the arguments for, as well as against, union representation.' (Id. at p. 1241, fn. omitted.) The United States Supreme Court later observed that the disclosure requirement established in *Excelsior Underwear* promotes the goal of fair elections 'by encouraging an informed employee electorate and by allowing unions the right of access to employees that management

10

already possesses.' (*NLRB v. Wyman-Gordon Co.* (1969) 394 U.S. 759, 767.)

Nearly 30 years ago, this court applied the Excelsior Underwear rule in the agricultural context. In *Carian v. Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, we upheld a regulation requiring employers to provide a list of employee names, street addresses, and job classifications to a union seeking to organize agricultural employees. We noted that employers had long been required to furnish unions with lists of employee names and addresses under *Excelsior Underwear* and that facilitating communication between employees and union organizers aided the administration of union elections. (*Carian*, at pp. 665-667.)" (56 Cal.4th at 918)

Here, the context of this case is seeking the addresses in aid of a card check campaign for Union recognition. A card check is at least a form of election, employees opting into recognition, as opposed to marking a ballot to do so. And, in that respect, the same interests recognized in *Excelsior* are involved, for the Unions have no access to worksites, since the Employer prohibits it, and addresses maximize the likelihood that all nonunion employees would be exposed to the arguments for union representation, providing an informed employee electorate, and offering the Union's access to employees as already possessed by the Employer. Accordingly, for these reasons recognized in the law, the balancing test required by *County of Los Angeles* with respect to employees' privacy, "comparatively mild" interests compared to other personnel file content information that might be sought to be disclosed (*see Detroit Edison Co. v. NLRB* (1979) 440 US 301, psychological aptitude test results), favors the Unions' interest as described above. As Employer witness employees pointed out, they throw away what they consider junk mail and don't answer the door to solicitors. (Tr. 112, 114) And, the Unions pledged in the neutrality agreement to not harass employees whose addresses are provided.

11

A countervailing argument here could be that there are to be no Employer arguments to employees in its favor since the Employer has agreed to a neutrality agreement, so the Union's access to employees to inform them of its views on the value of representation could not be opposed because of the agreed-to neutrality in a card check campaign.

Whatever the merits of that argument may be, they are not applicable to the specific facts of this case. For here, the Employer itself peremptorily launched a counter-campaign after bargaining, but before the neutrality agreement became effective, by the following letter sent to the homes of nonunion store employees:

> "November 27, 2012
>
> As you know, we have settled the contract with the UFCW in our Union stores and the strike is over. We are glad it's over and this is one of the reasons we are very grateful you and your store are Non-Union. I want to thank you for being Non-Union and allowing us to maintain a direct relationship with you without interference from the Union.
>
> Raley's believes there are <u>many reasons</u> why it is very beneficial for you to remain Non-Union and continue to reject the Union. These include:
>
> - The fact that your wages are the same or better than the Union stores.
>
> - Union dues would cost you $648 per year ($1,944 for a three year contract) and the UFCW raises union dues over time.
>
> - If you fail to pay your union dues, the Union will require us to fire you.
>
> - Raley's provides you a generous 401k match in addition to your retirement plan. The Union does not.

12

- Raley's Health Care plan is comparable to the Union's.

- Raley's Health Care plan requires NO monthly contributions for the majority of our Non-Union retail employees; the Union's plan will require monthly payments up to $200 per month, depending upon coverage ($2,400 per year).

- You will never be required to go on strike and lose pay checks. You will not be threatened with fines or personal threats of vandalism to your property if you don't go on strike.

- You have seen recent news stories about other strikes, like the one you went through. A union can bring conflict and confrontation to any business.

It was unfortunate the Union called a strike in an attempt to stop Raley's from implementing the reforms we needed to preserve our company's financial health for the future. I know that your store and your customers were personally affected by the pickets. This strike is just one more reason why Raley's prefers to be Non-Union.

I want you to know as part of the new UFCW contract, Raley's reluctantly agreed to a 'Neutrality Agreement'. It is important for you and all of us to understand that if the contract settlement is ratified in the coming weeks and we have a new contract, Raley's will be prohibited from *"making any statement or taking any action that may imply Raley's opposes the Union"*, if a Union campaign starts at your store.

By signing such an agreement, the Union is hoping that they will now be able to get you to sign cards to become a Union store without hearing any opposition from Raley's. **We are confident, after examining all the facts, that you will continue to reject the Union and not sign a card.**

I also want to make it crystal clear, although Raley's has agreed in the future to abide by this 'Neutrality Agreement', Raley's will always maintain our belief that employees are far better off without Unions and without paying Union dues. We believe paying dues is a waste of money and Union membership restricts your rights.

13

> Bottom line, there are many reasons to stay Non-Union. You may be asked several times by paid Union organizers in the future to 'sign authorization cards' (see sample card on the back of this page). Raley's is asking you now, before a union campaign starts at your store and we must remain neutral, <u>not to sign those cards.</u> By signing such a card, you are voting to have the Union take over your store and your work life. And once you vote the Union into your store by signing Union cards, they will be there to stay. It's almost impossible to get rid of the UFCW.
>
> If you have any questions, please do not hesitate to bring these to your Store Director or your HR Manager. Although, in the future, they will be prohibited from *'taking action or making any statement that will directly or indirectly state or imply any opposition by them to the Union'; despite this restriction on what your store director and HR Manager can tell you, <u>you will know their opinion on this critical issue.</u>*
>
> **Most importantly, this restriction on management from stating their opinion DOES NOT affect you! You will always have the freedom to express your opinions to fellow employees about joining a Union, signing cards or having your store become Union. And I hope you will let your fellow employees know how you feel. ...**" (Uns Ex. K, bold type, caps, italics and underlining in original)

Attached to the letter was a form authorization card annotated to include that phone numbers filled in may be sold to telephone marketers, and addresses may be sold to direct mail marketers, among other things.

Another letter was sent by the Employer to nonunion employees on December 12, 2012:

> "Last month I sent you a letter explaining a number of reasons why Raley's believes it is beneficial for you to remain Non-Union. Raley's is committed, now and in the future, to ensuring our Non-Union stores remain a great place to work with outstanding wages and benefits. So, I would like to provide you with additional information to demonstrate our commitment.
>
> Enclosed you will find a summary chart detailing Raley's Non-Union wages and benefits as compared to Raley's Union stores and

14

Save Mart. There is also a more detailed chart showing the differences in Raley's health care plan as compared to our competitors. Raley's health care plan is comparable in coverage and, more importantly, is at <u>no weekly premium cost to you</u>. The Union's plan will cost from $40 to over $300 per month to cover a spouse and children.

In addition to our impressive Non-Union wages and Non-Union health care benefits, Raley's is implementing a number of additional benefits at our Non-Union stores in 2013, including:

- 28-hour guarantee for part-time employees who want more hours;

- Expanded funeral leave for part-time employees;

- Full-time employees, once a year, can request two days off at the end of a week and at the beginning of the following week;

- Leave of absence for non-work related injuries extended from 12 months to 18 months;

- All employees will be designated P/T or F/T on paystubs;

- Schedules posted by noon on the Wednesday prior to the workweek (implemented in September 2012), and;

- Incentive-based bonus plan for Non-Union store employees.

We will be providing you with a full list of changes and more information on the incentive-based bonus plan in the weeks and months to come. ..." (Uns. Ex. L, underlining in original)

Under these facts, then, the privacy balancing test, which the Employer maintains must be applied, still tips in favor of the Union's interests over that of the nonunion employees in a card check campaign for the same reasons that would apply in an election situation. Addresses are necessary to inform the employees of the Unions' views to present them, in contrast, if they can be so presented, to those arguments of the

15

Employer's letters to them, as well as information provide at work (Tr. 109), already exposed to the same employees. Given the nature of the Employer's letters as quoted above, even with the passage of time, such counterarguments, if made, would be necessary for those employees' ability to hear both sides of the issues important to them in a card check representation campaign. The Employer's strong messages quoted above would likely not dissipate given that stores would still have employees who had received them working and that their recollections could be passed on to any new personnel assuming the Employer abides by the neutrality provisions.

Duress:

The Employer seeks to rescind the neutrality agreement on the basis that it was unlawfully obtained by forcing it to agree to a nonmandatory subject of bargaining to settle the strike which was having a devastating economic effect. The Employer recognizes that strikes are designed to provide economic pressure, if effective. But it maintains the NLRA was violated by the Unions' tactics of claiming to have taken neutrality off the bargaining table in the face of an unfair labor practice charge filed by the Employer with the NLRB. Thereafter they reintroduced it as a condition for settling the strike to which the Employer had to accede, although the Employer stated that the provisions were not enforceable when it did so. (Tr. 74)

The testimony of the Employer's witnesses was that the Unions stated that any neutrality proposal was withdrawn in June 2012. The strike occurred in November after the Employer had announced it was going to unilaterally implement a number of take-aways. (Tr. 224) Before the strike, the Parties' bargained by exchanging written

16

proposals and none after June proposed neutrality. (Tr. 223) No Unions' representatives

stated the reason for the strike was just to get neutrality. (Tr. 236)

After the strike progressed, a 25-hour bargaining session resulted in its settlement.

At that time,

> "I stated to the Union committee that Raley's was prepared to sign
> off on all documents that were being presented to it in order to end
> the strike because we could not sustain the economic turmoil this
> was causing us." (Tr. 76)

Nonetheless, the Employer would not sign a stabilization agreement if it had a

termination date (Tr. 78), a condition the Employer maintained it adhered to.

Whether the Unions' actions were unlawful, requiring that the obligation to adhere

to the neutrality agreement as a condition of ending the strike is, as the Unions contend,

an issue for the NLRB to determine whether there was a failure to bargain in good faith.

Further, they contend that the time for filing such a claim under its processes have long

since expired, as has any claim for contract recession, even if the Employer was entitled

under the strike settlement agreement to file a Board complaint.

As one of the citations of the Unions' explains:

> "In order to raise the defense of duress, a party must prove three
> elements: (1) a wrongful threat; (2) fear that induces a loss of free
> will and judgment; and (3) that there was no immediate legal
> remedy available as an alternative to executing the agreement.
> *Warner-Lambert Pharmaceutical Co. v. Sylk,* 471 F.2d 1137, 1143
> (3d Cir.1972); *Levin v. Garfinkle,* 492 F.Supp. 781, 807
> (E.D.Pa.1980), aff'd, 667 F.2d 381 (3d Cir.1981).
>
> Defendant's assertion of economic duress amounts to little more
> than a conclusory statement without adequate support. Financial
> distress is not enough to necessitate a finding of economic duress.
> *See Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 911 (3d Cir.1985).
> Also, there is a presumption under Pennsylvania law against

17

finding duress where a party is free to consult with legal counsel. *Carrier v. Wm. Penn Broadcasting, Co.*, 426 Pa. 427, 233 A.2d 519, 521 (1967). Defendant's own timeline of events proves that this case lacks the immediacy needed to find economic duress.

Furthermore, economic duress merely makes a contract voidable, not void. *Agathos v. Starlite Motel*, 977 F.2d 1500, 1506 (3d Cir.1992). Even if economic duress could be shown at the time of formation, the undisputed facts of the case show that defendant never complained of duress until plaintiff attempted to procure defendant's participation in the card check. By remaining silent, defendant ratified the contract. A party cannot sit idly by and receive benefits under a contract and then later raise claims of economic duress. *Seal v. Riverside Savings Bank*, 825 F.Supp. 686, 696 (E.D.Pa.1993) (citing *National Auto Brokers Corp. v. Aleeda Dev. Corp.*, 243 Pa.Super. 101, 364 A.2d 470, 476 (1976))." (*HERE Local 57 v. Sage Hospitality*, 399 F.Supp.2d 461 (W.D.Pa., 2003) aff'd 390 F.2d 204, n.10 (3rd Cir. 2004))

Here, the Employer not only did not complain, notwithstanding its bargaining spokesman's view of the unenforceability for the neutrality agreement, but, similar to *Sage*, had the benefit of the Stabilization Agreement, also reached as part of the strike settlement with its economic benefits, for at least two years before raising this issue. Further, as quoted above, the Employer represented to its own employees that it would adhere to the neutrality agreement once it was in effect.

No comment is thus required here about the merits, or lack thereof, concerning whether the Union failed to bargain in good faith so that its conduct was unlawful. Since that is an issue for the Board to determine under its procedures, at least at one point available to the Employer, it is contractually too late to assert that claim that the entire neutrality agreement is now void here.

18

Section 302:

The Employer finally maintains that the neutrality agreement violates Section 302

of the Taft-Hartley Act. As explained in the *Sage* Third Circuit decision cited above:

> "Next, Sage charges that the Neutrality Agreement is void because it required Sage to provide "things of value" to the union in violation of section 302 of the LMRA. That section provides, in pertinent part:
>
> > (a).  It shall be unlawful for any employer . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value
> > > (1) to any representative of any of his employees who are employed in an industry affecting commerce.
> > > (2)  to any labor organization, or any officer or employee thereof, which represents any of the employees of such employer who are employed in an industry affecting commerce;
> > (b).  (1) It shall be unlawful for any person to request, demand, receive, or accept, or agree to receive or accept, any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a). 29 U.S.C. § 186.
>
> When Congress enacted section 302, it was 'concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control.' *Arroyo v. United States*, 359 U.S. 419, 425-26, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959) (footnotes omitted); see also *Turner v. Local Union No. 302, Int'l Bhd. of Teamsters*, 604 F.2d 1219, 1227 (9th Cir.1979) ('The dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers.'). In short, section 302 'was passed to address bribery, extortion and other corrupt practices conducted in secret.' *Caterpillar Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 107 F.3d 1052, 1057 (3d Cir.1997) (en banc).

Not surprisingly, Sage is unable to provide any legal support for the remarkable assertion that entering into a valid labor agreement governing recognition of a labor union amounts to illegal labor

19

bribery. There are many reasons why this argument makes no sense, including the language of section 302 itself, which proscribes agreements to 'pay, lend, or deliver any money or other thing of value.' The agreement here involves no payment, loan, or delivery of anything. The fact that a Neutrality Agreement--like any other labor arbitration agreement--benefits both parties with efficiency and cost saving does not transform it into a payment or delivery of some benefit. Furthermore, any benefit to the union inherent in a more efficient resolution of recognition disputes does not constitute a 'thing of value' within the meaning of the statute. *Cf. Wyman-Gordon Co. v. NLRB*, 397 F.2d 394, 396 (1st Cir.1968) (transmitting list of names and addresses to union for election purposes is not violation of § 302), rev'd on other grounds sub nom., *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

Apart from the plain language of section 302, the structure of other provisions of the labor law also militates against Sage's position. Issues of labor-unit recognition and bargaining are comprehensively regulated by the NLRA. Courts have repeatedly upheld labor-management agreements providing for arbitration over recognition disputes. See, e.g., *Hotel & Rest. Employees Union Local 217 v. J.P. Morgan Hotel*, 996 F.2d 561 (2d Cir.1993); *Hotel Employees, Rest. Employees Union, Local 2 v. Marriott Corp.*, 961 F.2d 1464, 1468 (9th Cir.1992). Sage's interpretation of section 302 would wreak havoc on the carefully balanced structure of the laws governing recognition of and bargaining with unions. *Cf. Caterpillar*, 107 F.3d at 1056-57 (declining to read section 302 as invalidating benefits obtained under lawful collective bargaining)."

Both Parties here have cited the same quotation from *Mulhall v. UNITE HERE Local*, 667 F.3d 1121 (11th Cir. 2012), remanding after a motion to dismiss, the Employer citing it from the second paragraph below:

"It seems apparent that organizing assistance can be a thing of value, but an employer does not risk criminal sanctions simply because benefits extended to a labor union can be considered valuable. Violations of § 302 only involve payments, loans, or deliveries, 29 U.S.C. §186(a)–(b), and every benefit is not necessarily a payment, loan, or delivery. For example, intangible organizing assistance cannot be loaned or delivered because the actions 'lend' and 'deliver' contemplate the transfer of tangible items.

20

> Yet, a violation of § 302 cannot be ruled out merely because intangible assistance cannot be loaned or delivered. Section 302 also prohibits payment of a thing of value, and intangible services, privileges, or concessions can be paid or operate as payment. Whether something qualifies as a payment depends not on whether it is tangible or has monetary value, but on whether its performance fulfills an obligation. If employers offer organizing assistance with the intention of improperly influencing a union, then the policy concerns in § 302—curbing bribery and extortion—are implicated.

> It is too broad to hold that all neutrality and cooperation agreements are exempt from the prohibitions in § 302. Employers and unions may set ground rules for an organizing campaign, even if the employer and union benefit from the agreement. But innocuous ground rules can become illegal payments if used as valuable consideration in a scheme to corrupt a union or to extort a benefit from an employer."

The above *dicta* is followed by*:*

> "We need not address whether we require a 'thing of value' to have monetary value. Here, Mulhall alleged and a jury could find that Mardi Gras's assistance had monetary value. As evidence of the value, Mulhall points to the $100,000 Unite spent on the ballot initiative that was consideration for the organizing assistance. Mulhall's allegations are sufficient to support a § 302 claim."

Accordingly, *Mulhall* is not contrary to the *Sage* or the same line of cases reaching the same conclusions. There is no allegation here that the Employer seeks to bribe or corrupt the Unions, or *vice versa*.

DECISION:

The card check/neutrality provisions of the Settlement Agreement dated November 13, 2012, and the comprehensive proposal for a successor agreement between the Parties are enforceable. The provision with respect to disclosing nonunion-

represented employees' names and addresses is enforceable. The Employer shall forthwith fully comply with all such provisions.

_____
Arbitrator

Exhibit B

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

| | FOR COURT USE ONLY<br>*(SOLO PARA USO DE LA CORTE)* |
|---|---|

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

United Food and Commercial Workers, Local 8 - Golden State, a
California incorporated labor association; and Does 1-20

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

Raley's, a California corporation; Vicki Lynn Likes, an individual;  and
Lori Lynn Belger, an individual

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*  Sacramento Superior Court | CASE NUMBER:<br>*(Número del Caso)* |
|---|---|

Main Courthouse, 720 Ninth Street
Sacramento, CA 95814

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
The Zappia Law Firm, 333 S. Hope Street, Suite 3600, Los Angeles, CA 90071, (213) 814-5550

| DATE:<br>*(Fecha)* | Clerk, by<br>*(Secretario)* _____ | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* United Food and Commercial Workers, Local 8 - Golden State, a California incorporated labor association

   under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)   ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465<br>www.courtinfo.ca.gov |
|---|---|---|

Page 1 of 1

CM-010

| **ATTORNEY OR PARTY WITHOUT ATTORNEY** *(Name, State Bar number, and address):* | **FOR COURT USE ONLY** |
|---|---|

THE ZAPPIA LAW FIRM, A Professional Corporation
Edward P. Zappia (SBN: 175099) / Gail E. Wise (SBN: 240644)
333 S. Hope Street, Suite 3600
Los Angeles, CA 90071
  TELEPHONE NO.: (213) 814-5550    FAX NO.: (213) 814-5560
ATTORNEY FOR *(Name):* Petitioner and Plaintiffs

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** SACRAMENTO
  STREET ADDRESS: 720 Ninth Street
  MAILING ADDRESS:
  CITY AND ZIP CODE: Sacramento, CA 95814
  BRANCH NAME: Main Courthouse

CASE NAME:
Raley's, et al. v. United Food and Commercial Workers, Local 8-Golden

| **CIVIL CASE COVER SHEET** | | **Complex Case Designation** | | CASE NUMBER: |
|---|---|---|---|---|
| ✓ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter    ☐ Joinder | | |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: | |
| | | | DEPT: | |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
✓ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition *(not specified above)* (43)

2. This case ☐ is  ✓ is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. ☐ Large number of separately represented parties
  b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
  c. ☐ Substantial amount of documentary evidence
  d. ☐ Large number of witnesses
  e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
  f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☐ monetary   b. ✓ nonmonetary; declaratory or injunctive relief   c. ☐ punitive
4. Number of causes of action *(specify):*
5. This case ☐ is  ✓ is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date:  September 28, 2015
Edward P. Zappia
_____       ► _____
          (TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on **all** other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.
Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]           **CIVIL CASE COVER SHEET**           Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice– Physicians & Surgeons
Other Professional Health Care Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
Intentional Infliction of Emotional Distress
Negligent Infliction of Emotional Distress
Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/ Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court Case Matter
Writ–Other Limited Court Case Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award *(not unpaid taxes)*
Petition/Certification of Entry of Judgment on Unpaid Taxes
Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint Case *(non-tort/non-complex)*
Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late Claim
Other Civil Petition



# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SACRAMENTO
### SACRAMENTO, CALIFORNIA, 95814
### 916-874-5522
### WWW.SACCOURT.CA.GOV

## ALTERNATIVE DISPUTE RESOLUTION
## INFORMATION PACKAGE

Recognizing that many civil disputes can be resolved without the time and expense of traditional civil litigation, the Superior Court of California, County of Sacramento (Sacramento County Superior Court), strongly encourages parties in civil cases to explore and pursue the use of Alternative Dispute Resolution.

**What is Alternative Dispute Resolution?**

Alternative Dispute Resolution (ADR) is the general term applied to a wide variety of dispute resolution processes which are alternatives to lawsuits. Types of ADR processes include:

- Arbitration
- Mediation
- Settlement Conferences
- Private judging
- Neutral evaluation
- Mini-trials
- Negotiation and *hybrids* of these processes

All ADR processes offer a partial or complete alternative to traditional court litigation for resolving disputes. At the present time, the Sacramento County Superior Court offers Mediation and Arbitration.

**What are the advantages of using ADR?**

ADR can have a number of advantages over traditional court litigation.

* **ADR can save time.** Even in a complex case, a dispute can be resolved through ADR in a matter of months or weeks, while a lawsuit can take years.

* **ADR can save money.** By producing earlier settlements, ADR can save parties and courts money that might otherwise be spent on litigation costs (attorneys fees and court expenses.)

* **ADR provides more participation.** Parties have more opportunity with ADR to express their own interests and concerns, while litigation focuses exclusively on the parties' legal rights and responsibilities.

* **ADR provides more control and flexibility.** Parties can choose the ADR process most appropriate for their particular situation and that will best serve their particular needs.

* **ADR can reduce stress and provide greater satisfaction.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere found in litigation. Surveys of disputants who have gone through ADR have found that satisfaction with ADR is generally high, especially among those with extensive ADR experience.

**Arbitration and Mediation**

Although there are many different types of ADR processes, the types most commonly used to resolve disputes in California state courts are Arbitration and Mediation. The Sacramento County Superior Court currently offers pre-screened panelists with experience and training in each of the following areas.

**Arbitration.** An Arbitrator hears evidence presented by the parties, makes legal rulings, determines facts and makes an Arbitration award. Arbitration awards may be entered as judgments in accordance with the agreement of the parties or, where there is no agreement, in accordance with California statutes. Arbitration can be binding if the parties so agree in writing. If there is no such agreement, either party can reject the Arbitration award and request a trial.

---



Superior Court of California, County of Sacramento

Case Management

**Mediation.** Mediation is a voluntary, informal, confidential process in which the Mediator, a neutral third party, facilitates settlement negotiations. The Mediator improves communication by and among the parties, helps parties clarify facts, identify legal issues, explore options and arrive at a mutually acceptable resolution of the dispute.

Litigants are encouraged to use an ADR process as early in the case as circumstances permit. All appropriate cases will be reviewed for referral to ADR at the Case Management Conference(CMC).

### ADR Procedures for the Sacramento County Superior Court

Upon filing a complaint or cross-complaint, the plaintiff/cross-complainant must acquire this information package from the Court's Website, http://www.saccourt.ca.gov, or the Superior Court Clerk. Plaintiff is required to include the ADR Information Package when he or she serves the Complaint on the Defendant.

The court's ADR Panel List is available on-line at http://www.saccourt.ca.gov or may be obtained at the Civil Filing Counter at the Gordon D. Schaber Sacramento County Courthouse, 720 Ninth Street, Room 101, Sacramento, CA 95814.

**Mediation.**

All parties to the dispute may voluntarily agree to submit the case to a neutral Mediator, either through a court-appointment or through a private arrangement. The parties may choose either of the following Mediation choices:

> **Private Mediation.** Parties to a civil action agree to mediate their dispute with a Mediator of their choice without court assistance. The cost of Mediation must be borne by the parties equally unless the parties agree otherwise. Parties will be charged an amount as set by the Mediator (refer to the ADR Panel List for current rates).

> **Court Mediation.** Upon stipulation of the parties, a Mediator and alternate Mediator will be selected from the court-approved list of neutrals (ADR Panel List). The court will confirm the selected Mediator and notice parties by mail.

> The Mediator is then responsible for contacting the parties to confirm a date, time, and place for Mediation. Mediators on the court's approved ADR Panel List have agreed to provide up to three (3) hours of pro-bono Mediation. In the event the Mediation extends beyond 3 hours and parties determine it would be beneficial to continue the Mediation process; the parties will independently be responsible for compensating the Mediator in an amount as set by the Mediator.

UNLIMITED CIVIL CASES
- A *Stipulation and Order to Mediation – Unlimited Civil Cases,* Form CV\E-MED-179 *(see attached)* may be filed with the court at any time up to 15 calendar days prior to the Case Management Conference.

- If the parties do not stipulate to Mediation prior to their CMC, they may indicate their willingness to stipulate to Mediation at the CMC. In that event, parties must submit a *Stipulation and Order to Mediation – Unlimited Civil Cases* within 14 calendar days after their CMC.

- A *Mediation Statement* must be filed with the *Case Management Statement.*

LIMITED CIVIL CASES
- Parties may select and conduct voluntary Private Mediation without notification to the Court.

- Parties may stipulate to court mediation by filing a Stipulation and Order to Arbitration/Mediation - Limited Civil Cases form (CV\E-203) at any time after the filing of the Limited Civil Case Status Memorandum form (CV\E-202). This form is located on the court's website at http://www.saccourt.ca.gov. A Stipulation and Order to Arbitration/Mediation – Limited Civil Cases MUST be filed concurrently or subsequent to a Limited Civil Case Status Memorandum.



Superior Court of California, County of Sacramento
Case Management

## Arbitration
### UNLIMITED CIVIL CASES

- Plaintiff may elect, the parties may stipulate, or the judge may Order the case to Arbitration.  Parties will be asked to select an Arbitrator and three alternate Arbitrators from the court's ADR Panel List.  The court will send a Notice of Appointment and an appropriate Order to Arbitration to all parties.

- Arbitrations are conducted pursuant to California Rules of Court, rules 3.810 through 3.830, and Local Rules Chapter 2, Part 5.  Unless otherwise stipulated, an Award of Arbitrator is not binding upon the parties provided that they file a timely Request for Trial De Novo pursuant to California Rules of Court, rule 3.826.  Upon the filing of a timely Request for Trial De Novo, the case will proceed to a Trial-Setting Conference.  If no timely Request for Trial De Novo is filed, judgment based upon the Award of Arbitrator will be entered pursuant to California Rules of Court, rule 3.827.

### LIMITED CIVIL CASES
Arbitration may occur in a limited civil case under the following circumstances:

- When all parties stipulate to arbitration pursuant to Code of Civil Procedure section 1141.12.  A stipulation for arbitration shall be filed using the Court's local form, Stipulation and Order to Arbitration/Mediation – Limited Civil Cases form (CV\E-203).  A Stipulation and Order to Arbitration/Mediation – Limited Civil Cases MUST be filed concurrently or subsequent to a Limited Civil Case Status Memorandum form (CV\E-202).

- When plaintiff elects to refer the case to judicial arbitration. A written election by the plaintiff to submit an action or proceeding to arbitration shall be filed using the Court's local form, Limited Civil Case Status Memorandum form (CV\E-202).

### Additional Information
For additional information regarding the Court's ADR program, please go to the Court's website
http://www.saccourt.ca.gov.



**SUPERIOR COURT OF CALIFORNIA**
**County of Sacramento**
**720 Ninth Street**
**Sacramento, CA  95814-1380**
**(916) 874-5522—Website www.saccourt.ca.gov**

**Program Case Notice**
**Unlimited Civil Case**

The Case Management Program (CMP) requires the following timelines to be met in all cases except those that are excluded by California Rule of Court 3.712(b) and (c):

| Action | Requirement |
|---|---|
| **Service of Summons** | Summons, complaint and program case notice must be served on all named defendants and proofs of service on those defendants must be filed with the court within **60 days** from the filing of the complaint.<br><br>When the complaint is amended to add a new defendant, the added defendant must be served and proofs of service must be filed within **30 days** after the filing of the amended complaint.<br><br>A cross-complaint adding a new party must be served and proofs of service must be filed with the court **30 days** from the filing of the cross-complaint. |
| **Statement of Damages** | If a statement of damages pursuant to Section 425.11 of the Code of Civil Procedure or a statement of punitive damages is required, it must be served with the summons and complaint. |
| **Ex Parte Application** | Within **75 days** of the filing of the complaint, plaintiff must file a certificate of service or an Ex Parte Application for Extension of Time to Serve Pleading on a form provided by the Judicial Council. |
| **Responsive Pleadings** | If a responsive pleading is not served within the time limits and no extension of time has been granted, the plaintiff within **10 days** after the time for service has elapsed must file a request for entry of default.<br><br>Parties may stipulate without leave of court to one 15-day extension beyond the 30-day time period prescribed for the response after service of the initial complaint.<br><br>No extensions of time to respond beyond **105 days** from the filing of the complaint may be given. |
| **Judgment by Default** | When default is entered, the party who requested the entry of default must apply for a default judgment against the defaulting party within **45 days** after entry of default, unless the court has granted an extension of time. |
| **Case Management Statement** | The court will serve a notice of case management conference on all parties approximately 120 days after the complaint is filed.  A case management statement shall be filed at least **15 calendar days** prior to the date set for the case management conference. |
| **Mediation Statement** | The Mediation Statement shall be filed concurrently with the Case Management Statement as required under Local Rule 12.18 unless the parties have filed a Stipulation for Alternative Dispute Resolution form with the ADR Administrator at any time up to 15 calendar days prior to the Case Management Conference. |
| **Meet and Confer** | Parties must meet and confer, in person or by telephone as required in California Rules of Court 3.724 at least **30 calendar days** before the case management conference date. |
| **Case Management Conference** | A case management conference is generally held within **180 days** of the filing of the complaint. |

Failure to comply with the program rules may result in the imposition of sanctions or an order to show cause.  Please refer to Local Rule 1.01 for more information.

**NOTE: THIS NOTICE MUST BE SERVED WITH THE SUMMONS AND COMPLAINT.**

Program Case Notice (Unlimited Civil Case)